UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

```
----------------------------------------------------------------x
CHRISTOPHER FURNARI,                          :
                                              :
                           Petitioner,        :
                                              :    Civil Action No.
       -against-                              :
                                              :
UNITED STATES PAROLE COMMISSION               :
and WARDEN, Federal Correctional Institution: :
at Allenwood, Pennsylvania,                   :
                                              :
                           Respondents.  :
----------------------------------------------------------------x
```

3 : CV 12-2378

FILED
WILLIAMSPORT, PA

NOV 28 2012

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

## PETITION FOR A WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C.§2241

Petitioner, CHRISTOPHER FURNARI, by and through undersigned counsel hereby

petitions this Court pursuant to 28 U.S.C.§2241 for a Writ of Habeas Corpus challenging

the decision of the United States Parole Commission dated August 21, 2012, denying him

release on parole from a sentence imposed in 1987 for a conviction rendered prior to the

enactment of the Sentencing Reform Act.[1]  In support of his petition for release from

unlawful custody petitioner Furnari states the following:

### THE PARTIES

1.      Petitioner, Christopher Furnari, is an inmate at the Federal Correctional

---

[1]A copy of the Determination of the National Appeals Board is included as Exhibit
A in the Appendix submitted herewith.  A copy of the Notice of Action dated January 12,
2012 and the Interim Hearing Summary is submitted herewith as Exhibit B.

Institutional at Allenwood, located in White Deer Pennsylvania.  His Bureau of Prisons Registration Number is 19815-054.  Petitioner was  88 years old on April 30, 2012.

2.      The respondent United States Parole Commission ("USPC") is an independent agency within the United States Justice Department, charged by law with considering and setting  the petitioner's actual date of release from confinement.  18 U.S.C. §4203(b) (prospectively repealed).  By virtue of the USPC's actions, challenged in this petition, petitioner Furnari continues after almost 26 years in custody, to be held in the custody of the Attorney General.

3.      The respondent Warden of the medium security Federal Correctional Institution at Allenwood is petitioner's immediate custodian.  The Warden is named solely in his official capacity as petitioner's immediate custodian; no actions of the Warden or of the Bureau of Prisons are at issue.

### JURISDICTION

4.      This Court has jurisdiction to issue a writ of habeas corpus and to grant relief as law and justice require under 28 U.S.C. §1331, 2241(a), (c)(1) and 2243 because the petitioner is confined within the territorial jurisdiction of this Court.   *Rumsfeld v. Padilla*, 124 S.Ct. 2711, 2722 (2004).

### PROCEDURAL HISTORY & EXHAUSTION OF REMEDIES

5.      On January 13, 1987, Christopher Furnari was sentenced  by Judge Owen,

2

sitting in the Southern District of New York  to 100 years in prison, following his conviction,  not as a principal, but as an aider and abettor in a bid-rigging scheme.  85 CR 139 (RO)

6.      On December 3, 1996 Mr. Furnari had his initial parole hearing at FCI Allenwood.  On January 8, 1997 a notice of action issued ordering continuation "to a 15 year reconsideration hearing (December, 2011)".  Furnari's appeal was denied by the National Appeals Board.

7.      Following the decision of the United States Court of Appeals for the Third Circuit, *Furnari v. Warden, Allenwood  Federal Correctional Institution* 218 F.3d 250,252 (3d Cir. 2000), the Parole Commission issued a Notice of Action to reopen and schedule a de novo hearing .

8.      On December 27, 2000, following a de novo hearing, the Parole  Commission issued a  Notice of Action ordering continuation "to a 15 year reconsideration hearing (December, 2011)".  On April 24,  2001, the National Appeals Board affirmed its prior decision.

9.      On June 8, 2005,  Furnari had an interim hearing at which new evidence was presented.   On July 8, 2005, the Commission issued a Notice of Action   ordering continuation "to a 15 year reconsideration hearing (December, 2011)" .  On September 19, 2005 Petitioner appealed to the USPC National  Appeals Board.   On November 23, 2005

the appeal was denied.

10.     Petitioner filed for a writ of habeas corpus, pursuant to 28 U.S.C.§2241 on February 15, 2006.   The Petition was denied on June 20, 2007.  Petitioner 's appeal to the U.S. Court of Appeals for the Third Circuit was denied on July 9, 2008.  *Furnari v. U.S. Parole Com'n*, 531 F.3d 241 (3d Cir. 2008).

11.     On October 27, 2009 Petitioner had an interim hearing at which new evidence regarding his deteriorating health was presented.  On December 22, 2009, the Commission issued a Notice of Action   ordering continuation "to a 15 year reconsideration hearing (December, 2011)".

12.     On October 26, 2011 a 15-year Reconsideration Hearing was held at which the hearing examiner recommended parole effective January 12, 2012. A copy of the Hearing Examiner's recommendation is annexed hereto as Exhibit C.

13.     On December 2, 2011, the Second Examiner, who did not conduct the interview and had no opportunity to assess Furnari's condition recommended continuation to a fifteen year reconsideration hearing in 2026 ( Exhibit C at 3).

14.     On December 19, 2011, the Commission ordered  Original Jurisdiction Designation and transferred the case to the other Commissioners for their votes on the disposition of the case (Exhibit D).  On January 20, 2012, the Commission issued a Notice of Action continuing to a 15 year reconsideration hearing. (Exhibit B)

4

15.      All decisions by the National Appeals Board are final (Exhibit A at 4) 28 C.

F.R. §2.26(c).  28 C.F.R.§2.26( c) .  Accordingly, Petitioner has exhausted his administrative

remedies. *Moscato v. Federal Bureau of Prisons*, 98 F.3d 757, 760 (3d Cir.1996).

## BACKGROUND TO THE PETITION

16      Christopher Furnari is 88 years old.  Based on the decision of the Parole

Commission he will 103 years old and will have served 40 years  in prison before he is

eligible for a reconsideration hearing.  Upon information and belief he bears the unique

distinction of  being the only individual in the United States criminal justice system to be

condemned to almost a half-century imprisonment based on a conviction for aiding and

abetting a  bid-rigging scheme.

## A.      The 2011 Reconsideration Hearing

17.      At the hearing, Michael Gursky, Mr. Furnari's case manager described Mr.

Furnari as a model prisoner.   He went on to describe his physical condition and

institutional record as follows:

> Well, as you know, Mr. Furnari has no discipline history. He's
> also -- he has programmed up until several years ago where, I
> guess, because of his failing health hasn't been able to get
> around the compound as easily as in prior years. And I know
> from my experience with the inmates that are in my unit, they
> have been taking care of Mr. Furnari for the last -- I'm up there
> two years. It's probably been two years. Making sure he's been
> to medical. Making sure he eats daily all three meals, and
> pretty much taking care of his daily needs for him. As you
> know, his attorney has stated he has been sicker more I think

5

> in the past year than he's been over prior year. I think this year
> was a rough year, and the cold this last year really took its toll
> I think. ( Exhibit E: Hearing Transcript at 17-18)

18.     As his most recent medical records demonstrate, Petitioner suffers from

hypertension, coronary artery disease, congestive heart failure, COPD, angina, prostate

hypertrophy and a history of recurrent pneumonia. (See Exhibit F: Medical Records for

2012[2]).  He is confined to a wheel chair.

19.     On September 6, 2006, Petitioner was rushed to the emergency room of the

Williamsport Hospital and Medical Center where he was treated for an acute anterior

apical wall myocardial infarction.

20.     On March 13, 2007, he was re-admitted to Williamsport Hospital with chest

pressure and was diagnosed as suffering from "chronic obstructive pulmonary disease"

and BPH which was exacerbated by hypertension.   Once again, stints were inserted to

restore circulation of blood to the heart.

21.     On August 31, 2008, he was admitted to Willliamsport Hospital with

pneumonia which continued unresolved as of January, 2009. On March 13, 2007, he was

admitted to Williamsport Hospital with chest pressure and was diagnosed as suffering

from "chronic obstructive pulmonary disease" and BPH which was exacerbated by

---

[2]In the interest of judicial economy, only the 2012 medical records have been
provided. Should the court require production of Mr. Furnari's complete medical history,
all records will be provided on request

hypertension.  Once again, stints were inserted to restore circulation of blood to the heart. The stress test administered in April, 2008 revealed septal hypokineses.

22.     On  August 7, 2010, he was rushed to the emergency room of the Williamsport Hospital and Medical Center where he was treated for pneumonia an COPD. Following several hospitalizations in  2011 for pneunomia, in February, 2012 he was admitted to the hospital for chest pain and treated for recurring  pneumonia.

23.     In June, 2012 he was diagnosed with approved for cardiothoracic surgery However, he was subsequently hospitalized and again treated for pneumonia.

24.     On July 3, 2012 he was approved for screening  for an abdominal aortic aneurysm.  However before he could be screened, in  July, 2012 he was hospitalized again for bacterial pneumonia following discovery of lymphadenopathy and irregular soft tissue on his right lung.     In September, 2012, Petitioner was hospitalized for 10 days where he was again treated for pneumonia.

25.     Petitioner requires follow-up care and emergent treatment at the first sign of recurrent chest pains, groin pain, leg pain, welling, bleeding, fever, chills, rash, abnormal bleeding or bruising, dizziness, rapid heartbeat, shortness of breath or other problems

26.     As his case manager confirms he is confined to a wheelchair and cannot manage daily tasks on his own. As Mr. Furnari recognized at his hearing,  the likelihood that he will survive much longer is remote. (Exhibit E at 11)

7

27.     At the conclusion of the Hearing, the hearing examiner stated "now's the right time to recommend you be paroled" and committed to "making a strong argument" for parole (Exhibit E at 20-21). The basis for the Hearing Examiner's recommendation is set forth in his evaluation as follows:

> Christopher Furnari is an 87 year old male offender appearing for the Commission for a 15-Year Reconsideration Hearing. He was a [sic capo] in the Lucchese [sic Crime] Family which was involved in murders, extortion and racketeering. It should be noted that he was convicted of Extortion, Racketeering, and Conspiracy to Commit Racketeering which involved murders that he may have known about but did not participate in. Hence the Category Eight rating of his offense. The subject has maintained clear conduct during his entire period of his incarceration and has done some programming but never completed his GED. The subject is assigned a work detail but it is hard to believe that he does much in the way of work because he is a pretty frail old man and appear to weigh about 100 pounds.
>
> During today's hearing his attorney highlighted his multiple medical problems and I believe it is in the Commission's best interest to recommend the subject be paroled at this time as I don't believe he is going to live much longer based on his physical appearance and list of medical ailments. Additionally, I believe the subject should be paroled based on the amount of time he served and specifically he has engaged in some programming and maintained clear conduct.

Exhibit C at 2

28.     On December 2, 2011, a second examiner, who did not conduct the interview and had no opportunity to assess Furnari's condition, disagreed with with the

8

first examiner' recommendation and recommended continuation to a fifteen year reconsideration hearing.  Notably, the second examiner's based his recommendation, not on the offense conduct for which Furnari had been sentenced but on relevant conduct for which Furnari has never been convicted or even charged (Exhibit C at 3).

29.    The Notice of Action  which adopted the recommendation of the  second examiner based  its decision on the grounds that "a grant of parole at this time [i.e., after 26 years imprisonment], would minimize the seriousness of the offense and promote disrespect for the law" (Exhibit B)

30.    The decision of the Commission, denying Petitioner's National Appeal, summarily dismissed the evidence of mitigating circumstances based on Petitioner's advanced age and failing health as well as his argument on appeal that the decision lacked a rational basis with the summary conclusion that "there are no compelling circumstances in mitigation and that there was rational basis for the Commission's decision contained in its statement of reasons."  (Exhibit A).

**FIRST CLAIM FOR RELIEF**

> **THE COMMISSION'S FINDING THAT  GRANTING
> PAROLE TO A 88 YEAR OLD PRISONER WITH FAILING
> HEALTH WHO HAS SERVED 26 YEARS IN PRISON FOR
> AN EXTORTION CONVICTION WOULD DEPRECIATE
> THE SERIOUSNESS OF THE OFFENSE CONDUCT AND
> PROMOTE DISRESPECT FOR THE LAW IS  ARBITRARY
> CAPRICIOUS AND WITHOUT ANY RATIONAL BASIS**

9

Parole determination criteria focus on the nature and circumstances of the

offense and the history and characteristics of the offender as well as the consequences of

releasing the prisoner back into the public. Accordingly, Title 18 U.S.C. § 4206(a)(1)-(2)

provides that:

> If an eligible prisoner has substantially observed the rules of
> the institution or institutions to which he has been confined,
> and if the Commission, upon consideration of the nature and
> circumstances of the offense and the history and characteristics
> of the prisoner, determines: (1) that release would not
> depreciate the seriousness of his offense or promote disrespect
> for the law; and (2) that release would not jeopardize the
> public welfare; subject to the provisions of subsections (b) and
> (c) of this section, and pursuant to guidelines promulgated by
> the Commission pursuant to section 4203(a)(1), such prisoner
> shall be released.

Congress' purpose in passing the PCRA was to promote uniformity in parole

decisionmaking and to moderate, though not eliminate, the influence of the medical model

by emphasizing notions of just punishment. Congress believed that although "[t]here is

no body of competent empirical knowledge upon which parole decision-makers can rely,

... it is important for the parole process to achieve an aura of fairness by basing

determinations of just punishment on comparable periods of incarceration for similar

offenses committed under similar circumstances." H.R.Conf.Rep. No. 838, 94th Cong., 2d

Sess. 26, *reprinted in* 1976 U.S.Code Cong. & Ad.News 351, 358 [emphasis added]. The

Conference Report stated that parole serves various objectives of the correctional system:

10

"[i]n the first instance, parole has the practical effect of balancing differences in sentencing policies and practices between judges and courts.... In performing this function, the parole authority must have in mind some notion of the appropriate range of time for an offense which will satisfy the legitimate needs of society to hold the offender accountable for his own acts." Conference Report at 19; 1976 U.S.Code Cong. & Ad.News at 352.; *U.S.A. ex rel. Forman v. McCall*, 776 F.2d 1156 (3rd Cir.,1985); see also *Geraghty v. United States Parole Comm'n*, 719 F.2d 1199, 1208 (3d Cir. 1983)(when considering mitigating factors in its determination of when to set a release date or rehearing date, the Parole Commission can consider the length of a prisoner's sentence as compared to those of similarly situated prisoners).

Determinations of just punishment are part of the parole process, and these determinations cannot be easily made because they require an even-handed sense of justice. There is no body of competent empirical knowledge upon which parole decision-makers can rely, yet it is important for the parole process to achieve an aura of fairness by basing determinations of just punishment on comparable periods of incarceration for similar offenses committed under similar circumstances . *See Wilden v. Fields,* 510 F.Supp. 1295 (D.C. Wis., 1981)

Where the period of incarceration imposed upon a prisoner is so disproportionate as to shock the public conscience, it does not promote respect for the law but achieves the

11

opposite result. As the Supreme Court of the United States held in *Gall v. United States* 552 U.S. 38, 54, 128 S.Ct. 586 (2007), a grossly disproportionate period of incarceration "may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."

The National Appeal's Board's summary conclusion that "there was a rational basis for the Commission's decision contained in its statement of reasons" (Exhibit A), ignores the fact that there is not a single individual in the history of our criminal justice system who has been condemned to die in prison based on uncharged conduct. The decision to reject the recommendation of the hearing examiner and to deny Furnari parole after 312 months imprisonment results in a term of imprisonment which is grossly disproportionate to any other term of imprisonment vested on any similarly situated offender. As in *Gall*, it can only be viewed as merely a means to dispense harsh punishment.

Contrary to the National Appeal Board's conclusion, Petitioner's appeal specifically addressed the background, the characteristics and circumstances of the almost two dozen similarly situated offenders (Exhibit G: National Appeal[3]). Specifically:

a.     Venero Mangano, was alleged to be the Underboss of the Genovese crime family. He was charged with a conspiracy to murder witnesses. In a case very similar to

---

[3]The specifics related to each defendant listed are found in the case citations.

the "Commission Case" in which Petitioner was a defendant, Mangano was convicted of extortion. A term of imprisonment of 188 months was not deemed to "depreciate the seriousness of [his] offense conduct and promote disrespect for the law" (See Exhibit G at 8).

b.     Liborio Bellomo, was alleged to be the acting boss of the Genovese crime family. He was charged with conspiracy to commit murder and convicted of extortion. A term of imprisonment of 120 months was not deemed to "depreciate the seriousness of [his] offense conduct and promote disrespect for the law" (See Exhibit G at 9).

c.     Nicholas Corozzo was alleged to   the acting  boss of the Gambino crime family. He was indicted on 20 racketeering charges that included attempted murder, arson, and loansharking. He was convicted of violating the Hobbs Act & loansharking. On April 17, 2009, Corozzo was sentenced to 13½ years in federal prison for two murders (08 CR76 (EDNY). Neither of these terms of imprisonment were deemed to "depreciate the seriousness of [his] offense conduct and promote disrespect for the law" (See Exhibit G at 9).

d.     Anthony Urso, was alleged to have been the acting boss/acting consigliere of the Bonanno crime family. In 2004 he was indicted on RICO charges involving murder illegal gambling, loansharking. A term of imprisonment of 240 months was not deemed to"depreciate the seriousness of [his] offense conduct and promote disrespect for the law"

(See Exhibit G at 9).

e.      Joseph DeFede, the acting boss of the Lucchese Crime Family was charged with 19 other alleged members of organized crime on multiple counts of extortion of the garment industry in New York.  A term of imprisonment of 60 months did not "depreciate the seriousness of [his] offense conduct and promote disrespect for the law" (See Exhibit G at 9).

f.      Vito Rizzuto is alleged to have overseen a criminal empire affiliated with the Bonanno crime family, that imported and distributed tons of heroin, cocaine and hashish in Canada, laundered hundreds of millions of dollars, lent out millions more through loansharking operations and profited handsomely from illegal gambling, fraud and contract killings.  Rizzuto is considered by Canadian officials to be the most powerful mob boss in the country.  Dubbed "the Sixth Family", the Rizzuto clan allegedly rivals that of any of the Five Families in New York.   In January 2004 he was indicted on RICO charges involving loansharking and murder, in connection with the 1981 gangland killings of three rival Bonanno crime family captains (04 CR 1382 (EDNY).  A term of imprisonment of 120 months was not deemed to"depreciate the seriousness of [his] offense conduct and promote disrespect for the law" (See Exhibit G at 9).

g.      Marco D'Amico, for more than 15 years was  the boss of a criminal enterprise in Chicago  which was  regularly engaged extortion, armed robbery, and the operation of

14

gambling and bookmaking businesses. He was convicted of on RICO charges involving illegal gambling, extortion, robbery, tax evasion, and the use of a firearm in a connection with an armed robbery.    In this case a term of imprisonment of 147 months did not "depreciate the seriousness of [his] offense conduct and promote disrespect for the law" (See Exhibit G at 8).

   h.    Bolivar Benepe was the leader of Insane Deuces, a street gang engaged in a long-running conspiracy involving deadly violence and drug distribution in northern Illinois. He was convicted of RICO charges involving distribution of controlled substances. After a second round of deliberations, the jury returned a special RICO verdict assigning responsibility for four murders and forfeiture verdicts against Benape and another co-defendant. A term of imprisonment of 240 months was not deemed to"depreciate the seriousness of [his] offense conduct and promote disrespect for the law" (See Exhibit G at 9).

   i.    Benedetto Aloi, was alleged to be the consigliere of the Colombo crime family. He was charged with a conspiracy to murder witnesses.  In a case very similar to the "Commission Case" in which Petitioner was a defendant, Aloi was convicted of extortion.  A term of imprisonment of 200 months was not deemed to "depreciate the seriousness of [his] offense conduct and promote disrespect for the law" (See Exhibit G at 8)

15

j.      Leonard DiMaria was alleged to be a high-ranking member of the Gambino crime family and a member of the Gambino family 'Ruling Panel' controlling everything from loansharking and illegal gambling, to racketeering and murder for hire.   He was convicted on RICO charges of obstruction and was sentence to 108 months imprisonment.  On April 17, 2009, DiMaria was again charged with RICO charges involving extortion, illegal gambling and securities fraud and was  sentenced to 63 months in federal prison. (08 CR76 (EDNY). Neither of these terms of imprisonment were deemed to "depreciate the seriousness of [his] offense conduct and promote disrespect for the law" (See Exhibit G at 9).

k.      Joseph Tangorra, a high ranking member of the Lucchese crime family, and a member of the Lucchese "Construction Panel" was charged with loan sharking, extortion and narcotics.  He was convicted on RICO charges involving 47 Counts of Loansharking.  A term of imprisonment of 192 months was not deemed to "depreciate the seriousness of [his] offense conduct and promote disrespect for the law" (See Exhibit G at 9).

l..      Robert Panero, allegedly a high-ranking member of the Buffalo Mob was charged with various criminal acts, including ordering others to commit  murder and extortion.  He was convicted on RICO charges of a  conspiracy to interfere with interstate commerce by extortion in violation of the Hobbs Act.   A term of imprisonment of 180 months was not deemed to  "depreciate the seriousness of [his] offense conduct and

promote disrespect for the law" (See Exhibit G at 8).

     m.     Steven Cino allegedly a high-ranking member of the Buffalo Mob was charged with RICO violations involving various criminal acts, including murder and extortion. He was convicted of a conspiracy to interfere with interstate commerce by extortion in violation of the Hobbs Act. A term of imprisonment of 180 months was not deemed to "depreciate the seriousness of [his] offense conduct and promote disrespect for the law" (See Exhibit G at 8).

     n.     Gux Alex, alleged to be a high ranking member in the "Chicago Outfit" once led by Al Capone himself, was charged with extortion involving the operation of a protection racket, in which owners of restaurants, automobile dealerships, and other small firms were commanded to make substantial cash payments under threat of the destruction of their property and death and injury to themselves and their families. The crew committed at least six murders in furtherance of the criminal enterprise. A term of imprisonment of 188 months was not deemed to "depreciate the seriousness of [his] offense conduct and promote disrespect for the law" (See Exhibit G at 9).

     o.     Nicholas Gio alleged to be a member in the "Chicago Outfit" was charged with extortion in connection with the operation of a protection racket, in which owners of restaurants, automobile dealerships, and other small firms were commanded to make substantial cash payments under threat of the destruction of their property and death and

injury to themselves and their families.    The crew committed at least six murders in furtherance of the criminal enterprise.  A term of imprisonment of 137 months was not deemed to "depreciate the seriousness of [his] offense conduct and promote disrespect for the law" (See Exhibit G at 9).

p.    Joseph DiSimone was alleged to be a capo in the Bonanno crime family.  In 2004 he was indicted on RICO charges involving  murder, loandsharking and mail fraud.  A term of imprisonment of 144 months was not deemed to "depreciate the seriousness of [his] offense conduct and promote disrespect for the law" (See Exhibit G at 9).

q.    Peter Calabrese was alleged to be a soldier in the Bonanno crime family.  In 2004 he was indicted on RICO charges involving two murders, loansharking, narcotics and gambling.    A term of imprisonment of 120 months was not deemed to "depreciate the seriousness of [his] offense conduct and promote disrespect for the law" (See Exhibit G at 9).

r.    Michael Cardello was alleged to be a capo in the Bonanno crime family.  In 2004 he was indicted on RICO charges involving two murders, loansharking, narcotics and gambling.    A term of imprisonment of 120 months was not deemed to "depreciate the seriousness of [his] offense conduct and promote disrespect for the law" (See Exhibit G at 9).

s.    John Palazzolo was alleged to be a soldier in the Bonanno crime family.  In

2004 he was indicted on RICO charges involving three murders, one attempted murder and and extortion.   A term of imprisonment of 120 months was not deemed to"depreciate the seriousness of [his] offense conduct and promote disrespect for the law" (See Exhibit G at 9).

t.        Steven Scott, a career offender, is a member of the Ruling Council of the Aryan Brotherhood (AB), a violent prison gang engaged in a conspiracy to use violence and traffic drugs to maintain a position of power in prisons and to discipline other members.   Scott was indicted on RICO charges went to trial on the second count of the indictment for conspiring, while in prison to conduct the affairs of the AB through a pattern of racketeering activity, including the overt acts of murder and drug trafficking.  A term of imprisonment of 240 months was not deemed to"depreciate the seriousness of [his] offense conduct and promote disrespect for the law" (See Exhibit G at 9).

The sentences imposed upon each of the above defendants all reflected the basic objectives of sentencing which "must [promote] respect the law; ... must provide just punishment; and ... must provide adequate deterrence, and as well as protect the public from further crimes of the defendant." [emphasis added]. *United States v. Louis*, Slip Copy, 2012 WL 4513912 (3d Cir. 2012);  18 U.S.C. § 3553(a)(2)(A)). [emphasis added]

Contrary to the decision of the Parole Commission, Furnari's offense behavior did not involve  murder or conspiracy to commit murder (Exhibit A at 1).    Petitioner was

charged with and convicted of conspiracy to commit extortion and twelve counts of extortion or attempted extortion, in violation of 18 U.S.C. Sec. 1951(a) (1982). *United States v Salerno*, 868 F.2d 524 (2d Cir. 1989).[4]

Unlike the defendants listed above, Petitioner was never charged with the murders charged in the Indictment. Instead the Commission relied on information it received more than a decade after Petitioner's conviction to justify the unprecedented term of imprisonment it imposes on this 88 year old prisoner. However, even crediting the uncharged conduct upon which the Commission relied, there can be no rational basis for the Commission's decision to deny parole after 300 months.

Unlike Mangano, Bellomo, Corazzo, Urso, DeFede, Rizzuto, Benepe and D'Amico, Petitioner has never been alleged to have been the leader or "boss" of a criminal enterprise. Unlike Scott who was convicted of committing multiple murders while in prison and was sentenced to 240 months for his crimes, in the 312 months Petitioner has been in custody he has been described by the prison authorities as a "model prisoner" with not a single

---

[4]The finding regarding Furnari's role (consigliere) in the Enterprise, upon which the Court relied when it imposed sentence, later proved to be incorrect. In a letter dated January 2, 1996 (Exhibit H), almost a decade after Furnari had been sentenced and his time for appeal had been exhausted, David Kelley, Chief of the Organized Crime Unit wrote a letter amending Furnari's Pre-sentence Report in which he admitted that:

> Furnari was only a capo in the Luchese Family until the early eighties and consequently could not have sat on the Commission at the time of the Galante homicide

disciplinary infraction (See Exhibit E at 17-18).

How is possible that terms of imprisonment ranging from 120 - 240 meted out to the alleged bosses of organized crime who were <u>charged</u> with multiple murders, including contract killings and the murders of potential witnesses, are deemed to promote respect for the law and the parole of an 88 year old offender who has already served 312 months imprisonment can be deemed to "depreciate the seriousness of [his] offense conduct and promote disrespect for the law" based on uncharged conduct? How is it possible that a term of imprisonment of 240 months for a member of the Ayran Nation who commits murder while in prison does not promote disrespect for the law, yet the release on parole of an 88 year old offender with no disciplinary history and who has been described by prison authorities as a "model prisoner" can "depreciate the seriousness of [his] offense conduct and promote disrespect for the law" ?

It is respectfully submitted that the decision of the National Appeals Board lacks any rational basis and is simply arbitrary and capricious. Instead of achieving an "aura of fairness by basing determinations of just punishment " it "promotes *dis*respect for the law, and any semblance of justice in this outcome is purely coincidental" [emphasis in original] *see United States v. Cirilo-Munoz*, 504 F.3d 106 (1st Cir, 2007).

## SECOND CLAIM FOR RELIEF

## THE COMMISSION'S FINDING THAT PETITIONER PRESENTS A DANGER TO THE PUBLIC WAS ARBITRARY AND CAPRICIOUS AND LACKED ANY RATIONAL BASIS

In reviewing a decision of the Parole Commission, the district court's standard of review is whether there was a rational basis in the evidence before the Commission that allowed it to conclude by a preponderance of the evidence that Petitioner should be denied parole, or whether the actions of the Commission were arbitrary and capricious.   See *Gambino v. Morris*, 134 F.3d 155, 160 (3d Cir. 1998); *United States v. ex rel. Luther*, 953 F.2d 49, 54 (3d Cir. 1992).

It has been held that a denial of parole  based solely on circumstances of the commitment offense is unsupported by some evidence and is arbitrary when viewed in light of the extensive evidence of Petitioner's in-prison rehabilitation and exemplary behavior after 22 years of incarceration. *Milot v. Haws*, 628 F.Supp.2d 1152 (C.D.Cal.,2009); *see also McQuillion*, 306 F.3d at 906; *Nix v. Hartley*, 2009 WL 3055398 (C.D.Cal.,2009)(In the face of overwhelming evidence of Petitioner's rehabilitation in prison and suitability for parole, exhibited by his lack of serious disciplinary violations .. the unchanging circumstances of the commitment offense do not constitute "some evidence" bearing "indicia of reliability" to support the conclusion that Petitioner continues to pose an unreasonable risk to public safety).

Here, constrained to admit the obvious that Petitioner physical conditions limits his

22

ability to commit further crimes, the Commission states that "even though your physical condition may limit your ability to commit future crimes yourself, your past shows that you were able to work with others who committed serious offenses on your behalf" (Exhibit A).

Under this reasoning no prisoner who was convicted of participating in a conspiracy would ever be eligible for parole because based on the offense conduct, he would have shown that at one time he was able to work with others to commit a crime. This is not a rational application of the law.     Under any rational application of the standard, the aggravated nature of a crime committed more than 25 years before the parole is considered, cannot in and of itself provide some evidence of current dangerousness to the public unless the record also establishes that evidence exiss to support the determination of a <u>continuing</u> threat to public safety. *See Nelson v. Sisto*,  2010 WL 4530356, 5 (E.D.Cal.,2010) *compare with Tucker v. O'Brien*,  2000 WL 34233050 (W.D.Wis.,2000)( new criminal conduct in  prison warranted denial of parole based on a continuing danger to the public); *Young v. Apker*, 2007 WL 2049739 (S.D.N.Y.,2007)(decision to deny parole upheld where subsequent events provided a basis for the Commission's conclusion that prisoner was a continuing danger to the public).

In this case, Petitioner, has spent 26 years  in prison without a single disciplinary incident.  He has been described as a model prisoner (Exhibit E at 17-18).  He has had no

visitors in the past quarter century other than his immediate family (wife, children and grandchildren) and an occasional legal visit. Due to his age and deteriorating health he is unable to manage daily tasks without assistance, including remembering to take his medication. (Exhibit E at 17-18). There is no factual basis for the conclusion that after 26 years in custody Petitioner has the inclination or even the capacity to work with others who committed serious offenses on his behalf.    The Commission's determination that Petitioner continues to present a danger to the public is arbitrary and capricious and lacks any rational basis in fact.

### THIRD CLAIM FOR RELIEF

### THE COMMISSION'S REFUSAL TO GRANT PAROLE IN LIGHT OF PETITIONER'S MEDICAL CONDITION WAS ARBITRARY AND CAPRICIOUS AND AMOUNTED TO CRUEL AND UNUSUAL PUNISHMENT

As the hearing examiner's conclusion that Petitioner's clean record in prison combined with his advanced age and medical ailments and poor prognosis warrants release on parole (Exhibit C at 2), was fully consistent with other decisions by the Commission regarding similarly situated offenders and reflects the judgment of the courts that where prisoners have maintained a record of good conduct, ill health combined with advanced age resulting a limited life expectancy are considered mitigating circumstances sufficient for a grant of parole.

24

Again, the Commission's summary dismissal of Petitioner's plea for compassion due to his advanced age and ill health marks a dramatic departure from decisions rendered regarding similarly situated offenders. For example, Petitioner's co-defendant Salvatore Santoro, by Notice of Action dated January 27, 1999 was given a presumptive parole date of November, 13 2001 based on his age (83) and poor health. (Exhibit I: Pre-Hearing Assessment at 2) As distinguished from Petitioner who did not sit on the Commission and was not part of the hierarchy at the time of his conviction, Santoro was alleged to be the underboss of the Lucchese crime family and sat on the Commission which was alleged to have ordered the murders charged in the Indictment. Yet his advanced age and poor health were deemed compelling circumstances sufficient to grant parole.

Similarly, Philip "Rusty Rastelli", alleged to have been the Boss of the Bonanno Family, was granted parole on humanitarian grounds based on his age (73) and medical condition. *See also Fernandez v. United States*, 941 F.2d 1488, (11th Cir.1991)(Court denied jurisdiction but recommended earliest possible parole based on Defendant's medical condition (coronary artery disease); *Adams v. Schwartz*, 2008 WL 4224561, 11 (E.D.Cal.,2008)(denial of parole after 14 years in prison had no rational basis where prisoner, a 69 year old diabetic suffered from hypertension, chronic hepatitis C viral infection, bilateral lower extremity venous insufficiency and had history of good conduct.)

Petitioner has served 26 years in prison, more than a dozen years more than the

25

amount of time served by Adams, Santoro, Fernandez or any other similarly situated offender. He is 88 years old and suffers from hypertension, coronary artery disease, congestive heart failure, COPD, angina, prostate hypertrophy and a history of recurrent pneumonia. He is confined to a wheel chair. He requires an iInvacare oxygen infusion system in order to breath. As the hearing examiner observed he does not have long to live.

The decision of the Parole Commission to deny Petitioner's application for parole has no rational basis, is arbitrary and capricious and is precisely the kind of results oriented decision which can do nothing but promote disrespect for the law. *Gall v. United States*, 552 U.S. 38, 54, 128 S.Ct. 586 (2007).

WHEREFORE, Petitioner prays that this Court:

(1)    Enter an order directing the respondents to show cause before this Court why a writ of habeas corpus should not be issued;

(2)    After full consideration of the merits, issue the writ of habeas corpus, ordering the respondent Warden to release the petitioner from physical confinement and the respondent USPC to place him on parole for the balance of his sentence; and

(3)    Grant such other and further relief as law and justice requires.

26

Dated:     New York, New York

            November 5, 2012

Respectfully submitted,

Flora Edwards

*Attorney    for    Petitioner*
115   Broadway  -  Suite   1505
New  York,  New  York  10006
212-785-3344
FMELAW@aol.com

27

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I am the petitioner, I have read this petition or had it read to me, and the information in this petition is true and correct. I understand that a false statement of a material fact may serve as the basis for prosecution for perjury.

Dated: 11/14/2012

CHRISTOPHER FURNARI

28