Westlaw.

Not Reported in F.Supp.2d, 2007 WL 1804340 (M.D.Pa.)
(Cite as: 2007 WL 1804340 (M.D.Pa.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
M.D. Pennsylvania.
Christopher **FURNARI**, Petitioner
v.
UNITED STATES PAROLE COMMISSION, et
al., Respondents.

No. 4:CV-06-0342.
June 20, 2007.

### ORDER

MALCOLM MUIR, United States District Judge.

*1 Christopher Furnari, an inmate presently confined in the Allenwood Federal Correctional Institution, White Deer, Pennsylvania (FCI-Allenwood) filed this counseled petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. Furnari challenges a November 23, 2005 decision of the United States Parole Commission denying him release on parole. (Doc. No. 1, petition). The instant action is Furnari's fourth habeas corpus petition challenging some aspect of a Parole Commission decision. For the reasons set forth below, the petition will be denied.

### Background

Furnari is serving a 100-year sentence for racketeering, extortion, and racketeering conspiracy, imposed by the United States District Court for the Southern District of New York on January 13, 1987. According to the United States Court of Appeals for the Second Circuit, Furnari was the "consigliere" (counselor) of the Lucchese organized crime family, a position identified as "practically the equivalent of the underboss". *See United States v. Salerno,* 868 F.2d 524, 543 (2d Cir.1989). Furnari's conviction grew out of his participation in "the Commission", a national ruling body of La Cosa Nostra (Mafia) in the United States, the activities of which included the extortion and other racketeering acts which underlie his conviction. *(Id.).*

On December 3, 1996, Furnari's initial parole hearing was conducted. By Notice of Action dated January 8, 1997, the Regional Commissioner adopted the hearing examiner's recommendation that Furnari be required to serve to a fifteen-year reconsideration hearing in December, 2011. (Doc. No. 4, Ex. C, Notice of Action). On August 19, 1997, the National Appeals Board affirmed that decision. (Doc. No. 4, Ex. D, Notice of Action on Appeal). The National Appeals Board found that:

> You have properly been held accountable for murders committed to further the purposes of the Lucchese or other crime families. At a minimum, as the capo of a crew in the Lucchese family, you were in a position to be informed of murders ordered by the boss of the family. Given the hierarchical nature of the organization, it is likely that you directed the murderous acts of your crew members. And, in fact, the Parole Commission finds the information from the U.S. Attorney's Office on your personal responsibility for several of the murders (victims Schleifer, Taglianetti, and DeCicco) and attempted murder (victim Abinanti) to be credible and reliable, even though much of the information may have come from Anthony Casso, one of the most violent members of your organization. Reliable information on crimes committed through La Cosa Nostra activities has been provided by members of the criminal organization, including those who have committed violent crimes. Even if Casso has continued to commit or plot other crimes after his debriefing by federal law enforcement, this does not disqualify him as a reliable source concerning your criminal activities within the Lucchese family. In many cases, Casso's information is corroborated by information from other sources such as Carew and D'Arco.

*2 Your parole denial is warranted because you approved or participated in the planning of a contract murder. (Taglianetti), the murder of a potential informant/witness (Schleifer), and a murder

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1804340 (M.D.Pa.)
**(Cite as: 2007 WL 1804340 (M.D.Pa.))**

and attempted murder to further the aims of an on-going criminal organization (DeCicco and Abinanti, respectively). Any one of these crimes would support a parole denial. There are no mitigating factors, including your age, that justify your parole when weighed against the aggravated nature of the crimes.

*Id.*

On February 11, 1998, Furnari filed his first petition for writ of habeas corpus before this Court. *See Furnari v. Warden,* Civil Action No. 4:98-CV-0222 (M.D.Pa. Feb. 11, 1998). In that petition, Furnari claimed that his rights to due process, as well as the statutory rights afforded him by the Federal statutes and regulations governing parole, were violated in the following ways:

1. The USPC acted arbitrarily and capriciously when it grounded its denial of petitioner's parole almost entirely on the untested, non-specific allegations of Casso, someone, petitioner believes, should be deemed incredible as a matter of law;

2. The USPC incorrectly rated petitioner's offense severity as Category Eight, crediting "untested unsupported hearsay allegations" of Anthony Casso.

3. The government suppressed information revealing that Casso is not a reliable informant.

4. The USPC violated petitioner's due process right by relying on AUSA Kelley's "conclusory" statement that Casso's allegations are corroborated by D'Arco and Carew.

*Id.*

On December 9, 1998, during the pendency of petitioner's habeas corpus proceeding before this Court, the Parole Commission provided a statutory interim hearing to Furnari pursuant to 18 U.S.C. § 4208(h)(2). (Doc. No. 16, Ex.3., Review Hearing Summary). At that hearing, Furnari claimed that at the time Assistant U.S. Attorney Kelley was

presenting Casso's statements to the Parole Commission,[FN1] other prosecutors were concluding that Casso was not credible and was engaged in new criminal conduct while incarcerated. *Id.* at p. 3. Furnari presented an affidavit which Assistant U.S. Attorney Stambolidis had submitted in another case, stating that Casso had lied to prosecutors in matters relevant to that case. *Id.*

FN1. Assistant U.S. Attorney David N. Kelley wrote a letter to the Parole Commission dated August 1, 1996, detailing Furnari's involvement in various crimes, including the murders of Lee Schleifer, Richard Taglianetti and Frank DeCicco, and the attempted murder of Joseph Abinanti. Assistant U.S. Attorney Kelley's letter was based largely on information received from Anthony Casso, Thomas Carew and Alfonso D'Arco. *See Furnari v. U.S. Parole Commission,* Civil Action No. 4:02-CV-0555, slip op. at pp. 4-5 (M.D. Pa. April 4, 2002).

The hearing examiner discussed this document and explained his reasons for continuing to credit Casso and corroborating witnesses in the hearing summary. *Id.* The examiner recommended no change in the prior order that Furnari serve to a 15-year reconsideration hearing in December, 2011. *Id.* at p. 5. The Parole Commission adopted that recommendation. (Doc. No. 16, Ex. 4, Notice of Action). The Parole Commission did not, however, include the reasons for continuing to rely upon the Casso information notwithstanding the Stambolidis letter on the notice of action. *Id.* On April 2, 1999, the National Appeals Board affirmed the decision that Furnari serve to a 15-year reconsideration hearing in 2011. (Doc. No. 16, Ex.5., Notice of Action on Appeal).

**\*3** By order dated April 12, 1999, this Court denied Furnari's petition for writ of habeas corpus, finding that there was a rational basis in the record for the Parole Commission's decision. *Furnari v. Warden,* Civil Action No. 4:98-CV-0222 (M.D.Pa.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1804340 (M.D.Pa.)
(Cite as: 2007 WL 1804340 (M.D.Pa.))

Feb. 11, 1998). Furnari appealed this decision.

The United States Court of Appeals for the Third Circuit took judicial notice of the interim hearing and the notices of action which followed it. [FN2] *See Furnari v. Warden,* 218 F.3d 250 (3d Cir.2000). The Court of Appeals held that the Parole Commission had erred in failing to "make clear in its decision on the interim hearing whether it continued to believe that the discredited witness [Casso] was credible or otherwise concluded that there was sufficient information from other sources to tie Furnari to murder," and had thereby failed to follow its regulation requiring a statement of reasons for denying parole. *Id.* at 252. The court held, "[i]t is not possible to tell from [the Appeal Board's affirmance after the interim hearing] whether the Parole Commission continues to rely on Casso and find him credible, or has concluded that there is sufficient additional information tying Furnari to murder to conclude that he is a Category Eight even absent the information provided by Casso." *Id.* at 256. The Court of Appeals ordered the case remanded to the district court "with instructions to grant Furnari's petition conditionally and order the Parole Commission to provide a new statement of reasons consistent with this decision." *Id.* at 252.

> FN2. These materials were not before this Court when it made its decision on the habeas corpus petition.

By Order dated September 28, 2000, this Court, consistent with the Third Circuit's mandate, remanded the action to the Parole Commission, directing that the Commission either provide Furnari a new statement of reasons consistent with the Third Circuit's opinion, or afford him a *de novo* hearing, within ninety days of the date of this Court's Order. *Furnari v. Warden,* Civil Action No. 4:98-CV-0222 (Doc. No. 18) (M.D.Pa. Feb. 11, 1998).

On December 8, 2000, the Parole Commission conducted a *de novo* hearing in which the hearing examiner considered the following:

• A September 25, 2000 letter submitted to the Parole Commission by Assistant U.S. Attorney Kelley, which discussed the circumstances surrounding the Stambolidis affidavit.

• A December 6, 2000 letter from Furnari's attorney in response to Kelley's letter.

• A transcript of trial testimony of Carew in the *Pagliarulo* case, which was submitted by Furnari at the hearing.

(Doc. No. 16, Ex. 7, Initial Hearing Summary). By Notice of Action dated December 27, 2000, the Parole Commission found that Furnari's offense severity was properly rated as Category Eight because it involved murder, conspiracy to murder and multiple separate acts of extortion through racketeering offenses. (Doc. No. 16, Ex. 8, Notice of Action). The Parole Commission found that a decision more than 48 months above the guideline minimum of 100 months was warranted because of the following aggravating factors:

*4 You were involved in the hierarchy, first as a Capo and later as a Consigliere of a major organized crime organization and were involved either directly [or indirectly] in the planning or approval of murder and/or attempted murder. Further, the murder of Lee Schleifer was of a prospective informant/witness and the conspiracy to murder/ murder of Richard Taglianetti was a contract murder. The Commission has determined that there is sufficient corroboration of information provided by Casso to rely upon the information supplied by Casso notwithstanding the affidavit from AUSA Stambolidis of the Eastern District of New York.

*Id.* Finally, the Commission ordered Furnari "continue to a 15-year Reconsideration hearing (December 2011). *Id.* By Notice of Action on Appeal dated April 24, 2001, the National Appeals Board affirmed the Parole Commission's decision. (Doc. No. 16, Ex. 9, Notice of Action on Appeal).

On April 4, 2002, Furnari filed a second peti-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1804340 (M.D.Pa.)
(Cite as: 2007 WL 1804340 (M.D.Pa.))

tion for writ of habeas corpus in this Court. *Furnari v. U.S. Parole Commission,* Civil Action No. 4:02-CV-0555 (M.D. Pa. April 4, 2002). In his petition, Furnari asserted the following four challenges to the Parole Commission's April 24, 2001 de- cision:

1. The Parole Commission violated due process, the controlling statute, its own regulations and the law of the case, when it failed to provide adequate reasons for crediting information supplied by the mob informant whom the government concedes has lied.

2. The Parole Commission violated the ex post facto clause by relying on a provision of its regulations which created a significant risk of prolonging Mr. Furnari's incarceration, as compared with the provision in effect at the time of commission of the conviction offenses.

3. The Parole Commission's decision rests on evidence lacking sufficient indicia of reliability to satisfy due process or the governing statutory criteria, as authoritatively interpreted in the [Parole Commission's] own rules, and without a basis in fact.

4. The Parole Commission's reliance on conduct other than the offenses of conviction to set petitioner Furnari's offense severity category violates the Commission's own rules as well as due process.

*Id.* at pp. 11-12. By Order dated July 18, 2002, this Court granted in part and denied in part, Furnari's petition. Finding that the Parole Commission's reliance on the retroactive change violated the Ex Post Facto Clause, this Court directed that within sixty days of the Court's Order, the Parole Commission reevaluate Furnari's application for parole in accordance with the version of 28 C.F.R. § 2.20 in effect when Furnari committed the underlying offenses. *Id.* at p. 28. This Court further determined that the Commission's statement of reasons for its decision was supported by a rational basis in the re-

cord and denied Furnari's petition in all other respects. *Id.*

By Notice of Action dated August 13, 2002, in compliance with this Court's July 18, 2002 Order, the Parole Commission reviewed Furnari's case on the record, and found the following:

*5 In compliance with the order of the United States District Court for the Middle District of Pennsylvania dated July 18, 2002, the Commission has reviewed your case on the record, without reference to or application of the presumption against parole for certain Category Eight offenders contained in the Note to the Parole guidelines Table, 28 C.F.R. § 2.20.[FN3] The Commission orders no change in its prior decision that parole is denied and that you serve to a 15 year reconsideration hearing in December, 2011. Without presuming that you should be denied parole, the Commission finds that a decision more than 48 months above the guideline minimum of 100 months (and denial of parole) is warranted based on the following pertinent case factors: as a high-ranking member of a Mafia crime family, you are responsible for multiple murders (Schleifer, Taglianetti and DeCicco) and attempted murder (Abinanti) under a theory of vicarious liability, and also because you personally solicited or ordered some of the crimes. These crimes are aggravated by the fact that they were committed in furtherance of the aims of a criminal organization. The commission continues to rely upon the reasoning and conclusion about the evidence contained in the April 24, 2001 Notice of Action on Appeal.

> FN3. The Commission's rules contain a presumption against parole for certain Category Eight offenses, specifically: murder committed to silence a victim or witness, contract murder, murder by torture, murder of a law enforcement officers to carry out an offense, and murder committed to further the aims of an on-going criminal oper-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1804340 (M.D.Pa.)
**(Cite as: 2007 WL 1804340 (M.D.Pa.))**

ation. 28 C.F.R. § 2.20, Note to guidelines table. This provision was not part of the Commission's rules when Furnari committed his offenses.

(Doc. No. 16, Ex. 10, Notice of Action). By Notice of Action on Appeal dated November 14, 2002, the National Appeals Board affirmed the Parole Commission's decision. (Doc. No. 16, Ex. 11, Notice of Action on Appeal).

On November 13, 2003, Furnari filed his third petition for writ of habeas corpus before this Court. *Furnari v. U.S. Parole Commission,* Civil Action No. 4:03-CV-2046, Slip Op. at 2-3 (M.D.Pa. Nov. 13, 2003). Furnari's petition raised the same claims that were considered and rejected by this Court in its July 18, 2002 Order. By Order dated March 10, 2004, this Court denied the petition, finding there to be a rational basis in the Parole Commission's April 24, 2001 decision, as well as the Commission's August 13, 2002 reevaluation of Furnari's request for parole. *Id.* On March 8, 2005, the United States Court of Appeals for the Third Circuit affirmed the denial of Furnari's petition, also finding that the Commission's findings were supported by a rational basis. *See Furnari v. U.S. Parole Commission,* 2005 WL 535390 (3d Cir.2005).

On June 8, 2005, the Parole Commission conducted a statutory interim hearing for Furnari. (Doc. No. 16, Ex. 12, Hearing Summary). At the hearing, Furnari's counsel submitted new evidence in support of their argument that Casso and D'Arco were unreliable, presenting lists of alleged lies by each. *Id.* at pp. 4-5. The hearing examiner found that "the information submitted does not warrant the setting of a presumptive parole date or the advancement of the 15 year reconsideration hearing." *Id.* at p. 5. Thus, by Notice of Action dated July 8, 2005, the parole Commission ordered "no change in 15-year Reconsideration Date December 2011." (Doc. No. 16, Ex. 13, Notice of Action).

*6 On November 23, 2005, the Parole Commission issued its final decision affirming the previous

decision. (Doc. No. 16, Ex. 14, Notice of Action on Appeal). The National Appeals Board explained in detail the reasons for its findings as follows:

Your first claim is that the Parole Commission exceeded its authority by ordering no change in your 15-year reconsideration hearing in 2011 at a time when you should have been given a parole release date within your guidelines under § 235(b)(3) of the Sentencing Reform Act. This is essentially the same claim you made in your administrative appeal in 2002. The Board rejected your claim then, advising you that your Category Eight guidelines have no upper limit and thus the Commission's decision for you is within the guidelines, and that in any event § 235(b)(3) does not require the Commission to give you a decision within your guidelines but rather requires the Commission to set a release date pursuant to 18 U.S.C. § 4206 before the Commission goes out of existence. As you may know, on September 29, 2005, the Commission's existence was extended for an additional three years in the United States Parole Commission Extension and Sentencing Commission Authority Act of 2005. You are therefore not entitled to have the Commission set a release date for you at this time, and the Commission did not exceed its authority when it ordered no change in your 15 year reconsideration hearing in 2011.

You have also raised your second claim in a prior administrative appeal, that your guidelines are incorrect because your offense behavior should have been rated as Category Seven rather than as Category Eight and that the Commission erroneously used "unsworn, unsubstantiated, and unreliable information to impose vicarious criminal liability" on you. The Board rejected the claim on April 24, 2001, and finds no need to address it again. The Board notes, in fact, that your claim appears to appeal the findings in the Board's April 24, 2001 Notice of Action. Both a district court and a court of appeals have upheld the Board's April 24, 2001 decision, as modified on

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1804340 (M.D.Pa.)
**(Cite as: 2007 WL 1804340 (M.D.Pa.))**

November 14, 2002. *See Christopher Furnari v. U.S. Parole Com'n,* Civil No. 4:02-CV-0555 (M.D.Pa. July 18, 2002); *Christopher Furnari v. U.S. Parole Com'n,* Civil No. 4:03-CV-2046 (M.D.Pa. March 10, 2004); *Christopher Furnari v. U.S. Parole Com'n, et al.,* No. 04-2109 (3rd Cir. March 8, 2005). You appealed the district court's decision denying your habeas corpus petition to the Third Circuit, and on March 8, 2005, the court of appeals ruled that the Commission was "within its authority in relying upon conduct other than the offense of [your] conviction, including [your] alleged involvement in murders and an attempted murder for which [you] were neither charged nor convicted." As to your challenge to the Parole Commission's factual findings with respect to your alleged involvement in these other murders, the Third Circuit found "that a rational basis in the record existed for the Commission's conclusions."

*7 Your third claim is that there was significant information in existence but not known at the time of your initial hearing in 2000, and that the information was not properly considered at your statutory interim hearing. The allegedly "significant information" you offer is "that the information provided by Alphonse D'Arco either fails to corroborate Casso or is inherently incredible because it is factually impossible."

As an initial matter, the Board has reviewed the record and finds that the Commission very carefully examined the information you presented at your statutory interim hearing. See the interim hearing summary, which you were given on September 13, 2005 in response to your FOI request. The fact that the Commission did not agree with your conclusion does not mean that your claim and the information that you provided to support that claim were not considered. The Board adopts the Commission's analysis and conclusion on page 5 of the hearing summary and continues to find that the testimony of D' Arco corroborates Casso and is credible. You yourself

have previously conceded that D'Arco "was an expert on the hierarchy and structure of organized crime." *See Furnari v. Warden, Allenwood F.C.I.,* 218 F.3d 250 (3d Cir.2000), where the Third Circuit said that "Kelley also noted that Furnari has conceded that D'Arco was an expert on the hierarchy and structure of organized crime, and noted that D' Arco has stated that murders committed by Furnari's crew while Furnari was a capo would only have been done with his knowledge and consent. Kelley stated that there were a number of murders by the family both when Furnari was capo and when he was consigliere." 218 F.3d at 253. In addition, the Board notes that at least two federal judges have found D'Arco to be a highly credible witness. *See United States v. Defede,* 7 F.Supp.2d 390, 395 n. 32 (S.D.N.Y.1998) (after noting D' Arco's extensive testimony at a jury trial which resulted in the defendant's conviction for two murders, Judge Kaplan concluded that "D' Arco's record suggests that he is quite reliable"); *United States v. Avellino* 1995 WL 728420 (E.D.N.Y., Nov. 20, 1995) (in response to a credibility challenge to D' Arco as a witness, the court noted that Judge Nickerson had found D' Arco not only "very credible" but "one of the more credible witnesses ... [he had] ever heard").

Furthermore, while you attempt to discredit D' Arco by saying that he was not "in the know" about your actions because he was not inducted into the Lucchese family until 1982, the information you submitted with your appeal (Exhibit P) shows that he was part of the Lucchese family for many years prior to his 1982 induction and "was treated as a member, going to family functions and 'sit downs' ." (Exhibit P, pp. 1-2). In addition, if he was not "in the know" about events prior to 1982, he could not have made the statements favorable to you that resulted in the government's January 2, 1992 letter to your sentencing court. *See* Exhibit H. That letter requested the modification of your presentence report based on the testimony of D' Arco that you were a capo

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1804340 (M.D.Pa.)
(Cite as: 2007 WL 1804340 (M.D.Pa.))

Page 7

in the Lucchese family in the 1970's and that you were not made consigliere of the Lucchese family until the early 1980's. As a result, because according to D' Arco you were a capo and not consigliere in the late 1970's, the government conceded that you were not sitting on the "Commission" in 1970 when it approved the murders of Carmine Galante, Leonard Coppola, and Giuseppi Turrano and that you "could not have sat on the Commission at the time of the Galante homicide." (Exhibit H).

*8 Finally, you provide an excerpt of cross-examination testimony by D' Arco from a Vincent Gigante trial (Exhibit Q) in support of your assertion that D'Arco is not credible because he "testified that in early 1988, he saw Amuso, Casso and Furnari who were on their way to a Commission meeting," at a time when you were already incarcerated. The excerpt you provide does not support your assertion. When D'Arco was asked "didn't you tell the FBI, around early ' 88 you recalled Amuso and Casso on their way to see The Robe, as you called him," D'Arco responded that he "never told him 1988. I don't know what they got there, but they're incorrect." The cross-examiner then asked, "So if they had written down early 1988, they wrote down the wrong date. That's your testimony; am I right," to which D'Arco responded, "Yes." (Exhibit Q, p. 1261).

Your fourth claim is that there was "significant exculpatory evidence" in existence but not known at the time of the statutory interim hearing that proves that you had nothing to do with the murder of Richard Taglianetti. You assert that Taglianetti was not murdered as a result of a contract that you put out on him in 1983 for a murder the Lucchese Family believed he committed involving a member's son and because of which he fled. Rather, you claim that Taglianetti was murdered after you were imprisoned solely because he struck his wife's sister, who was George Zappola's wife, after an argument. In support of

your claim, you submit an August 28, 2005 affidavit from George Zappola. (Exhibit X). The Board finds that neither your claim nor the affidavit are "evidence that was in existence but not known" at the time of your statutory interim hearing. First the allegedly exculpatory evidence that Taglianetti's murder was in response to his slapping his sister-in-law is not information that was "unknown" at the time of your 2005 statutory interim hearing, because you made the identical argument during your initial hearing on December 8, 2000. Second, George Zappola's affidavit was obviously not "in existence" at the time of your statutory interim hearing on June 8, 2005, because it was signed on August 28, 2005, nearly three months later. Thus, the claim based on the affidavit was not correctly raised in this administrative appeal, see 28 C.F.R. § 2.26, but should have been submitted to the Commission after August 28, 2005 as "new favorable information" under 28 C.F.R. § 2.28(a).

Nonetheless, in the interest of expediency, the Board will consider the claim and affidavit in this appeal. The Board rejects your claim and finds that the affidavit does not prove that you had nothing to do with the murder of Richard Taglianetti. The Board finds Zappola's affidavits not to be credible because it was submitted so late, five years after you made this argument at your initial hearing in 2000, and because it is not corroborated, whereas the reason for Taglianetti's murder on which the Commission relied was corroborated by several individuals. Further, Zappola affirms in his affidavit that "Taglianetti was killed only because of what he did to my wife" (Exhibit X), but that assertion is contradicted by evidence in your Exhibits V and W. The Board finds more credible the contradictory evidence contained in the exhibits. First, according to the testimony of an FBI agent set forth in Exhibit V, Taglianetti's argument with his sister-in-law was not the sole or even the most important reason for the murder, but was simply the event that caused the Lucchese Family to more vigorously pursue

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1804340 (M.D.Pa.)
(Cite as: 2007 WL 1804340 (M.D.Pa.))

the still existing contract that you put out on him in 1983 when you were the Lucchese consigliere. FBI Agent Byrne testified in 1995:

*9 Basically, Your Honor, there had been a long standing contract to kill Richie Taglianetti going back as far as about 1983. An individual in the Lucchese Crime Family, his son was murdered and the Lucchese Family believed that Richie Taglianetti had committed the murder and a contract was put on Mr. Taglianetti's life. In the beginning they couldn't locate Mr. Taglianetti and it was not really fully pursued when they first couldn't find him **and the contract was just always in effect.** And then there came a time shortly before he was killed when Mr. Taglianetti and Louise Zappola, who is the wife of a Lucchese capo, they had a dispute and Richie Taglianetti slapped Louise Zappola around. Then once again they put a full court press on to try to find Mr. Taglianetti and kill him....They started looking for him and eventually they came to a plan where they would have two sets of shooters and they would put surveillance basically 24 hours a day on his house until one set of shooters located him and killed him....Eventually one group of shooters got Mr. Taglianetti coming out of his house and they shot and killed him.

(Exhibit V, pp. 8-9) (bold added). Second, as shown in Exhibit W, when Zappola pleaded guilty to Taglianetti's murder, he never mentioned avenging his wife's honor or her being "slapped around" by Taglianetti as a reason for the murder. He affirmed that the murder was to advance his position in the racketeering enterprise. Zappola testified at the plea hearing that he conspired with others to murder Taglianetti "for the purpose of maintaining and increasing my position in an association in fact enterprise, consisting of myself and others, which enterprise engaged in racketeering activity" (Exhibit W, p. 53), and that he "murdered and aided and abetted

the murder" of Taglianetti "for the purpose of maintaining and increasing my position in an association in fact enterprise consisting of myself and others, which enterprise engaged in racketeering activity." (Exhibit W, pa. 54).

Finally, the Board does not find exculpatory Zappola's statement in his affidavit that you did not communicate with him after your incarceration or directly instruct him to kill Taglianetti. The Board does not find that the contract simply "lapsed" with the passage of time, a conclusion that is supported by the FBI Agent's testimony. As the Lucchese consigliere, you put the Taglianetti contract in place before you were incarcerated and it needed no further direction from you.

Your fifth claim is that the 100-year sentence imposed on you by the court was "grossly disproportionate" and is a mitigating circumstance that the Commission can and should remedy. You compare your sentence to sentences imposed on other defendants in other cases, but not to your own co-defendants. The Board refers you to the Second Circuit's decision, *United States v. Salerno,* 868 F.2d 524, 542-43 (2d Cir.1989), where the court affirmed your 100-year sentence and the 100-year sentences imposed on all but one of your co-defendants. The Second Circuit found that your 100-year sentence was constitutional and it rejected your argument that your sentence was disproportionate to your crime, pointing out that you were a consigliere of the Lucchese Family and "had been involved in many of the recorded meetings where inmate knowledge of the Commission's violent business was evident." 868 F.2d at 543. The Board agrees with the Commission's conclusion on page 4 of the hearing summary that your sentence was not disproportionate to you crime and it declines to change the Commission's decision for you.

*10 Finally, you request a more lenient decision on the ground of compassion. The Board does not find that a more lenient decision is warranted for

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1804340 (M.D.Pa.)
(Cite as: 2007 WL 1804340 (M.D.Pa.))

you on that basis.

(Doc. No. 16, Ex. 14, Notice of Action on Appeal).

On March 3, 2006, Furnari filed the instant petition for writ of habeas corpus in which he raises the following claims for relief:

1. The Parole Commission violated 18 U.S.C. § 4206(a) and § 235(b)(3) of the Sentencing Reform Act when it ordered a 15-year reconsideration hearing for 2011.

2. The Parole Commission's rating of Furnari's offense severity rating as a Category Eight lacks a rational basis because it demonstrates a lack of concern for the probable accuracy of the evidence used to support the findings.

3. The National Appeals Board denied Furnari due process and violated its own rules by summarily rejecting the exculpatory evidence obtained after the hearing.

4. The Parole Commission has ignored the grossly disproportionate nature of Furnari's sentence and has abdicated responsibility to minimize the effects of sentencing disparities.

(Doc. No. 1, petition).

### DISCUSSION

It is well-settled that "there is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex,* 442 U.S. 1, 7 (1979). To the extent that any liberty interest exists, it must be created by the applicable parole statute. *Id.* Furthermore, even if a liberty interest exists, due process requires only that a hearing be provided, and that the prisoner be given a statement of reasons for denial of parole, if parole is denied. *Board of Pardons v. Allen,* 482 U.S. 369 (1987).

As to a parole decision rendered by the Com-

mission, it is well settled that the determination of eligibility for parole has been committed by Congress to the discretion of the Commission. *United States v. Addonizio,* 442 U.S. 178 (1979); *Campbell v. United States Parole Commission,* 704 F.2d 106 (3d Cir.1983). The function of judicial review of a Commission decision on a petition for writ of habeas corpus is to determine whether the Commission abused its discretion. The Court is not empowered to substitute its judgment for that of the Commission in evaluating habeas petitioner's claims unless the Commission's exercise of discretion represents an egregious departure from rational decision-making. *See Butler v. United States Parole Commission,* 570 F.Supp. 67-77 (M.D.Pa.1983).

The Court of Appeals for the Third Circuit has routinely recognized that a federal court's review of a decision issued by the Parole Commission is limited. *Furnari v. Warden,* 218 F.3d 250, 254. (3d Cir.2000). The standard applied in such a review " 'is not whether the [Commission's decision] is supported by the preponderance of the evidence, or even by substantial evidence; the inquiry is only whether there is a rational basis in the record for the [Commission's] conclusions embodied in its statement of reasons.' " *Id.* (quoting *Zannino v. Arnold,* 531 F.2d 687, 691 (3d Cir.1976). However, the review should consider whether the Parole Commission " 'has followed criteria appropriate, rational and consistent' with its enabling statutes so that its 'decision is not arbitrary and capricious, nor based on impermissible considerations.' " *Id.* (quoting *Zannino,* 531 F.2d at 690).

**\*11** As the Third Circuit noted in *Furnari,* "[t]he Commission is required, under 18 U.S.C. § 4206(b), to 'state with particularity the reasons' for a denial of parole. See also 28 C.F.R. § 2.13(c) ('At the conclusion of the hearing, the examiner shall discuss the decision to be recommended by the examiner, and the reasons therefor, except in the extraordinary circumstances of a complex issue that requires further deliberation before a recommendation can be made.')" *Furnari,* 218 F.3d at 256. Fur-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1804340 (M.D.Pa.)
**(Cite as: 2007 WL 1804340 (M.D.Pa.))**

thermore, the Third Circuit has stated,

> We do not find it either overly intrusive or con-
> trary to the statute to require the Commission,
> which is under a statutory mandate to 'state
> with particularity the reasons for [parole] deni-
> al,' to truly provide reasons. We believe that a
> statement of reasons must reveal reasoning, and
> not simply present conclusions, at least where
> the reasoning is not apparent from the facts of
> the case.

*Marshall v. Lansing,* 839 F.2d 933, 942-43 (3d
Cir.1988). With the above legal principles in mind,
the court will turn to a consideration of the merits
of the petition.

**Furnari's First Claim: The Parole Commission
violated 18 U.S.C. § 4206(a) and § 235(b)(3) of
the Sentencing Reform Act when it ordered a
15-year reconsideration hearing for 2011.**
The Sentencing Reform Act of 1984 ("SRA")
abolished the Parole Commission and repealed fed-
eral parole statutes. Pub.L.No. 98-473, Title II, ch.
II, 98 Stat.1987, 2017-2034 (codified as amended at
18 U.S.C. § 3551-3742 (1994)). In their place, the
SRA set up a determinate sentencing scheme utiliz-
ing the sentencing guidelines. *Id.* The SRA became
effective on November 1, 1987, *Lewis v. Martin,*
880 F.2d 288, 290 (10th Cir.1989). In order to pro-
cess prisoners convicted under the old parole sys-
tem, the life of the Parole Commission was origin-
ally extended to five years beyond the effective
date of the SRA. *See* 98 Stat. at 2027, 2032, §
218(a) (5), § 235(b)(1)(A). The five-year provision
was amended by § 316 of the Judicial Improve-
ments Act of 1990, and again by the Parole Com-
mission Phaseout Act of 1996. Congress has contin-
ued to extend the life of the Parole Commission and
it is now scheduled to expire on October 31, 2008.
*See* United States Parole Commission Extension
and Sentencing Commission Authority Act of 2005,
Pub.L.No.  109-76,  119  Stat.2035,  Sec.  2
(September 29, 2005).

When the SRA was originally enacted, §
235(b)(3) instructed the Parole Commission to set a
release date for prisoners before the expiration of
the Parole Commission and "within the range that
applies to the prisoner under the applicable parole
guideline." Pub.L.No. 98-473, § 235(b)(3), 98
Stat.2032 (1984). Just thirty-six days after the SRA
became effective, § 235(b)(3) was amended to cla-
rify that release dates were to be set under 18
U.S.C. § 4206. Section 235(b)(3), as amended by
the 1987, 1990 and 1996 amendments, reads as fol-
lows:

> The United States Parole Commission shall set a
> release date, for an individual who will be in its
> jurisdiction on the day before the expiration of
> the fifteen years after the effective date of this
> Act, pursuant to 4206 of Title 18, United States
> Code. A release date set pursuant to this para-
> graph shall be set early enough to permit consid-
> eration of an appeal of the release date, in accord-
> ance with Parole Commission procedures, before
> the expiration of fifteen years following the ef-
> fective date of this Act.

**\*12** *See* Sentencing Reform Act of 1984, §
235(b)(3), (Title II of Comprehensive Crime Con-
trol Act of 1984, Pub.L.No. 98-473, 98 Stat.1987
(1984), as amended by the Sentencing Act of 1987,
§ 2(b) (2) of Pub.L.No. 100-82, 101 Stat. 1271
(November 1, 1987); the Judicial Improvements
Act of 1990, § 316, Pub.L.No. 101-650, 104 Stat.
5115 (December 1, 1990); and the Parole Commis-
sion Phaseout Act of 1996, Pub.L.No. 104-232, 110
Stat. 3055 (October 2, 1996)).

Furnari's contention that the Parole Commis-
sion is required to set a release date is unavailing.
Section 235(b)(3) only requires that a release date
be set "early enough to permit consideration of an
appeal" before the expiration of the Commission. It
has been estimated that appeals of final release
dates will take three to six months. See 28 C.F.R.
2.64 (1987); 52 Fed.Reg. 5763-64 (Feb. 26, 1987).
The Parole Commission issued its Notice of Action
on July 8, 2005, clearly within the three to six
month estimated appeal time. Pursuant to 28 C.F.R.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1804340 (M.D.Pa.)
**(Cite as: 2007 WL 1804340 (M.D.Pa.))**

§ 2.26, a federal prisoner challenging an adverse parole decision by the Commission must file an appeal to the Board within 30 days from the date of entry of the decision that is the subject of the appeal. Furnari did not file his appeal until September 19, 2005, some 73 days after the Parole Commission's initial decision. Even though Furnari filed his appeal well beyond the 30 day statutorily prescribed time frame, his petition was still considered by the Board. Thus, the Court finds that it was Petitioner's own dilatoriness that caused the window of time for consideration of his appeal to close. Nonetheless, Furnari's allegation that the Commission failed to allow enough time to permit an appeal is of no moment in light of Congress' decision, on September 29, 2005, while Furnari's petition was pending, to extend the Parole Commission three additional years until October 31, 2008.

With respect to Furnari's argument that the Parole Commission ordered a 15 year reconsideration hearing to be held in December 2011, six years after the authority of the Parole Commission expired, as fully explained above, § 235(b)(3) will require the Parole Commission, prior to its expiration, to set a definite release date (or, as it may lawfully do, to deny parole), but that statute does not require that the Parole Commission set such a date now.

**Furnari's Second Claim: The Parole Commission's rating of Furnari's offense severity rating as a Category Eight lacks a rational basis because it demonstrates a lack of concern for the probable accuracy (sic) of the evidence used to support the findings .**

As is correctly noted by the National Appeals Board, Furnari's claim that his offense severity level is incorrectly rated as a Category Eight has been previously raised, considered and upheld by the Board, this Court, and the United States Court of Appeals. *See Furnari v. U.S. Parole Com'n,* Civil No. 4:02-CV-0555 (M.D.Pa. July 18, 2002); *Furnari v. U.S. Parole Com'n,* Civil No. 4:03-CV-2046 (M.D.Pa. March 10, 2004); *Furnari*

*v. U.S. Parole Com'n, et al.,* No. 04-2109 (3rd Cir. March 8, 2005) (holding that the Commission was "within its authority in relying upon conduct other than the offense of [your] conviction, including [your] alleged involvement in murders and an attempted murder for which [you] were neither charged nor convicted"). Thus, any further litigation of this issue is considered by this Court to be an abuse of the writ. *See McCleskey v. Zant,* 499 U.S. 467(1991); 28 U.S.C. § 2244(b).

**Furnari's Third Claim: The National Appeals Board denied Furnari due process and violated its own rules by summarily rejecting the exculpatory evidence obtained after the hearing.**

***13** Furnari claims that the National Appeals Board summarily rejected the Affidavit of George Zappola, submitted after the Parole Board's initial decision, and attesting to the fact that the murder of Richard Taglianetti, which occurred more than five years after petitioner was in custody, had nothing to do with petitioner. However, viewed in the light of the present record, it is apparent that this claim applies more to Furnari's dissatisfaction with the weight and credibility the Parole Commission attributed to the Zappola Affidavit. In this regard it should be noted that the weight and credibility to be given mitigating factors is within the discretion of the Parole Commission. *Slader v. Pitzer,* 107 F.3d 1243, 1249 (7th Cir.1997) ("The weight to be accorded mitigating factors is clearly entrusted to the discretion of the Commission." (citing *Campbell v. U.S. Parole Commission,* 704 F.2d 106, 113 (3d Cir.1983))); *Hackett v. U.S. Parole Comm'n,* 851 F.2d 127, 131 (6th Cir.1987) ("we have no power to overturn a credibility determination made by the Commission").

Although not statutorily obligated to consider the Zappola Affidavit [FN4], the Parole Commission did consider the affidavit, and found it to not be credible, as is evident from the record. (*See* Doc. No. 16, Ex. 14, pp. 2-4). Thus, the record reflects that, contrary to Furnari's contention, the mitigating factor, namely the Zappola Affidavit, presented by

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1804340 (M.D.Pa.)
**(Cite as: 2007 WL 1804340 (M.D.Pa.))**

him in favor of parole was considered by the Parole Commission and thoroughly examined.

> FN4. Pursuant to 28 C.F.R. § 2.28(a), Furnari should have presented the Zappola Affidavit to the Parole Commission for reopening, citing the affidavit as "new favorable information" in support of reopening.

**Furnari's Fourth Claim: The Parole Commission has ignored the grossly disproportionate nature of Furnari's sentence and has abdicated responsibility to minimize the effects of sentencing disparities.**

Furnari claims that the National Appeals Board rejected his claim that the grossly disproportionate sentence imposed by Judge Owen was based on erroneous and false information, constituting a mitigating circumstance which the Commission is empowered to address.

Once again, as is apparent from the record, the Appeals Board explicitly considered Furnari's sentence and determined that it did not qualify as a mitigating factor. That the alleged "disproportionate nature" of Furnari's sentence did not compel the Commission to find it was a mitigating factor warranting remedy does not amount to an abuse of discretion by the Commission. *Campbell,* 704 F.2d at 113.

To the extent that Furnari is attacking the imposition of the 100-year sentence, a federal criminal defendant's conviction and sentence are only subject to collateral attack in a proceeding before the sentencing court pursuant to 28 U.S.C. § 2255. E.g., *United States v. Addonizio,* 442 U.S. 178, 179 (1979). The petition for writ of habeas corpus will be denied. An appropriate order will enter.

AND NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. The petition for writ of habeas corpus is **DENIED.**

2. The Clerk of Court is directed to **CLOSE**

the case.

M.D.Pa.,2007.
Furnari v. U.S. Parole Com'n
Not Reported in F.Supp.2d, 2007 WL 1804340 (M.D.Pa.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2009 WL 3055398 (C.D.Cal.)
**(Cite as: 2009 WL 3055398 (C.D.Cal.))**

C
Only the Westlaw citation is currently available.

United States District Court,
C.D. California.
Anthony Delmar NIX, Petitioner,
v.
James D. HARTLEY, Warden, et al., Respondents.

No. EDCV 07-1435-DOC (OP).
Sept. 24, 2009.

West KeySummary**Pardon and Parole 284** ⬅︎49

284 Pardon and Parole
    284II Parole
        284k48 Eligibility for Parole or Parole Consideration
            284k49 k. Factors governing decision, in general. Most Cited Cases
    Parole board's reliance on the unchanging circumstances of prisoner's offense of second degree murder did not support a conclusion that he was still a danger to society. Overwhelming evidence was presented regarding prisoner's rehabilitation in prison such as a lack of serious disciplinary violations, participation in self-help groups, educational advancement, vocational efforts, and positive psychological evaluations. Given this evidence, the circumstances of the offense no longer constituted reliable evidence that prisoner posed a threat to public safety. 15 CCR §§ 2281, 2402(b-d).

Anthony Delmar Nix, Avenel, CA, pro se.

Lora Fox Martin, CAAG Office of Attorney General of California, San Diego, CA, for Respondents.

ORDER ADOPTING FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS OF
UNITED STATES MAGISTRATE JUDGE
DAVID O. CARTER, District Judge.
    **\*1** Pursuant to 28 U.S.C. § 636, the Court has reviewed the Petition, all the records and files

herein, and the Report and Recommendation of the United States Magistrate Judge, *de novo*. The Court concurs with and adopts the findings, conclusions, and recommendations of the Magistrate Judge.

    IT IS ORDERED that Judgment be entered: (1) approving and adopting this Report and Recommendation; and (2) directing that Judgment be entered granting a writ of habeas corpus as follows: The Board shall find Petitioner suitable for parole at a hearing to be held within 30 days of the finality of this decision, unless new, relevant and reliable evidence of her conduct in prison or change in mental status subsequent to the September 11, 2006, parole consideration hearing is introduced that is sufficient to support a finding that Petitioner currently poses an unreasonable risk of danger to society if released on parole; and in the absence of any such new relevant and reliable evidence showing Petitioner's unsuitability for parole, the Board shall calculate a prison term and release date for Petitioner in accordance with California law. Further, if the release date already has lapsed, Respondent shall, within ten days of the Board's hearing, either release Petitioner forthwith if his release date lapsed more than three years earlier, or release Petitioner on parole for that period of her three year parole term that remains if the release date lapsed less than three years earlier.

REPORT AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE
OSWALD PARADA, United States Magistrate Judge.
    This Report and Recommendation is submitted to the Honorable David O. Carter, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 194 of the United States District Court for the Central District of California.

**I.**
***PROCEEDINGS***
    On October 31, 2007, Anthony Nix

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3055398 (C.D.Cal.)
(Cite as: 2009 WL 3055398 (C.D.Cal.))

("Petitioner"), filed the current Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254. Petitioner challenges the Board of Parole Hearings' ("Board" or "BPH") September 11, 2006, decision finding him unsuitable for release on parole. On January 22, 2008, Respondent filed an Answer to the Petition. On February 11, 2008, Petitioner filed a Traverse to the Answer. Thus, this matter is now ready for de- cision.

## II.
### FACTUAL BACKGROUND
A. *Commitment Offense.*[FN1]

> FN1. The facts of the commitment offense are taken from the transcript of the hearing and based on a summary of the commitment offense prepared by Correctional Counselor Kirkpatrick. (Lodgment 3 at 7.)

The Board read the following summary of facts of the commitment offense as prepared by Correctional Counselor Kirkpatrick for the October 2005 calendar:

"On July 14, 1991 at 12:27 a.m. Riverside Sheriff's Deputies responded to 4055 Briggs ... Avenue in ... Rubidoux, ... area of Riverside County in regard to an assault with a deadly weapon that had just occurred. As the deputy approached the area a witness flagged him down and indicated they just ran around the corner and she pointed eastbound on Tilton ... Street. The deputy observed the defendant and co-defendant[ ] David Bernich ... and made contact with them. When asked what happened at the Briggs apartment, co-defendant indicated 'That guy broke a window at my house. I was just defending myself, my family' "-I'm going to read verbatim: " 'my family could have been hurt'. The deputy then asked who hit the victim and co-defendant replied 'we did.' The co-defendant was observed to have fresh blood on his right hand and he initially identified himself to the deputy as Jamie ... Dominguez.... The codefendant was then asked,

'Where is the person you hit?' He responded, quote, 'He is laying there at the apartments' end quote. Both the suspects were placed into custody at that time and returned to where the victim was. While en route to the location, the co-defendant spontaneously indicated, 'we were just defending ourselves. He came at us with a knife so we hit him with some sticks'. The defendant did not make any statement at this time. The victim, Donald Howard, was pronounced dead at the scene. A follow-up investigation was conducted and it was determined that the victim had been at the co-defendant's apartment earlier prior to the assault. The victim had gotten into an argument with his girlfriend and was being very loud at the co-defendant's apartment. The co-defendant told him to leave, at which time the victim exited the apartment and as he was leaving broke a window, which shattered glass on the codefendant's sleeping infant. The codefendant then woke up the defendant who was sleeping in one of the bedrooms and they pursued the victim. The defendants confronted the victim at the above location at which time they argued and began hitting one another. The victim had apparently gotten control of the situation and defendants fled at that time. They returned with sticks and a garden hoe. The victim walked up the stairs to an apartment, retrieved a butcher knife and returned. The defendants then proceeded to beat the victim until he was dead. Witnesses indicated that once the victim had fallen to the ground and was unconscious, the defendants continued beating him. The autopsy report indicates that a penetrating jab to the heart and additional blow to the temple area of the head caused the death. The blow to the temple area penetrated through the skull. Both defendants were arrested and booked for the murder at that time and placed into custody. When asked if he had any comments he, Nix, indicated, quote, 'Not really' end quote. He knows what happened and it was a quote, 'accident' end quote. He didn't mean to harm the victim and he's sorry it happened. He declined further comment."

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3055398 (C.D.Cal.)
(Cite as: 2009 WL 3055398 (C.D.Cal.))

*2 (Lodgment 3 at 7-10.)

**B. *Trial and Sentencing.***

On February 20, 1992, Petitioner was con-
victed by a jury of second degree murder. (Pet. at
2.) On March 31, 1992, Petitioner was sentenced to
a state prison for a term of fifteen-years-to-life plus
one year. (*Id.;* Lodgment 1.) Petitioner became eli-
gible for parole consideration on March 14, 2002.
(Lodgment 3 at 1.)

**C. *Parole Hearing.***

On September 11, 2006, Petitioner appeared
before the Board for a subsequent parole considera-
tion hearing, the one at issue in this matter.
(Lodgment 3.) This was his second hearing after
becoming eligible for parole in 2002.[FN2] (*Id.* at 69.)

> FN2. Petitioner's first hearing was held on
> July 2, 2001, and parole was denied for
> three years. The next hearing was sched-
> uled for October 18, 2004. Petitioner stipu-
> lated to unsuitability at that time and the
> panel recommended he stay discipline free,
> get additional self-help, and earn positive
> chronos, and set the next hearing for the
> 2005 calendar. (Pet.Ex. C.)

The Board determined that Petitioner was un-
suitable for parole for the following reasons:

We considered many factors. We started with the
commitment offense and the Panel noted that the
offense was carried out in an especially cruel and
callous manner.... The motive for the crime, it ba-
sically started as a fight and at a point in time
when Mr. Howard was again no longer a threat
that's when the fight ended and that's when the,
essentially the assault began.... So far as the prior
record, the Panel noted that you had failed to
profit from society's previous attempts to correct
your criminality, and that included time at a ju-
venile ranch and also a term at juvenile hall. In so
far as the criminality, this was for sale of cocaine,
a controlled substance. So far as your institution-

al behavior, the Panel's noted that there's a couple
of areas that [need] some improvement, we think
you'd definitely served to have vocational certi-
ficates. You've got some pieces of vocations, but
to complete one if it's possible. And one of the
other areas that the Panel's concerned that you
haven't sufficiently participated in some benefi-
cial self-help programs and we're going to recom-
mend two different programs to you today. One
is a parenting class ... and [the second is] to do
some additional work in the area of anger man-
agement.... Misconduct while incarcerated, the
Panel noted that you did have seven 128A coun-
seling chronos, the last one being July 13, 1998,
and that's for a failure to report and that you did
have a 12-26-03 115 for refusing to work. The
panel noted that it's administrative, but it's a
115.... Psychological report, June of 2001, by Dr.
Lille, ... it's generally a favorable report. It's risk
assessment now, unfortunately, is a little bit
dated.... Parole plans, your parole plans are a
little bit weak.... [T]he 3042 notices resulted in an
appearance from a representative from the Dis-
trict Attorney's Office. You heard him indicate
opposition to the granting of parole .... As a result
of the last 115, the Panel still finds that your
gains are recent and you're going to have to
demonstrate an ability to maintain these over an
extended period of time. Specific reasons for the
finding [of a two-year denial] is follows: that you
committed an offense in an especially cruel man-
ner, specifically that Mr. Donald Howard was
beaten to death. He had two fatal wounds, one
was to the heart and the other was to the head.
The instrument that was used was a hoe. Offense
was carried out in a very dispassionate manner,
and again, once the victim was on the ground and
he dropped the knife he no longer posed a partic-
ular threat to you at that point. In so far as the of-
fense being carried out in an exceptionally cal-
lous disregard for human suffering, and again, the
Panel noted that the victim was on the ground, he
was no longer a threat, had it ceased at that point
in time it would have been probably closer to
what you described as a fight. But at that point in

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3055398 (C.D.Cal.)
(Cite as: 2009 WL 3055398 (C.D.Cal.))

time it changed from the fight, and again, the motive in the separate decision we noted that this thing started as a fight, a dispute, where you were drawn into it unfortunately, while asleep, and made to come out and confront this individual. So far as the psychological report that was done by Dr. Lille in June of 2001, the doctor indicates a longer period of observation and evaluation would be appropriate, therefore a longer period of observation and evaluation's going to be required before the Board could find that you're suitable for parole. During this next two-year period we want you to, to a certain Degree, become and remain disciplinary free, to the extent that the programs are available upgrade yourself vocationally and get a vocational certificate, continue to participate in your self-help associated with the AA/ NA, to give serious thought to our recommendations around the parenting class and anything else that you can do in anger management. And again, if those programs aren't available don't let that be an obstacle to you, going out and showing initiative for the next Panel and bringing something to them that would indicate that you listened to us today, you took it heart and you did something about it ....

*3 (*Id.* at 61-71.)

The Panel noted Petitioner's positive work reports, the fact that he completed his GED while in prison, and the fact that he had participated in various vocational courses, including auto mechanics, mill and cabinetry, office services clerk, chaplain clerk, refrigeration and air conditioning, but had no certificates of completion from those courses.[FN3] (*Id.* at 40-41, 46-47, 49-50, 69.) The Panel also noted Petitioner's continued involvement in NA, that he was currently enrolled in a life skills program entitled Work, Education and Business Planning, was active in the Islamic faith, and had attended several self-help workshops. (*Id.* at 49-50.) The next hearing was set for two years later. (*Id.* at 72.)

FN3. Petitioner explained that he had taken a number of vocational courses but received no certificates because the classes had been shut down. (Lodgment 3 at 41.)

### III.
### PROCEDURAL BACKGROUND

On September 11, 2006, the Board informed Petitioner he was unsuitable for parole. (Lodgment 3.)

On March 19, 2007, Petitioner filed a habeas petition in the Riverside County Superior Court. (Lodgment 4.) On March 27, 2007, the superior court denied his petition. (Lodgment 5.)

On June 20, 2007, Petitioner filed a habeas petition in the California Court of Appeal. (Lodgment 6.) On July 3, 2007, the court of appeal summarily denied the petition. (Lodgment 7.)

On or about July 10, 2007, Petitioner filed a habeas petition in the California Supreme Court. (Lodgment 8.) On September 12, 2007, the supreme court summarily denied the petition. (Lodgment 9.)

### IV.
### PETITIONER'S CLAIMS

Petitioner contends that the Board's decision, based on the unchanging facts of the crime, bears no nexus to his current parole risk; that his rights to due process were violated because he has served his primary prison term; and that the Board did not properly weigh all relevant evidence that would show his suitability. (*See* Pet. Mem. P. & A. at 6.)

### V.
### STANDARD OF REVIEW

The standard of review applicable to Petitioner's claims is set forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3055398 (C.D.Cal.)
**(Cite as: 2009 WL 3055398 (C.D.Cal.))**

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). Further, a State court factual determination must be presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of State court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). To determine what, if any, "clearly established" United States Supreme Court law exists, the court may examine decisions other than those of the United States Supreme Court. *La-Joie v. Thompson,* 217 F.3d 663, 669 n. 6 (9th Cir.2000); *Van Tran v. Lindsey,* 212 F.3d 1143, 1154 (9th Cir.2000), *overruled on other grounds by Lockyer v. Andrade,* 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). Ninth Circuit cases "may be persuasive." *Duhaime v. Ducharme,* 200 F.3d 597, 600 (9th Cir.1999). On the other hand, a state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law, if no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court. *Brewer v. Hall,* 378 F.3d 952, 955 (9th Cir.2004); *see also Carey v. Musladin,* 549 U.S. 70, 127 S.Ct. 649, 654, 166 L.Ed.2d 482 (2006) (in the absence of a Supreme Court holding regarding the prejudicial effect of spectators' courtroom conduct, the state court's decision could not have been contrary to or an unreasonable application of clearly established federal law).

*4 Although a particular State court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. *Williams,* 529 U.S. at 403. A State court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam); *Williams,* 529 U.S. at 405-06. When a State court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by § 2254(d) (1)." *Id.* at 406. However, the State court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early,* 537 U.S. at 8.

State court decisions that are not "contrary to" Supreme Court law may only be set aside on federal habeas review "if they are not merely erroneous, but 'an *unreasonable* application' of clearly established federal law, or are based on 'an *unreasonable* determination of the facts.' " *Early,* 537 U.S. at 11 (citing 28 U.S.C. § 2254(d)). Consequently, a State court decision that correctly identified the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case. *See Williams,* 529 U.S. at 406-10, 413 (e.g., the rejected decision may state *Strickland* rule correctly but apply it unreasonably); *Woodford v. Visciotti,* 537 U.S. 19, 24-25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the State court's application of Supreme Court law was "objectively unreasonable." *Woodford,* 537 U.S. at 27. An "unreasonable application" is different from an erroneous or incorrect one. *Williams,* 529 U.S. at 409-10; *see also Woodford,* 537 U.S. at 25; *Bell v. Cone,* 535 U.S. 685, 686, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3055398 (C.D.Cal.)
(Cite as: 2009 WL 3055398 (C.D.Cal.))

## VI.
### *DISCUSSION*

**A. *The Current State of the Law on "Some Evid-
ence".***

**1. *Ninth Circuit and Federal Law.***

As a matter of clearly established Supreme
Court law, the Board's or Governor's decision to
deny parole must be supported by "some evidence"
with some indicia of reliability and cannot other-
wise be arbitrary. *Irons v. Carey,* 505 F.3d 846, 851
(9th Cir.2007); *Sass v. Cal. Bd. of Prison Terms,*
461 F.3d 1123, 1129 (9th Cir.2006) (quoting *Super-
intendent v. Hill,* 472 U.S. 445, 457, 105 S.Ct.
2768, 86 L.Ed.2d 356 (1985)); *Jancsek v. Or. Bd. of
Parole,* 833 F.2d 1389, 1390 (9th Cir.1987)
(adopting the "some evidence" standard set forth by
the Supreme Court in *Hill* ); *see also Biggs v. Ter-
hune,* 334 F.3d 910, 915 (9th Cir.2003); *McQuillion
v. Duncan,* 306 F.3d 895, 904 (9th Cir.2002).

*\*5 In denying parole, the Board or Governor
may rely solely on unchanging factors such as the
circumstances or gravity of the commitment of-
fense, and the prisoner's conduct prior to imprison-
ment. *See Irons,* 505 F.3d at 851-53; *Sass,* 461 F.3d
at 1129; *Biggs,* 334 F.3d at 916; *Jancsek,* 833 F.2d
at 1390-91. The Ninth Circuit has observed that re-
liance on such unchanging factors to deny parole
might eventually constitute a violation of due pro-
cess. *See Biggs,* 334 F.3d at 916-17; *see also Irons,*
505 F.3d at 853; *Sass,* 461 F.3d at 1129. However,
that observation by the Ninth Circuit in *Biggs* con-
stituted merely dicta. *See Kunkler v. Muntz,* 226
Fed. Appx. 669, at \*2 (9th Cir.2007) (referring to
the Ninth Circuit's comments in *Biggs* about the
continued reliance on the gravity of the commit-
ment offense as dictum).

By way of contrast to the Ninth Circuit's expli-
cit holding that the "some evidence" standard is
clearly established under Supreme Court law for
AEDPA purposes, the Ninth Circuit has never held
that, as a matter of clearly established Supreme
Court law, due process is violated by the Board's or
the Governor's continued reliance on the unchan-

ging circumstances of the commitment offense to
deny parole.[FN4] *See Medway v. Schwarzenegger,*
257 Fed. Appx. 44 (9th Cir.2007) ("there is no
'clearly established Federal law' ... that limits the
number of times a parole board or the governor
may deny parole based on the brutality of the com-
mitment offense") (citation omitted); *Culverson v.
Davison,* 237 Fed. Appx. 174, at \*3 (9th Cir.2007)
(same). [FN5]

> FN4. *But see Hayward v. Marshall,* 512
> F.3d 536, 542 (9th Cir.2008), *rehearing en
> banc granted by* 527 F.3d 797 (9th
> Cir.2008). Although application of the
> some evidence standard in this manner is
> precisely how the Ninth Circuit framed the
> standard in the now uncitable *Hayward* de-
> cision, this Court does not rely on *Hay-
> ward* in concluding that some evidence
> must support the decision of the Board or
> Governor and not simply the enumerated
> factors. Rather, the Court relies on the
> *Irons* court's instruction to frame applica-
> tion of the some evidence standard by ref-
> erence to the State's statutes and regula-
> tions coupled with the California Supreme
> Court's recent clarification of the proper
> construction of those statutes and regula-
> tions.

> FN5. *Kunkler, Medway,* and *Culverson* are
> citable for their persuasive value pursuant
> to Ninth Circuit Rule 36-3.

**2. California Law.**

Under *Irons,* the Court's analysis of whether
the Board's or the Governor's unsuitability determ-
ination is supported by some evidence is framed by
the "statutes and regulations governing parole suit-
ability" determinations in California. *See Irons,* 505
F.3d at 851. First, the Court must determine the
findings "necessary to deem a prisoner unsuitable
for parole." *Id.* Then, the Court must review the re-
cord to determine whether the state court's decision
holding that these findings were supported by
"some evidence" constituted an unreasonable ap-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3055398 (C.D.Cal.)
**(Cite as: 2009 WL 3055398 (C.D.Cal.))**

plication of the "some evidence" standard. *Id.* However, "[t]o determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.' " *Sass,* 461 F.3d at 1128.

California law mandates that a parole release date be set unless the panel determines that "the gravity of the current convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offenses, is such that consideration of public safety requires a more lengthy period of incarceration ...." Cal.Penal Code § 3041(b). The Board is charged with determining "whether the life prisoner is suitable for release on parole," and whether "the prisoner will pose an unreasonable risk of danger to society if released from prison." Cal.Code Regs. tit. 15, § 2402(a). In determining suitability for parole, the panel is directed to consider "all relevant, reliable information," and is guided by circumstances tending to show suitability and unsuitability for parole.[FN6] *Id.* at § 2402(b)-(d).

> FN6. The California regulation provides that the information to be considered includes:
>
> All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the

prisoner's suitability for release.

Cal.Code Regs. tit. 15, § 2402(b).

*6 Title 15, section 2281, of the California Code of Regulations sets forth, as a guide, a nonexhaustive list of factors that are to be considered by the board in evaluating parole suitability or unsuitability. Factors that weigh against parole include that a prisoner: (1) carried out the offense in an especially heinous, atrocious, or cruel manner, e.g., the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering, involved an attack on multiple victims, involved abuse or mutilation of the victim, or the motive for the crime was inexplicable or trivial in relation to the offense; (2) has a prior record of violence; (3) has an unstable social history; or (4) has engaged in serious misconduct in prison. Cal.Code Regs. tit. 15, § 2402(c).

Factors that weigh in favor of parole include that the prisoner: (1) has shown signs of remorse, including attempting to repair the damage or indicating that he understands the nature and magnitude of the offense; (2) has no juvenile record; (3) has a stable social history; (4) is of an age that reduces the probability of recidivism; (5) committed the crime as a result of significant stress in his life; (6) has made realistic plans for release or has developed marketable skills that can be put to use upon release; or (7) has engaged in institutional activities that indicate an enhanced ability to function within the law upon release. *Id.* § 2402(d).

It has now been clarified under recent California law [FN7] that the task of the Board is to determine whether the prisoner would be a danger to society if he or she were paroled:

> FN7. Because the recent California Supreme Court cases of *In re Lawrence,* 44 Cal.4th 1181, 82 Cal.Rptr.3d 169, 190 P.3d 535 (2008) and *In re Shaputis,* 44 Cal.4th 1241, 82 Cal.Rptr.3d 213, 190 P.3d 573 (2008), merely clarify existing California

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3055398 (C.D.Cal.)
(Cite as: 2009 WL 3055398 (C.D.Cal.))

law there is no need to analyze the retroactive effect of those decisions:

> The relevant determination for the Board and the Governor *is, and always has been,* an individualized assessment of the continuing danger and risk to public safety posed by the inmate. If the Board determines, based upon an evaluation of each of the statutory factors as required by statute, that an inmate remains a danger, it can, and must, decline to set a parole date.... Notably, despite the conclusion we reach in the present case, we reiterate our recognition in *Dannenberg* that pursuant to section 3041, subdivision (b), the Board has the express power and duty, in an individual case, to decline to fix a firm release date, and thus to continue the inmate's indeterminate status within his or her life maximum sentence, if it finds that the circumstances of the inmate's crime or criminal history *continue* to reflect that the prisoner presents a risk to public safety.

> *In re Lawrence,* 44 Cal.4th at 1227-28, 82 Cal.Rptr.3d 169, 190 P.3d 535 (first emphasis added).

[A] parole release decision authorizes the Board (and the Governor) to identify and weigh only the factors relevant to predicting "whether the inmate will be able to live in society without committing additional antisocial acts." ... These factors are designed to guide an assessment of the inmate's threat to society, *if released,* and hence could not logically relate to anything but the threat *currently* posed by the inmate....

...

[U]nder the statute and governing regulations, the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if,

those circumstances are probative to the determination that a prisoner remains a danger to the public. It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public.

*In re Lawrence,* 44 Cal.4th 1181, 1205-06, 1212, 82 Cal.Rptr.3d 169, 190 P.3d 535 (2008) (citations omitted) (abrogating prior California Supreme Court decisions in *In re Rosenkrantz,* 29 Cal.4th 616, 128 Cal.Rptr.2d 104, 59 P.3d 174 (2002) and *In re Dannenberg,* 34 Cal.4th 1061, 23 Cal.Rptr.3d 417, 104 P.3d 783 (2005), to the extent that those decisions implied that a particularly egregious commitment offense always will provide the requisite modicum of evidence supporting the Governor's decision).

*\*7* The *In re Lawrence* court clarified that "the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense" and a parole decision is not "dependent solely upon whether the circumstances of the offense exhibit viciousness above the minimum elements required for conviction of that offense." *Id.* at 1221, 82 Cal.Rptr.3d 169, 190 P.3d 535. "Accordingly, when a court reviews a decision of the Board or the Governor, the relevant inquiry is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings" supporting suitability or unsuitability for parole. *Id.* at 1212, 82 Cal.Rptr.3d 169, 190 P.3d 535; *see also In re Shaputis,* 44 Cal.4th 1241, 82 Cal.Rptr.3d 213, 190 P.3d 573 (2008) (companion case to *In re Lawrence* ).

With respect to the Board's or Governor's reliance solely on the commitment offense to deny parole, the California Supreme Court also held:

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3055398 (C.D.Cal.)
(Cite as: 2009 WL 3055398 (C.D.Cal.))

[T]he aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's preor post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.

*In re Lawrence,* 44 Cal.4th at 1214, 82 Cal.Rptr.3d 169, 190 P.3d 535. The court went on to note that in the case where i) an inmate's rehabilitation and suitability for parole is overwhelming, ii) the only evidence related to unsuitability is the gravity of the commitment offense, and iii) that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide some evidence that inevitably supports the ultimate decision that the inmate remains a threat to public safety. *Id.* at 1191, 82 Cal.Rptr.3d 169, 190 P.3d 535. Under California law, therefore, "the proper articulation of the standard of review is whether there exists 'some evidence' that an inmate poses a current threat to public safety, rather than merely some evidence of the existence of a statutory unsuitability factor." *In re Shaputis,* 44 Cal.4th at 1254, 82 Cal.Rptr.3d 213, 190 P.3d 573.

Thus, the California Supreme Court has expressly rejected the notion that the mere existence of one or more unsuitability factors described in the State's regulations is itself necessarily sufficient to support the ultimate conclusion that the inmate currently poses an unreasonable risk of danger if released, which is the "focus" of and only relevant determination underpinning the parole decision. *Id.* at 1210, 82 Cal.Rptr.3d 213, 190 P.3d 573. As a matter of California law, the individualized consideration of the specified factors that is due an inmate "requires more than rote recitation of the relevant

factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision the determination of current dangerousness." *Id.*

**\*8** This Court is bound by the California Supreme Court's construction of its own laws. *See Estelle v. McGuire,* 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991): *see also Bradshaw v. Richey,* 546 U.S. 74, 76, 126 S.Ct. 602, 163 L.Ed.2d 407 (2005). Moreover, as noted above, the *Irons* decision itself explicitly instructs that the California statutes and regulations frame the application of the some evidence standard.[FN8]

FN8. Given the *Irons* instruction and the California Supreme Court's recent clarification that the mere existence of one or more of the factors identified in the State's regulations does not necessarily support the conclusion that an inmate poses a current risk of dangerousness if released, this Court joins those other California District Courts that have found that, in order for the some evidence standard to be satisfied, the factors identified by the BPT or Governor in denying parole must themselves support the ultimate conclusion that the inmate's release poses an unreasonable risk of danger to the public. *See, e.g., Adams v. Schwartz,* No. S-05-2237 JAM JFM P, 2008 WL 4224561, at *12-*13 (E.D.Cal. Sept.12, 2008) (granting habeas relief, citing *In re Lawrence* and describing some evidence standard as requiring that "an inmate poses a current threat to public safety, rather than merely some evidence of the existence of a statutory unsuitability factor"); *Tash v. Curry,* No. C 05-2417 CW (PR), 2008 WL 3984597, at *4, *10-*12 (N.D.Cal. Aug.27, 2008) (granting habeas relief, citing *Irons'* direction to look to California law and analogizing case to *In re Lawrence* ); *see also Ortega v. Dexter,* No. 08-4147-CAS(E), 2008

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

Not Reported in F.Supp.2d, 2009 WL 3055398 (C.D.Cal.)
**(Cite as: 2009 WL 3055398 (C.D.Cal.))**

WL 5263833, at *6 (C.D.Cal. Dec.16, 2008) (denying habeas relief, but citing *In re Lawrence* and describing some evidence standard as "not whether the evidence supported any particular factor regarding parole suitability, but rather whether 'some evidence' indicates the prisoner's release unreasonably would endanger public safety").

**B. *Petitioner's Pre- and Post-Conviction History.***
Prior to the commitment offense at age eighteen, Petitioner's only criminal history was in 1989, at age sixteen, for sale of cocaine, a non-violent offense. (Pet. Ex. G at 3.) He was declared a ward of the court and placed at the county's Twin Pines Ranch detention center. (*Id.*)

At the time of the hearing, thirty-two-year-old Petitioner worked as a housing unit porter, and his supervisors indicated he performs his job "extremely well, reports to work 'on-time,' and follows instructions." (*Id.* at 4.) He also was participating in such self-help activities as Narcotics Anonymous (receiving several Certifications of Appreciation), a Life Skills Program titled "Work, Education and Business Planning (WEB) from an Islamic Perspective," and Breaking Barriers (which develops "good belief principles, self-development, and social skills towards corrective change.") (*Id.*) In the past, he had completed programs in Friends Outside National Organization, Creative Conflicts Resolutions, Business Management, Parenting Education, Cage Your Rage, and vocational programs in Electrical Work (Lodgment 3 at 31-32), and Air Conditioning and Refrigeration, reaching the level of foreman in the latter program. (*Id.* at 39-40.) For two years, he voluntarily saw a facility therapist in order to better evaluate his own progress. (*Id.* at 32.) Since 1995, he had been conducting religious services for his fellow Muslim inmates. (*Id.* at 33.)

As reflected by the record, Petitioner's most recent "serious" disciplinary action was a 115,[FN9] classified as "administrative," and received in 2003 for refusing to report to a work assignment. (Pet.

Ex. G at 4.) Prior to that, he had a 115 in 1997 for refusing a direct order, and one in 1995 for being absent from work. (*Id.*) He also had a few 128s: in 1998, for failing to report to a work assignment; in 1995, for being absent from work; in 1994, for failing to obey orders; and in 1992, for failing to obey orders and failing to report to a work assignment. (*Id.*)

> FN9. "When ... minor misconduct recurs after verbal counseling or if documentation of minor misconduct is needed, a description of the misconduct and counseling provided shall be documented on a CDC Form 128-A, Custodial Counseling Chrono." *See* Cal.Code Regs. tit. 15, § 3312(a)(2). "When misconduct is believed to be a violation of law or is not minor in nature, it shall be reported on a CDC Form 115 (Rev.7/88), Rules Violation Report." *See* Cal.Code Regs. tit. 15, § 3312(a)(3). Petitioner received no 115s.

Petitioner's parole plans at the time of the hearing included residing with his mother in Corona and an offer of employment as a trainee in the construction field. (Lodgment 3 at 37-39.)

**C. *Analysis.***
As described above, to support its denial, the Board cited circumstances relating to the commitment offense, Petitioner's prior criminal history, his failure to obtain vocational certificates, his insufficient participation in some "beneficial" self-help programs (recommending a parenting class and some additional anger management), his prison disciplinary record, parole plans that were deemed "a little bit weak," the District Attorney's failure to support release, and a 2001 psychological report that purportedly stated "a longer period of observation and evaluation" was required. (*Id.* at 61-71.)

**1. *The Commitment Offense.***
*9 With respect to the circumstances relating to the commitment offense, the Board noted that it was carried out "in an especially cruel and callous

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3055398 (C.D.Cal.)
**(Cite as: 2009 WL 3055398 (C.D.Cal.))**

manner." (*Id.* at 61.) The Board supported these findings on the facts that Petitioner and codefendant Bernich beat the victim to death, and continued to beat him even after he had dropped the butcher knife and no longer posed a threat. (*Id.*) The Board also mentioned that the motive initially was that it started as a fight but that when the victim dropped the knife and was no longer a threat, "that's when the fight ended and that's when, the essentially the assault began." (*Id.*) The Board, however, relied on Petitioner's commitment offense as "some evidence" of unsuitability without proper consideration of the impact of fourteen years of incarceration on the reliability of these factors in determining Petitioner's current dangerousness. (*Id.*)

The Court finds Petitioner's case to be just the sort of case the Ninth Circuit envisioned in *Biggs, Sass,* and *Irons,* and that the California Supreme Court envisioned in *In re Lawrence:* where the commitment offense is relied on to deny parole notwithstanding the prisoner's exemplary behavior and evidence of rehabilitation since the commitment offense.

The crime here was aberrant behavior, and not part of a pattern of continuing violent criminality. [FN10] *See* Cal.Code Regs. tit. 15, §§ 2402(d)(6) (no significant history of violent crime as a suitability factor). Nor were any of Petitioner's prison disciplinary actions were for violent behavior. The murder, while terrible, was not notably worse than other second-degree murders. Most importantly, there was nothing articulated by the Board to support a nexus between this factor and a conclusion that Petitioner posed a current risk of violence. In fact, the evidence was all to the contrary.

> FN10. Petitioner's only prior criminal history was as a juvenile for sale of cocaine, a non-violent offense. (Pet. Ex. G at 4.); *see also infra,* Part VI.C.2.

There are two psychological evaluations in the record: one completed in 1995, and one in 2001. ( *See* Pet. Ex. E ("1995 Report" and "2001 Report").)

Petitioner's 2001 psychological evaluation indicated a "low probability" that Petitioner would be a danger to others or society if released. (2001 Report at 10.) In this forensic psychological evaluation, the psychologist concluded:

> If released to the community, there is a lowered risk with a related low probability that he would be a danger to others or society. He does appear to have matured, both intellectually and spiritually. It generally appears that his degree of violence was an isolated event and his history prior to and since being placed in State Prison is otherwise free of aggressive behavior or violence. There is one exception, although not proven, which involves a police complaint of spousal battery in 1991.
>
> ...
>
> ... The risk of violence typically subsides as individuals reach their late 30's or early 40's in the majority of cases. There is only minor concern in this case that Inmate Nix will perform any acts of violence in the future due to his increased insight, awareness and maturation. Predicting which individuals will remain violent is clearly difficult to ascertain without actually releasing the individual back into society at some risk. However, in this case the risk appears low.
>
> **\*10** The risk for future violence in the case of Inmate Nix is low when compared to other inmates based on his score on the Hare PCL-R. There does not appear to be a substantial risk to society at this time.... There is evidence to support that in a less controlled setting, such as a return to the community, he will be able to hold his current gains.... Significant risk factors for re-offending and precursors to violence are considered to be significantly low in comparison to other inmates.

(*Id.* at 11-12, 82 Cal.Rptr.3d 169, 190 P.3d 535.) The psychologist also stated that "[i]t generally appears that his degree of violence was an isol-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

Not Reported in F.Supp.2d, 2009 WL 3055398 (C.D.Cal.)
(Cite as: 2009 WL 3055398 (C.D.Cal.))

ated event and his history prior to and since being placed in State Prison is otherwise free of aggressive behavior or violence." (*Id.* at 11, 82 Cal.Rptr.3d 169, 190 P.3d 535 .)

The 1995 psychological evaluation did not comment on Petitioner's risk of danger to society, but did opine that Petitioner "does not seem likely to have any disciplinary problems during his incarceration." (1995 Report at 2.) That psychologist recommended only that Petitioner complete his GED, continue his work assignment, obtain vocational training, and attend AA meetings when available. (*Id.*)

As noted by the court in *In re Lawrence,* the aggravated nature of the crime itself does not provide some evidence of current dangerousness unless the record also establishes that something in Petitioner's pre- or post-incarceration history, or his current demeanor and mental state, indicates that the implications regarding his dangerousness that derive from his commission of the commitment offense remain probative to a determination of a continuing threat to public safety. *Lawrence,* 44 Cal.4th at 1214, 82 Cal.Rptr.3d 169, 190 P.3d 535. With respect to the circumstances of the commitment offense, committed almost fourteen years prior to the hearing, a review of the Board's decision and the entire record indicates that the Board articulated no nexus whatsoever between those circumstances and Petitioner's current dangerousness.

As the Ninth Circuit has noted:

While relying upon petitioner's crime as an indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstances-after nearly two decades of incarceration and half a dozen parole suitability hearings-violates due process because petitioner's commitment offense has become such an unreliable predictor of his present and future dangerousness that it does not satisfy the "some evidence" standard. After nearly twenty years of rehabilitation, the ability

to predict a prisoner's future dangerousness based simply on the circumstances of his or her crime is nil.

*Rosenkrantz v. Marshall,* 444 F.Supp.2d 1063, 1084 (C.D.Cal.2006): *see also In re Burdan,* 169 Cal.App.4th 18, 29, 86 Cal.Rptr.3d 549 (2008). In *Burdan,* the court noted that the murder involving the deliberate shooting of the petitioner's wife multiple times at close range did not constitute "some evidence" of an exceptionally callous disregard for human suffering or that petitioner's release would pose an unreasonable risk of danger to society in the face of overwhelming evidence of his suitability for parole. *Id.* at 36, 86 Cal.Rptr.3d 549. As discussed by the court, all murders involve some degree of callousness, but the measure of atrociousness is whether the crime was *particularly* heinous, atrocious, or cruel. *Id.*

**\*11** This case is similar to *Burdan.* Here, the Board recited the facts of the murders, terming the circumstances "especially cruel and callous." (Lodgment 3 at 61.) Pursuant to the California Code of Regulations, examples of a crime that is especially heinous, atrocious, or cruel include those with multiple victims, offenses carried out in a dispassionate and calculated manner, those in which the victim was abuse, defiled or mutilated, where the manner of committing the offense showed an exceptionally callous disregard for human suffering, or where the motive was inexplicable or trivial in relation to the offense. Cal.Code Regs. tit. 15, § 2281(c)(1). None of these factors are present in this case.

As in *In re Burdan,* it is evident that Petitioner's crime was "cruel and callous," and even assuming it was more cruel and callous than the typical second degree murder because the victim was beaten even after he had dropped the butcher knife with which he was threatening Petitioner and co-defendant Bernich and fallen to the ground, the bigger issue is that there still was no evidence cited by the Board that this determination supported a finding that Petitioner remains a current threat to public

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3055398 (C.D.Cal.)
**(Cite as: 2009 WL 3055398 (C.D.Cal.))**

safety. In the face of overwhelming evidence of Petitioner's rehabilitation in prison and suitability for parole, exhibited by his lack of serious disciplinary violations, his participation in NA and other self-help groups, his educational advancement, his vocational efforts and prison work, and his positive psychological evaluation, the Court finds that the unchanging circumstances of the commitment offense do not constitute "some evidence" bearing "indicia of reliability" to support the conclusion that Petitioner continues to pose an unreasonable risk to public safety. *In re Lawrence,* 44 Cal.4th at 1211-12, 82 Cal.Rptr.3d 169, 190 P.3d 535 (there must be a rational nexus between the facts relied upon by the Board and the ultimate conclusion of current dangerousness); *see also McQuillion,* 306 F.3d at 904; *Tash,* 2008 WL 3984597, at *12 (finding Governor's parole reversal based on circumstances of commitment offense unsupported by some evidence and arbitrary in light of "the extensive evidence of Petitioner's in-prison rehabilitation and exemplary behavior" after 22 years of incarceration on a 17-year-to-life sentence); *Adams,* 2008 WL 4224561, at *11 (finding that "petitioner's age, health, religious beliefs, stable family history and present relationships, lack of prison disciplinaries since 1997, commitment to sobriety, and psychologists' reports demonstrate he no longer poses an unreasonable risk to public safety" and that parole rescission based on circumstances of commitment offense and criminal record was not supported by some evidence where petitioner had served fourteen years past minimum eligible parole date).[FN11] Accordingly, the Board's reliance on the unchanging circumstances of the commitment offense to deny parole was not based on "some [relevant and reliable] evidence" in the record, and, therefore, does not support a conclusion that Petitioner is a current danger to society.

> FN11. As of the hearing date, Petitioner had served more than four years beyond his minimum eligible parole date.

**2. Prior Criminal History.**

*12 In support of its denial, the Board found that Petitioner had failed to profit from society's previous attempts to correct his criminality, and noted that he had spent time at a juvenile ranch and juvenile hall for sale of cocaine. (Lodgment 3 at 64.) Petitioner's prior criminal record consisted of a conviction as a sixteen-yearold juvenile for selling a controlled substance, for which he was deemed a ward of the court and sent to Twin Pines Ranch, a detention facility. (2001 Report at 5.) The Board did not explain how this minimal prior criminal record or purported "failure to profit" from a stint in a juvenile detention facility at age sixteen, for a non-violent offense, was probative of Petitioner's current dangerousness nearly seventeen years later.

In the face of the evidence of Petitioner's rehabilitation before the Panel recounted above, the Court finds that Petitioner's seventeen-year-old non-violent criminal record did not constitute "some evidence" of Petitioner's current dangerousness if released. *In re Burdan,* 169 Cal.App.4th at 29, 86 Cal.Rptr.3d 549 ("Where one or more factors are used to support a denial of parole, the relevant inquiry is whether those factors, when considered in light of the other factors in the record, are predictive of current dangerousness of the inmate.") (citing *Shaputis,* 44 Cal.4th at 1254-55, 82 Cal.Rptr.3d 213, 190 P.3d 573).

**3. Prison Disciplinary Record.**

In support of its denial, the Board also relied on Petitioner's post-incarceration disciplinary record, specifically his most recent 115, received in 2003, almost three years prior to the hearing. (Lodgment 3 at 66.) With respect to this 115 the Board stated:

> The panel noted that it's administrative [for failure to report to work], but it's a 115. You need to get that one a little bit further behind you. I think you're generally going to find most of the Panels speak about a five-year period. If you've got that thing about five years behind you don't reset the clock, and by resetting the clock get yourself another one. Let that one continue to get further and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3055398 (C.D.Cal.)
(Cite as: 2009 WL 3055398 (C.D.Cal.))

further behind you to the point where it will no longer be of any significance.... As a result of the last 115, the Panel still finds that your gains are recent and you're going to have to demonstrate an ability to maintain these over an extended period of time.

(Id. at 66, 68-69, 82 Cal.Rptr.3d 213, 190 P.3d 573.)

Again, the Board did not explain how this 115, for a non-violent, admittedly administrative-type offense, was probative of Petitioner's current dangerousness. As discussed in the 2001 psychological report, *none* of Petitioner's disciplinaries during his then ten-year incarceration, several of which involved a failure to report to work similar to the 115 received in 2003, reflected any incident of aggression, and none were indicative of any specific difficulty accepting authoritarian or strict supervision as may be needed in the community. (2001 Report at 5, 7.)

Additionally, prior to this 2003 disciplinary action, the last 115 was in 1997, nine years before the hearing and six years before the 2003 action. Just how or why this 2003 administrative 115 wiped out any of Petitioner's prior "gains," resetting the clock for another five-year period, defies logic and explanation. In fact, the Board's mention of an apparently routinely imposed five-year penalty period for 115s, casually imposed by this panel even for a 115 as insignificant as this one, is troubling and indicative of the lack of thought put into whether anything in the pre- and post-incarceration record of this Petitioner actually supported a finding that he is currently a danger. Such a "penalty" in this case not only is unsupported by "some evidence," but the Court finds that it is entirely arbitrary.

**4. *Failure to Obtain Vocational Certificates.***
**\*13** In support of its denial, the Board stated that Petitioner definitely would be well-served to have vocational certificates in his record. They stated he has "some pieces of vocations," but needs to "complete one if it's possible." (Lodgment 3 at 65.)

As previously discussed, Petitioner had completed vocational training in Electrical Work, and in Air Conditioning and Refrigeration during his incarceration. Since the time of the prior hearing, he had attended training in auto mechanics, mill and cabinetry, office services, chaplain clerk, and refrigeration and air conditioning. As he explained to the Board, however, he was unable to obtain any completion certificates because each of those classes had been shut down. (Id. at 41, 82 Cal.Rptr.3d 213, 190 P.3d 573.)

Again, the Board panel failed to articulate how Petitioner stood to benefit from any further vocational programming, or why his extensive participation in, but inability to complete a vocational program due to circumstances outside his control, indicated that he posed a current risk of violence if released. Since the 2001 parole hearing, Petitioner had simply stayed on the same productive, rehabilitative path he had been on prior to the 2001 hearing, maintaining prison employment, continuing his educational and vocational advancement, and amassing no significant prison disciplinary reports or infractions that reflected a need for further rehabilitation through programming. Thus, the Board's reliance on Petitioner's failure to obtain any additional vocational certificates since the 2001 hearing, to the extent this factor was used as a basis for its unsuitability finding, was not supported by any evidence having any indicia of reliability. Rather, it too, was arbitrary. Put another way, there was no evidence before the Board to support a finding that further vocational training was necessary to Petitioner's rehabilitation. *See In re Singler,* 169 Cal.App.4th 1227, 1242, 87 Cal.Rptr.3d 319 (2008) (psychologist opined that inmate was "free from the customary concerns with regard to public safety, emotional stability and personal responsibility" and that limited clinical services were more wisely used on other prisoners).

Accordingly, the Court finds that Petitioner's lack of completed vocational programming since

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3055398 (C.D.Cal.)
**(Cite as: 2009 WL 3055398 (C.D.Cal.))**

the last parole hearing did not constitute "some evidence" of his current dangerousness if released.

**5. Self-Help Programming.**

In support of its denial, the Board stated that it was "concerned" that Petitioner had not "sufficiently participated in some beneficial self-help programs" and recommended two different programs to him: one a parenting class, and the other anger management. (Lodgment 3 at 65.) They Board went on:

> [W]e were especially taken today with your admission about the early difficulties when you had that domestic violence situation involving parenting skills at that time, and you were young, you were a lot younger at that time, but the only [thing] I can tell you is the parent, pressures of being a parent now are even greater than they were then. Particularly as they get older and the skills you're going to need change from parenting an infant to parenting a teenager. Big difference. Big difference.

*14 (*Id.* at 65-66, 87 Cal.Rptr.3d 319.)

Preliminarily, the Board's disingenuous comment that Petitioner had not sufficiently participated in self-help programs is arbitrary and wholly without merit. As previously discussed, since the prior hearing, Petitioner had participated in numerous self-help programming classes: Narcotics Anonymous (receiving several Certifications of Appreciation), a Life Skills Program titled "Work, Education and Business Planning (WEB) from an Islamic Perspective," and Breaking Barriers (a program which develops "good belief principles, self-development, and social skills towards corrective change.") (*Id.* at 31-32, 87 Cal.Rptr.3d 319.) Since 1995, he had been conducting religious services for his fellow Muslim inmates. (*Id.* at 33, 87 Cal.Rptr.3d 319.) In the past, he had completed programs in Friends Outside National Organization, Creative Conflicts Resolutions, Business Management, two classes in Parenting Education, two courses in anger management, and Cage Your

Rage. (*Id.;* 2001, 87 Cal.Rptr.3d 319 Report at 3.) For two years, he voluntarily saw a facility therapist in order to better evaluate his own progress. (Lodgment 3 at 32.) In his 2001 report, the psychologist noted that Petitioner "has worked very hard on many avenues to self-improvement" and had a commitment to a clean and sober lifestyle which is "well ingrained." (2001 Report at 11.) The psychologist also reported a "high level of motivation to continue his education, self-improvement skills, and vocational skills since entering State Prison." (*Id.* at 3, 87 Cal.Rptr.3d 319.) He opined that even "in a less controlled setting, such as a return to the community," Petitioner would be able to "hold his current gains," and went no further than recommending Petitioner maintain involvement in religious activities, recovery programs as available, and activities "that will *maintain* his deeper insight and understanding into the factors that led to his violent Life Crime." (*Id.* at 12, 87 Cal.Rptr.3d 319.)

With respect to the "domestic violence situation" referred to by the Board, Petitioner was having relationship problems with his girlfriend in 1991 and "didn't know how to be a father." (Lodgment 3 at 44-45.) She left him and took his infant son with her. He went to her mother's house to see if her mother would intervene in the relationship and when she would not help, he went into the house on his own to get his son. (*Id.* at 45-46, 87 Cal.Rptr.3d 319.) On the way out with his son, his girlfriend tried to stop him, and he shoved her, knocking her down. (*Id.* at 46, 87 Cal.Rptr.3d 319.) She apparently reported to the police that he struck her with a fist and kicked her in the abdomen. (Pet. Ex. E 2001 Report at 5.) No charges were ever filed. (*Id.*) The psychologist noted that "[t]he matter of the corporal punishment on spouse/cohabitant was never adjudicated, therefore, is *not a useful factor* in determining criminal history." (*Id.* at 9, 87 Cal.Rptr.3d 319 (emphasis added).) The Court agrees that this incident does not constitute relevant or reliable evidence that Petitioner is a current danger.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3055398 (C.D.Cal.)
**(Cite as: 2009 WL 3055398 (C.D.Cal.))**

**\*15** Moreover, the Court fails to see how this incident even translates into a current need for an additional parenting class.[FN12] At the time of the hearing, the child was sixteen, living with his mother and a stepfather (Lodgment 3 at 7) and, while Petitioner hoped to stay in contact with his son, he clearly expressed that he did not want to come between his son and his stepfather. (*Id.* at 34, 87 Cal.Rptr.3d 319; 2001 Report at 3.) Thus, it is unclear how much "parenting" Petitioner would even be involved in if released. Moreover, there is no indication that Petitioner's son was any sort of a "problem" as implied by the Board. In fact, Petitioner noted that the boy had won a scholarship for his grades. (Lodgment 3 at 34.) Nevertheless, while the Court does not dispute that parenting classes might be useful for giving any parent some tools for dealing with a teenage son, there was nothing articulated by the Board to support a nexus between the recommendation to take this class and a conclusion that Petitioner posed a current risk of violence unless he did so.

> FN12. Petitioner had previously completed two parenting courses. (2001 Report at 3.)

The same is true of the Board's recommendation for "additional work in the area of anger management" and its gratuitous suggestion that failure to do additional work in the area of anger management might be "an obstacle or a barrier coming back before the Panel next time." (*Id.* at 65, 87 Cal.Rptr.3d 319.) There is absolutely no indication that Petitioner was having any sort of post-incarceration anger management problems. In fact, every indication was that he had participated in, and was currently participating in, a plethora of programming addressing such issues which had led to deeply ingrained insight and self-control. (2001 Report at 6, 7, 8, 9, 10, 11, 12.) While additional anger management programming could almost certainly do no harm, there certainly was nothing articulated by the Board to support a nexus between the "recommendation" to take this class and a conclusion that Petitioner posed a current risk of violence

or would be found unsuitable for parole at the next hearing simply by failing to obtain additional anger management or parenting programming.

Again, there was no relevant or reliable evidence before the Board to support a finding that further anger management or parenting programming was necessary to Petitioner's rehabilitation. *See In re Singler,* 169 Cal.App.4th at 1242, 87 Cal.Rptr.3d 319 (psychologist opined that inmate was "free from the customary concerns with regard to public safety, emotional stability and personal responsibility" and that limited clinical services were more wisely used on other prisoners).

**6. Parole Plans.**

The Board found Petitioner's parole plans to be "a little bit weak ... in that we've got year old letters." (Lodgment 3 at 67.) It noted that the employment offer had not been confirmed in the most recent letters received by the Board. (*Id.*) The Board encouraged Petitioner to come back next time with "fresh letters" of support, particularly from family, detailing nearby AA/NA resources, who will help with transportation, information on public transportation routes if needed, whether there is help and assistance available from people involved in his faith, and the location of the closest place of worship. (*Id.*)

**\*16** There does not appear to be any reason to suggest that Petitioner's parole plans were any different or less viable in 2006 than they had been when documentation was prepared for the 2004 hearing which was continued by stipulation. Nor is the Court convinced the Board was using this reason to deny parole. Even if it was a reason for the denial of parole, the Board's reasoning again fails to create a nexus between the allegedly incomplete details and whether Petitioner is currently a danger to society. Moreover, the information the Board found incomplete or lacking can easily be supplemented prior to release.

**7. District Attorney's Failure to Support Release.**

In support of its denial, the Board fleetingly

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3055398 (C.D.Cal.)
**(Cite as: 2009 WL 3055398 (C.D.Cal.))**

mentioned that the "3042 notices resulted in an appearance from a representative from the District Attorney's Office. You heard him indicate opposition to the granting of parole, but I also hope you also heard that there was some compliments that were also presented to you for your consideration." (*Id.* at 68, 87 Cal.Rptr.3d 319.)

At the hearing, the District Attorney noted that "[w]ith the passage of time some of the aggrievialities [sic] of what life used to be like for him have been blurred though and I think Mr. Nix needs to spend some more time dealing with that in order to continue his rehabilitation." (*Id.* at 54, 87 Cal.Rptr.3d 319.) Not only is this statement virtually nonsensical, there is no evidence to support what appears to be a reference to Petitioner's insight into the crime-a factor not even considered by the Board in its denial. If referring to Petitioner's insight into the crime, the psychologist's report confirms that Petitioner is deeply insightful about his prior actions. (2001 Report at 12.) The District Attorney also compares Petitioner's account of the "domestic violence incidence" with the account his girlfriend gave police, and commented that the incident "deals with the inmate's ability to control his temper and his anger when dealing with others and his violence." (Lodgment 3 at 55.) He also discussed in detail the commitment offense itself, stating:

> [Petitioner] needs to confront this ugly reality that when he continued that attack when this guy was down on the ground, he was killing this guy.... And he needs to confront that and he needs next time he walks in here to be able to express those feelings ... a little bit better and a little bit more richly and I think he'll be that much more closer to parole.

(*Id.*) Again, there is no evidence that Petitioner did not already understand that his actions were reprehensible and that he felt remorse for what he had done indeed, all of the relevant evidence was to the contrary. (*See* 2001 Report at 11 ("He has fully accepted the magnitude of his criminal culpability

from the time of his arrest and has since developed a deeper insight and understanding as to what led him to such brutal behavior.").)

Although unclear whether the Board was relying on the District Attorney's opinion to support its denial of parole, a review of that opinion shows that it does nothing more than "mirror" the Board's decision anyway, relying primarily on the commitment offense and on the unsubstantiated details of the long-ago domestic violence incident. For the reasons noted above, these factors are not relevant and reliable evidence that Petitioner is a current danger.

**8. *Psychological Evaluation.***
**\*17** In support of its denial, the Board noted that the 2001 psychological report was "a little bit dated," and stated that they had asked for a new psychological exam to be completed before the next hearing. (Lodgment 3 at 66-67.)

A panel's request for a new psychiatric evaluation may be viewed by the California courts as a "sham" particularly where the record ably supports, as it does here, that Petitioner has been found not to be a danger to society. *See In re Ramirez,* 94 Cal.App.4th 549, 571, 114 Cal.Rptr.2d 381 (2001), *disapproved on other grounds by In re Dannenberg,* 34 Cal.4th 1061, 23 Cal.Rptr.3d 417, 104 P.3d 783 (2005). The only intervening fact between the 2001 report and the 2006 hearing was the administrative 115 for refusing to report to work, an infraction for which Petitioner had previously received disciplinary actions and which the psychologist found not to be significant as an indication for aggression or violence. (2001 Report at 5, 7, 11.) Thus, any new report would add little to Dr. Lille's comprehensive and thorough 2001 report.

The Board also inexplicably stated that the psychologist in his 2001 report indicated "a longer period of observation and evaluation would be appropriate, therefore a longer period of observation and evaluation's going to be required before the Board could find that you're suitable for parole."

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3055398 (C.D.Cal.)
**(Cite as: 2009 WL 3055398 (C.D.Cal.))**

(Lodgment 3 at 70.) The Court has reviewed the 2001 report and finds nothing even remotely resembling this statement. In fact, Dr. Lille's report is highly supportive of Petitioner's success in the community and low risk of danger if he were to be released.

Accordingly, the factors cited by the Board relating to the 2001 psychological report do not constitute relevant and reliable evidence that Petitioner ·was a current danger if released.

**D. *The State Court's Denial of Petitioner's Habeas Petition Was an Unreasonable Application of Clearly Established Federal Law.***

The superior court denied Petitioner's habeas petition using a check mark form. (Lodgment 5.) It checked the portions of the form that found a denial for failure to state a prima facie case, makes assertions regarding applicable law that are contrary to established California case decisions, and failure to raise any new issues not previously addressed in an earlier writ petition. (*Id.*) The California Court of Appeal and the California Supreme Court both denied Petitioner's claims without comment or citation to authority. (Lodgments 7, 9.) A denial of relief without comment or citation constitutes a denial on the merits. *Hunter v. Aispuro.* 982 F.2d 344, 347-48 (9th Cir.1992). Because, as here, no state court supplied a reasoned decision, this Court performed an " 'independent review of the record' to ascertain whether the state court decisions were objectively unreasonable." *Himes v. Thompson,* 336 F.3d 848, 853 (9th Cir.2003) (quoting *Delgado v. Lewis,* 223 F.3d 976, 982 (9th Cir.2000)).

Because there was no reliable and relevant evidence before the 2006 Board panel supporting its conclusion that Petitioner's release posed an unreasonable risk to public safety, the Court finds that (a) the Board's decision resulted in an arbitrary deprivation of Petitioner's liberty interest in parole and violated due process, and (b) the State courts' determination to the contrary was based on an unreasonable determination of the facts in light of the evidence presented and involved an unreasonable

application of the "some evidence" standard.

## VII.
### *RECOMMENDATION*

**\*18** IT THEREFORE IS RECOMMENDED that the District Court issue an Order: (1) approving and adopting this Report and Recommendation; and (2) directing that Judgment be entered granting a writ of habeas corpus as follows: The Board shall find Petitioner suitable for parole at a hearing to be held within 30 days of the finality of this decision, unless new, relevant and reliable evidence of her conduct in prison or change in mental status subsequent to the September 11, 2006, parole consideration hearing is introduced that is sufficient to support a finding that Petitioner currently poses an unreasonable risk of danger to society if released on parole; [FN13] and in the absence of any such new relevant and reliable evidence showing Petitioner's unsuitability for parole, the Board shall calculate a prison term and release date for Petitioner in accordance with California law. Further, if the release date already has lapsed, Respondent shall, within ten days of the Board's hearing, either release Petitioner forthwith if his release date lapsed more than three years earlier, or release Petitioner on parole for that period of her three year parole term that remains if the release date lapsed less than three years earlier.

> FN13. *See, e.g., Milot v. Haws,* No. 08-3814-SGL (RNB), 2009 WL 1606657, at \*4 n. 3 (C.D.Cal. June 8, 2009) (noting that "the futility of remanding a parole case for 're-review' when the habeas court already has reviewed the evidence and found it insufficient to sustain an unsuitability finding has not escaped the state or federal courts" and citing cases); *see also In re Rico,* 171 Cal.App.4th 659, 89 Cal.Rptr.3d 866 (2009) (directing Board to conduct a new parole suitability hearing within thirty days and to find petitioner suitable for parole "unless either previously undiscovered evidence or new evid-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3055398 (C.D.Cal.)
**(Cite as: 2009 WL 3055398 (C.D.Cal.))**

ence subsequent to the 2007 parole hearing, regarding his conduct, circumstances, or change in his mental state, supports a determination that he currently poses an unreasonable risk of danger to society if released on parole"); *In re Gaul,* 170 Cal.App.4th 20, 87 Cal.Rptr.3d 736 (2009) (directing Board to hold new hearing within 30 days of finality of decision and to find inmate suitable for parole unless new evidence of conduct or change in mental state after 2007 parole consideration hearing is introduced and is sufficient to support a finding of current dangerousness); *In re Singler,* 169 Cal.App.4th at 1230, 87 Cal.Rptr.3d 319 (2008) (where, as here, petitioner had never before been found suitable, court remanded for further proceedings to hear any motions relevant to defendant's plea and, if appropriate, hold a new sentencing hearing); *see also In re Vasquez,* 170 Cal.App.4th 370, 387, 87 Cal.Rptr.3d 853 (2009) (reversing Governor's decision overturning Board's parole grant and reinstating Board's parole release order); *In re Aguilar,* 168 Cal.App.4th 1479, 1491, 86 Cal.Rptr.3d 498 (2008) (reversing Governor's decision overturning parole grant, reinstating Board's parole release date, and ordering inmate released forthwith pursuant to conditions set forth in Board's 2005 decision finding inmate suitable for parole).

C.D.Cal.,2009.
Nix v. Hartley
Not Reported in F.Supp.2d, 2009 WL 3055398 (C.D.Cal.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2008 WL 4224561 (E.D.Cal.)
(Cite as: 2008 WL 4224561 (E.D.Cal.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
E.D. California.
Benjamin ADAMS, Petitioner,
v.
Teresa SCHWARTZ, Warden, Respondent.

No. CIV S-05-2237 JAM JFM P.
Sept. 12, 2008.

David M. Porter, Office of the Federal Defender,
Sacramento, CA, Marylou Elin Hillberg, Marylou
Hillberg, Attorney at Law, Sebastopol, CA, for Petitioner.

Krista Leigh Pollard, California Attorney General's
Office, Sacramento, CA, for Respondent.

*FINDINGS AND RECOMMENDATIONS*
JOHN F. MOULDS, United States Magistrate Judge.
   **\*1** Petitioner is a 69 year old state prisoner proceeding through counsel with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner also suffers myriad medical ailments: he is a brittle diabetic (DOJ001844) [FN1] and has hypertension, chronic hepatitis C viral infection, bilateral lower extremity venous insufficiency secondary to an old gunshot wound (DOJ001841), chronic low back pain and an allergy to sulfonamides. (DOJ001873.) On March 4, 2008, petitioner's counsel notified the court that petitioner had been diagnosed with prostate cancer, but had not yet received treatment. (Docket No. 40.)

   FN1. On May 28, 2008, respondent lodged
   the administrative record. (Docket No. 54.)
   Citations are to the page numbers Bates
   stamped on the bottom right hand corner of
   each page. (For example, "DOJ001844.")

   Petitioner is serving a sentence of life with the

possibility of parole, following his 1984 conviction
on charges of kidnaping for robbery, robbery, and
attempted robbery. Petitioner challenges the April
10, 2003 decision of the California Board of Parole
Hearings (Board) to deny him a parole date. Petitioner contends that he was deprived of a constitutionally protected liberty interest because there was
no evidence to support the Board's decision to rescind the 2002 grant of parole and there is no evidence that petitioner's release will unreasonably endanger public safety.

   On April 15, 1996, a superior court judge appointed counsel for petitioner, and, in granting the
state petition for writ of habeas corpus, ordered the
Board to set aside its December 21, 1995 unsuitability finding, stating:

   The record before this court reflects that Petitioner has done all that prior panels have asked him
   to do. He has realistic goals upon release and a
   supportive family. By ignoring all positive
   factors, the factual basis upon which to find Petitioner unsuitable for parole was skewed against
   his favor. There simply is no evidence to support
   the [Board's] finding that Petitioner would pose
   an unreasonable risk of harm. In finding Petitioner unsuitable for parole, the court finds that the
   [Board] abused its discretion.

   (April 15, 1996 Order, appended to Petition as
   Ex. B at 42; DOJ001789-93.) (Judge Silver.) Despite Judge Silver's order, petitioner was denied parole at the subsequent parole consideration hearing.

   Since the initial denial, despite Judge Silver's
order, a classification score of zero, the absence of
any prison disciplinary conviction after 1997,[FN2]
multiple psychologist's conclusions that petitioner
presents a low potential for violence, a stable and
supportive family, an offer of employment in the
family business, completion of a certified vocation
in 1995, consistently good work reports, participation in Narcotics Anonymous and numerous reli-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4224561 (E.D.Cal.)
(Cite as: 2008 WL 4224561 (E.D.Cal.))

Page 2

gious activities, petitioner, a licensed minister and grandfather of two, who suffers multiple health issues, has been denied parole at nine subsequent parole consideration hearings from 1989 through 2003, since he was initially denied parole in 1988.

> FN2. During his almost 24 years of incarceration, petitioner has had three disciplinary convictions, all of which were 115s received before 1997. (Answer, Ex. 5 at 15.)

For the reasons set forth below, this court finds that the rescission of petitioner's parole was not supported by even the minimal quantum of evidence required to satisfy the requirements of the federal due process clause. Moreover, the rescinding Board's 2003 decision to rescind parole for another year, as well as their failure to parole petitioner over five years later, makes manifest and inescapable the conclusion that no purpose will be served in remanding this matter for another parole consideration hearing or setting a parole date. It is therefore the recommendation of this court that respondent be directed to release petitioner forthwith on parole.

### PROCEDURAL BACKGROUND

*2 In 1984, petitioner was found guilty after a jury trial of robbing two men and attempting to rob a third on separate occasions. As to one victim, petitioner was found guilty of both robbery and kidnaping for purposes of robbery and sentences were imposed on both counts. The trial court imposed two-year sentence enhancements under Penal Code § 12022.1 because petitioner committed the additional crimes while he was free on bail after his arrest for the first robbery. Petitioner appealed, and his case was remanded for re-sentencing on December 17, 1985. On April 5, 1990, petitioner was sentenced to life with the possibility of parole for the kidnaping for robbery, plus one year for the weapon enhancement, five years for one count of robbery, and eight months for the attempted robbery. (Answer, Ex. 1.) The court stayed the sentence on the other robbery count. Petitioner was received in state prison on April 24, 1984. (DOJ0000880.)

After appeal and re-sentencing, petitioner was sentenced to life with the possibility of parole. At the time of the commitment offenses, petitioner was forty-six years old, and appeared to suffer a drug addiction.[FN3] Petitioner was not convicted of inflicting bodily injury on any of the victims. *Id.* Prior to this conviction, petitioner had no juvenile record, but he had an extensive criminal record.

> FN3. A copy of the probation report is included in Exhibit 3 to the Answer.

On April 1, 1996, a hearing was held on petitioner's state habeas petition challenging the December 1995 denial of parole. *In re Application of Benjamin Adams,* Case No. HC 2809 (April 16, 1996) (DOJ001789). The state court noted that petitioner's prior petition had come before that court in November 1994. *Id.* The prior state court petition was denied on December 27, 1994. Based on a minimum factual basis to support the Board's findings, the court found respondent had not abused its discretion in finding petitioner unsuitable for parole. *Id.* However, the state court indicated that "if petitioner was again found unsuitable for parole, the court would consider setting the matter for hearing." *Id.*

Petitioner filed a Petition for Peremptory Writ of Mandate on December 29, 1995. The state court construed this filing as a petition for writ of habeas corpus and set the matter for hearing on April 1, 1996. (*Id.,* DOJ001790.) As noted above, Judge Silver found the Board abused its discretion in denying petitioner parole in 1995 as "[t]here simply is no evidence to support the [Board's] finding that Petitioner would pose an unreasonable risk of harm." (*Id.,* DOJ001793.) Judge Silver ordered respondent to set aside its December 21, 1995 decision finding petitioner unsuitable for parole and hold a new suitability hearing within thirty days. (*Id.*)

Petitioner filed another petition for writ of habeas corpus in state court, but that petition was denied as unexhausted. *In re Application of Ben-*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4224561 (E.D.Cal.)
**(Cite as: 2008 WL 4224561 (E.D.Cal.))**

jamin Adams, Case No. HC 3028 (September 22, 1997) (DOJ000685.)

On April 2, 2004, petitioner filed a petition for writ of habeas corpus in the Los Angeles County Superior Court challenging the 2003 rescission of parole. (Answer, Ex. 7.) The Superior Court upheld the rescission of parole, finding that the granting panel failed to adequately discuss the nature of the commitment offenses, merely incorporating by reference a statement of facts from prior transcripts, and did not consider all of petitioner's prior criminal convictions. *In re Benjamin Adams,* Case No. BH002706, Los Angeles County Superior Court, September 17, 2004 (Answer, Ex. 9.)

*\*3* On October 5, 2004, petitioner filed a petition with the California Supreme Court. (Answer, Ex. 10.) On August 15, 2007, that petition was denied with a citation to *People v. Duvall,* 9 Cal.4th 464, 474, 37 Cal.Rptr.2d 259, 886 P.2d 1252 (1995) . (Answer, Ex. 9.)

Petitioner filed the instant action on January 6, 2005 in the Northern District of California. The case was transferred here on November 4, 2005.

Petitioner has served 14 years beyond his minimum eligible parole date of 1994,[FN4] and was denied parole at nine subsequent parole consideration hearings before he was granted parole at the 2002 Board hearing.

> FN4. The date was calculated as May 11, 1994 (DOJ000709; DOJ000833) or November 8, 1994 (DOJ000830).

## ANALYSIS

### I. *Standards for a Writ of Habeas Corpus*

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Su-

preme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. *Early v. Packer,* 537 U.S. 3, 7, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (*citing Williams v. Taylor,* 529 U.S. 362, 405-406, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)).

Under the "unreasonable application" clause of section 2254(d) (1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Williams,* 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 412; *see also Lockyer v. Andrade,* 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.' ") The court looks to the last reasoned state court decision as the basis for the state court judgment. *Avila v. Galaza,* 297 F.3d 911, 918 (9th Cir.2002).

### II. *Petitioner's Claims*

Petitioner alleges his "federal rights to due process of law were violated by the rescission of his parole which had been granted by the [Board] on a

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4224561 (E.D.Cal.)
(Cite as: 2008 WL 4224561 (E.D.Cal.))

proper finding of suitability for parole based upon substantial evidence." (November 16, 2006 First Amended Petition.)

A. *"Some Evidence"*
**\*4** In the context of the rescission of parole, "[t]he process that is due before a prisoner can be deprived of such an interest is a showing that there is 'some evidence' in the record to support a later rescission of that date." *McQuillion,* 306 F.3d at 898.

The last reasoned rejection of this claim is the decision of the Los Angeles County Superior Court on petitioner's petition for writ of habeas corpus. The state court rejected this claim as follows:

Even after parole is granted, the Board is authorized to rescind the grant of parole for good cause after a rescission hearing. ( *Caswell, supra,* at 1026, 112 Cal.Rptr.2d 462.) [FN5] "Cause" includes new information indicating parole should not occur or fundamental errors which resulted in the improvident grant of parole. ( *Caswell, supra,* at 1026, 112 Cal.Rptr.2d 462; *see* Cal.Code Regs., tit. 15, § 2451.) However, cause for rescission is not limited to those grounds enumerated in California Code of Regulations, title 15, section 2451, and can also be found where the granting panel has failed to adequately consider the gravity of the prisoner's convictions. ( *Caswell, supra,* at 1026-27, 112 Cal.Rptr.2d 462.) "When the granting panel misstated facts or explicitly declined to consider information germane to the gravity of the crimes, it can fairly be said that reasonable minds could differ on whether the panel gave adequate consideration to the severity of the crimes." (*Id.* at 1029, 112 Cal.Rptr.2d 462 .) In those cases, there is "some evidence" of the panel's failure to consider the gravity of Petitioner's offense, justifying rescission of the parole release date. (*Id.*) The rescission panel is required to articulate specific facts or cite express omissions of the granting panel, in rescinding a parole date. (*Id.* at 1031, 112 Cal.Rptr.2d 462.)

FN5. *In re Caswell,* 92 Cal.App.4th 1017, 1026-27, 112 Cal.Rptr.2d 462 (2001) (Board found good cause to rescind the grant of parole based on the gravity of the offense and the prisoner's minimization of his role in the offense.

The rescission panel reviewed the granting panel's record with regard to the gravity of the life offense. The record established that the granting panel, rather than read a description of the life crime into the record, merely incorporated by reference a statement of facts taken from prior transcripts. (*See* April 10, 2003 Parole Hearing Transcript, at 13 and 18.) The rescission panel characterized the discussion of the life crime as an "exchange" between the panel and Petitioner, rather than any official rendition of the events. ( *Id.* at 18.) The granting panel's summary of the facts was limited to "it was three different events basically ... Aldon Doolittle, who was 72, Sherman Elsberry, and Paul Singer ... you used a firearm and you kidnapped and robbed some elderly victims." (*Id.* at 13-15.)

The record with regard to the granting panel's review of Petitioner's criminal history, established that the granting panel "incorporated" Petitioner's adult arrest record, including his personal and social history, by way of an October 1995 Board report. (*See* April 10, 2003 Parole Hearing Transcript, *supra,* at 41 .) Additionally, the granting panel discussed some of Petitioner's prior convictions, but not all. (*Id.* at 42.) The rescission panel found at least nine prior convictions that were not even mentioned during the April 2003 hearing. (*Id.*)

**\*5** The rescission panel's findings that good cause existed to rescind Petitioner's parole date are supported by "some evidence." ( *Caswell, supra,* 92 Cal.App.4th 1017, 1026-27, 112 Cal.Rptr.2d 462.)

Accordingly, the petition is denied.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4224561 (E.D.Cal.)
(Cite as: 2008 WL 4224561 (E.D.Cal.))

(*In re Benjamin Adams,* Case No. BH002706 (September 17, 2004 Los Angeles County Superior Court) (Answer, Ex. 9.)

The Board is the executive agency authorized to grant parole and set release dates for prisoners serving life sentences, and in certain circumstances it may rescind an unexecuted grant of parole. ( Cal.Penal Code, §§ 3040, 3041.) Section 3041 of the California Penal Code provides prisoners sentenced in California to a state prison term that provides for the possibility of parole with "a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause." *Irons v. Carey,* 479 F.3d 658, 662 (9th Cir.2007) (citing *Sass v. California Board of Prison Terms,* 461 F.3d 1123, 1128 (9th Cir.2006); *Biggs v. Terhune,* 334 F.3d 910, 914 (9th Cir.2003); *McQuillion v. Duncan,* 306 F.3d 895, 903 (9th Cir.2002); and *Bd. of Pardons v. Allen,* 482 U.S. 369, 377-78, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987) (*quoting Greenholtz v. Inmates of Neb. Penal & Corr. Complex,* 442 U.S. 1, 12, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979)).) California law requires that the Board "determine whether a prisoner is presently too dangerous to be deemed suitable for parole based on the 'circumstances tending to show unsuitability' and the 'circumstances tending to show suitability' set forth in Cal.Code. Regs., tit. 15 § 2402(c)-(d)." *Irons,* 479 F.3d at 662-63. The *Irons* court described the regulations as follows:

[T]he circumstances tending to show that a prisoner is unsuitable include: (1) the commitment offense, where the offense was committed in "an especially heinous, atrocious or cruel manner"; (2) the prisoner's previous record of violence; (3) "a history of unstable or tumultuous relationships with others"; (4) commission of "sadistic sexual offenses"; (5) "a lengthy history of severe mental problems related to the offense"; and (6) "serious misconduct in prison or jail." Cal.Code. Regs., tit. 15 § 2402(c). Circumstances tending to show that a prisoner is suitable for parole include: (1)

the prisoner has no juvenile record; (2) the prisoner has experienced reasonably stable relationships with others; (3) the prisoner has shown remorse; ... (6) the prisoner lacks any significant history of violent crime; ... (8) the prisoner "has made realistic plans for release or has developed marketable skills that can be put to use upon release"; (9) "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." Cal.Code. Regs., tit. 15 § 2402(d).

*Id.* at 663 n. 4.

It has been clearly established by the United States Supreme Court "that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by 'some evidence in the record,' *Sass,* 461 F.3d at 1128-29 (*citing Superintendent v. Hill,* 472 U.S. 445, 457, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)); *see also Biggs,* 334 F.3d at 915 (*citing McQuillion,* 306 F.3d at 904), or is "otherwise arbitrary," *Hill,* 472 U.S. at 457, 105 S.Ct. 2768, 86 L.Ed.2d 356." *Id.* at 662. The main concern in determining parole suitability is public safety. *In re Dannenberg,* 34 Cal.4th 1061, 1080, 1084, 1085, 1086, 23 Cal.Rptr.3d 417, 104 P.3d 783 (Cal.), *cert. denied,* 546 U.S. 844, 126 S.Ct. 92, 163 L.Ed.2d 109 (2005) ("the overriding statutory concern" is for public safety; purpose of the statutes is to "guarantee that the Board has fully addressed the public safety implications" of the release determination).

**\*6** Rescission of a prisoner's parole does not violate due process so long as "some evidence" having "some indicia of reliability" "supports the decision." *McQuillion,* 306 F.3d at 904 (quoting *Superintendent v. Hill,* 472 U.S. 445, 456, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)) Petitioner's "argument that the rescinding panel did not base its decision on any evidence raises questions of fact that requires examination of both the granting panel's and rescinding panel's decisions." *Caswell v. Calderon,* 363 F.3d 832, 839 (9th Cir.2004) (citation omitted).[FN6]

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in F.Supp.2d, 2008 WL 4224561 (E.D.Cal.)
(Cite as: 2008 WL 4224561 (E.D.Cal.))

FN6. Rescission may be based on (1) the prisoner's disciplinary conduct; (2) his psychiatric deterioration; (3) "[f]undamental errors" during the hearing at which parole was granted; or (4) new information indicating parole should not occur. Cal.Code Regs., tit. 15, § 2451, subds. (a)-(d). Cause for rescission is not limited to § 2451; parole may be rescinded if the granting panel failed to adequately consider the gravity of the prisoner's convictions. *In re Steven Caswell,* 92 Cal.App.4th 1017, 112 Cal.Rptr.2d 462 (1st Cir.Cal.2001). However, "a rescission may not be upheld merely because the Board has mouthed words that have been held to constitute "cause" for rescission. There must also be an adequate 'factual underpinning for the Board's determination of cause.' " *Id.,* 92 Cal.App.4th 1027, citation omitted.

The reasoning in *McQuillion v. Duncan,* 306 F.3d 895 (9th Cir.2002) is on point here. Courts "must apply the federal due process standard announced by the Supreme Court in *Hill.* Courts must determine whether the rescission panel had "some evidence" to support its finding of "good cause" to rescind [petitioner's] parole." *McQuillion,* 306 F.3d at 906. Thus, the court will address each of the three "good cause" grounds set forth by the rescinding panel to determine if there was "some evidence" supporting any of those grounds, as well as the state court's order concerning those grounds.

1. Failure of the Granting Panel to Adequately Consider Gravity of the Offenses
On April 10, 2003, the Board reviewed the 2002 decision and found good cause to rescind the parole date based on the commitment offenses:

1. *Gravity of commitment offenses.* The gravity of the commitment offense[s] was given insufficient weight by the granting panel, noting in addition, the prisoner clearly minimized his role in these crimes. The three (3) victims were kidnapped for robbery. Two (2) victims were confronted by the

prisoner wielding a knife. The granting panel incorporated by reference the statement of facts from the hearing of September 6, 2001, pages 6 through 20. Here the victims' names were mentioned and the fact there were three different victims. In referencing the September 6, 2001 transcript, the panel members mentioned that the prisoner used a firearm and kidnapped, robbed elderly victims. The prisoner responded "yes" to victims being elderly, however, stated later that there was no weapon involved. He then contradicted this when he stated, "Yes, I used a weapon." The panel did not examine in detail the prisoner's continued minimization of the three separate crimes or the contradictions in prisoner's statements. The granting panel did not go into the specifics of the crimes sufficiently enough to consider the gravity of the commitment offense[s]. We find good cause.

(Answer, Ex. 2.) The state court found the granting panel failed to read the facts of petitioner's commitment offenses into the record. (Answer, Ex. 9.)

The state court relied on the rescinding Board's view that the granting panel failed to adequately consider the gravity of the commitment offenses. However, there was sufficient information before the Board to demonstrate that the facts of the commitment offenses were known to and considered by the Board. Specifically, the 1995 Life Prisoner Evaluation Report, incorporated by the granting panel, set forth the commitment offenses as follows:

*7 Offense summary: On May 22, 1983, at approximately 5:45 p.m. when [petitioner] approached Sherman Elsbury requesting help to start his vehicle, [petitioner] stated that his battery was dead. Sherman Elsbury agreed to help him. As Sherman Elsbury gave [petitioner] a ride, [petitioner] told Sherman Elsbury that he had a .45 Caliber weapon in his pocket. The victim gave him his wallet. The subject fled the vehicle. Sherman Elsbury observed the subject entering a

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4224561 (E.D.Cal.)
(Cite as: 2008 WL 4224561 (E.D.Cal.))

Lincoln Continental with Arizona plates. He reported this to the police. The police observed [petitioner] in the Lincoln Continental and took [petitioner] into custody. The victim identified [petitioner] as the assailant. On May 24, 1983, at approximately 11:15 a.m., Paul Singer was approached by [petitioner] who asked if he had jumpe[r] cables. Paul Singer replied he did not have any and was forced into his vehicle at knife point. The victim was forced to drive to North South Alley on 20th Street. Subject took $280.00. On May 28, 1983, at approximately 12:45 p.m., the same arresting officers observed [petitioner] on Pacific Avenue talking to an elderly gentleman. The officers overheard [petitioner] asking Alden Doolittle for assistance in starting his car. When the officers approached Doolittle and [petitioner], [petitioner] immediately indicated that he was working for Doolittle. Mr. Doolittle immediately indicated that he never saw the subject before.

(Answer, Ex. 6.) The state court faulted the granting panel for choosing to incorporate facts from prior transcripts "rather than read a description of the life crime into the record" and failed to set forth "any official rendition of the events." However, neither the state court nor the rescinding panel explained how the failure to read facts known to petitioner and the Commissioners into the record demonstrate the granting Board failed to adequately consider the commitment offenses. Both the state court and the rescinding Board noted that the granting panel discussed with petitioner the fact that there were three separate offenses, with three separate, elderly victims, and identified the victims by name. Neither the state court nor the rescinding Board explained what facts should have been included or how any of the omitted facts demonstrate the granting panel failed to adequately consider the commitment offenses. There is no evidence here that the granting panel "misstated facts or explicitly declined to consider information germane to the gravity of the crimes." *In re Caswell,* 92 Cal.App.4th at 1029, 112 Cal.Rptr.2d 462.

Rather, the granting panel's decision makes clear the panel was familiar with petitioner's commitment offenses:

The basic term of ... confinement ... would be the base life offense of which the prisoner has been convicted is kidnap for robbery, Penal Code Section 209(B). The offense occurred on May the 24th of 1983. The term is derived from the matrix located in the CC & R Title 15, and that would be 22-Penal Code Section 2282(C), kidnap for robbery. The Panel finds that Category AI ... is the appropriate category in that there was minor movement of the victim, ... minor injury or unharmed to the victim as well.... He received no injuries in his-your attack on him ... in that particular case.... So, the base assessment would be 144 months for the base offense noted. This would be the aggravated term, and the aggravated because of the age of the victims, all of the victims were elderly men.... And then for the adjustment for weapons, a deadly weapon, we gave you six months.

*8 (Answer, Ex. 5 at 47-48.)

Although the state court did not address this issue, the rescinding panel made much of petitioner's alleged contradiction concerning use of a weapon. However, the alleged contradiction concerning use of a weapon took place during the 2001 Board hearing. The record reflects that petitioner dispelled any contradiction in the 2002 hearing by admitting he used a deadly weapon in the commission of the instant offenses. Commissioner Moore asked petitioner about his claim in the 2001 parole hearing that he did not have a weapon. (Answer, Ex. 5, at 8.) Petitioner declined to revisit that "controversy," but accepted responsibility for the crimes and apologized. *(Id.)* Before Commissioner Moore referred to the 2001 hearing, petitioner affirmatively answered the Commissioner's question, "you used a deadly weapon to kidnap and rob the elderly victims and in an attempt to support your drug habit, heroin?" *(Id.* at lines 5-9.) Petitioner also admitted he committed crimes against three different, elderly victims.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4224561 (E.D.Cal.)
**(Cite as: 2008 WL 4224561 (E.D.Cal.))**

(Answer, Ex. 5 at 8, lines 1-4; 9, lines 5-8.) [FN7]

> FN7. The rescinding Board also incorrectly recited the facts of the commitment offenses. The rescinding Board stated: "Two (2) victims were confronted by the prisoner wielding a knife." (Answer, Ex. 2 at 3.) However, the probation report reflects that during the first criminal act, on May 22, 1983, petitioner "indicated he had a .45 caliber weapon in his pocket." (Answer, Ex. 3 [docket no. 42-4 & 5 .] ) During the May 24, 1983 crime, petitioner forced the victim into the vehicle at knife point. (*Id.*) During the May 28, 1983 crime, a police officer intervened before the crime could be completed and there is no mention of the use of a weapon at all. (*Id.*) On direct appeal, the state appellate court did not mention use of a knife as to the third charge. *People v. Adams,* 175 Cal.App.3d at 855, 221 Cal.Rptr. 298. Although the prosecution included allegations petitioner used a dangerous and deadly weapon in all three counts, petitioner was convicted with only one count of use of a knife (Count 6). (Answer, Ex. 3.) Petitioner was not convicted of use of a firearm. (*Id.*)

> These facts surrounding the three different incidents might explain petitioner's alleged contradiction during the 2001 hearing. Perhaps petitioner should be credited for ultimately acknowledging he used a weapon, "Yes, I used a weapon," rather than viewed as contradicting himself during the 2001 hearing.

The fact that the granting Board considered petitioner was not convicted of inflicting bodily injury on any of the three victims and noted the "minor movement of the [kidnapping] victim" (Answer, Ex. 5 at 48), demonstrates that the Board adequately considered the gravity of petitioner's commitment offenses, even if the granting Board did not read the details of petitioner's commitment offenses into the record. The granting panel specifically found that petitioner's commitment offenses were a result of significant stress based on his addiction to heroin, which apparently mitigated the weight of petitioner's commitment offenses, particularly given his long-term sobriety in prison. These findings also demonstrate the granting panel adequately considered the gravity of petitioner's commitment offenses.

The court presumes "that the panel considered all of this evidence that was squarely before it." *McQuillion,* 306 F.3d at 906. Given the brief good cause statement on this ground, as well as the state court's emphasis on a simple failure to read facts into the record, this court finds that the rescinding panel's "good cause" finding on this issue was not supported by "some evidence." While it is apparent the rescinding panel disagreed with the granting panel's decision, such disagreement does not mean that the granting panel failed to adequately consider the evidence before it.

**2. Failure of the Granting Panel to Adequately Consider Prior Criminal History**

On April 10, 2003, the Board also found good cause to rescind the parole date based on petitioner's criminal history:

> 2. *Criminal history.* The prisoner's history was not sufficiently addressed by the granting panel. They incorporated by reference his criminal history and cited the 1995 Board Report as the source document. That report does not reflect an accurate description of the prisoner's criminal history. Commissioner Moore had discussed the history at the September 6, 2001 hearing. (Deputy Commissioner Cassady was not at the 2001 hearing.) However, he failed to mention at least eight convictions, did not address the bench warrants or parole violations. When there was discussion of criminal history, the prisoner minimized his record. The granting panel's omissions were sufficient to warrant a finding of good cause.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4224561 (E.D.Cal.)
**(Cite as: 2008 WL 4224561 (E.D.Cal.))**

**\*9** (Answer, Ex. 2.) The state court found the granting panel incorporated petitioner's adult arrest record, including personal and social history, and failed to discuss or mention at least nine prior convictions. (Answer, Ex. 9.) The state court relied on the rescinding Board's view that the granting panel failed to adequately consider petitioner's criminal history.

However, the record reflects that Commissioner Moore discussed petitioner's criminal history at the 2001 Board hearing. Although Commissioner Cassady was not at the 2001 hearing, Commissioner Moore stated at the beginning of the 2002 hearing that "[w]e've reviewed [petitioner's] Central Files and [his] prior transcript." (Answer, Ex. 5, at 3.) Thus, the granting panel had reviewed petitioner's criminal history recounted at the 2001 Board hearing. In addition, petitioner's central file was replete with references to his lengthy criminal record. For example, in 1988, one Board member referred to petitioner's sixteen page rap sheet and convictions spanning a 22 year period. (DOJ0000884.) During the 1995 Board hearing, a Board member stated petitioner had over forty arrests. (DOJ000845.) The fact that petitioner had a lengthy criminal history prior to his commitment offenses was information readily accessible in petitioner's central file to each Board member prior to the 2002 parole hearing. In fact, Commissioner Cassady noted petitioner's "extensive prior arrest record for drug related offenses" (Answer, Ex. 5 at 23) while relating Dr. Collins' clinical assessment. Commissioner Cassady also referred to petitioner's "extensive arrest and conviction record which spanned three decades," including grants of probation six times and grants of parole twice. (*Id.* at 29.)

The 1995 Life Prisoner Evaluation Report also contained the most serious convictions, including the 1965 conviction for misdemeanor assault with a deadly weapon, and the narcotics possession and influence convictions for which petitioner was placed in drug treatment, jail and prison (twice). The omitted convictions were primarily possession or influence of controlled substance convictions. There was one conviction for petty theft (1968) and one for shoplifting (1982). None of the omitted convictions changed the picture presented by the 1995 report-petitioner had a lengthy criminal history of crimes fairly typical of a person addicted to illegal drugs, and he had previously served time in drug rehabilitation, jail and prison. Neither the state court nor the rescinding Board explained how the failure of the Commissioners to read a list of each conviction or arrest demonstrates that the granting panel failed to adequately consider petitioner's lengthy criminal history, particularly in light of all the evidence of his criminal history set forth in the 2001 transcript, the 1995 Life Prisoner Report, and the central file.

In addition, other than the 1983 commitment offenses, the only violent offense was petitioner's June 10, 1965 arrest for assault with a deadly weapon and disturbing the peace; he was convicted of these misdemeanor offenses on August 24, 1965, 38 years prior to the rescinding Board's 2003 decision.[FN8] The arrests and convictions during the interim eighteen year period were primarily drug-related: possession and/or use of narcotics and/or controlled substances and theft to fund his drug addiction.

> FN8. Petitioner was sentenced to a $110.00 fine / 10 days in jail. (Answer, Ex. 4, at 3.)

**\*10** Similarly, in discussing petitioner's criminal history, the rescinding Board failed to consider that most of petitioner's criminal history was due to a serious drug addiction. This court finds that it was unreasonable for the rescinding Board to disregard the granting panel's decision concerning petitioner's criminal history simply because the granting panel failed to recite every conviction, bench warrant, parole violation and arrest, particularly given the length of petitioner's criminal history as well as the length of time that had passed since petitioner last committed a crime or sustained a prison disciplinary. The commitment offenses occurred in 1983; petitioner's last serious prison disciplinary occurred

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4224561 (E.D.Cal.)
(Cite as: 2008 WL 4224561 (E.D.Cal.))

Page 10

in 1997. None of petitioner's prison disciplinaries involved violence and few of petitioner's prior convictions involved violence.

Neither the state court nor the rescinding panel pointed to misstated facts or evidence demonstrating that the granting panel "explicitly declined to consider information germane," *In re Caswell,* 92 Cal.App.4th at 1029, 112 Cal.Rptr.2d 462, to petitioner's criminal history. Petitioner's lengthy criminal history was known to the granting panel and well-covered in the materials provided to the granting Board prior to the 2002 hearing. The court presumes "that the panel considered all of this evidence that was squarely before it." *McQuillion,* 306 F.3d at 906. Thus, this court finds that the rescinding panel's "good cause" finding on this issue was not supported by "some evidence." Although the rescinding panel may have disagreed with the granting panel's decision, that disagreement does not demonstrate the granting panel failed to adequately consider the evidence before it.

3. Petitioner Minimized His Crimes

The state court did not address the rescinding Board's finding that petitioner had minimized his crimes. Accordingly, the court reviews this claim de novo.

A review of the record reflects that petitioner has accepted responsibility for his crimes, has not just become a Christian, but became a licensed minister, who preaches to other prisoners. In an addendum to the September 1996 psychiatric evaluation, petitioner "expressed his regret for that [criminal] lifestyle and said that he has become a Christian now and wants to devote his life to the service of others." (Bruce M. Bakeman, Ph.D., DOJ000956.) In 1993, petitioner also expressed regret for his crimes. (DOJ000957.)

This was made clear at the 2002 hearing as well. Petitioner expressed remorse for the crimes, stating he was sorry for what happened, and that he has tried to give back to the community by ministering to young prisoners about the hazards of drug abuse and helping handicapped and elderly prisoners. Petitioner even wrote a letter of apology to one of his victims. The record does not reflect that petitioner minimizes his crime; rather, the record demonstrates that petitioner understands his crimes were primarily drug-related and is committed to an effort to help others avoid the same fate. Petitioner has remained disciplinary free since 1997, and has sustained no prison disciplinaries for violent behavior during his entire incarceration, demonstrating petitioner's commitment both to a nonviolent lifestyle as well as to his sobriety. Petitioner, as well as psychologists and other prison staff, recognizes that petitioner's crimes were drug-related; such recognition does not mean that petitioner is minimizing his criminal history or his commitment offenses. This court finds that the rescinding Board's characterization that petitioner "minimized" his crime was not based on some evidence in the record.

*11 Moreover, a prisoner's refusal to admit participation in the crime on matters of conflicting evidence does not necessarily constitute unsuitability for parole or mandate rescission. Cal.Code Regs., tit. 15, § 2236. "A prisoner may refuse to discuss the facts of the crime in which instance a decision shall be made based on the other information available and the refusal shall not be held against the prisoner." *Id.* Respondent has failed to provide any legal authority for the proposition that petitioner's alleged minimization of his involvement in the commitment offenses is sufficient to warrant rescission, particularly where the record reflects petitioner has accepted responsibility for the commitment offenses and demonstrated remorse.

4. Conclusion

A review of the record fails to reveal any evidence in support of the rescinding Board's conclusion that the grant of parole was improvidently granted for failure to consider the gravity of the commitment offenses, petitioner's criminal history or the alleged minimization of his crimes. Rather, the record demonstrates that the granting panel gave great weight to the other factors of suitability,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4224561 (E.D.Cal.)
**(Cite as: 2008 WL 4224561 (E.D.Cal.))**

[FN9] found petitioner presented no danger to the public safety, and minimized the weight of petitioner's commitment offenses and criminal history based on his underlying drug addiction. The granting panel expressly stated petitioner's "commitment offense was a result of significant stress based on his addiction to heroin." Indeed, the record before this court shows facts congruent with those described by Judge Silver in 1996, justifying petitioner's release twelve years ago.

> FN9. For example, a classification score of zero, the absence of any prison disciplinary conviction after 1997, multiple psychologist's conclusions that petitioner presents a low potential for violence, a stable and supportive family, an offer of employment in the family business, completion of a certified vocation in 1995, consistently good work reports, and participation in Narcotics Anonymous and numerous religious activities.

Accordingly, the state courts' rejection of this claim was contrary to controlling principles of United States Supreme Court authority. Petitioner is entitled to relief under 28 U.S.C. § 2254(d) because the rescission of parole was not supported by "some evidence" and the state court's decision was an unreasonable application of federal law. Petitioner's first claim for relief should be granted.

B. *Present Danger*

Petitioner also argues there is no evidence to demonstrate he remains an unreasonable risk of danger to society or a threat to public safety based on the following:

• Petitioner has no juvenile record, his adult criminality was linked to his addiction to heroin, he has spent years in prison in recovery through Narcotics Anonymous and religious counseling, and his only other crime of violence was an assault with a deadly weapon in 1965.

• Petitioner has a stable family history with strong family ties to his brothers who have offered him shelter and employment in the family business.

• Petitioner is deeply religious and is a licensed minister who plans to reach out to those who might succumb to addiction and criminality.

• Petitioner is 69, a brittle diabetic and remorseful for his actions. Petitioner's last prison disciplinary was in 1997.

(Traverse at 2.)

**\*12** Respondent denies the commitment offenses and petitioner's criminal history have lost their predictive value and are no longer evidence of petitioner's current risk of danger to society. (Answer at 4.) Respondent argues that the United States Supreme Court has "endorsed the concept that '[p]revious instances of violent behavior are an important indicator of future violent tendencies.' " (Answer at 11, quoting *Heller v. Doe by Doe,* 509 U.S. 312, 323, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) [internal citations omitted]. [FN10][FN11]

> FN10. California courts have noted conflicting opinion in this regard: "a large number of legal and scientific authorities believe that, even where the passage of time is not a factor and the assessment is made by an expert, predictions of future dangerousness are exceedingly unreliable. [Citations omitted.] According to a Task Force of the American Psychiatric Association, "[n]either psychiatrists nor anyone else have demonstrated an ability to predict future violence or dangerousness. (Am.Psych.Assn., Task Force Report 8, *Clinical Aspect of the Violent Individual* (1974) at p. 28, 221 Cal.Rptr. 298.) As our Supreme Court has also noted, 'the same studies which proved the inaccuracy of psychiatric predictions [of dangerousness] have demonstrated beyond dispute the no less disturbing manner in which such

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4224561 (E.D.Cal.)
(Cite as: 2008 WL 4224561 (E.D.Cal.))

prophecies consistently err: they predict acts of violence which will not in fact take place ('false positives'), thus branding as 'dangerous' many persons who are in reality totally harmless. [Citation.]' "[Citation omitted.] *In re George Scott*, 133 Cal.App.4th 573, 595 n. 9, 34 Cal.Rptr.3d 905 (1st Dist.2005).

FN11. *Heller* is distinguishable because it was addressing the involuntary commitment of mentally retarded individuals who suffer from "a permanent, relatively static condition." *Heller*, 409 U.S. at 323. Unlike the individuals addressed in *Heller*, criminals can be rehabilitated.

The state court did not address whether petitioner posed a current risk of danger to society; thus, the court will review the record de novo.

Under California law, parole may be denied if the Board "determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for [the] individual ." California Penal Code § 3041(b). However,

[a] prisoner's commitment offense may constitute a circumstance tending to show that a prisoner is presently too dangerous to be found suitable for parole, but the denial of parole may be predicated on a prisoner's commitment offense only where the Board can "point to factors beyond the minimum elements of the crime for which the inmate was committed" that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released. *[In re] Dannenberg*, 34 Cal.4th [1061] at 1071, 23 Cal.Rptr.3d 417, 104 P.3d 783 (Cal.2005). Factors beyond the minimum elements of the crime include, *inter alia*, that "[t]he offense was carried out in a dispassionate and calculated manner," that "[t]he offense was carried out in a manner which demon-

strates an exceptionally callous disregard for human suffering," and that "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Cal.Code. Regs., tit. 15 § 2402(c)(1)(B), (D)-(E).

*Irons*, 479 F.3d at 663. "Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." Cal.Code Regs. tit. 15 § 2281(a).

Recently, the California Supreme Court provided clarification of the "some evidence" standard to be employed by state courts reviewing denial of parole decisions:

because the paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety, and because the inmate's due process interest in parole mandates a meaningful review of a denial-of-parole decision, the proper articulation of the standard of review is whether there exists "some evidence" that an inmate poses a current threat to public safety, rather than merely some evidence of the existence of a statutory unsuitability factor.

**\*13** *In re Richard Shaputis*, 44 Cal.4th 1241, --- Cal.Rptr.3d ----, 190 P.3d 573, 2008 WL 3863608 at \*7 (Cal.), citing *In re Lawrence*, 44 Cal.4th 1181, 2008 WL 3863606 at 2 (Cal.).

There is simply no evidence in this record to demonstrate that petitioner "constitutes a current threat to public safety." *In re Lawrence*, at \*7; *Irons*, 479 F.3d at 663; *see also In re Rosenkrantz*, 29 Cal.4th 616, 682-83, 128 Cal.Rptr.2d 104, 59 P.3d 174 (Cal.2002), *cert. denied*, 538 U.S. 980, 123 S.Ct. 1808, 155 L.Ed.2d 669 (2003) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more ag-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4224561 (E.D.Cal.)
**(Cite as: 2008 WL 4224561 (E.D.Cal.))**

gravated or violent than the minimum necessary to sustain a conviction for that offense").

"[D]ue consideration" of the specified factors requires more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision-the determination of current dangerousness. "It is well established that a policy of rejecting parole solely upon the basis of the type of offense, without individualized treatment and due consideration, deprives an inmate of due process of law."

*In re Lawrence,* at *7, quoting *Rosenkrantz,* 29 Cal.4th at 684, 128 Cal.Rptr.2d 104, 59 P.3d 174.

Here, although petitioner had an extensive criminal history, it was not particularly violent. Petitioner had one conviction for misdemeanor assault with a deadly weapon in 1965; then, in 1983, was convicted of using a knife during a kidnaping for robbery. Petitioner was not convicted of inflicting bodily injury on the victim. Indeed, petitioner was not convicted of inflicting bodily injury on any of the victims in the commitment offenses. As noted above, petitioner's criminal history was primarily drug-related, and was not marred by the type of violence often found in the histories of inmates serving life sentences.

Moreover, while prior violent behavior may be an important indicator of future violent tendencies, the passage of time and efforts undertaken by the prisoner during that time, reduces the predictive value of those early violent tendencies. Petitioner had benefit of rehabilitation by education, employment, Narcotic's Anonymous ("NA"), religious conversion and good conduct for nineteen years before the Board rescinded his parole in 2003.

The psychologists' reports also demonstrate petitioner's low threat of danger to public safety. On June 11, 2002, Gary Collins, Ph.D., assessed petitioner's level of dangerousness as follows:

His extensive prior arrest record for drug-related offenses implied that he would be a poor candidate for rehabilitation. However, his behavior within prison for several years and the content of his behavior when other reporters have spoken with him refute that negative point of view.

Conditions for changes which have reduced this man's violence potential to a low level in the writer's opinion include:

*14 A. Age.

B. Years of apparent abstinence from addicting drugs.

C. The development of a positive philosophy organized around religious concepts.

D. Better self-esteem through teaching of values imbedded in his religious beliefs.

E. No sign of psychiatric disorder.

F. More capable functioning than psychological testing had implied would be possible.

G. Family support and employment if paroled.

(DOJ001622.)

In the October 18, 1999 psychosocial evaluation, Dean J. Clair, Ph.D., noted petitioner was not a "dangerous" person.[FN12] Petitioner's classification score had been zero since at least 1993, and

> FN12. Dr. Clair acknowledged petitioner was found to be "manipulating staff" in 1996 and had received a number of 128 writeups based on "his being occasionally resistive and cantankerous in his dealings with staff." (DOJ000950; 1544.)

[a]t age 60 and with several potentially debilitating medical problems, this man would face living out his remaining days in prison if he were responsible for even a minor felony. His own words were, "I'm never never going to return to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4224561 (E.D.Cal.)
(Cite as: 2008 WL 4224561 (E.D.Cal.))

Page 14

prison!"
(DOJ000950; 1544.) In the August 27, 1998 Psychological Evaluation, Robert Wagner, Ph.D., concluded petitioner's "potential for violence is very low and would most likely hold if paroled." (DOJ000954; 1546.)

On April 3, 1997, Steven J. Terrini, Ph.D., performed a psychological evaluation and concluded that "given [petitioner's] greater maturity, his Christian orientation (which appears to be genuine) and his lack of CDC-115s, his violence potential is estimated to be below average relative to this inmate population at this time." (DOJ001124.)

In 1996, Bruce M. Bakeman, Ph.D., concluded petitioner "continues to be emotionally stable, and if released, should present no danger to the general population." (DOJ000956; DOJ000992.)

On June 17, 1993, Bruce M. Bakeman, Ph.D., performed a psychiatric evaluation, and stated if petitioner were released, "he should be able to maintain these gains, provided he avoids alcohol and illicit drugs." (DOJ000958.) "If he is considered for parole, his level of dangerousness should be less than for the average inmate." (*Id.*) In the 1991 psychiatric evaluation, Dr. S.J. Falkenstein, M.D., concluded that "[i]n a less controlled setting, such as return to the community, [petitioner] is considered likely to continue improvement," and "[v]iolence potential outside a controlled setting in the past is considered to have been less than average and at present is estimated to be the same." (DOJ000959; DOJ1783; DOJ000707.) On October 6, 1988, in petitioner's first psychological evaluation, V.L. McGaughran, Ph.D. concluded that:

> There is an indirect relationship between the diagnosed psychopathology and the instant offense. Previous violence potential would have been rated as above average. That potential has been decreased and currently would be rated as average for this population. At this time there is no clinical indications for psychotherapeutic programming.

(DOJ000961.)

The California Code of Regulations also calls for consideration of a prisoner's behavior before, during and after the commitment offense as well as any treatment programs that a prisoner has attended or continues to attend. While petitioner's drug abuse prior to the offenses and conduct during the offenses do not weigh in favor of parole suitability, his exemplary conduct since his incarceration does. Petitioner has not received a rules violation report since 1997.[FN13]

> FN13. Petitioner has received three 115s during his entire incarceration, none of which were for violent behavior. His last disciplinary conviction was in 1997 for intentional manipulation of staff in an effort to negate his work assignment. (DOJ000390.)

**\*15** While not clear that there was a strong causal connection between petitioner's use of heroin and his commitment offenses and criminal history, his past use of heroin does not by itself reasonably establish current unsuitability because there is no additional evidence to complete a chain of reasoning between his past drug use and a finding that because of it he currently poses an unreasonable risk of danger if released. In other words, in the absence of some evidence to support a reasonable belief that petitioner might start using heroin again, the fact that he was addicted to heroin more than 20 years ago does not by itself represent some evidence that he is currently dangerous.

Moreover, here the record does not contain any evidence to support reasonable grounds to believe petitioner might start using heroin if released. There is no evidence that petitioner's former desire for heroin might still be present. The record reveals that he has been clean and sober for a substantial period of time. There is no evidence that he refused, failed, or did poorly in NA. And there is no evidence that petitioner ever used any type of illicit substance or alcohol during his incarceration.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4224561 (E.D.Cal.)
(Cite as: 2008 WL 4224561 (E.D.Cal.))

"[A]lthough the state expects prisoners to behave well in prison, the absence of serious misconduct in prison and participation in institutional activities that indicate an enhanced ability to function within the law upon release are factors that must be considered on an individual basis by the Governor in determining parole suitability." *In re Rosenkrantz*, 29 Cal.4th 616, 682, 128 Cal.Rptr.2d 104, 59 P.3d 174 (Cal.2002).

Although an addiction to heroin may have been the root cause of petitioner's commitment offenses and criminal history, that addiction alone does not constitute some evidence that petitioner might start using drugs and become violent again, and therefore that he currently poses an unreasonable risk of danger if paroled. Indeed, if petitioner's past use of heroin established this unsuitability, the Board could deny parole for the rest of petitioner's life based on this unchanging factor, without regard to subsequent evidence that petitioner has no current desire for heroin and that there is little current likelihood of drug relapse, let alone a return to violent conduct as a result of it. At the time of his commitment offenses, petitioner was estranged from his family. Petitioner now has the support of his family, with an offer of housing and employment awaiting his release.

By the 2003 rescission hearing, petitioner had been denied parole at nine subsequent parole consideration hearings before he was granted parole at the 2002 Board hearing, after he had served nineteen years. (He has now been in custody for twenty-four years.) Petitioner's classification score has been zero since at least 1993 .FN14

> FN14. Petitioner's classification score was 101 in 1985 (DOJ000352), 22 on February 2, 1988 (DOJ000351), and reduced to 4 on June 20, 1990 (DOJ000348).

Unlike the petitioners in *Biggs, Sass* and *Irons*, petitioner has served 14 years beyond his minimum eligible parole date of 1994.

*16 The instant case is similar to *In re Lawrence* in that the commitment offenses and criminal history were repeatedly relied on to deny parole notwithstanding petitioner's exemplary behavior and evidence of rehabilitation since the commitment offenses. Here, petitioner's age, health, religious beliefs, stable family history and present relationships, lack of prison disciplinaries since 1997, commitment to sobriety, and psychologists' reports demonstrate he no longer poses an unreasonable risk to public safety. In light of the extensive evidence of petitioner's in-prison rehabilitation and exemplary behavior, the reliance on the unchanging facts of the commitment offenses and criminal history to deny petitioner parole for the tenth time, twenty-four years after the commitment offenses, violated his right to due process. "The 'some evidence' standard provides more protection than against fabricated charges or bureaucratic mistakes; the 'some evidence' standard also protects against arbitrary decisions. *See Hill*, 472 U.S. at 454-55, 457." *Tash v. Curry*, 2008 WL 3984597 at *7 (N.D.Cal.). The rescinding panel's failure to determine whether petitioner's commitment offenses and criminal history demonstrated petitioner posed a present danger to society constituted an unreasonable application of *Hill. Id.* The petition should be granted.

In accordance with the above, IT IS HEREBY RECOMMENDED that:

1. Petitioner's application for a writ of habeas corpus be granted; and

2. Respondents be directed to release petitioner on parole forthwith.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within ten days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4224561 (E.D.Cal.)
**(Cite as: 2008 WL 4224561 (E.D.Cal.))**

and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst,* 951 F.2d 1153 (9th Cir.1991).

E.D.Cal.,2008.
Adams v. Schwartz
Not Reported in F.Supp.2d, 2008 WL 4224561 (E.D.Cal.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.