## PAGE 137   SHEET 35                                        560

### Cincotta-cross-Horlick

1  A.   And then there is a cafe.  I think the Cafe Segesta or
2  Cafe Sicilia.
3  Q.   Which is?  Sicilia or Segesta?
4  A.   I really can't recall.
5  Q.   You do know there is a cafe there?
6  A.   There is a cafe.
7  Q.   And white Camaro is written on there paper?
8  A.   White Camaro, 5:38.
9         MR. ROSE:   If I may read this document?
10        THE COURT:   Certainly.  It is in evidence.
11        MR. ROSE:   In front of realty 65th Street and Bay
12 Parkway, 5:38, white Camaro.
13        Thank you, sergeant.
14        THE COURT:   Do you have any questions, Mr. Horlick?
15        MR. HORLICK:   Yes, Your Honor.
16 CROSS-EXAMINATION
17 BY MR. HORLICK:
18 Q.   Sergeant, that little paper that you have just looked at,
19 did you ever determine whose handwriting it was written in?
20 A.   No, sir.
21 Q.   Were there any tests done to determine who wrote these
22 five or eight pages of handwriting?
23 A.   Which five or eight pages?
24 Q.   I will hold them up for you.
25 A.   No.

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

## PAGE 138                                                    561

### Cincotta-cross-Horlick

1  Q.   That's Exhibit 12-A-5.
2         No specific tests or handwriting tests?
3  A.   No.
4  Q.   The diary that you say you found which is 12-A-6 in
5  evidence, this red book, did you look through it to see if
6  there were other appointments similar to that?
7  A.   Yes, I did.
8  Q.   Did you find similar notations about places to go or cars
9  to bring?
10 A.   Yes, I did.
11        But not for that date.
12 Q.   No, these are other dates.
13 A.   Yes, right.  Exactly.
14 Q.   That white Camaro, did you ever learn whether or not it
15 was the property of Mr. Sisona?
16 A.   He was in possession of it.  He dealt in cars.  I did not
17 research it to see if the title was in his name.  He was in
18 the business of selling used cars.  At the time of his death
19 he had about five or six cars in his possession.
20 Q.   On December 7, 1988, was that white Camaro a stolen car
21 or was it properly owned and registered?
22 A.   It was not stolen.  The status of his registration was in
23 question.  It was not properly registered.
24 Q.   Since 1988, have you been able to determine the status of
25 the registration?

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

## PAGE 139                                                    562

### Cincotta-redirect-Rose

1  A.   No.
2  Q.   What do you mean when you say the status of the
3  registration?
4  A.   I mean that the vehicle wasn't reported stolen.  It was
5  not currently registered.
6  Q.   Correct on December 7?
7  A.   Right.
8  Q.   By the way, did it have any license plates on it?
9  A.   Yes.  It had a Jersey license plate on it that did not
10 belong to that car.
11        MR. HORLICK:   Thank you.
12        THE COURT:   All right.
13 REDIRECT EXAMINATION
14 BY MR. ROSE:
15 Q.   Do you know where Dino Marino lived in relation to Angelo
16 Sisona?
17 A.   At the time I knew exactly where he lived.  Right now I
18 can only recollect that it was like a block or two away on one
19 of the bay streets.  Bay 41 or so.
20        MR. ROSE:   Thank you, sergeant.
21        THE COURT:   All right.  Do you have another -- thank
22 you.
23        Do you have another witness?
24        MR. O'CONNELL:   Yes, Your Honor.
25        The government is calling Thomas Carew—

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

## PAGE 140                                                    563

### Carew-direct-O'Connell

1         THE COURT:   Okay.
2         MR. O'CONNELL:   It will just take a minute to arrange
3  to bring him in, Your Honor.
4         (Pause.)
5         THE COURT:   All right.  Just stop there and face me
6  and raise your right hand, while these gentlemen sit down.
7  T H O M A S     C A R E W
8         called as a witness, having been first duly sworn,
9         was examined and testified as follows:
10 DIRECT EXAMINATION
11 BY MR. O'CONNELL:
12        THE COURT:   Please be seated.
13        Would you state your name, please?
14        THE WITNESS:   Thomas Carew.
15        THE COURT:   How do you spell your last name?
16        THE WITNESS:   C A R E W.
17        THE COURT:   Okay.  That microphone isn't on.
18 Mr. Carew.  So you could sit back and keep your voice up so
19 everyone can hear.
20        THE WITNESS:   Okay.
21        MR. O'CONNELL:   May I proceed, Your Honor?
22        THE COURT:   Please.
23        All right, Mr. O'Connell.
24 Q.   Mr. Carew, are you testifying pursuant to a plea
25 agreement with the government?

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

**Carev-direct-O'Connell** 564

1 A. Yes, I am.

2 Q. A cooperation agreement?

3 A. Yes.

4 MR. O'CONNELL: nag I approach the witness, Your

5 Honor?

6 THE COURT: Yes.

7 Q. I show you what's been marked as Government Exhibit

8 3500-1478. Please take a moment to examine it.

9 (Pause.)

10 Is that a signed copy of your agreement, your

11 cooperation agreement, Mr. Carev?

12 A. Yes.

13 Q. Does that bear your signature and the signature of

14 government counsel and of your own attorney?

15 A. Yes.

16 Q. Is that the entire agreement that you have with the

17 United States Government?

18 A. Yes.

19 Q. Mr. Carev, pursuant to that agreement, am I correct you

20 pled guilty to all criminal charges in the indictment in this

21 case, the pending case?

22 A. Yes.

23 Q. Yes, sir?

24 A. Yes.

25 Q. Keep your voice up, please.

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

---

**Carev-direct-O'Connell** 566

1 You were arrested in this case in approximately

2 October 1992; is that correct?

3 A. Yes.

4 Q. Earlier in your life, you were arrested previously?

5 A. Yes, I was.

6 Q. Tell the jury when you were arrested for the first time

7 and the offense for which you were arrested?

8 A. In 19 and 61, I was arrested for conspiracy to armed

9 robbery.

10 Q. Were you convicted in that case?

11 A. Yes, I was.

12 Q. Did you receive a sentence?

13 A. I did, yes.

14 Q. Tell the jury what sentence you received?

15 A. I received a three and a half to seven year sentence.

16 Q. Mr. Carev, around that time, 1960, 1961, prior to your

17 arrest, had you engaged in other criminal activity other than

18 that specific offense, for which you were arrested?

19 A. Yes.

20 Q. Explain to the jury just very briefly the kinds of

21 criminal activity that you were engaging in back in 1960,

22 1961, around that time?

23 A. I was engaged in gambling, selling stolen property and

24 armed robbery.

25 THE COURT: Keep your voice up.

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

---

PAGE 142

**Carev-direct-O'Connell** 565

1 A. Okay.

2 Q. Those charges included racketeering, murder and

3 extortion; is that correct?

4 A. Yes.

5 Q. Could you tell the jury what sentence you are currently

6 facing under your cooperation agreement and guilty plea in

7 this case?

8 A. Zero to life imprisonment.

9 Q. Could you tell the jury what your understanding is as to

10 what your obligation under this cooperation agreement is?

11 A. To tell the truth and tell everything I know.

12 Q. Under your agreement with the government, what promises

13 has the government made to you in return for your cooperation

14 and your compliance with this agreement?

15 A. They didn't make any promises. They just said that if I

16 testify truthfully they will give the judge a letter that I --

17 that they feel that I testified truthfully.

18 Q. Has anyone in the government promised you a specific

19 sentence of any kind in return for your cooperation?

20 A. No.

21 Q. What is your understanding as to who will determine what

22 sentence you will receive?

23 A. The judge.

24 Q. Mr. Carev, I'd like to turn your attention now to a brief

25 inquiry into your own background.

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

---

PAGE 144

**Carev-direct-O'Connell** 567

1 THE WITNESS: Okay.

2 Q. Back around that same time, did there come a time when

3 you met a member of an organized crime family that you later

4 became associated with?

5 A. Yes.

6 Q. Who was that person?

7 A. Chris Funari, Christy Tic.

8 Q. What crime family did you learn he belonged to?

9 A. Lucchese Crime Family.

10 Q. In the early 1960s or approximately 1960, could you

11 explain to the jury how your relationship with Mr. Funari

12 began and how frequently you began to see him?

13 A. Yes. I -- I had a -- an argument with a couple of guys

14 and they went -- they went to Christy and because -- because I

15 started hanging out at his club and he straightened out the

16 argument and I started staying with him more and more.

17 Q. At the time you began staying with him, as you put it,

18 did you recognize at that time that he was a person who was

19 involved in organized crime?

20 A. Yes.

21 Q. You made your own deliberate decision at that time,

22 voluntarily, to become associated with that individual?

23 A. Yes.

24 Q. Is it fair to say that that was the beginning of a long

25 relationship that you had with the Lucchese Crime Family?

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

PAGE 145  SHEET 87

Carev-direct-O'Connell                                    568

1  A.  Yes.
2  Q.  Now, you testified a moment ago that you served
3  approximately three years in jail; is that correct?
4  A.  I did about thirty-one months out of the three and a half
5  to seven year bit.
6  Q.  Could you tell the jury over what period of time
7  approximately you served that particular prison sentence?
8  A.  I was convicted in 1963 and I did about six months at
9  that time and I was released on a certificate of reasonable
10 doubt pending an appeal, and I was out on an appeal bond for
11 about two years.  I went back to jail in 19 and 66 after
12 losing the appeal, and I was in jail until the end -- towards
13 the end of '68.
14 Q.  Now from the time you were arrested until the time you
15 went to jail, did you still continue from time to time to
16 engage in criminal activities?
17 A.  Yes.
18 Q.  Notwithstanding your conviction?
19 A.  Yes.
20 Q.  Did you continue to maintain your relationship with
21 Mr. Funari?
22 A.  Yes.
23 Q.  Turning your attention to the time period you were
24 actually in jail, the longer stretch, if you will, in the
25 mid-to late sixties?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 146

Carev-direct-O'Connell                                    569

1  A.  Yes.
2  Q.  Can you tell the jury whether you made any other friends,
3  if you will, or associates, associations with people who were
4  engaged in organized crime while you were actually in jail?
5  A.  Yes, Vic Amuso was in jail at the same time as I was and
6  he worked right near me.  We were friends.  And Anthony
7  Stabile was there and I was friendly with him too.
8  Q.  This individual Vic Amuso you are referring to, is that
9  the same individual who later was promoted to a very high
10 ranking position in the Lucchese Crime Family?
11 A.  Yes.  Eventually he became the boss.
12 Q.  After you came out of prison in late 1960s, did you
13 continue seeing Mr. Funari?
14 A.  Yes.
15 Q.  Did your relationship grow closer with him?
16 A.  Yes.
17 Q.  Could you explain to the jury what you began to do for
18 Mr. Funari upon your release from prison in the late 1960s and
19 rejoining?
20 A.  Well, I started to hang out with him quite a bit and
21 eventually I was -- he made me his driver and I used to drive
22 him around to his meetings and pick him up and hang out with
23 him, kind of bodyguard and driver.
24 Q.  Did you continue to engage in criminal activities in
25 addition to being his driver, bodyguard?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

Carev-direct-O'Connell                                    570

1  A.  Yes.
2  Q.  Tell the jury just generally the kinds of criminal
3  activities you engaged in after rejoining Mr. Funari in late
4  1960s?
5  A.  Selling swag or stolen property, hijacking, labor
6  racketeering enforcer, insurance fraud.  That's about it.
7  Q.  Did you ever engage in illegal gambling?
8  A.  Oh, yes, gambling and I had a juntyard.  I chopped some
9  cars.
10 Q.  Roughly over what period of time did you serve as the
11 driver for Christy Tic Funari?
12 A.  Late '60s through the middle '70s, around '76 or
13 somewhere around there.  '77.
14 Q.  You told the jury about one arrest you had in 1961.
15      During the time period in which you were working as a
16 driver for Mr. Funari, did there come a time when you were
17 arrested again?
18 A.  Yes.
19 Q.  Approximately when were you arrested for the second time?
20 A.  In 1971, I was arrested for possession of stolen
21 property.  I had a transmission from a stolen car was found in
22 my place of business, my juntyard.
23 Q.  Was this during the same time period in which you were
24 selling stolen car parts?
25 A.  Yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 148

Carev-direct-O'Connell                                    571

1  Q.  What happened to that case?
2  A.  It was dismissed.
3  Q.  Did there come a time when you were arrested for a third
4  time?
5  A.  Yes.
6  Q.  Tell the jury for what?
7  A.  In the middle '70s I was arrested for possession of
8  fireworks.  I had a garage full of fireworks and I was
9  arrested for that.
10 Q.  What was the disposition of that case, Mr. Carev?
11 A.  I paid a fine.
12 Q.  During this time period in 1970s, while you were the
13 driver for Mr. Funari, you testified a moment ago that you
14 engaged in labor racketeering.
15      Can you explain to the jury what your role was in
16 labor racketeering and what connection if any it had to
17 Mr. Funari and the Lucchese Crime Family?
18 A.  Well, at various times I worked as a shop steward on
19 construction jobs that Mr. Funari put me on, and then later
20 on, I was acting -- active in giving a couple of union guys
21 beatings to put them in line.
22 Q.  During this time period, did you consider in your own
23 mind to hold a position within that Lucchese Crime Family of
24 some sort?
25 A.  Not really.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

572

Carew-direct-O'Connell

1  Q.  Did you ever become a -- an actual member or --
2  A.  No, I can't.
3  Q.  Or soldier in the Lucchese Family?
4  A.  No, I'm Irish and I couldn't be.
5  Q.  What did you have to be in terms of ethnic background as
6  you understood it to become an actual member?
7  A.  Your father had to be Italian.
8  Q.  You were disqualified by reason of your Irish ancestry?
9  A.  Yes.
10  Q.  During that time period in the 1970s, did you meet a
11  person named Peter Chiodo?
12  A.  Yes, I did.
13  Q.  Approximately when did you meet Mr. Chiodo?
14  A.  Around 1975.
15  Q.  Briefly, could you explain the circumstances to the jury
16  that led to your meeting Mr. Chiodo?
17  A.  Mr. Chiodo had asked -- Mr. Chiodo's father had asked
18  Chris Funari to help his son Pete.  He had a dispute with some
19  members of the Colombo Crime Family, and he wanted Christy to
20  represent his son with them, and Chris did.
21      We -- he had a meeting one night in which I attended
22  and he sat down with them and he got a good decision for Pete
23  and then Pete came with him.
24  Q.  After Mr. Chiodo obtained this result that you described
25  from his meetings with Mr. Funari, did Mr. Chiodo become

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

573

Carew-direct-O'Connell

1  associated in any way with Mr. Funari?
2  A.  Yes.
3      He stayed with -- he stayed in The 19th Hole with
4  us.  He became friendly with Chris.
5  Q.  You just referred to a place called The 19th Hole?
6  A.  Yes.
7  Q.  Could you explain to the jury what The 19th Hole had to
8  do with the Lucchese Crime Family activities as you understood
9  it back in the mid-1970s?
10  A.  Well, we stayed there.  Chris kind of held court there.
11  That was his hangout.  It was his place and we stayed there and
12  we had all his meetings were -- were made there and his
13  appointments.
14      (Continued on the next page.)
15
16
17
18
19
20
21
22
23
24
25

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

574

Carew/direct/O'Connell

1  BY MR. O'CONNELL:
2  Q.  Now, by reason of your relationship with Mr. Funari, did
3  you come to know other persons who were associated with
4  Mr. Funari during that time period?
5  A.  Yes.
6  Q.  Could you give the jury a few examples of persons who
7  associated with Mr. Funari in his 19th Hole crowd back in the
8  mid-1970's?
9  A.  Nick DiCostanza, Angelo DeFendis, Frankie Bollino,
10  Frankie Hart, myself, Tommy DiDonato, Johnny Black, but Johnny
11  was in Florida, but when he came up, he came there.  That's
12  about it.  Oh, Pete Chiodo.  Do you want associates, too?
13  Q.  If you can mention associates in the 1970's?
14  A.  Associates, Dino Marino was coming around.  Dino had a
15  barbershop, and he used to cut Chris's hair.  He got friendly
16  with him and he started coming around.  Frankie Bola, B O L A.
17  Q.  You mention a Mr. Amuso, who you had met in prison from
18  the early 1960's.  Did he have any relationship with
19  Mr. Funari during this time period?
20  A.  Yes, Vic came around, and Gaspipe, Anthony Casso.  Vic
21  came around.  Anthony was around first, and then Vic came
22  around after that.
23  Q.  Did there come a time in the 1970's when certain persons
24  who were associated with Mr. Funari, who met the right
25  criteria, became actually made members of the Lochese Crime

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

575

Carew/direct/O'Connell

1  Family that were in your group?
2  A.  Yes.
3  Q.  Who were those individuals that became made members of
4  the Lochese Crime Family from among the associates around
5  Mr. Funari around that time?
6  A.  Vic Amuso, Anthony Casso, Bobby Amuso, Angelo, Nicky
7  DiCostanza, Frankie Hart, Frankie Bollino, Tommy DiDonato,
8  Johnny Black; later on, Johnny Black became a member.
9  Q.  You referred to a person by the name of Angelo.  Did you
10  know that person's last name?
11  A.  Yes, DeFendis.
12  Q.  Now, during this time period in the 1970's, you mentioned
13  that Mr. Chiodo as well as yourself were in this crew with
14  Mr. Funari, is that correct?
15  A.  Yes.
16  Q.  Did you and Mr. Chiodo ever engage in criminal activities
17  together during that time period?
18  A.  Yes.
19  Q.  And briefly describe to the jury the kinds of criminal
20  activities you and Mr. Chiodo engaged in?
21  A.  We worked crap games together, and we did one of the --
22  we did an assault on a union official together.
23      We used to sell, you know, stolen property and
24  different things like that.  I hung out with Pete quite a bit.
25  Q.  Did you become friends with Peter Chiodo?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

576

Carew/direct/O'Connell

1  A.  Yes. I'm godfather to his daughter.
2  Q.  Mr. Carew, you just referred to an assault on a union
3  official.  Do you recall who that union official was who was
4  assaulted?
5  A.  Yes. His name was Volford, James Volford.
6  Q.  What union was he connected to?
7  A.  He was in the painters' union.
8  Q.  Just very briefly, how did it come to pass that you and
9  Mr. Chiodo became involved in an assault on James Volford of
10 the painters' union?
11 A.  Jimmy Bishop, who was an official of the union, went to
12 Dino Marino and asked if Dino could get him some help to get
13 Volford out of the way so that Jimmy Bishop would have more
14 control over the union.  And Dino went to Chris, and we were
15 assigned to give him a beating.
16 Q.  Did you participate in that beating?
17 A.  Yes, I did.
18 Q.  What was the result?
19 A.  He eventually left.  I believe he resigned his position,
20 and went back to a different part of the state where he came
21 from.  I think he came from Buffalo, but I'm not sure.
22 Q.  What happened, if anything, to Mr. Bishop in connection
23 with the union?
24 A.  After that, he became very strong and he was the Luchese
25 Crime Family's guy in the union.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 154

572

Carew/direct/O'Connell

1  Q.  Did the Luchese Crime Family continue a relationship with
2  the painters' union following that episode?
3  A.  Yes.
4  Q.  For how long, as you understood?
5  A.  Right up until recently, you know, until the present.
6  Q.  Now, you testified that during the 1970's, that you
7  engaged in violence from time to time, is that correct?
8  A.  Yes.
9  Q.  One example was the beating that you participated in
10 involving Mr. Volford, is that right?
11 A.  Yes.
12 Q.  Did you learn that the Luchese Crime Family engaged in
13 murder?
14 A.  Yes.
15 Q.  Calling your attention to the mid-1970's, did there come
16 a time when you received a particular assignment where you
17 were requested to assist Anthony Casso in a certain matter?
18 A.  Yes.
19 Q.  Tell the jury what the assignment was and briefly
20 describe what happened?
21 A.  I was to meet Anthony in a club on 15th Avenue.  It was
22 owned by a fellow by the name of Swaggie at that time.  We had
23 previously had the crap game in the basement of that club.  I
24 was told to meet Anthony there, that he needed my help with
25 something, and I went there and rang the bell and banged on

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

578

Carew/direct/O'Connell

1  the door.  Anthony came to the door.  He led the way.  He
2  closed the door.  He led the way to the basement.  There was a
3  body on the floor and I helped him put the body in a bag, and
4  I cleaned up the blood, and we carried the body out through
5  the back door.  And there was an alleyway and he had a car
6  parked there.  We put the body in the trunk of the car and we
7  took it and dumped it, dropped it on the street off West 6th
8  Street, I think it was West 7th and Avenue V.  A little dead
9  end street.  We put the body in there, and then we left.
10 Q.  Did you participate in the murder of that individual?
11 A.  No, I didn't.
12 Q.  Had you participated in the planning of that murder?
13 A.  No.
14 Q.  Was your role limited to what you just described in your
15 testimony?
16 A.  Just that was it.
17 Q.  Did Mr. Casso indicate, at that time when he brought you
18 to that body lying on the basement floor, who had killed that
19 individual?
20 A.  No.  Who had killed him?
21 Q.  Who had killed that individual?
22 A.  I assumed he did.  He was the only one there.  He said
23 that --
24 Q.  Was there a weapon in the area of the body?
25 A.  Yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 156

579

Carew/direct/O'Connell

1  Q.  What kind of weapon?
2  A.  It was -- I believe it was an automatic weapon.  It was
3  on the sink.  I didn't really pay attention.  He picked it up
4  and took it after that.
5  Q.  Turning your attention to the late 1970's, did there come
6  a time when you actually received an assignment from
7  Mr. Fanari to murder the son of a Luchese member?
8  A.  Yes.
9  Q.  Who was that individual?
10 A.  Joey Abbinanti.  He was the son of a guy by the name of
11 Pete the Killer.
12 Q.  Was Joey Abbinanti killed?
13 A.  No.  We did some surveillance.  While that was in
14 progress, the thing was called off.  They told us the contract
15 was off at that time.
16 Q.  So there's no misunderstanding with your role in that
17 particular episode, when you were asked to participate by
18 Mr. Fanari, did you agree to it?
19 A.  Yes.
20 Q.  Over the years in the 1970's, Mr. Carew, in the course of
21 your experience, did you come to learn that the Luchese Crime
22 Family, including Mr. Fanari's crew, would store weapons for
23 use by its members and associates from time to time?
24 A.  Yes.
25 Q.  Did you ever become involved in the storing of weapons?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

Carew/direct/O'Connell                                          580

1   A.   Yes.
2   Q.   Could you explain to the jury what kinds of weapons you
3   stored for the Luchese Crime Family and over what period of
4   time?
5   A.   Well, myself and I believe two other guys were given
6   attache cases that held handguns.  The one I had had ten
7   handguns in it, and I put it away.
8   Q.   For how long did you store this case of handguns?
9   A.   I had it a long time.  I gave it to Peter Chiodo and
10  Anthony Casso around '87, '88.  So I had to have it probably
11  close to ten years.
12  Q.   Apart from the guns that you stored for the Luchese Crime
13  Family, did you also keep guns for yourself?
14  A.   Yes, I did.
15  Q.   Tell the jury the kinds of guns that you would have at
16  various times over the years?
17  A.   I had a machine gun with a silencer.  I had a couple of
18  automatic pistols with silencers.  I had regular Smith &
19  Wesson .38's, handguns.
20  Q.   Did there come a time when you decided to get rid of all
21  the weapons in your possession?
22  A.   Yes, I did.
23  Q.   Was there a particular event that took place which
24  influenced you to make that decision?
25  A.   Yes.

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

Carew/direct/O'Connell                                          581

1   Q.   What was the event that made you make that decision to
2   get rid of all the weapons you had?
3   A.   Well, Peter Chiodo was shot, and he was cooperating with
4   the government, so I got rid of everything that I had in my
5   possession.
6   Q.   Now, turning your attention back to the late 1970's, the
7   time period in which you were the driver, as you described it,
8   for Mr. Funari.  You testified that Mr. Funari was a made
9   member of the Luchese Crime Family, am I correct?
10  A.   Yes.
11  Q.   Did there come a time in the late 1970's when Mr. Funari
12  was promoted to a higher position in the Luchese family?
13  A.   Yes.
14  Q.   Tell the jury what position and approximately when?
15  A.   He was made captain I think it was around '77, something
16  like that, somewhere in that vicinity.  1977, I think.
17  Q.   Up until the time that Mr. Funari became a captain, you
18  were his driver?
19  A.   Yes.
20  Q.   Did Mr. Funari's promotion to captain affect you and your
21  position with Mr. Funari in any way?
22  A.   Well, when you're in that position, you have to have a
23  made member so your running around, because you have to make
24  appointments with other people, and sometimes you sit in on
25  different things.  And there, usually the protocol was, a made

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

Carew/direct/O'Connell                                          582

1   member had to do that.  Some guys might not want to, somebody
2   who wasn't a made member, or wouldn't want to make
3   appointments with them and everything.  They would want to
4   deal with a member.
5   Q.   Did you lose your position then as Mr. Funari's driver?
6   A.   Yes.
7   Q.   Following that change in your position in the late
8   1970's, did there come a time when you reduced your
9   involvement, your active involvement, with the Luchese Crime
10  Family?
11  A.   Yes.
12  Q.   Approximately when did that happen?
13  A.   Around the end of '79, I started -- I had a couple of
14  legitimate business opportunities, and I went and asked if it
15  would be all right if I took them and spent less time, you
16  know, with the group, and I had everybody's blessing.  They
17  let me go.
18  Q.   When you say 'everybody's blessing,' was there anybody in
19  particular who allowed you to dissociate yourself from active
20  involvement with the Luchese family?
21  A.   Yes, Chris Funari.
22  Q.   Could you just very briefly describe the kinds of
23  activities you were planning to engage in once you separated
24  from the Luchese family?
25  A.   Yes.  I had an opportunity to go into the jobber business

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

Carew/direct/O'Connell                                          583

1   in the clothing center, sell job lots of clothing, and I
2   wanted to take it.
3   And I had started to buy and sell some buildings, fix
4   them up and sell them, you know, one-story taxpayer buildings
5   I was fixing and selling.  That's what I wanted to do.
6   Q.   Is it fair to say that up until now, throughout the
7   1960's, 1970's, that you didn't declare or report to the
8   government all of the income you were earning in your various
9   illegal activities?
10  A.   Yes.  That's fair to say.
11  Q.   Is it also fair to say that throughout the next decade,
12  you followed that same pattern and failed to report all of
13  your income from your various activities?
14  A.   I declared some, but I didn't declare it all, no.
15  Q.   Now, you described several kinds of businesses that you
16  were planning on entering into.  Did you, in fact, go into the
17  business of selling job lots of clothing and enter into the
18  construction business starting in late 1979 and 1980?
19  A.   Yes, I did.
20  Q.   During that time period, so the jury understands clearly,
21  did you still remain friendly, if you will, with the Luchese
22  Crime Family figures you had been associated with for the past
23  twenty years?
24  A.   Yes, I did.
25  Q.   Did you still, from time to time, go to see Mr. Funari

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

PAGE 161

Carew/direct/O'Connell                                584

1  over in the 19th hole?

2  A.  Yes.

3  Q.  You described some legitimate business activities you

4  engaged in, starting in 1979 or 1980, Mr. Carew?

5  A.  Yes.

6  Q.  Despite moving into some legitimate businesses, did you

7  nevertheless, from that time forward, also engage in criminal

8  activities from time to time?

9  A.  Yes, I did.

10 Q.  Did you engage in any criminal activities tied to the

11 clothing business?

12 A.  Yes, I did.

13 Q.  Briefly, tell the jury what kind of criminal activities

14 you engaged in that area?

15 A.  I was manufacturing knock-off, what they call knock-off

16 jeans.  I would make a jean with the same label and hangtags

17 and everything of a major-name jean, and I would sell them

18 through vendors that I had become acquainted with.

19 Q.  You testified back in the 1970's from time to time you

20 would sell stolen property?

21 A.  Yes.

22 Q.  Did opportunities to sell stolen property present

23 themselves, in the 1980's, to you from time to time?

24 A.  Occasionally, yes.

25 Q.  And did you engage in that kind of activity?

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

PAGE 162

Carew/direct/O'Connell                                585

1  A.  I did, a couple of times, yes.

2  Q.  Did there come a time when you defrauded an insurance

3  company in connection with a car?

4  A.  Yes.

5  Q.  Very briefly, what did that involve?

6  A.  I claimed a car was stolen, and I collected the money,

7  the insurance company money.

8  Q.  With regard to the construction business, could you

9  briefly describe the type of construction businesses you

10 engaged in in the 1970's?

11 A.  I had a concrete company, and I used to do foundations

12 and sidewalks and things like that.  I had another company

13 that dealt strictly in home improvement and in building of

14 homes, and that's what I did.

15 Q.  When you say you had a concrete company, did you actually

16 manufacture concrete?

17 A.  No.  We put in the foundations and the frames and

18 everything, the forms for the foundations.  We owned the

19 forms, and we set foundations and footings for other

20 builders.  And we did sidewalks, in general, concrete work,

21 curbs and sidewalks, things like that.

22 Q.  So you were a contractor of sorts involved in concrete

23 foundation installation, and sidewalks?

24 A.  Yes.

25 Q.  That area?

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

Carew/direct/O'Connell                                586

1  A.  Yes, as well as building houses.  Yes.

2  Q.  Now, in the mid-1980's, did there come a time when a

3  particular Luchese member asked you to work on a construction

4  job on his residence?

5  A.  Yes.

6  Q.  Who was that Luchese member in the 1980's who asked for

7  your services in construction-related work on a residence?

8  A.  Anthony Casso.

9  Q.  Could you just briefly describe the job that Mr. Casso

10 asked you to do?

11 A.  Anthony had some plans that he had for a house that he

12 wanted to be built on a lot he owned on Avenue X, in the Mill

13 Basin section of Brooklyn.  The house was to be put on a plot

14 that there was an existing house on.

15      He wanted the existing house to be demolished and to

16 put a foundation and everything in, footings and foundation in

17 to support the new house that he wanted to have built there,

18 and he wanted me to guide him through it.  He asked me if I

19 could spend some time and give him some advice, that he asked

20 me to do the foundation work, which I did.

21 Q.  I would like to return to that matter in a moment.  I

22 would like to ask you a few other questions first.

23      Mr. Carew, throughout your criminal career, were you

24 ever involved in selling, manufacturing, importing or using

25 narcotics or drugs of any kind?

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

PAGE 164

Carew/direct/O'Connell                                587

1  A.  No.

2  Q.  Mr. Carew, did there come a time when a particular

3  Luchese member who you knew to be involved in a drug deal

4  asked you for particular assistance on that drug deal?

5  A.  Yeah.

6  Q.  Who was that Luchese member who asked for the help?

7  A.  Mike DeSantis asked me to do him a favor and sit on a

8  house, be kind of a watchman on a house that he intended to

9  bring some drugs into.  He was going to put a van in the garage,

10 and he wanted to make sure the house was clean and that nobody

11 went near it.

12 Q.  Were the drugs ever brought to the house?

13 A.  No.  The load was confiscated.

14 Q.  Approximately when did Mr. DeSantis ask you to perform

15 that function?

16 A.  In 1990.  I guess it was the end of the summer of 1991, I

17 believe.

18 Q.  On another occasion, did some other person, at a previous

19 time, who you also knew was involved in drug dealing, once ask

20 you to do him a favor?

21 A.  Yes, a fellow by the name of Ray Fontaine.  He asked me

22 to mediate a dispute he had with one of his partners on a drug

23 deal.  The guy took a bunch of pot that they had, and Ray

24 wanted his share back.  And I mediated the deal and they had

25 an agreement who got what.

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

Carew/direct/O'Connell                    588

1 Q.   Were you involved in that pot deal?

2 A.   No.

3 Q.   What was your understanding of why Mr. Fontaine looked to
4 you to help mediate his dispute?

5 A.   Well, more or less, it was like a strong-arm reason. He
6 felt I had a reputation that might get him the results he
7 wanted.

8 Q.   What was the result?

9 A.   He got the results he wanted. They made an agreement on
10 the goods that they had, and Rag got his share and the other
11 guy got his share.

12 Q.   Did you have to engage in violence to accomplish that?

13 A.   Yes.

14 Q.   Were you prepared to, if necessary?

15 A.   Yes.

16 Q.   I would like to return to the construction job Mr. Casso
17 asked you to perform -- is that the mid-1980's, approximately?

18 A.   I believe it was around the end of '86, sometime in '86,
19 the summer of '86.

20 Q.   Did you work on that project over a period of time?

21 A.   Yes, I did. We had -- as I said before, there was an
22 existing house there, so I had to -- he had a building permit
23 that was a reconstruction permit.

24      It wasn't a total brand-new house, so we had a leave
25 a couple of walls up, and we had to be a little delicate about

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

Carew/direct/O'Connell                    590

1 I thought Pete would go for it. And I said, I think so, but I'm
2 not sure, you know. He's doing construction up in Jersey.
3 And I wasn't sure. But I agreed to go to Pete and ask him,
4 which I did.

5 Q.   Now, is it fair to say, Mr. Carew, that discussions
6 regarding the straightening out, as you put it, or the making
7 of a member in the Luchese Crime Family, is something that
8 ordinarily would only be discussed with and among some
9 members?

10 A.   Yes.

11 Q.   Could you explain to the jury what your understanding was
12 as to why Mr. Casso would discuss this matter with you when
13 you've explained to the jury that you weren't a made member?

14 A.   I knew Anthony a long time, and I had been around the
15 family a long time and I was friendly with Pete, and it fit
16 the time frame. I could get to Pete, and I was trusted by
17 Mr. Casso. So he told me to bring the message to him.

18 Q.   By that particular point in time, based on your
19 testimony, is it fair to say that you had been friendly with
20 members of the Luchese Crime Family for over twenty-five years
21 by that point in time?

22 A.   Middle's '80s, from '50. Twenty-five years.

23 Q.   Well, in accordance with Mr. Casso's request, did you
24 contact Mr. Chiodo?

25 A.   Yes, I did.

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

PAGE 166

Carew/direct/O'Connell                    589

1 how we put that in so that the building department didn't come
2 down on him and make him stop. So I took the house down in
3 sections, and we put in the foundation, and eventually we took
4 the whole house down. He decided not to go any further with
5 the house, and we took the other house down and we fenced in
6 the lot.

7 Q.   Throughout the time period when you were working on that
8 job, did you see Mr. Casso?

9 A.   Yes. There was several months I saw him all the time,
10 yes.

11 Q.   This is the same Mr. Casso whom you had met back in the
12 1970's or thereabouts, around Mr. Funari, is that correct?

13 A.   I know Anthony close to twenty-five, thirty years, yes,
14 the same one.

15 Q.   Turning your attention to late 1986, around the turn of
16 the year, early 1987, did there come a time when Mr. Casso
17 brought up in conversation with you a very specific matter
18 concerning your friend Peter Chiodo?

19 A.   Yes.

20 Q.   Tell the jury, as best you can recall, what Mr. Casso
21 discussed with you on that occasion concerning Mr. Chiodo?

22 A.   He asked me if I could get in touch with Pete. He said
23 that he would like to see him and discuss having Pete be
24 straightened out, having him be a made member.

25      He asked me what I thought about that, you know, if I

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

PAGE 168

Carew/direct/O'Connell                    591

1 Q.   Did you have a conversation concerning this matter with
2 him?

3 A.   Yes.

4 Q.   Did you receive a response from him?

5 A.   Yes.

6 Q.   What was that?

7 A.   He told me to tell Anthony and Vic that it would be his
8 honor, and I made an appointment for him to come and talk to
9 them himself.

10 Q.   Did there come a time when you learned that Mr. Chiodo
11 was actually inducted as a member into the Luchese Crime
12 Family?

13 A.   Yes.

14 Q.   How long after Mr. Casso brought this matter up?

15 A.   I would say it was probably a couple of months. I was
16 called and told to meet Pete and bring him to a location, and
17 I did.  I picked him up, I met him.

18      We met Frankie Lastorino and Bobby Amuso, and they
19 went in a car and went away. I was told to come back a couple
20 -- in a couple of hours.

21 Q.   Were you able to accompany Mr. Chiodo to this ceremony,
22 if you will?

23 A.   No. As I said, I was told to come back in a couple of
24 hours, which I did, and I met them after they came back.

25 Q.   Did you discuss what had happened with Mr. Chiodo upon

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

Carew/direct/O'Connell                 592

1  his return?
2  A.  Yes.  We had a drink congratulating Pete, and then Bobby
3  left, and I had dinner with Pete.
4  Q.  After Mr. Chiodo became a member of the Luchese Crime
5  Family, turning your attention to early 1987, did you make a
6  decision to become a little more active once again in the
7  affairs of the Luchese Crime Family?
8  A.  Yes.
9  Q.  Could you tell the jury, briefly, what led you to making
10 this decision to become more active once again in the affairs
11 of the Luchese Crime Family?
12 A.  Well, Pete said he needed me to hang out.  I knew a lot
13 of guys and I had been around a long time, and he wanted me to
14 start hanging out with him again and become active, and he
15 said there would be a lot of financial opportunities that I
16 would do good.  And then I decided to go back into it almost
17 every day, getting back into the crime family.
18 Q.  After Mr. Chiodo became an actual member of the Luchese
19 Crime Family, did he set up a headquarters of any kind or a
20 meeting place for himself and the persons around him?
21 A.  Yeah.  We put up a club on McDonald Avenue, myself,
22 Gabe, Mikey D and Pete put up some money, and we built a
23 club.  We took a building and made it a club.
24 Q.  You just referred to an individual named "Mikey D."  Do
25 you know that person's last name other than "D"?

              ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 170

Carew/direct/O'Connell                 593

1  A.  Yes, Mike DeSantis.
2  Q.  You mentioned a person named "Gabe."  Do you know that
3  person's last name?
4  A.  I'm not sure of Gabe's last name.  Lombardo, I think.
5  Yeah, Gabe Lombardo.
6  Q.  Prior to coming to court today, did you have an
7  opportunity to view certain photographs --
8  A.  Yes.
9  Q.  -- in preparation for your testimony?
10 A.  Yes.
11 Q.  At the time you reviewed them, were names that appear on
12 these photographs covered?
13 A.  Yes.
14 Q.  Were you able to verify the identity of any of the
15 persons depicted in the photographs you reviewed?
16 A.  Yes.
17    MR. O'CONNELL:  Your Honor, may I approach the
18 witness?
19    THE COURT:  Yes.
20 Q.  I would like you to examine Government's Exhibit 2-78,
21 which is in the jurors' books.
22    (Pause.)
23 Q.  Have you had an opportunity to look at it?
24 A.  Yes.
25 Q.  Is this one of the photographs you reviewed?

              ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

Carew/direct/O'Connell                 594

1  A.  Yes.
2  Q.  Are these persons indicated as "Michael DeSantis and Gabe
3  Lombardo" two of the individuals that you identified
4  previously?
5  A.  Yes.  The fellow over here next to me, his name is Sal.
6  Q.  You're off to the far right of the picture?
7  A.  The far right, yes.
8  Q.  You're indicated by your name, "Tommy Carew"?
9  A.  Yes.
10 Q.  The person next to you --
11 A.  No.  His name is not there.  Sal was around Joe Beck, and
12 that's Don Trusciello.
13 Q.  The other two individuals, Michael DeSantis and Gabe
14 Lombardo?
15 A.  Yes, that's Michael DeSantis and Gabe Lombardo.  Gabe
16 died a couple of years ago.
17 Q.  Mr. DeSantis and Mr. Lombardo were one of the first
18 persons to open the club on McDonald Avenue, along with you
19 and Mr. Chiodo?
20 A.  Yes.
21 Q.  Turn your attention to Exhibit 2-61, the photo of the La
22 Donna Rosa restaurant.  Would you go to the La Donna Rosa
23 restaurant from time to time?
24 A.  Yes.
25 Q.  Did anybody in particular operate the La Donna Rosa

              ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 172

Carew/direct/O'Connell                 595

1  restaurant?
2  A.  Yes, it was operated by Little Al D'Arco.
3  Q.  Was he associated in some way with the Luchese Crime
4  Family?
5  A.  Yes.  He was the acting boss for a while.
6  Q.  Prior to becoming acting boss, what position did he hold,
7  Al D'Arco?
8  A.  He was a captain.  He had what was the Paulie Vario's old
9  crew.
10 Q.  Are these individuals --
11    THE COURT:  They are not hearing you, Mr. Carew.
12 Q.  Can you repeat that answer?
13    THE COURT:  You have to keep your voice up.
14    Who was Al D'Arco?  He had something?
15    THE WITNESS:  He was the acting boss.  Then, prior
16 to that, he was a captain, that he had members of the old
17 Paulie Vario crew under his jurisdiction.
18 Q.  With respect to Exhibit 2-61, are these individuals
19 accurately indicated by the names on these photos, "Michael
20 DeSantis," the far right?
21 A.  That's Michael DeSantis.  That's myself.  Don Trusciello,
22 and that guy is Petey Canarsie.  You don't have a name by him.
23 Q.  Which fellow are you referring to as "Petey Canarsie"?
24 A.  The fellow in back of me.  Looks like he's coming out the
25 door.

              ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

596

Carew/direct/O'Connell

1  Q.  Did he have any connection with the Luchese Crime Family?

2  A.  He was friends with Mike DeSantis. He didn't have no

3  real connection to the family. He was a friend of Mikey

4  DeSantis.

5  Q.  If you would turn to Exhibit 2-131. Moving from left to

6  right, could you identify the persons that you know or knew,

7  and what relationship, if any, they had with any organized

8  crime entity?

9  A.  That's Angelo DeFendis. He's a soldier with us.

10      Bruno Facciola, he was a soldier.

11      Frankie the Hat. He was just an associate.

12      Sammy Kaplan was an associate and a good friend of

13  Chris', Chris Funari. When he left, he was the consoliiere of

14  the family.

15      THE COURT:  Keep your voice up, now. You don't have

16  a little private conversation with Mr. O'Connell.

17      THE WITNESS: Okay.

18      THE COURT:  Keep your voice up.

19      THE WITNESS:  Chris was the consigliere of the

20  family when he left.

21  Q.  When you say "he left," did he go on vacation or

22  someplace else?

23  A.  No. He was sentenced to a hundred years in prison for

24  his role in the Luchese Crime Family dealings.

25  Q.  Turning your attention back to 1987 once again, you

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

597

Carew/direct/O'Connell

1  testified that early on when you became active once again in

2  the Luchese Crime Family's affairs, that you and Mr. Chiodo,

3  Sabo Lombardo and Michael DeSantis opened a club on McDonald

4  Avenue?

5  A.  Yes.

6  Q.  Did Michael DeSantis have a particular business that he

7  operated in the same vicinity?

8  A.  Yes. He had a body and fender shop across the street.

9  Q.  What was the name of that business?

10  A.  Concept Auto Body.

11  Q.  Did you and Mr. Chiodo and other persons in your crew

12  meet from time to time at the Concept Auto premises in

13  addition to McDonald Avenue -- the McDonald Avenue social

14  club?

15  A.  Yes.

16  Q.  During this time in 1987, did there come a time when

17  Mr. DeSantis introduced you to a friend of his who was to

18  become an associate of your crew?

19  A.  Yes.

20  Q.  Who was that person?

21  A.  Richie Pagliarulo.

22  Q.  Do you see that person Richard Pagliarulo, who

23  Mr. DeSantis introduced you to at that time, present in this

24  courtroom today?

25  A.  Yes, I do.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

598

Carew/direct/O'Connell

1  Q.  Would you point him out and describe him for the jury?

2  A.  Richie is sitting right there in the middle between Jay

3  Horlick and Mr. Heelan.

4      THE COURT:  All right. He identified

5  Mr. Pagliarulo.

6  Q.  Mr. DeSantis introduced you to Mr. Pagliarulo?

7  A.  Yes.

8  Q.  Prior to meeting Mr. Pagliarulo, did Mr. DeSantis or

9  Mr. Chiodo describe Mr. Pagliarulo to you?

10  A.  Yes.

11  Q.  Could you tell the jury what, in substance, Mr. Chiodo

12  and Mr. DeSantis told you about Mr. Pagliarulo at this time?

13  A.  They told me he was a tough guy and he was a shooter and

14  he was a good friend of Michael's.

15  Q.  After being introduced to him, did Mr. Pagliarulo engage

16  in conversation with you from time to time directly?

17  A.  Yes.

18  Q.  In this time period when you first met Mr. Pagliarulo,

19  did he give you, from time to time, some information directly

20  from him to you concerning his own background in connection

21  with organized crime?

22  A.  Yes. Well, he had said that he originated with the Gallo

23  crew. I believe his uncle was one of the Gallos, either Joey

24  or Albert, one of the Gallos.

25  Q.  Who was Joey Gallo?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

599

Carew/direct/O'Connell

1  A.  He was the head of a faction that broke off from the

2  Colombo crew, and years ago they had a war, which is what they

3  call the Gallo wars. Joey was one of the main participants.

4  He was a leader of one of the factions.

5  Q.  Is it fair to say that over the next several years, you

6  spent a lot of time with Mr. Chiodo, Mr. DeSantis,

7  Mr. Pagliarulo and other persons involved with Mr. Chiodo and

8  his crew?

9  A.  Yes.

10  Q.  Is it also fair to say that you personally engaged in

11  plots involving murder and in an actual murder with

12  Mr. Pagliarulo and other members of that crew over the next

13  few years?

14  A.  Yes.

15      (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

Carew-direct-O'Connell                                          600

1  EXAMINATION CONTINUES
2  BY MR. O'CONNELL:
3  Q.   I'd like to turn your attention, Mr. Carew, to an
4  individual named Joseph Martinelli.
5       Did you know Mr. Martinelli or who Mr. Martinelli was
6  back in the 1980s?
7  A.   Yes.
8  Q.   Tell the jury who you knew Mr. Martinelli to be at that
9  time?
10 A.   Mr. Martinelli was the -- one of the principals in a
11 construction company called Northberry Construction.
12 Q.   Turning your attention to around the time that Mr. Chiodo
13 first became a member, in approximately early 1987.  Did there
14 come a time when a member of the Lucchese Crime Family
15 approached you and attempted to assign you to a matter
16 involving Mr. Martinelli?
17 A.   Yes.
18 Q.   Who was that Lucchese member who approached you?
19 A.   Chris Funari, Junior, Jumbo.
20 Q.   As of early 1987, who -- what position, if any, did Chris
21 Funari, Junior or Jumbo hold in the Lucchese Crime Family?
22 A.   He was acting captain for a while.  Then he was put back
23 to the regular soldier.
24 Q.   What assignment involving Mr. Martinelli did Mr. Jumbo
25 Chris Funari Junior attempt to assign to you?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 178

Carew-direct-O'Connell                                          601

1  A.   He wanted me to give -- to get Pete Chiodo and give
2  Martinelli a beating.
3  Q.   Did he explain to you the reason?
4  A.   He said that Martinelli wasn't doing the right thing with
5  money.
6  Q.   Was Mr. Chris Funari, Junior the son of Chris Funari,
7  Senior, the man you described who eventually became the
8  consigliere, later was jailed?
9  A.   Yes.
10 Q.   Did you discuss this matter with Mr. Chiodo after being
11 approached by Mr. Funari to go give Mr. Martinelli a beating?
12 A.   I did.
13 Q.   Who at that time were you and Mr. Chiodo reporting to?
14 Who was the captain in charge of Mr. Chiodo?
15 A.   Bobby Amuso, Vic Amuso's brother.
16 Q.   Did Mr. Chiodo attempt to review with any of his
17 superiors this request from Chris Funari, Junior to give
18 Martinelli a beating?
19 A.   Yes.  Well, we had talked it over and Chris had -- I had
20 asked Chris that, and he said that his father wanted it done
21 and that he had gotten the okay from Bobby Amuso.
22      We figured we'd better just check it out with Bobby
23 before we went and did anything, and before it went any
24 further, and Pete made arrangement to do that.
25 Q.   Did you later receive word from Mr. Chiodo about what

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

Carew-direct-O'Connell                                          602

1  decision had been made, whether you should proceed or not
2  proceed with the beating of Mr. Martinelli?
3  A.   Yes.  He said it was called off.  He had made an
4  appointment to meet Angelo DeFendis and Mickey DiCostanzo at
5  Angelo's club on a Saturday and proceed to give Martinelli a
6  beating after that, and they called it off and they said that
7  Bobby had nothing to do with it, that he didn't even know
8  about it.
9  Q.   Was there any repercussion that followed from this and
10 any other incidents involving Mr. Funari around this time
11 period?
12 A.   Could you repeat that?
13 Q.   Okay.
14      I will rephrase it entirely.
15      Around this time period, following this particular
16 event where Mr. Funari had asked you and others to go give a
17 beating to Mr. Martinelli, did Mr. Martinelli's position in
18 the family change?  Excuse me.  Mr. Funari's position in the
19 family change around this time period?
20 A.   Yes.
21      He -- I think they called him down on the fact that
22 he said that, you know, he tried to get something done to
23 Martinelli without getting it okayed and saying that he had it
24 okayed.  And I believe eventually he was shelved for that and
25 a few other things that took place.  They didn't -- they put

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 180

Carew-direct-O'Connell                                          603

1  him on what we call the shelf.  He was inactive.
2  Q.   Now, this event you described took place sometime in
3  early 1987, as you recall?
4  A.   Yes, I would say early '87, spring of '87.
5  Q.   Turning your attention to about two years later.  Did
6  there come a time when you learned that a murder contract was
7  placed on Joseph Martinelli?
8  A.   Yes.
9  Q.   Who informed you of this?
10 A.   Pete Chiodo.
11 Q.   What did Mr. Chiodo tell you in substance at the time?
12 A.   He said that Gas and Vic wanted Martinelli taken out, or
13 killed, and that we wound up with the assignment, and to get
14 on it and start doing some layout work, surveillance.
15 Q.   Other than yourself, was anyone else in your crew
16 assigned the task of participation in the planning, the
17 carrying out of the murder of Joseph Martinelli back in 1989?
18 A.   Yes.
19 Q.   Tell the jury who else participated in the planning and
20 attempts to kill Mr. Martinelli from that time forward?
21 A.   Mike DeSantis, myself, Richard Pagliarulo, Pete Chiodo
22 and Walter Cappello.  Greg Cappello.
23 Q.   Can you tell the jury what the first steps were that you
24 and Mr. Pagliarulo and the others took regarding your efforts
25 to plan and carry out this murder contract?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

**584**

Carew-direct-O'Connell

1 A.   Well, we did -- first thing we did, we did surveillance
2 on the house and on his place of business, Voodberry
3 Construction (sic), to see what -- where the best place to --
4 where we would have the best opportunity to take him out.
5 Q.   Was Mr. -- was the Northberry Construction site found by
6 you and the others to be a good location for attempting to
7 kill Mr. Martinelli?
8 A.   We went there on a few occasions and every time that we
9 saw Martinelli -- Mr. Martinelli there, he was always in
10 somebody's company, and there was always a lot of people in
11 his place of business. We decided that the best place was at
12 the house and that's where we -- we decided to make the first
13 attempts.
14 Q.   You used this term "surveillance." What was the purpose
15 of conducting surveillance at the Northberry site, at the
16 house that you just mentioned?
17 A.   To get familiar with his movements, so we could, you
18 know, kind of get a time when, or an opportunity where we
19 could -- could shoot him.
20 Q.   Now, did you and the others plan to use cars in the
21 course of your efforts to set up on and murder Mr. Martinelli?
22 A.   Yes, we did.
23 Q.   Could you tell the jury what plans generally were made
24 regarding what cars to use for this assignment?
25 A.   Well, we always -- we used to do -- we get a couple of

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

**586**

Carew-direct-O'Connell

1 A.   The first attempt was made at his house. We went and we
2 laid across the street. We saw his car. It was Richie,
3 myself, Mike and Gregory, and we saw his car by the house and
4 we waited for him to come. He never came out, and then Mikey
5 decided to lay in the lot. There was a lot across the
6 street. Mikey decided that the next attempt he would lay in
7 the lot, either the next evening or a couple of evenings after
8 that. He would lay in the lot and wait for the opportunity if
9 Martinelli came home, he would shoot him.
10 Q.   When you say he would lay in the lot, was there any kind
11 of screening or coverage?
12 A.   It was a wooded lot. There was bushes and leaves and all
13 kinds of things there.
14 Q.   For this --
15 A.   Fairly well wooded lot.
16 Q.   Excuse me.
17      For this particular assignment, did you and
18 Mr. Chiodo and Mr. Pagliarulo and the others decide who, if
19 anyone, among you was to be the shooter?
20 A.   Yes.
21 Q.   For the murder of Mr. Martinelli at this stage, who was
22 it decided?
23 A.   Richie wanted Mike Mike to do the work. Felt it was
24 Mike's turn to, you know, to get in and do the work.
25 Q.   It was Mr. Pagliarulo who suggested Mr. DeSantis do this

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

**585**

Carew-direct-O'Connell

1 work cars, either rentals that were rented in a phony name or
2 cars that were stolen and we would put them in the nearby area
3 and when we needed them, we would use them to do the work.
4 Q.   When you and Mr. Pagliarulo and the others engaged in
5 these efforts to kill Mr. Martinelli, would you take certain
6 precautions so as not to leave fingerprints?
7 A.   Yes.
8      While we're in the work cars we would usually wear
9 gloves.
10 Q.   What kind of gloves would you wear?
11 A.   We would either wear that -- what they call the racing
12 driver's gloves or we would wear the plastic kind of gloves
13 like a doctor wears.
14 Q.   Surgical gloves?
15 A.   Surgical gloves, yes.
16 Q.   Is it fair to say that over the next few months, you,
17 Mr. Pagliarulo and other members of your crew made a series of
18 attempts to kill Mr. Martinelli?
19 A.   Yes, we did.
20 Q.   Were any of these attempts to kill Mr. Martinelli
21 successful?
22 A.   No.
23 Q.   Can you tell the jury what location was the first
24 location that you and Mr. Pagliarulo and the others selected
25 to make an actual attempt to murder Joseph Martinelli?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

**587**

Carew-direct-O'Connell

1 work?
2 A.   Yes.
3 Q.   What role did you intend for yourself to play or what was
4 decided by you and the others would be played by yourself?
5 A.   I was going to be a crash -- I was driving a crash car
6 or, you know, one of the follow-up cars. Pickup car.
7 Q.   This series of attempts beginning at the first location,
8 Mr. Martinelli's house, what role did Mr. Pagliarulo agree to
9 play in the attempted murder of Mr. Martinelli?
10 A.   At the house?
11 Q.   At the house, and subsequently.
12 A.   At the house, he was just present on the one occasion
13 where we set up and Martinelli didn't come out of the house.
14 Other than that, he didn't have nothing else that I know of.
15 I think he went with Mikey one time to -- while Mikey was
16 doing his thing in the lot. He accompanied Mikey. Other than
17 that, I don't think he had any other involvement at the
18 house.
19 Q.   So with regard to the house, Mr. Pagliarulo's role was in
20 the form of backup, is that fair to say?
21 A.   Yes.
22 Q.   Similar to your own?
23 A.   Yes.
24 Q.   Not the shooter?
25 A.   No.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

608

Carey-direct-O'Connell

1  Q.   You said that the first efforts to kill Mr. Martinelli at
2  his home were unsuccessful. Is that right?
3  A.   Yes.
4  Q.   Before we move on, I'd like to turn to --
5       MR. O'CONNELL:  May I approach the witness, Your
6  Honor?
7       THE COURT:  Yes.
8  Q.   I'd like to turn your attention to Government Exhibits
9  2-150, 151 and 153.
10      First, number 150.
11      Do you recognize the location depicted in Government
12 Exhibit 2-150?
13 A.   Yes.
14 Q.   What location do you recognize that to be?
15 A.   That corner building with the brown shingle on the top is
16 Martinelli's office, Northberry -- down to --
17 Q.   Keep your voice up.
18 A.   It's -- it's Martinelli's office for Northberry
19 Construction.
20 Q.   Turning your attention to 2-151.
21 A.   That's a different view from the other side of the same
22 place.
23 Q.   Is this the same location that you and the others you
24 mentioned surveilled, if you will, in the early stages of this
25 efforts to kill Joseph Martinelli?

609

Carey-direct-O'Connell

1  A.   Yes.
2  Q.   This is the location that you and the others decided not
3  to set up on to make an attempt?
4  A.   Yes.
5  Q.   Turn your attention to 2-153.
6       Do you recognize 2-153?
7  A.   Yes.  It looks like Martinelli's house on Stratford.
8  Q.   Is this the place that you and the others set up on
9  several occasions unsuccessfully to attempt to kill
10 Mr. Martinelli?
11 A.   Yes.
12 Q.   Now, after you and the others were unsuccessful in your
13 efforts to catch Mr. Martinelli near his residence and to
14 murder him there, did there come a time when you selected an
15 alternate -- an alternative location to attempt to set up on
16 him and murder him?
17 A.   Yes.
18 Q.   What was the second location that you and the others
19 picked for this purpose?
20 A.   Nostrand Avenue in Brooklyn.  It was by a Prudential Life
21 Insurance.  I think it was around Avenue X, Avenue Y,
22 something like that.
23 Q.   Who selected this location, if you recall?
24 A.   I think Pete Chiodo did, but I am not sure.
25 Q.   Can you tell the jury what efforts were first made to

610

Carey-direct-O'Connell

1  lure Mr. Martinelli to this location for the purpose of
2  murdering him?
3  A.   I believe Pete made an appointment to meet him in front
4  of that location and we went and checked it out and then we
5  set up at the time of the meeting, we set up, I believe Richie
6  and Mike were in one car.  I was there in one car and I think
7  Gregory Cappello was across the street in the parking lot.
8  Q.   What happened with the first attempt?
9  A.   He came -- he came with his brother and they decided not
10 to do it.  I was parked around the corner.  They came and told
11 me that it was off, he came with his brother.
12 Q.   Did you see who showed up or was this just reported to
13 you?
14 A.   No.  Him coming with his brother?  No, I didn't see
15 that.
16 Q.   Where were you located?
17 A.   I was around the corner, on the -- in other words, if --
18 where he would have pulled up, if -- if they hadda shot him,
19 they would have turned the corner and went right past me.  I
20 would have pulled out in back of them to block anybody that
21 would have been coming, and that's where I was parked.
22 Q.   After that first attempt at this location on Nostrand
23 Avenue failed, was another effort made to lure Mr. Martinelli
24 to the same general area for the purpose of murdering him?
25 A.   Yes.

611

Carey-direct-O'Connell

1  Q.   Could you describe for the jury what the second plan, if
2  you will, was for murdering Mr. Martinelli at that location?
3  A.   We had a -- they had told him to meet them in the -- in
4  the building where the Insurance company was upstairs and
5  Gregory was across the street.  He was going to pull down
6  around the -- to the driveway of the building and act as a
7  crash car if they came out that side of the building.  There
8  was a -- in the building there was an alleyway in the back and
9  it was a rear door, so if they -- they were going to come out
10 the rear door I was going to pick them up and leave.
11 Q.   Who is "they"?
12 A.   Richie Pagliarulo and Mike DeSantis.
13 Q.   What role was Mr. DeSantis assigned on this second effort
14 to kill Mr. Martinelli at the Nostrand Avenue location?
15 A.   Mike was supposed to be the shooter.
16 Q.   What role was Mr. Pagliarulo assigned on the second
17 effort to kill Mr. Martinelli at this Nostrand Avenue
18 location?
19 A.   He was going to back him up.
20 Q.   What role were you to perform?
21 A.   I was going to pick them up when they come out the back
22 door and leave.  Gregory was acting as a crash car, back us
23 up.
24      MR. O'CONNELL:  May I approach again, Your Honor?
25      THE COURT:  Yes.

612

Carew-direct-O'Connell

1 Q. I direct your attention to Government Exhibit 2-146.
2 Do you recognize the area depicted in Government
3 Exhibit 2-146?
4 A. Yes.
5 Q. Tell the jury what location this is, as you recall?
6 A. This is the Prudential Insurance building on Nostrand
7 Avenue, where we were going to shoot Martinelli. To your
8 right of the picture --
9 THE COURT: Keep your voice up.
10 A. To the right of the picture is the entrance where it says
11 Professional Plaza and when you go in there you go up steps to
12 the -- there are steps and you go up to where the offices
13 are. There is a big hallway there and in that hallway, they
14 were going to get him as he came in either coming up the steps
15 or in the hallway.
16 Q. I will show you what's been marked as 2-147.
17 Did this location have a unique kind of entrance and
18 exit arrangement for that doorway?
19 A. For which one? The --
20 Q. For that entrance that you --
21 A. Oh, yes.
22 You entered the building down to the right. You went
23 up the stairs and the Prudential office was on one side.
24 There were some other offices there. Then there was a -- you
25 went down the stairs in the back there was a -- a stairs going

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

613

Carew-direct-O'Connell

1 down to a service door into the alleyway. That was going to
2 be used for the escape.
3 Q. So a person could go through the front door, up the
4 stairs, and immediately down the staircase and out the back?
5 A. Yes, through the back there is another door.
6 Q. I will show you Government Exhibit 2-149.
7 Does 2-149 look familiar to you, Mr. Carew?
8 A. Yes.
9 It looks like the alley in back of the Prudential
10 Insurance building.
11 Q. Now, on this second attempt at the Nostrand Avenue
12 location, again could you tell the jury where you were
13 positioned during the attempt?
14 A. I was up in the other end of the alley.
15 Q. Please keep your voice up?
16 A. I was in this end of the alley up here.
17 Q. Pointing to the right?
18 A. Looking down this way. In other words, the fence would
19 have been on my left side as I was looking down.
20 Q. Now, what I'd like you to do for the jury briefly is to
21 explain to the jury what actually happened on the day that you
22 and Mr. Pagliarulo and the others made this second attempt to
23 kill Joseph Martinelli at the Nostrand Avenue location, as
24 best as you can recall today.
25 THE COURT: Move a little away so he keeps his voice

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

614

Carew-direct-O'Connell

1 up.
2 A. Well, we went there. We -- we were starting to set up.
3 Mikey pulled up next to the car that me and Richie were in and
4 he said he was -- he had to do something with the car that he
5 was driving and that he would meet us in the insurance
6 building.
7 We drove around, looked the area over.
8 Greg went across the street. He was going to wait
9 there until he saw Martinelli go in and then move around the
10 corner to where he was, to where he would act as the crash
11 car, if anyone was after us.
12 I went around the block several times and around the
13 area to check that it was clean, into the alley and
14 everything, and then Mikey pulled up next to us and he said he
15 had a problem with the car and that he would meet us by the
16 building.
17 We went around again for a little while and we
18 decided Richie was worried that Mikey went in the building and
19 if Martinelli came, you know, we wouldn't have a backup with
20 him and Richie went in, got out of my car, the car I was
21 driving, and he had a shotgun wrapped up in a shirt or a
22 sweatshirt type thing like and sawed off shotgun and he went
23 into the building. I went around the corner and stayed on the
24 corner.
25 About five, ten minutes later, Richie came out. He

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

615

Carew-direct-O'Connell

1 said Mikey never showed up and Martinelli never showed up and
2 we left.
3 Q. Did Mr. Pagliarulo make any comment to you regarding
4 Mr. DeSantis about that time?
5 A. Yes.
6 Q. Tell the jury as best as you can recall what
7 Mr. Pagliarulo said about Mr. DeSantis?
8 A. In effect he said he was a punk. He didn't show up, some
9 words to that effect.
10 MR. O'CONNELL: Your Honor, this would be a good time
11 for a short break, perhaps?
12 THE COURT: All right. Let's do that, members of the
13 jury.
14 Don't discuss the case.
15 (The following occurred in the absence of the jury.)
16 THE COURT: All right.
17 (Recess taken.)
18 (Continued on the next page.)
19
20
21
22
23
24
25

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

Carew-direct-O'Connell                                616

1    (The following occurred in the absence of the jury.)
2    THE COURT: Well, are we all ready to resume,
3 Mr. O'Connell?
4    MR. O'CONNELL: Yes, Your Honor.
5    THE COURT: All right. Would you ask the jury in?
6    THE MARSHAL: Yes, Your Honor.
7    MR. O'CONNELL: He's daring me to try to argue that
8 motion again.
9    MR. ROSE: He made me go through with it first.
10    THE COURT: What is the penalty for contempt?
11    MR. O'CONNELL: Life.
12    (Jury present.)
13    THE COURT: Please be seated.
14    All right, Mr. O'Connell.
15 EXAMINATION CONTINUES
16 BY MR. O'CONNELL:
17 Q.    Mr. Carew, after you and Mr. Pagliarulo and the others
18 failed in your second attempt to murder Joseph Martinelli at
19 the Nostrand Avenue location that you described, am I correct
20 that you and the others selected yet another location to
21 attempt to set up and murder Joseph Martinelli?
22 A.    Yes.
23 Q.    Tell the jury what the next location was that was
24 selected?
25 A.    It was a garage building down on 13th Street, around

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 194

Carew-direct-O'Connell                                617

1 Fourth Avenue. It was a garage owned by Vinnie Guarino. He
2 had his electric company base in there. And Pete made an
3 appointment to meet Martinelli and bring him to that location,
4 where Mike DeSantis, Richie and Greg Cappello would be waiting
5 inside the building.
6    I was going to be on the outside across the street on
7 the corner watching for them to come in and we had two-way
8 radios so I could tell them when he pulls up to the door and
9 to get ready.
10 Q.    If you can just stop there for a second?
11    You referred to two-way radios.
12 A.    Yes.
13 Q.    In prior efforts to set up on Mr. Martinelli, did you
14 also use radios to contact each other in some of the attempts?
15 A.    Yes.
16 Q.    Or some of the surveillances?
17 A.    We had them, yes. On one other occasion.
18 Q.    What kind of radios were these?
19 A.    Two-way radios, like you would use like the police use,
20 similar to that.
21 Q.    Were you actually sitting in your cars at the locations
22 where you physically couldn't see each other and communicate
23 to one another over radios in your efforts to murder
24 Mr. Martinelli?
25 A.    Yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

Carew-direct-O'Connell                                618

1 Q.    On this next attempt at Mr. Guarino's business?
2 A.    Yes.
3 Q.    Is this the same Vincent Guarino you mentioned earlier
4 who was an associate of your crew?
5 A.    Yes.
6 Q.    Did Mr. Vincent Guarino have any street name that he was
7 known by from some of you?
8 A.    Vinny Electric or Vinny Electrician.
9 Q.    Did Mr. Guarino or Vinny Electric develop a close
10 relationship over time with anybody in particular on your
11 crew?
12 A.    He was close with Richie.
13 Q.    Mr. Pagliarulo?
14 A.    Yes.
15 Q.    Now, you have described generally what the plan was.
16 Again you were to be outside in an automobile?
17 A.    I was up the street and I could watch when they turned to
18 go down that building whichever way they came. I could see
19 them going right up to the building. I had good vision on the
20 building. And I would just tell them that they're coming and
21 they would, you know, they would be ready.
22 Q.    What time of the day did you and Mr. Pagliarulo and the
23 others select?
24 A.    It was early evening.
25 Q.    Excuse me?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 196

Carew-direct-O'Connell                                619

1 A.    Early evening.
2 Q.    Evening.
3    Who was designated by you and the others, Mr. Chiodo,
4 Mr. Pagliarulo, to be the shooter on this latest attempt at
5 Vinny Electric's building to shoot and kill Mr. Martinelli?
6 A.    Mike DeSantis I believe was supposed to be. Richie was a
7 little aggravated that he didn't show up the prior attempt and
8 he — I believe Mike was the shooter and Richie and Greg were
9 back upstairs.
10 Q.    The Greg you are referring to is Greg Cappello?
11 A.    Yes.
12 Q.    He also had a street name?
13 A.    Whitey.
14    (Continued on the next page.)
15
16
17
18
19
20
21
22
23
24
25

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

620

Carew/direct/O'Connell

1 BY MR. O'CONNELL:

2 Q.   What plans were made to lure Mr. Martinelli to his murder

3 at Vinny Electric's?

4 A.   Pete just told him he had to talk to him.  I'm not sure.

5 I think he told him that Vic might be there, but I'm not

6 sure.  I know he had used that on another occasion.

7 Q.   Did Mr. Chiodo assume the role of luring Mr. Martinelli

8 to the location?

9 A.   Yes, Mr. Chiodo was bringing him there.

10 Q.   Mr. Carew, now, as best as you can recall, would you

11 describe to the jury what happened on the evening that you,

12 Mr. Pagliarulo and the other members of the crew were involved

13 in this that night, what happened?

14 A.   Well, we went there, and the guys went in the building.

15 I set up on the other corner.  And a little while later, I saw

16 Mikey come out of the place, and he went up to Fourth Avenue

17 and went a block away or went out of my vision, went a block

18 away or so.  I didn't see him after that.

19            And a little while later, Pete pulled up with

20 Martinelli in the car.  I told Richie and Whitey, the guys on

21 the phone, I called them on the radio and I told them that

22 Pete was outside.  They said Mikey wasn't back, and they were

23 not going to open up.  Pete banged on the door.  I saw him

24 bang on the door a few times, and then they got in the car and

25 they left.

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

621

Carew/direct/O'Connell

1 Q.   Did you meet with Mr. Pagliarulo and others following the

2 departure of Mr. Chiodo and Mr. Martinelli?

3 A.   Yes.

4 Q.   Did you have a conversation with Mr. Pagliarulo about

5 what happened inside Vinny Electric's business premises that

6 evening?

7 A.   Yeah.  Evidently, there was surveillance cameras for a

8 burglar alarm, and they didn't know if they were direct to the

9 burglar alarm place or they were storing the pictures and they

10 would see them in there and everything.  That's what Mikey or

11 somebody went out to try find out what was going on there,

12 and he didn't come back, you know, in time, whatever.  I

13 didn't see him right away.  He came back later or something.

14 Q.   Sometime after this failed attempt at Vinny Electric's

15 building, did Mr. Pagliarulo make any comment to you regarding

16 Mr. DeSantis' performance that night?

17 A.   He said, he did it again.  He didn't, you know -- he

18 wasn't where he was supposed to be when the hit was supposed

19 to go down.

20 Q.   Did Mr. DeSantis, following this failed attempt to kill

21 Mr. Martinelli at Vinny Electric's, ever give you any

22 explanation for why he left that building that evening and was

23 out of place for that murder?

24 A.   He said something about he was trying to get a phone that

25 worked, and the phones didn't work, the outside phones, and he

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

622

Carew/direct/O'Connell

1 had to go a few blocks away to the phone or whatever.

2 Q.   Sometime after this failed attempt at Vinny Electric's

3 business premises that you described for the jury, did you

4 learn that Mr. Chiodo and another person in your crew made

5 still another attempt to kill Mr. Martinelli?

6 A.   Yes.

7 Q.   From whom did you learn this?

8 A.   From Richie and Pete.

9 Q.   With respect to what you learned from Mr. Pagliarulo,

10 could you tell the jury, as best as you can recall, what, in

11 substance, Mr. Pagliarulo told you about this next attempt to

12 murder Joseph Martinelli?

13 A.   He said he made an appointment and met him again.

14           THE COURT:  Who said?

15 A.   Richie said that Pete made another appointment to meet

16 Martinelli again, and they met him, and that Martinelli was

17 sitting in the car and the gun -- Pete went to shoot him and

18 the gun didn't go off.  And later, Pete told me -- Richie said

19 that Pete told him not to say nothing, so, I didn't say

20 nothing.

21           And a couple of weeks later, Pete told me, maybe a

22 week or ten days later, Pete told me that he pulled the gun on

23 the guy and went to shoot him and it didn't click, it didn't

24 go off, and he told him it was his kid's toy.  Martinelli

25 believed his.

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

623

Carew/direct/O'Connell

1 Q.   Were you involved in any other attempts to kill

2 Mr. Martinelli?

3 A.   No.

4 Q.   Throughout each of those attempts, Mr. Carew, that you

5 have described, beginning at his home, following up at the

6 insurance offices on Nostrand Avenue and at the business

7 premises of Vinny Electric, as you described it, so there's no

8 mistake at all about this, were you deliberately committed to

9 participating in murdering Joseph Martinelli?

10 A.   Yes.

11 Q.   Could you tell the jury what your understanding was as to

12 your own culpability in each of those efforts, notwithstanding

13 you were not the designated shooter?

14 A.   If they shot him, I'm just as guilty as the guy who did

15 it.

16           MR. O'CONNELL:  May I approach, your Honor?

17           THE COURT:  Yes.

18 Q.   Please try and keep your voice up, though I'm standing

19 right near you, so the jury can hear you.

20           Turning your attention to 2-148, you've had an

21 opportunity to examine 2-148?

22 A.   Yes.

23 Q.   Again, could you identify for the jury the persons

24 depicted 2-148?

25 A.   Sitting down is Vinny Guarino, Vinny Electric.  I'm

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

624

Carev/direct/O'Connell

1 standing in back of him. Peter Chiodo is next to me.

2 Q.   Turning to 2-142.  In the top photo, marked as "2-142,"

3 could you tell the jury, from left to right, who those persons

4 are?

5 A.   Vinny Guarino is sitting down, that's Vinny Electric.

6 Richie is standing up next to me, and I'm sitting down on the

7 right-hand side of Richie.

8 Q.   With respect to 2-143, in the lower half of this exhibit,

9 again, from left to right, the person on the far left seated,

10 who is that?

11 A.   Richard Pagliarulo and myself. I'm next to him.

12 Q.   Please keep your voice up.

13      Across the table, there's a person indicated. Do you

14 recognize him?

15 A.   Mike DeSantis. Next to him is Bob McGarvy. And the far

16 side of Mike is my in-law, Joe Belfiore.

17 Q.   This was the occasion of your daughter's wedding

18 reception?

19 A.   Yes.

20 Q.   Was it customary during your days with the Luchese Crime

21 Family to invite members and associates of your crew to social

22 functions that you might have?

23 A.   Yes.

24 Q.   Turning to 2-141, do you recognize the individuals in

25 2-141?

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

625

Carev/direct/O'Connell

1 A.   Yes.

2 Q.   Could you identify them for the jury, going from left to

3 right, and telling the jury who they are and what affiliation

4 with any organized crime family the individuals depicted have?

5 A.   Dominick Trusciello, a member of the Luchese Family;

6 Anthony Casso, he was the underboss of the Luchese Family;

7 Joey Testa and Anthony Senter, members of the Luchese Family;

8 and Frankie Lastorino was a captain and part of the

9 administration of the Luchese Family.

10 Q.   I have two more pictures. Turn to 2-144, please.  I show

11 you 2-144, taken at -- it's actually a photo from

12 Mr. Pagliarulo's wedding reception.  Did you attend that

13 reception?

14 A.   Yes, I did.

15 Q.   You recognize the individuals, of course, here?

16 A.   Yes. Right-hand side is Richard Pagliarulo, and next to

17 him is Frankie Lastorino.

18 Q.   Did Mr. Lastorino play any role in the wedding ceremony?

19 A.   Frankie was Richie's best man.

20 Q.   Turning your attention to 2-145, could you quickly

21 identify the persons from left to right?  Again, this is from

22 the photos from the wedding.

23 A.   Yes. Frank Lastorino, Mike Spinelli and Richard

24 Pagliarulo.

25 Q.   What position did Mike Spinelli hold in the Luchese

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

626

Carev/direct/O'Connell

1 Family?

2 A.   He was an associate, and then later on, a member.

3 Q.   Could you keep your voice up, please?

4 A.   Yes. He was an associate, and later on, a member.

5 Q.   When did he become a member, if you know?

6 A.   He became a member, I would believe, in 1992 -- 1993.

7 Q.   Do you know where he was at the time?

8 A.   Yes, in prison.

9 Q.   You mean the ceremony was actually taking place in

10 prison?

11 A.   That's what I heard, yes.

12 Q.   Did you hear who presided over that ceremony to elevate

13 Mr. Spinelli to a soldier in the Luchese Family while he was

14 in prison?

15 A.   I know who was in prison at the time.  I don't know

16 exactly who presided.

17 Q.   Did you know whether he had been formally proposed and

18 approved by the boss of the family?

19 A.   Yes. I believe Vic approved it.

20 Q.   Mr. Carev, just briefly, what high-ranking persons were

21 in prison and located in the same institution as Mr. Spinelli

22 at the time you learned that he was promoted to an actual

23 member of the Luchese Family?

24 A.   Well, Anthony Bowat was there.  Sal Avellino was in

25 prison with us.  Anthony Casso, Frank Lastorino, Anthony

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

627

Carev/direct/O'Connell

1 Casso, Sal Avellino, Anthony Baratta.  And then Mike DeSantis

2 and a few other members were there.

3 Q.   Mr. Carev, I would like you to turn your attention to

4 September 1989.  First, I'll ask you whether you knew a person

5 named John Morrissey?

6 A.   Yes.

7 Q.   Did you know him to have a street name?

8 A.   "Sonny."

9 Q.   Would you tell the jury who you knew John Sonny Morrissey

10 to be?

11 A.   Sonny was a union official with the Ironworkers' union.

12 I think it was Local 580.

13 Q.   Did you know this particular union to have any

14 affiliation with the Luchese Crime Family?

15 A.   Yes.

16 Q.   Briefly describe what you knew that to be?

17 A.   Sonny was close to Vic, and Pete had told me that they

18 belonged to our family, that that union belonged to our

19 family.

20 Q.   Did you know Mr. Morrissey to have any particular

21 friendship with any individual member of the Luchese Crime

22 Family in particular?

23 A.   He was friends with Vic Amuso.

24 Q.   The boss of the family?

25 A.   Yes.

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

628

Carew/direct/O'Connell

1    MR. O'CONNELL:  May I approach?

2        THE COURT:  Yes.

3        MR. O'CONNELL:  Please turn to 2-109.

4    Q.  Do you recognize the persons depicted in this exhibit

5    marked 2-109?

6    A.  Yes.

7    Q.  From left to right, could you identify them?

8    A.  On the left in the brown jacket is Sonny Morrissey, and

9    the other guy is Pete Savino.

10   Q.  Did you know Pete Savino to have a street name?

11   A.  Black Beard.

12   Q.  Black Beard?

13   A.  Yes.  That was his nickname.  The guys used to — that

14   was his nickname.

15   Q.  Keep your voice up.

16   A.  That was his nickname.  The guys used to call him Black

17   Beard among themselves.  I don't know if they called him that

18   to his face.

19   Q.  I show you Exhibit 2-130.  Do you recognize the persons

20   depicted in 2-130?

21   A.  Yes.

22   Q.  Going from left to right, could you identify them for the

23   jury?

24   A.  Yes, the heavyset guy is Joe Cakes, Joe Marion; Sonny

25   Morrissey is in the middle; and Frankie Arpino has his back to

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

PAGE 206

629

Carew/direct/O'Connell

1    the camera.

2    Q.  Did you know Mr. "Joe Cakes" Marion to have an

3    affiliation with any crime family?

4    A.  Yes.  He was around us a while, the Luchese Crime Family.

5    Q.  What about Mr. Arpino?

6    A.  Yes.  He was friends with Vic and Gas.

7    Q.  Keep your voice up, please.

8    A.  Yes.  He was friends with Vic and Gas.  He was around us,

9    too.  He used to come to the Walnut all the time.

10       MR. O'CONNELL:  You can put the books down.  I won't

11   be referring to the photographs anymore.

12   Q.  Again, turning your attention to September 1989,

13   Mr. Carew.

14   A.  Yes.

15   Q.  Did there come a time when a certain member of the

16   Luchese Crime Family asked you to participate in the murder of

17   John "Sonny" Morrissey?

18   A.  Yes.

19   Q.  Who was the member of the Luchese Crime Family who asked

20   you to do this?

21   A.  Pete Chiodo.

22   Q.  Could you tell the jury, as best as you can recall, what

23   Mr. Chiodo told you, in substance, at the time he asked you to

24   assist him in killing John "Sonny" Morrissey?

25   A.  He said that Vic and Gas thought that Sonny was going bad

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

630

Carew/direct/O'Connell

1    and they wanted him hit, and we were supposed to do it.

2    Q.  What does "going bad" mean, as you understood it?

3    A.  That he was going to be an informer.

4        THE COURT:  Going to be what?

5        THE WITNESS:  An informer.

6    Q.  Did you agree to assist Mr. Chiodo in murdering John

7    "Sonny" Morrissey?

8    A.  Yes.

9    Q.  Did Mr. Chiodo inform you whether or not other members of

10   your crew would also be assisting Mr. Chiodo and yourself in

11   killing John "Sonny" Morrissey?

12   A.  Yes.

13   Q.  Who else?

14   A.  He said that Mike DeSantis and Richard Pagliarolo would

15   be there, and he said that Richie would be the shooter.

16   Q.  I would like to review with you the events that led up to

17   the murder of Mr. Morrissey.

18       Mr. Carew, did Mr. Chiodo make any arrangements, to

19   your knowledge, to meet with Mr. Morrissey in September 1989?

20   A.  Yes, he did.

21   Q.  And did you accompany Mr. Chiodo to a meeting place where

22   he, in fact, met with Mr. Morrissey?

23   A.  Yes.

24   Q.  Tell the jury where you went, and who was there when you

25   got there, and what happened?

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

PAGE 208

631

Carew/direct/O'Connell

1    A.  I went with Pete to a coffee shop, I think it was on

2    Second Avenue between 28th and 29th Street in Manhattan.  And

3    when we got there, Sonny Morrissey was there with Jimmy

4    McCarthy and Paulie Paiola.

5    Q.  Did you know Jimmy McCarthy?

6    A.  Yes.

7    Q.  What did you know about Jimmy McCarthy?  Who was he, to

8    your knowledge?

9    A.  Jimmy and Paulie owned a windows installation company,

10   and they were friends with Sonny, as well as other members of

11   the family.

12   Q.  Did you see Mr. Chiodo engage Mr. Morrissey in

13   conversation?

14   A.  Yes.  Him and Sonny, after saying hello and everything,

15   we sat down and Pete took Sonny for a walk and came back about

16   fifteen minutes later.  Everybody said, you know, a few

17   things, social things, and then the meeting broke up, and me

18   and Pete went back to Brooklyn.

19   Q.  Mr. Carew, did you have a conversation with Mr. Chiodo on

20   your return from Manhattan, in which Mr. Chiodo told you what

21   he had discussed with Sonny Morrissey?

22   A.  Yes.

23   Q.  Tell the jury, as best as you can recall, what Mr. Chiodo

24   informed you at that time?

25   A.  He said that he told Sonny to meet him tomorrow and come

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

632

Carew/direct/O'Connell

1 alone, that he was going to have Vic present at a meeting, Vic
2 wanted to see Sonny, and that he should come alone the next
3 day, and then made an appointment for a restaurant, a
4 luncheonette, I believe it was on First Avenue, right on the
5 corner of 29th Street -- I think it was on the corner, anyway.
6 Q.   Did Mr. Chiodo give you any further instructions
7 regarding what you might do the next day?
8 A.   Yes. He told me to come loaded, which meant to bring a
9 gun.
10 Q.   Did you meet with Mr. Chiodo the next day?
11 A.   Yes, I did.
12 Q.   Did you follow his instructions to bring a gun?
13 A.   Yes, I did.
14 Q.   What kind of gun did you bring?
15 A.   I had a .38 snub-nose revolver.
16 Q.   Did you and Mr. Chiodo drive to the prearranged site to
17 collect Mr. Morrissey?
18 A.   Yes, we did.
19 Q.   This was that luncheonette you described?
20 A.   Yes.
21 Q.   Did he come alone, as he was instructed?
22 A.   Yes, he did.
23 Q.   After you picked him up, where did you go from there?
24 A.   We got in the car. He was in the back, I was in the
25 front next to Pete, and Pete drove. We went to a development

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

633

Carew/direct/O'Connell

1 in Jersey, the housing development that Pete was involved
2 with. He had lived on the site at one time, and we drove
3 there.
4 Q.   Before you picked up Mr. Morrissey, prior to that time,
5 did Mr. Chiodo tell you what role you would be playing that
6 day in the murder of Sonny Morrissey --
7 A.   Yes.
8 Q.   -- what role he would play, what role Mr. Pagliarulo would
9 play and what role Mr. DeSantis would play?
10 A.   Yes.
11 Q.   Tell the jury what Mr. Chiodo told you?
12 A.   He said that Richie would do the shooting, and I would
13 back him up. Mikey and him would be there for backup, if we
14 needed it, and to help us with anything that we might have
15 needed help with.
16 Q.   Please, try and keep your voice up.
17      Mr. Carew, could you tell the jury what you saw as
18 you and Mr. Chiodo drove into that site you described in
19 New Jersey, with Mr. Morrissey in the car with you?
20 A.   Yes. As we drove in, we went down a road, a dirt road.
21 And on the right-hand side, there's a chalet-type building
22 that Pete used as an office for his housing development.
23      There was a parking lot. We pulled into the parking
24 lot and on the front of the chalet building, there was a
25 porch, a wooden deck. And on the wooden deck, Richard

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

634

Carew/direct/O'Connell

1 Pagliarulo was waiting when we got there.
2      We got out of the car. We went up the ramp to the
3 deck. We started to walk inside, and Pete introduced Richie
4 to Sonny, and we got inside. And Pete left to go --
5 supposedly to go get Vic.
6      And as he went waiting out, I took my jacket off and
7 put it on the desk that was there. And I turned around and
8 Richie had reached into a wastebasket or some kind of
9 receptacle, a pail that was there, and he had an automatic gun
10 with a long silencer on it. He pulled it out, and he pointed
11 it at Sonny.
12      Sonny looked, and he said, I'm no rat. And Richie
13 shot him twice in the head, and the gun jammed. When the gun
14 jammed, he said, shoot him. So I turned around and
15 went to the pocket of my jacket and took out the gun. Sonny
16 was on the floor, and he said, it hurts, finish me, it hurts,
17 and I shot him.
18      And as I was shooting him, I shot him a few times,
19 and as I was shooting him, Richie went like this, wait a
20 minute, and he had unjammed his gun. He walked over to where
21 Sonny was. Sonny was on the ground like moaning, and he put
22 the gun to his head and shot him, or stood there and shot him
23 one more time.
24 Q.   After Mr. Morrissey was shot that last time by
25 Mr. Pagliarulo in the head, did he stop moaning?

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

635

Carew/direct/O'Connell

1 A.   Yes.
2 Q.   Did you and Mr. Pagliarulo make some efforts to conceal
3 Mr. Morrissey's body and avoid detection by the authorities?
4 A.   What we did was, there was a rug on the floor, and I had
5 a little penknife and we couldn't find nothing to put the body
6 in, so we started cutting the rug.
7      And Pete came in, wanted to know what happened
8 because he heard gunshots. And we told him what happened,
9 that the gun jammed. And he went out and got Mike, and Mike
10 came with a backhoe, and right in back of the chalet, between
11 the chalet and there was a trailer-type building that Pete
12 used to live in, they started to dig a hole. It was right
13 near the back door of the chalet. And they started to dig a
14 hole with the backhoe.
15      I went back in and started cutting the rug with the
16 little penknife, and it was a tiresome job. So after a while,
17 if Richie helped me. We took turns, and we cut the rug. And
18 then we -- I think Pete took the stuff out of Sonny's pockets,
19 and we wrapped the body in the rug. And we found some wire, I
20 think it was telephone wire or electric wire or something like
21 that, and we tied the rug up with it.
22      And then the four of us dragged the body out to the
23 back where the hole had been dug, and we threw the body in the
24 hole. The hole was a little lopsided. Mikey wasn't too
25 familiar with the backhoe, and he didn't dig the hole

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

636

Carew-direct/O'Connell

1 straight, it was on a slant. And we threw the body in there,

2 and then Mikey started to bury it with the backhoe.

3 Q. Backing you up just a bit to the point where

4 Mr. Morrissey had been shot for the final time, did either

5 Mr. DeSantis or Mr. Chiodo come inside where you and

6 Mr. Pagliarulo were?

7 A. Yes. I said that Pete came in. Pete came in and wanted

8 to know what happened. He heard the shots. And we told him

9 -- we explained to him that the gun jammed and I had to shoot

10 him with the revolver, the one that didn't have a silencer.

11 That's why he heard the shots.

12 Q. Mr. Carew, after Mr. Morrissey's body was buried by you

13 and the others, how did you leave and how did Mr. Pagliarulo

14 leave?

15 A. Richie and Mike left together. They took the guns with

16 them and disposed of them. And I left with Pete, and on the

17 way back, we broke up Sonny's credit cards, and Petey ripped

18 up his wallet. We threw it out the window of the car at

19 various intervals as we were driving.

20        (Continued on next page.)

21

22

23

24

25

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

637

Carew-direct-O'Connell

1 EXAMINATION CONTINUES

2 BY MR. O'CONNELL:

3 Q. Jumping ahead, you became aware at some point in 1991

4 Mr. Chiodo was shot, is that correct?

5 A. Yes.

6 Q. You also became aware that Mr. Chiodo began cooperating

7 with the government?

8 A. Yes.

9 Q. Did there come a time when you, Mr. Pagliarulo and others

10 discussed possibly moving Mr. Morrissey's body after

11 Mr. Chiodo's cooperation became known?

12 A. Yes.

13        Mikey, Richie and myself discussed it. Mikey was

14 going to go there and check out, see what -- you know, if it

15 was feasible to move the body, if it was -- if there was, you

16 know, if it was easily accessible, what was going on in Hidden

17 Hills. Nobody had been there for a while.

18        So Mikey went and checked it out and he came back and

19 he said that there was new construction and there was a lot of

20 activity there and that you know, he didn't feel that it was a

21 good idea to move -- to try to move the body. We might get

22 caught.

23 Q. One last question about the actual day when Mr. Morrissey

24 was murdered by yourself and Mr. Pagliarulo and the others.

25        You testified that Mr. DeSantis had some difficulty

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

638

Carew-direct-O'Connell

1 operating the back hoe; is that correct?

2 A. Yes.

3 Q. Did he cause any damage that you recall?

4 A. Yes.

5        At one point, the -- with the fork on the -- you

6 know, on the hoe, with the part with the hoe on it, he hit the

7 building, made a gash in the -- in the trailer that was next

8 to where we buried the body.

9 Q. Mr. Carew, you pled guilty under your agreement for your

10 role in murdering Mr. Morrissey, is that correct?

11 A. Yes.

12 Q. I am going to turn your attention, Mr. Carew, if I may,

13 to about a year before, in the fall of 1988.

14        I'd like to ask you some questions concerning a

15 particular faction of the Lucchese Crime Family.

16        Did you know of a faction or crew of the Lucchese

17 Crime Family that operated out of New Jersey at about that

18 time?

19 A. Yes.

20 Q. Do you know who was the captain of that crew at that

21 time?

22 A. Yes. Anthony Accetturo, Tumac.

23 Q. The street name was?

24 A. Tumac, yes.

25 Q. Tumac?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

639

Carew-direct-O'Connell

1 A. Yes.

2 Q. Did Mr. Accetturo have a family member who was a made

3 member in that crew?

4 A. Yes; his son.

5 Q. What was his name, if you recall?

6 A. Anthony Junior.

7 Q. Prior to 1988, had you ever met Anthony Accetturo, Senior

8 or Junior?

9 A. Yes.

10 Q. Who had you met?

11 A. I had met Senior and I had met Junior at the Walnut.

12 Junior used to frequent the Walnut Bar, where we used to meet

13 occasionally on weekend -- we used to meet there once or twice

14 a week.

15 Q. Was that a location that was used much like The 19th

16 Hole?

17 A. Yes. Gas and Vic used it for their meeting place.

18 Q. Gas and Vic?

19 A. Yes.

20 Q. Now, in the fall, late 1988, did you learn that Gas and

21 Vic or Mr. Casso and Mr. Amuso had reached a certain decision

22 on how to deal with Mr. Accetturo?

23 A. Yes.

24 Q. Tell the jury what decision you learned about?

25 A. They were going to kill him.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

Carey-direct-O'Connell 640

1 Q. Did you learn why they were going to kill him?
2 A. Yeah.
3 After -- he had a case and after he beat the case,
4 he -- he wasn't turning in money to the family and then he
5 refused to come in when they wanted to see him. He kept
6 making excuses and not coming in.
7 Q. When you say come "in," could you perhaps explain that a
8 little more?
9 A. Come to a meeting with -- with Anthony Casso and Vic
10 Amuso.
11 Q. Was there any particular requirement among the membership
12 of the Lucchese Crime Family when an order came out from the
13 administration to report to a meeting?
14 A. Yes.
15 You had to go or you had to have a real good excuse
16 not to go. He couldn't just keep putting it off.
17 Q. Now, is it fair to say that over the next few years, you
18 were personally involved along with others in efforts to hunt
19 down and kill Mr. Accetturo and certain members of his crew?
20 A. Yes.
21 Q. Turning your attention to late 1988. Did there come a
22 time when a Lucchese member suggested using your own home,
23 your own residence, for a meeting with Mr. Accetturo?
24 A. Yes.
25 Q. Who suggested using your own home for a meeting with

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 218

Carey-direct-O'Connell 641

1 Mr. Accetturo?
2 A. First Anthony Casso. He asked me if I could make
3 arrangements for my house to be used for a meeting with Tumac
4 and his son.
5 Q. What was initially envisioned by Mr. Casso as he related
6 it to you for the use of your home in this meeting, for what
7 purpose?
8 A. At -- in the first time?
9 Q. Initially.
10 A. I thought it was just a meeting to settle, you know, to
11 try to settle the dispute.
12 Q. Did there come a time when another member of the Lucchese
13 Crime Family informed you that your home was to be used for a
14 different purpose?
15 A. Yes.
16 Q. Who informed you of this and what was it that you were
17 told?
18 A. Pete Chiodo told me that they wanted to use my house to
19 kill Anthony Accetturo and his son. That they had made an
20 arrangement for a meeting and when they showed up, they were
21 going to be killed.
22 Q. Who is the "they" who made this decision to use your
23 home?
24 A. Gas and Vic.
25 Q. Were you instructed to make certain arrangements in

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

Carey-direct-O'Connell 642

1 preparation of this event?
2 A. Yes.
3 They told me to make sure my family wasn't home and
4 they said to get some sandwiches and food to make it, you
5 know, look like it was a real -- that we really had intentions
6 of having a meeting there, which I did. I prepared it. I got
7 it ready.
8 Q. How far did the plan to kill Accetturo and his son at
9 your house progress?
10 A. Well, a short time before, I think a day or two before it
11 was supposed to happen, they told me it was called off, that
12 Accetturo couldn't make it. He wasn't going to come. It was
13 a short time before.
14 Q. Before it was called off, could you tell the jurors as
15 best as you can recall what the plan was to lure Mr. Accetturo
16 to your home and who was to participate in this particular
17 attempt?
18 A. They were going to meet him by the -- either in a hotel
19 or by the airport. I think by the airport. They were going
20 to meet him and bring him because he was coming I think from
21 Florida. They were going to meet him by the airport and bring
22 him to my house. I think Frankie Lastorino, Gas, Pete
23 Chiodo. I don't know who else. Myself. I was going to be
24 there. Vic.
25 Q. Did you actually make arrangements to bring food in?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 220

Carey-direct-O'Connell 643

1 A. Yes.
2 My son-in-law had a -- a salamaria, Italian grocery
3 store and meat store, butcher store, and I had told him to
4 make up some sandwiches and potato salad and things like that,
5 that I might need them on a certain day. I believe it was a
6 Thursday.
7 Then I called him and told him to forget about it
8 after -- after they told me that the meeting wasn't going
9 to --
10 THE COURT: Keep your voice up.
11 Q. Did you actually make arrangements to have your family
12 out of there for that date that was selected?
13 A. I told my wife that, you know, I wanted her to leave. I
14 didn't know exactly what, you know, when. But I would let her
15 know. And then I wanted her and my daughters to -- to go stay
16 with a friend of theirs for the day, and they agreed. My
17 daughter was going to go after work.
18 Q. Mr. Carey, when Mr. Chiodo told you that Mr. Amuso and
19 Mr. Casso wanted to use your home for murdering Mr. Accetturo
20 and his son, what was your reaction?
21 A. Well, I wasn't happy about it. You know, I didn't think
22 it was right, that they should look to use my house. But I
23 was going to go along with it.
24 Q. You agreed to go along with it?
25 A. Yeah.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

644

Carew-direct-O'Connell

1  Q.  Around this same time period, do you recall an occasion
2  where you and Mr. Chiodo and Mr. Pagliarulo traveled to
3  Florida together?
4  A.  Yes.
5  Q.  Did Mr. Chiodo meet anyone in particular in Florida that
6  you recall on this trip?
7  A.  Yes.
8  Q.  Who do you remember he met?
9  A.  He had to meet a -- a Spanish fellow by the name of
10 Junior.  I had an appointment in a hotel in Cocoanut Grove in
11 Miami.
12 Q.  Did you go to the Cocoanut Grove or whatever place
13 Mr. Chiodo met Junior at?
14 A.  Yes, yes.
15 Q.  Were you introduced to Junior?
16 A.  Yes, I was.
17 Q.  Was Mr. Pagliarulo?
18 A.  Yes.
19 Q.  Did Mr. Chiodo and this person Junior meet together, away
20 from you?
21 A.  Yes.  They went in -- and sat together and me and Richie
22 stayed together.
23 Q.  Tell the jury what, if anything, you observed took place
24 between Mr. Chiodo and this person Junior you described?
25 A.  Well, Pete was in a huddle with him.  He gave him a

ANTHONY M. MANCUSO, CSR      OFFICIAL COURT REPORTER

---

PAGE 222

645

Carew-direct-O'Connell

1  little package wrapped in paper, in gift paper.
2  Q.  Did you and Mr. Pagliarulo subsequently learn what the
3  contents of that package were?
4  A.  Later on, Pete told me there was fifty thousand in it
5  from Gas.  They were going -- that was his -- a fee, a
6  start-up fee for the guy to kill the Accetturos.  Or to kill
7  Anthony Accetturo, Senior.
8  Q.  Now, did you ever travel to Florida again as you -- as
9  best as you can recall for the purpose of murdering anyone in
10 Mr. Accetturo's crew?
11 A.  No.
12 Q.  Did you learn that other members of your crew did in fact
13 travel again to Florida for that purpose?
14 A.  Yes.
15 Q.  From whom did you learn this?
16 A.  From the guys that were going back and forth to Florida,
17 Richie, Mike DeSantis, Mike Spinelli and Pete Chiodo.
18 Q.  From time to time would Mr. Pagliarulo, Mr. Chiodo and
19 the other members of your crew discuss with you what they did
20 in Florida on these trips?
21 A.  Yes.
22 Q.  Did you keep generally abreast of what they were doing
23 down there through these conversations that you had with them
24 from time to time?
25 A.  Yes, I would say so.  Yes.

ANTHONY M. MANCUSO, CSR      OFFICIAL COURT REPORTER

---

646

Carew-direct-O'Connell

1  Q.  Could you tell the jury as best as you can recall what
2  you learned from Mr. Pagliarulo and Mr. Chiodo about what
3  their first efforts were on their trips to Florida to help
4  find and kill Mr. Accetturo and other members of his crew?
5  A.  Well, when they first went down there, they needed a
6  place to stay so they could start doing their surveillance and
7  try to get some information on where Mr. Accetturo stayed and
8  everything.  They enlisted Danny Laratro.  He was -- Danny was
9  the son of -- of Joey Narrows, who was a long time Lucchese
10 member and he had moved to Florida.  He lived in Florida and
11 they -- they went and see Danny and Danny let them stay at a
12 house -- at his house.
13 Q.  Did you learn whether they found other accommodations?
14 A.  Yes.  After a while they found out that Accetturo hung
15 out in the Diplomat occasionally and went to the Diplomat,
16 which is a hotel in Fort Lauderdale.  At that point they
17 rented an apartment across the street from the Diplomat that
18 they could see whoever went in and everything with spy glasses
19 and long-range glass that they had.
20 Q.  Did they make any other arrangements to surveil
21 Mr. Accetturo that they discussed with you during this time
22 period?
23 A.  Yes.
24        He came up with an address --
25 Q.  Keep your voice up?

ANTHONY M. MANCUSO, CSR      OFFICIAL COURT REPORTER

---

PAGE 224

647

Carew-direct-O'Connell

1  A.  They came up with an address that was Accetturo's house
2  in Florida.
3        THE COURT:  Who told that you?
4        THE WITNESS:  Pete Chiodo.
5        And they went down there and they were looking for a
6  house to rent on the block so that they could have
7  surveillance on the house and see who came in and out and if
8  there was a possibility to get him.  They couldn't rent a
9  house so they wound up, there was a house for sale on the
10 block and they winded up buying the house or proceeding to buy
11 it.
12 Q.  Did you learn whether they were successful in their
13 efforts to hunt down and kill Anthony Accetturo?
14 A.  No, they weren't.
15 Q.  Did there come a time when you learned that Mr. Chiodo
16 and other members of your crew made an attempt to kill a
17 member other than Mr. Accetturo or Mr. Accetturo's crew?
18 A.  Yes.
19 Q.  Who was that person they attempted to kill?
20 A.  A fellow they called Uncle Joe.
21 Q.  From whom did you learn this?
22 A.  I learned it from Pete Chiodo and Mike DeSantis.
23 Q.  Tell the jury as best as you can recall what you learned
24 from Mike DeSantis and Pete Chiodo regarding this attempt to
25 kill Uncle Joe.

ANTHONY M. MANCUSO, CSR      OFFICIAL COURT REPORTER

648

Carey-direct-O'Connell

1  A.  They went and did some surveillance on him and they
2  looked at his house a few times and then I think he had
3  another place, a store or something that he used to -- to have
4  something to do with or frequent and they went there and
5  finally, on one occasion after a couple of times going back
6  and forth, they set up by the guy's house.  I think Richie
7  and -- and Pete were in one car and Mike and Mike Spinelli
8  were in the other and they spotted him coming home.  They
9  pulled up next to him.  Mike Spinelli got out, shot him, and
10  then they left him.  Poet and Richie followed them out, after
11  they passed him, followed them out.  I think that guy's name
12  was Joe La Norte, his real name.  They called him Uncle Joe.
13  Q.  How long after Mr. La Norte was shot do you recall
14  learning about that event from Mr. DeSantis and Mr. Chiodo?
15  A.  I would say, a couple of days later.
16  Q.  Did you learn from Mr. DeSantis what they believed at the
17  time they left Mr. La Norte following the shooting?
18  A.  They thought he was dead.
19  Q.  Did you learn when they learned -- withdrawn.
20      Did you learn how they came to discover that he was
21  alive and survived this attempt?
22  A.  About a week later they told me he was alive.
23  Q.  You testified that you did not play a role in the
24  activities of your crew down in Florida that you have
25  described apart from the trip when the meeting with Junior

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

---

PAGE 226

649

Carey-direct-O'Connell

1  took place; is that correct?
2  A.  Yes.
3  Q.  Nevertheless, were you involved in efforts in this area?
4  A.  Yes.
5  Q.  To track down certain -- certain individuals who were
6  aligned with Mr. Accetturo?
7  A.  Yes.
8      There was a fellow by the name of Tommy Ricciardi and
9  I was given an address and I went to check it out and then I
10  went there a few times and I brought the other fellows there,
11  different occasions.  It was a house next to a horse farm, on
12  a Vermont Avenue in Toms River, New Jersey.
13  Q.  Who were the others that you went to this location with
14  from time to time?
15  A.  Mike DeSantis.  I am not sure, I think Richie was there
16  at one time.  I went there with Al D'Arco and his son.
17  Q.  So there is no mistake about it, were your trips to New
18  Jersey to look for Mr. Ricciardi aimed at finding him and
19  killing him?
20  A.  Yes.
21      At a given point, Mikey DeSantis rented a --
22  Q.  Please keep your voice up.
23  A.  Mikey DeSantis rented a place in the horse farm.  He had
24  a friend of his that had a horse and he rented a spot to leave
25  the horse there so he would have reason to go to the farm

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

---

650

Carey-direct-O'Connell

1  right next door to Tommy Ricciardi's house and if he had an
2  opportunity, he would try to shoot Tommy Ricciardi.  That was
3  the plan.
4  Q.  Were you successful, you and the others, in your efforts
5  to hunt down and kill Mr. Ricciardi?
6  A.  No.
7  Q.  To your knowledge, were your fellow crew members,
8  Mr. Pagliarulo and the others, successful in their efforts to
9  hunt down and kill Mr. Accetturo?
10  A.  No.
11      MR. O'CONNELL:  With the Court's permission, this
12  would be a good time to break.
13      THE COURT:  All right.  Let's take the rest of the
14  afternoon off, members of the jury.
15      Don't discuss the case.
16      I will see you tomorrow.
17      By the way, on Friday, I won't be able -- Friday is
18  my day for motions and other things in the morning so I won't
19  be able to meet with you until 1:30.  So you will have had
20  your lunch by 1:30 and we will start in at 1:30.  You can
21  sleep late.
22      Okay.  Don't discuss the case.
23      Monday though is a holiday, the following Monday.
24      (The following occurred in the absence of the jury.)
25      THE COURT:  Mr. Heelan, don't lean back in those

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

---

PAGE 228

651

Carey-direct-O'Connell

1  chairs.
2      MR. HEELAN:  Are they that fragile?
3      THE COURT:  No.  As you can see, they are old.  We
4  have no money to buy new ones.
5      MR. HEELAN:  Okay, Your Honor.
6      THE COURT:  All right.  All right.  How much longer
7  do you plan to be with this witness?
8      MR. O'CONNELL:  I think about half an hour to an
9  hour.  On direct.
10      THE COURT:  Then --
11      MR. O'CONNELL:  I'd say at least an hour.
12      THE COURT:  Okay.  Then you have another witness?
13      MR. ROSE:  Yes.
14      THE COURT:  How long will that witness be?
15      MR. ROSE:  Mr. Marino will -- could be two hours.
16  Two hours.  Two to three hours for Mr. Marino.
17      THE COURT:  We may spend a good portion of the day
18  tomorrow on those two?
19      MR. O'CONNELL:  Mr. Horlick has his cross.
20      THE COURT:  Oh, that's true.
21      All right.
22      MR. O'CONNELL:  I don't know how long he anticipates
23  the cross will be.
24      THE COURT:  All right.  Then after that, what do you
25  have?

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

PAGE 229  SHEET 59

652

Carew-direct-O'Connell

1       MR. ROSE:  Crime scene searches.  That's all.
2       THE COURT:  That's about it?
3       MR. ROSE:  Yes.
4       THE COURT:  We should finish next week then.
5       MR. ROSE:  I believe so, sir.  Given that you might
6  consider tomorrow whether you -- not sit on Friday.
7       THE COURT:  Let me think about that and --
8  prayerfully.
9       All right.
10      MR. ROSE:  And the plea agreement?
11      THE COURT:  Pardon?
12      MR. ROSE:  And perhaps the plea agreement.
13      THE COURT:  I will find that Learned Hand case for
14  you.
15      (Matter recessed until 9:30, May 26, 1994.)
16
17
18
19
20
21
22
23
24
25

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

PAGE 230

653

Carew-direct-O'Connell

1                        I N D E X
2

3  Witness          Direct   Cross   Re-d   Re-X   Voir Dire
4  Peter Chiodo     426
5  Chris Cincotta   551      560     562
6  Thomas Carew     563
7
8                    E X H I B I T S
9
10 Plaintiff/Govt    For Identification    In Evidence
11 11 A 1                                  498
12 11-L-1                                  554
13 12-A-5, 12-A-6,
14 12-A-6-A                                556
15 12-A-8                                  558
16 12-A-7                                  559
17
18 Defendant         For Identification    In Evidence
19 A                 498
20
21
22
23
24
25

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

PAGE 1  SHEET 1

654

```
                UNITED STATES DISTRICT COURT
1               EASTERN DISTRICT OF NEW YORK
2  - - - - - - - - - - - - - - - x
3  UNITED STATES OF AMERICA,      :   CR 90-446(S)
4           v.                    :   U.S. Courthouse
                                      Brooklyn, New York
5  RICHARD PAGLIARULO,            :
6           Defendant.            :   May 26, 1994
                                      9:30 O'clock a.m.
7  - - - - - - - - - - - - - - - x
8
            TRANSCRIPT OF TRIAL
9  BEFORE THE HONORABLE EUGENE H. NICKERSON
   UNITED STATES DISTRICT JUDGE, and a jury.
10
11  APPEARANCES:
12  For the Government:     ZACHARY W. CARTER
                           United States Attorney
13                         By: CHARLES ROSE
                           GREGORY O'CONNELL
14                         Assistant U.S. Attorney
                           225 Cadman Plaza East
15                         Brooklyn, New York 11201
16  For the Defendant:      JAY HORLICK
                           RICHARD HEELAN
17
18  Court Reporter:         Anthony M. Mancuso
                           225 Cadman Plaza East
19                         Brooklyn, New York 11201
                           (718) 330-7607
20
21
22
23  Proceedings recorded by mechanical stenography, transcript
24  produced by CAT.
25

      ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER
```

PAGE 2

655

```
1           (Trial resumed.)
2           (In open court; jury not present.)
3           THE COURT:  Gentlemen, before we start, I think I
4  was wrong yesterday on the cooperation agreement. I looked at
5  the cases and I was under the impression -- erroneous
6  impression -- that the impeachment had to be cross-examination
7  with respect to the particular agreement rather than a general
8  attack on the credibility.
9           And it's clear to me from reading the cases that any
10  questioning of the credibility of the witness will allow the
11  cooperation agreement to be put in. And I'll cite to you the
12  cases:  It's United States v. Musacchia, 900 F.2d 493, Second
13  Circuit. And it cites all the cases, all of which I have
14  read, United States v. Fernandez, United States v. Borello and
15  United States v. Arroyo-Angulo.  In most of them they found
16  harmless error even though it was introduced on direct
17  examination.
18           However, I am going to give a charge along these
19  lines -- I'll let you argue this -- I am going to give a
20  charge after the point where it's charged the fact that he's
21  gotten a cooperation agreement and he's gotten a break and it
22  may give him a motive to testify falsely.
23           I'm going to charge something like this: This motive
24  to testify falsely is not eliminated by the fact that the
25  agreement this witness may have entered into with the

      ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER
```

PAGE 3

656

```
1  government requires him to testify truthfully.  You should
2  consider whether the witness may nevertheless believe that if
3  he says what he thinks is helpful to the prosecution it is
4  unlikely that the U.S. Attorney will claim he lied and
5  withdraw benefits conferred by the plea agreement.
6           That's not as strong as what Judge Friendly said one
7  could charge.  At any rate, I'll bear you on that charge
8  before I actually give it.  But you may offer the cooperation
9  agreement and I will receive it over Mr. Horlick's objection.
10           MR. ROSE:  Shall we do that right away?
11           THE COURT:  We'll do it whenever you want.  He's
12  identified it.
13           MR. O'CONNELL:  Can I have one moment before you
14  call in the jury, your Honor.
15           THE COURT:  Sure.
16           I'm going to sit Friday, by the way, at 1:30.
17  THOMAS CAREY, resumed.
18           (Pause.)
19           THE COURT:  Are we ready now?
20           MR. O'CONNELL:  Yes, your Honor.
21           THE COURT:  Would you ask the jury in.
22           (Jury present.)
23           THE COURT:  Please be seated.  Shall we resume?
24           MR. ROSE:  Before we continue with this witness,
25  yesterday I neglected to offer and I offer now Government's

      ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER
```

PAGE 4

657

```
1  Exhibit 3500-676, the plea agreement between the United States
2  and Peter Chiodo.
3           THE COURT:  I'll receive it probably after
4  cross-examination.
5           MR. ROSE:  Yes, sir.
6           THE COURT:  I don't receive it now.
7           I'm sorry.  That's Mr. Chiodo's.  I'll receive it.
8           (So marked.)
9           THE COURT:  All right.  Let's move ahead.
10           MR. O'CONNELL:  Yes, your Honor.
11  DIRECT EXAMINATION
12  BY MR. O'CONNELL:  (Continuing).
13  Q.  Mr. Carey, we left off yesterday afternoon with your
14  testimony concerning the activities of your crew and yourself
15  as part of that crew relating to the Accetturo faction.
16       Do you recall that?
17  A.  Yes.
18  Q.  I would like to turn your attention now to another event
19  which occurred in the spring of 1989.  Calling your attention
20  to the spring of 1989, did there come a time when you and
21  other members of your crew went to a business location that
22  was known as the Renewal Arts Company?
23  A.  Yes.
24  Q.  Who asked you to accompany other members of your crew to
25  Renewal Arts?

      ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER
```

PAGE 5

657

Carew/direct/O'Connell

1  A.  Pete Chiodo.

2  Q.  In the spring of 1989 Mr. Chiodo was the captain of your

3  crew, is that correct?

4  A.  Yes.

5  Q.  Do you recall who else accompanied you to Renewal Arts at

6  that time from your crew?

7  A.  It was Pete Chiodo, Mike DeSantis, Richie Pagliarulo,

8  Dino Mariao, Mike Spinelli, Angelo DeFeddis.

9  Q.  Jumping ahead, on that day that you traveled there,

10  Mr. Carew, briefly, what was your role in the events of that

11  day at Renewal Arts?

12  A.  We were supposed to go there to give a guy a beating.

13  Q.  A beating?

14  A.  Yes.

15  Q.  You testified yesterday that pretty much throughout your

16  early part of your career you engaged in strong-arm tactics,

17  is that correct?

18  A.  Yes, sir.

19  Q.  You had given beatings before, isn't that right?

20  A.  Yes, sir.

21  Q.  You testified that while you were associated with

22  Mr. Fonari, from time to time, he would ask you to go to act as

23  an enforcer, is that right?

24  A.  Yes.

25  Q.  Now, this event that you are describing at Renewal Arts,

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

659

Carew/direct/O'Connell

1  is it fair to say it's much like the other strong-arm tactics

2  that you personally had been involved in in the past?

3  A.  Yes.

4  Q.  Had you ever been to this company Renewal Arts before?

5  A.  No.

6  Q.  Had you taken part in any plans involving a shakedown of

7  that company, personally?

8  A.  No.

9  Q.  So there's no mistake about it, when Mr. Chiodo asked you

10  to go visit Renewal Arts that day with other members of your

11  crew, you agreed to go and participate in giving a beating to

12  a person, is that correct?

13  A.  Yes.

14  Q.  You didn't even know who that person was at that time?

15  A.  No.

16  Q.  But you agreed to go nevertheless, is that right?

17  A.  Yes.

18  Q.  You testified that there was several others that traveled

19  with you that day?

20  A.  Yes.

21  Q.  Did you all travel to Renewal Arts in the same manner?

22  A.  We went in two cars.

23  Q.  In two separate cars?

24  A.  Yeah.  I believe so, yes.

25  Q.  I would like you to turn your attention back to the

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

660

Carew/direct/O'Connell

1  events of that day, upon your arrival, and describe for the

2  jury as best as you can recall what happened, what you did and

3  what the other members of your crew did that day?

4  A.  Well, we entered the building.  We went into the offices

5  that were Renewal Arts and Mr. Chiodo confronted some people

6  in the first office and he was looking for this guy that we

7  were supposed to give a beating.  And in the beginning nobody

8  would say where he was and then somebody said that he was in

9  the office and they pointed in a little hallway.

10  At that time Mike DeSantis, Richie Pagliarulo and

11  myself went into that office.  There was a guy there standing

12  -- standing -- he was behind a desk on a phone.  Mike had

13  some words with him and threw a punch at him.  I grabbed the

14  phone out of his hand and Mike and Richie started throwing

15  some punches at him.

16  After that we went back out into the hall and Pete

17  was in conversation with this other guy that he was talking to

18  there.  When we walked out, we walked right past him and we

19  off left, got back in the cars and left.  Dino was outside.

20  Q.  Mr. Carew, at the time that you walked into the office,

21  saw that person at Renewal Arts sitting at a desk, you

22  testified he was on a telephone?

23  A.  Yes.

24  Q.  Is it fair to say you ripped the telephone out of his

25  hands?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 8

661

Carew/direct/O'Connell

1  A.  Yes.

2  Q.  Stood right there as that man was beaten up?

3  A.  Yes.

4  Q.  Was he beaten badly?

5  A.  Yeah.  He was hit pretty good.

6  Q.  Did you see any outward signs of injury before you left?

7  A.  I really didn't notice anything.  I turned around and we

8  started to walk out.

9  Q.  Do you recall whether he was bleeding from this beating?

10  A.  I don't recall any blood.  I don't remember seeing any

11  blood.

12  Q.  While you were there that day, Mr. Carew, did you have

13  any doubt in your mind that the purpose was to instill fear in

14  that man who was given a beating that day?

15  A.  Yes.  I would feel that that was the intention.

16  Q.  Other than playing a role in the physical beating of that

17  man at Renewal Arts that day, did you have any further

18  involvement in matters dealing with that company or those

19  individuals?

20  A.  No, I didn't.

21  Q.  Now, as part of your agreement, did you enter a plea of

22  guilty relating to your role in this extortion of Renewal Arts

23  and the beating that you participated in?

24  A.  Yes.

25  Q.  You understand that that event, as the case with the

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

662

Carev/direct/O'Connell

1  others that you have described, would be considered at the
2  time of your sentencing?
3  A.  Yes.
4  Q.  I would like to turn your attention to 1990, Mr. Carev,
5  specifically, the summer of 1990.
6      Is it fair to say that following Mr. Chiodo's arrest
7  in May 1990 that you and the other members of the crew had far
8  less contact with him?
9  A.  Yes.
10 Q.  In August of 1990, approximately August 1990, did you
11 learn that a member of your Luchese Crime Family, an actual
12 made member, named Bruno Facciola was murdered at that time?
13 A.  Yes.
14 Q.  Did you know Bruno Facciola personally?
15 A.  Yes, I did.
16 Q.  Could you tell the jury who you knew Bruno Facciola to
17 be?
18 A.  Bruno was a member of the family.  Originally he was part
19 of the Paulie Vario crew.  He worked in crap games with us and
20 he usually handled Paulie Vario's end.  He had a stable and
21 some businesses in Canarsie.
22 Q.  Was Mr. Facciola a long time member of the Luchese
23 Family?
24 A.  Well, he -- I don't know how long.  He wasn't a
25 member that long.  But he was in the family for a lot of

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

---

PAGE 10

663

Carev/direct/O'Connell

1  years.  He was an associate for a lot of years before he was a
2  member.
3  Q.  Based on your own personal knowledge, he was an
4  individual who had been associated with the Luchese Crime
5  Family for quite a long time prior to August 1990?
6  A.  Yes.
7  Q.  When you learned of Mr. Facciola's murder, did the fact
8  of his murder, that occurrence, become the topic of
9  conversation among the members of your crew, including
10 yourself?
11 A.  Yes.
12 Q.  Could you explain to the jury, in substance, what was
13 discussed, following your learning of this murder, among the
14 members of your crew?
15 A.  Well, a lot of guys were wondering why he was killed, if
16 he was a rat or if it was for some other reason, he was using
17 money or what.  Everybody was trying to -- they had an opinion
18 on what was the reason.
19 Q.  Not long after you learned of Mr. Facciola's murder, did
20 you have a conversation with Mr. Pagliarulo directly
21 concerning this subject matter where in he made a remark to
22 you?
23 A.  Yes.
24 Q.  As best as you can recall, tell the jury what in
25 substance you said to Mr. Pagliarulo and what he said to you

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

---

664

Carev/direct/O'Connell

1  at that time?
2  A.  Well, I asked Richie if he thought that Bruno was a rat
3  and he turned around and said I don't know if he was a rat but
4  when he saw me he tried to make a break for it.
5  Q.  Now, as of the summer of 1990 you had already been
6  involved, as you testified, in several murder plots with
7  Mr. Pagliarulo, is that correct?
8  A.  Yes.
9  Q.  Including the actual shooting of Mr. Morrissey?
10 A.  Yes.
11 Q.  At the time Mr. Pagliarulo made that remark to you
12 concerning Mr. Facciola, what did you understand him to mean
13 by that comment?
14     MR. NORLICK:  Objection.
15     THE COURT:  Read that question, please.
16     (Record read.)
17     THE COURT:  Sustained.
18 Q.  You testified that you were arrested in October 1992,
19 Mr. Carev?
20 A.  Yes.
21 Q.  Following your arrest you were incarcerated, is that
22 right?
23 A.  Yes.
24 Q.  Along with other Luchese members and associates who were
25 arrested at that time?

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

---

PAGE 12

665

Carev/direct/O'Connell

1  A.  Yeah.
2  Q.  Did there come a time when you learned, following your
3  arrest, that a dispute had developed between Mr. Pagliarulo
4  and Mr. DeSantis?
5  A.  Yes.
6  Q.  Did you have conversations with Mr. DeSantis concerning
7  this?
8  A.  Yes.
9      MR. NORLICK:  Objection.
10     THE COURT:  Come up here.
11     (Sidebar.)
12     THE COURT:  I'm not sure I understand how this is in
13 furtherance of a conspiracy.
14     MR. O'CONNELL:  May I make a proffer?
15     THE COURT:  Yes.
16     MR. O'CONNELL:  Mr. Carev will testify that
17 following their arrest he and the others still remained active
18 loyal associates and members of the Luchese Crime Family -- if
19 I'm pressed to bring that out -- that they continued to
20 exchange information concerning the Luchese Crime Family's
21 activities --
22     THE COURT:  This is Mr. DeSantis.
23     MR. O'CONNELL:  Mr. DeSantis, a member of his crew
24 and what this lead to is the following:  Mr. DeSantis and
25 Mr. Pagliarulo shared certain Luchese Family business

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

666

Carew/direct/O'Connell

1  interests. Mr. DeSantis was arrested first. While
2  Mr. Pagliarulo remained on the street, before his
3  apprehension, a dispute arose because Mr. Pagliarulo was, in
4  Mr. DeSantis' view, mistreating his business interests on the
5  street. That became a subject of dispute between the two
6  which led to a resolution by higher ranking members in the
7  Luchese Crime Family in a sit-down in prison, following which
8  -- and this is the punch line -- your Honor, following which
9  Mr. Pagliarulo complained to Mr. Carew that he had been
10  mistreated in this sit-down, that he was not given credit for
11  all the work he had done and that the people he had killed for
12  the Luchese Crime Family including Sonny Morrissey, with him,
13  and Bruno Facciola, among others.
14      That is what I'm leading to. I'm trying to set the
15  context for this comment by Mr. Pagliarulo where he admits
16  directly ordering Bruno Facciola to Mr. Carew.
17      THE COURT: Well, that part is certainly
18  admissible. Do you want to press your objection?
19      MR. HORLICK: Judge, yes, I would like to press my
20  objection.
21      THE COURT: Tell me again what the question is
22  that's pending.
23      MR. O'CONNELL: There's a preliminary question
24  setting the stage.
25      THE COURT: Yes. But what is the question?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

667

Carew/direct/O'Connell

1      MR. O'CONNELL: I believe it's did you learn that a
2  dispute had developed between Mr. Pagliarulo and Mr. DeSantis
3  over certain matters. I can tailor this and keep it down to a
4  minimum without getting into the nitty-gritty of what the
5  dispute was about.
6      THE COURT: Why don't you get to the admission of
7  Mr. Pagliarulo?
8      MR. O'CONNELL: It would really lose its impact.
9  Ordinarily, as the jury will hear from these other witnesses,
10  they don't volunteer with great frequency their roles in
11  homicides.
12      THE COURT: Can you ask him did you have a
13  conversation with Mr. Pagliarulo in which he brought up the
14  question that he had been treated unfairly in a sit-down as a
15  result of a dispute with Mr. DeSantis?
16      MR. O'CONNELL: I think that would be fine to tailor
17  it down further with a couple of preliminary questions. Was
18  there a dispute? Did it become the subject of a sit-down?
19  Did Mr. Pagliarulo express his unhappiness with the result?
20      THE COURT: I think I'll allow that. Just keep it
21  to the minimum.
22      (In open court.)
23  BY MR. O'CONNELL:
24  Q.  Mr. Carew, following your arrest, without getting into
25  details, did you learn from conversations with other Luchese

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

668

Carew/direct/O'Connell

1  family members and associates that Mr. Pagliarulo had become
2  embroiled in a dispute with Mr. DeSantis over certain matters
3  around that time?
4  A.  Yes.
5  Q.  Did you learn that that dispute was resolved or a ruling
6  was made by certain higher ranking persons in the Luchese
7  Crime Family?
8  A.  Yes.
9  Q.  Following that ruling relating to the dispute between
10  Mr. Pagliarulo and Mr. DeSantis, did Mr. Pagliarulo express to
11  you at one time his dissatisfaction with how that dispute was
12  resolved by his superiors?
13  A.  Yes.
14  Q.  Could you, as best as you can recall, tell the jury what
15  Mr. Pagliarulo said to you after he learned that the ruling
16  concerning that dispute with Mr. DeSantis had gone against
17  him?
18  A.  Well, he said that he was being treated like shit and
19  that after all the things he did for the family, he says,
20  Tommy, you know I worked with you. I worked with Bruno -- I
21  did a thing with Bruno and I did a lot of work for this family
22  and they are treating me like shit he says. It wasn't right.
23  It started in with some other things that they didn't call him
24  to the legal meetings and things like that.
25  Q.  All right. Without getting into further detail,

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

669

Carew/direct/O'Connell

1  Mr. Carew, you used the term "work"?
2  A.  Yes.
3  Q.  In the course of your experience and your activities with
4  the Luchese Crime Family, did you understand "work" to have a
5  certain meaning?
6  A.  Yes.
7  Q.  How was the term "work" used and what did it mean?
8  A.  It usually meant that you killed somebody.
9  Q.  Did you yourself use the term "work" when referring to
10  murder?
11  A.  Yes.
12  Q.  Did you yourself hear other individuals use the term
13  "work" when referring to murder?
14  A.  Yes.
15  Q.  Did you understand Mr. Pagliarulo to be referring to
16  murder when he used the term "work" at that time?
17  A.  Yes.
18  Q.  Who did you understand him to be referring to when he
19  made his reference to Bruno?
20  A.  Bruno Facciola.
21  Q.  Mr. Carew, turn your attention now to an earlier time
22  period, if you could collect your thoughts. I'm turning your
23  attention now back to the summer of 1989. I would like to ask
24  you a few questions concerning an individual named Julius
25  Calder.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

670

Carew/direct/O'Connell

1  First, did you come to learn that a person named
2  Julius Calder was murdered?
3  A.  Yes.
4  Q.  Tell the jury who Julius Calder was?
5  A.  He was a long-time associate of the Luchese family. He
6  was in the numbers business originally and then after that he
7  was in the heroin business.
8  Q.  Now, you testified that you learned that Mr. Calder was
9  murdered?
10 A.  Yes.
11 Q.  Did you have any role in the planning or carrying out of
12 the murder of Julius Calder?
13 A.  No.
14 Q.  Prior to Julius Calder's murder did there come a time
15 when you had a conversation with him where he informed you
16 that he owed a particular individual a sum of money?
17 A.  Yes.
18 Q.  Tell the jury what Mr. Calder said to you regarding this
19 debt and who Mr. Calder explained to you he owed the money to?
20 A.  He told me he owed $9,000 to Anthony Casso and that
21 Anthony was breaking his chops for the money.
22 Q.  Prior to his murder, did you have any conversation with
23 Mr. Casso where Mr. Casso brought up the subject matter of
24 this debt or a debt that was owed to him by Mr. Calder?
25 A.  Yes. He asked me if I had seen Red around and he told me

671

Carew/direct/O'Connell

1  that he wanted to see him. He said he owed him some money.
2  Q.  Again, prior to Mr. Calder's murder, do you recall having
3  a conversation with Mr. Chiodo concerning Mr. Calder?
4  A.  Yes.
5  Q.  Could you tell the jury what Mr. Chiodo told you about
6  this Luchese family associate Julius Calder prior to the time
7  that he was killed, as best as you can recall on that
8  occasion?
9  A.  He asked me if I seen him lately and where he hung out
10 and I told him where I thought -- that he hung out in a video
11 store on Fourth Avenue, near the Tiffany Diner and he hung out
12 in the Italian restaurant right across the street from the
13 Tiffany Diner on Fourth Avenue.
14    I asked him what's going on and he said that they are
15 looking to clip Red, which meant kill Red.
16 Q.  Following the time that Mr. Calder was actually killed,
17 did there come a time when you overheard certain associates in
18 your crew discussing the fact of his murder?
19 A.  Yes.
20 Q.  As best as you can recall, who do you remember discussing
21 Mr. Calder's murder with?
22 A.  Well, there was myself, Georgie Conte, Mike DeSantis and
23 somebody else. I just can't place who it was. I thought it
24 was Joe D'Arco, but I'm not sure. We were outside Concept
25 Autobody. We had just come from someplace and we were

672

Carew/direct/O'Connell

1  standing in the driveway next to Concept Autobody and Georgie
2  Conte was talking to Mike about Red and he said something
3  about that Frankie Bono didn't want to stop shooting him was
4  the remark that he made.
5  Q.  Who was Frankie Bono?
6  A.  He was a member of the family.
7  Q.  Now, you testified that you played no role in the actual
8  murder of Julius Calder or had no involvement in that episode
9  other than the extent to which you testified to this jury?
10 A.  Yes. I didn't have nothing to do with it.
11 Q.  Am I correct that you learned of no information from your
12 crew concerning any role that Mr. Pagliarulo played, as far as
13 you know?
14 A.  As far as I know, he didn't have nothing to do with it.
15 Q.  I would like to ask you a few questions now, Mr. Carew,
16 concerning the attempted murder of Mr. Chiodo.
17    Mr. Chiodo was shot several times you learned in May
18 1991, is that correct?
19 A.  Yes.
20 Q.  Now, as of the time that Mr. Chiodo was shot in 1991,
21 what was your understanding as to what his status, Mr.
22 Chiodo's status, was in the Luchese Crime family?
23 A.  He was a skipper, but he was on the shelf and he wasn't
24 in good graces with the bosses.
25 Q.  Had you and other members of your crew learned that Mr.

673

Carew/direct/O'Connell

1  Chiodo, prior to the time he was shot, had pled guilty in
2  certain cases pending against him?
3  A.  Yes.
4  Q.  Did that become a topic of conversation among your crew?
5  A.  Yes, it did, because evidently he didn't get permission
6  from Gas and Vic before he copped out and they didn't like
7  that and that was one of the topics of conversation.
8     Then he supposedly owed some money to them and they
9  were mad that the money didn't jibe with what the figures that
10 he had put in.
11 Q.  Did you participate in planning of the shooting or the
12 actual shooting of Mr. Chiodo in May 1991?
13 A.  No, I did not.
14 Q.  Now, there came a time, did there not, following Mr.
15 Chiodo's shooting, when you and the other members of your crew
16 learned that he had survived?
17 A.  Yes.
18 Q.  Did the fact that he survived that shooting likewise
19 become a topic of conversation among the members of your crew,
20 including yourself?
21 A.  Yes.
22 Q.  And Mr. Pagliarulo?
23 A.  Yes.
24 Q.  Did you and the others discuss what Mr. Chiodo might do?
25 A.  Yes.

674

Carew/direct/O'Connell

1 Q.  Explain that to the jury.

2 A.  Well, we figured that he would become an informer.

3 Q.  And cooperate with the government?

4 A.  Cooperate with the government, yes.

5 Q.  Did you and the other members of your crew, including

6 Mr. Pagliarulo, from time to time discuss what consequences

7 might fall to you, him, Mr. Pagliarulo, by reason of Mr.

8 Chiodo's cooperation?

9 A.  Yes. We felt that he could do a lot of damage to us.

10 Q.  After this attempt on the life of Mr. Chiodo failed,

11 following the time or at or about the time that you and

12 Mr. Pagliarulo and the others engaged in the conversation

13 you've described, did there come a time when Mr. Pagliarulo

14 made a specific reference to a role he played in the attempted

15 murder of Peter Chiodo?

16 A.  Yes.

17 Q.  Where did this conversation take place when

18 Mr. Pagliarulo made these references?

19 A.  Around the corner from the Cafe Cecilia on 64 Street in

20 Brooklyn.

21 Q.  Tell the jury as best as you can recall, what

22 Mr. Pagliarulo said to you at that time around the corner from

23 the Cafe Cecilia, regarding the attempt on Peter Chiodo?

24 A.  He said that if he was one of the shooters instead of

25 being in the crash car Pete wouldn't be alive today.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

675

Carew/direct/O'Connell

1 Q.  You've previously made a reference in your testimony to

2 the term crash car?

3 A.  Yes.

4 Q.  Could you explain to the jury, again, what a crash car is

5 and what role, if any, a crash car would play in a murder or a

6 hit?

7 A.  Usually, what a crash car does is they block anybody from

8 following you, if there's anybody in pursuit of the guys who

9 did the work. The crash car crashes them and let's the other

10 people getaway or he cuts them off and stops them from being

11 in pursuit.

12 Q.  Now, you testified that prior to the time when Mr. Chiodo

13 was shot in early 1991 or thereabouts he was a captain but he

14 was on the shelf, is that right?

15 A.  Yes.

16 Q.  That's your term, on the shelf?

17 A.  Yes, sir.

18 Q.  Is it fair to say that has a meaning that he was inactive

19 as captain?

20 A.  Yes.

21 Q.  Well did the Luchese Crime Family have someone take his

22 place for a time period to supervise your crew while he was on

23 the shelf?

24 A.  Yes. For a while Frank Lastorino took care of us.

25 Q.  Now, did there come a time when the Luchese Crime Family

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

676

Carew/direct/O'Connell

1 administration decided to officially appoint a replacement for

2 Mr. Chiodo as captain of your crew?

3 A.  Yes.

4 Q.  Who did the administration of the Luchese Crime Family

5 select to replace Mr. Chiodo as the captain of your crew?

6 A.  Richard Pagliarulo.

7 Q.  Mr. Pagliarulo was promoted?

8 A.  Yes.

9 Q.  And became captain?

10 A.  Yes.

11 Q.  How long after the attempted murder of Mr. Chiodo in the

12 spring of 1991 was Mr. Pagliarulo made captain of your crew?

13 A.  I think it was late summer, early fall.

14 Q.  After Mr. Pagliarulo was elevated to the position of

15 Luchese Crime Family captain, did he select any particular

16 location or locations to hold meetings for the crew that he

17 supervised, your crew?

18 A.  Well, he had two places. One was the Cafe Cecilia on

19 65th and Bay Parkway. It was on Bay Parkway near 65th. He

20 had another place. He had opened a restaurant, the Cafe La

21 Gondola I think it was the name. It was on 85th Street and

22 20th Avenue on the corner.

23 Q.  From the summer of 1991 until October 1992 when you were

24 arrested, what kinds of criminal activities did you know to

25 Mr. Pagliarulo to engage in as captain of your crew of the

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

677

Carew/direct/O'Connell

1 Luchese Crime Family, briefly and generally?

2 A.  Well, he still had a shylock business and he was handling

3 the construction business for the family. He was the liaison

4 with some of the other families with the construction business

5 and the jobs that were going around and who got what, things

6 like that.

7 Q.  Was there any particular person from another crime family

8 that he would contact as liaison for the Lucheses, for

9 example?

10 A.  He was in contact with Johnny G., who was taking care of

11 the Gambino crime family construction business, things with

12 the unions.

13 Q.  Did you know Johnny G.'s last name?

14 A.  Gianbola or something like that.

15 Q.  You knew him on the street as Johnny G.?

16 A.  Yes. He hung out in a bar around Third Avenue and 83th

17 Street in Brooklyn.

18 Q.  Was there any particular associate on your crew who had a

19 close relationship with Mr. Pagliarulo that he would use from

20 time to time, more frequently than others?

21 A.  You mean towards the end?

22 Q.  Well, at any time during this time period.

23 A.  In the end Vinny Guarino was doing a lot of the running

24 around for him.

25 Q.  Vinny Guarino, is that the same Vinny Guarino you

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

678

Carew/direct/O'Connell

1 referred to earlier in connection with the Martinelli murder
2 plot and his business premises?
3 A.  Yes.
4 Q.  Vinny Guarino had what street name?
5 A.  Vinny Electric or Vinny The Electrician.
6      MR. O'CONNELL:  May I approach the witness, your
7 Honor?
8      THE COURT:  Yes.
9      MR. O'CONNELL:  You can take our photo albums out.
10 Q.  First, I would like to show you 2-51.
11      Are you able to recognize the individuals depicted in
12 2-51, Mr. Carew?
13 A.  Yes.  From left to right that's Frank Lastorino, Frankie
14 Bones and Richie Pagliarulo.
15 Q.  The person that's indicated Frank Papaoni, his street
16 name was Frankie Bones?
17 A.  Yes.
18 Q.  It's the same individual you heard Mr. Conte refer to in
19 connection with the Calder murder as you testified before?
20 A.  Yes.
21 Q.  If you could turn to 2-131.  You previously identified
22 the individuals in this photograph.  The one you identified as
23 Mr. DeFendis, is he one of the Luchese soldiers who
24 accompanied you and the others to Renewal Arts the day you
25 described?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

680

Carew/direct/O'Connell

1 to certain documents that are in evidence in the 79 series,
2 the Casso records.  The jury has copies of these.
3 Q.  Turn to 79-A-7-C.
4      MR. O'CONNELL:  May I approach the witness, again,
5 your Honor?
6      THE COURT:  Yes.
7 Q.  I know I'm standing close to you, Mr. Carew.  I'll remind
8 you to keep your voice up if you could so that the jury can
9 hear you.  Direct your voice to them, not just to me.
10      Turning your attention to 79-A-7-C.  This is one of
11 many documents that are in evidence and it's stipulated were
12 recovered from Mr. Casso's residence at the time of his
13 arrest.
14      You've had an opportunity to examine this document
15 prior to testifying today, is that correct?
16 A.  Yes.
17      THE COURT:  See that last juror over there?
18      THE WITNESS:  Yes.
19      THE COURT:  Speak to him so he can hear you.  I can
20 barely hear you.
21      THE WITNESS:  Okay, your Honor.
22      THE COURT:  His ears are younger than mine.
23 Q.  Now, in the course of your dealings with various members
24 and associates of the Luchese Crime Family, did you become
25 familiar with who occupied certain positions of authority in

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

679

Carew/direct/O'Connell

1 A.  Yes.
2 Q.  Next to him is the person you previously identified as
3 Bruno Facciola.  Is that the individual who was murdered in
4 the summer of 1990?
5 A.  Yes.
6 Q.  Toward the end of his life, Mr. Carew, prior to the time
7 that he was murdered, did you personally know of any change in
8 his physical well-being or health?
9 A.  I know he was sick.  I think he had a serious operation
10 at one time.
11 Q.  Turn your attention to 146, 2-148.  You previously
12 identified in this photograph Mr. Chiodo and Mr. Guarino?
13 A.  Yes.
14 Q.  Is that the same Vincent Guarino or Vinny Electric that
15 you have testified about today?
16 A.  Yes.
17 Q.  Turn to 2-142.  Again in 2-142 you previously identified
18 Mr. Guarino and Mr. Pagliarulo?
19 A.  Yes.
20 Q.  That's the same Vinny Electric that you testified became
21 very active with Mr. Pagliarulo?
22 A.  Yes.
23 Q.  Towards the end?
24 A.  Yes.
25      MR. O'CONNELL:  Your Honor, I will be referring now

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

681

Carew/direct/O'Connell

1 the Luchese Crime Family as captains, for example?
2 A.  Yeah.
3 Q.  Turning your attention to about the time of your arrest
4 in 1992, were you familiar generally with certain individuals
5 who occupied that high ranking position of captain in the
6 Luchese Crime Family?
7 A.  Yes, in most cases.
8 Q.  Keep your voice up, please?
9 A.  In most cases, yes.
10 Q.  Turning your attention to Government's Exhibit 79-A-7-C,
11 directing your attention to the center of that document, I
12 would like you to start from right to left.  There's indicated
13 a name Sal, is that correct?
14 A.  Yes.
15 Q.  Did you know of any person in the Luchese Crime Family
16 who held the position of captain who had the name Sal at or
17 about that time?
18 A.  Yes.
19 Q.  Who was that?
20 A.  Sally Avellino.
21 Q.  Next to the left of that name is the name Steve.  Did you
22 know anyone in the Luchese Crime Family who held that position
23 of captain in the Luchese Crime Family with the name of Steve?
24 A.  Yes, Stevie Corrao.
25 Q.  Turning your attention down the page further did you know

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

682

Carew/direct/O'Connell

1 of any person in the Luchese Crime Family who held the
2 position of captain who had the name Joe G?
3 A.  Yes, Joey Giampa.
4 Q.  Next to that is the Bronx, did you know of any connection
5 between Joey Giampa and the Bronx?
6 A.  Yes.
7 Q.  What was that?
8 A.  Joey was captain of a crew that came from the Bronx.  It
9 was originally Nikey Salerno's crew and Nikey was killed and
10 Joey G took the crew over.
11 Q.  Under Joey G further down is a reference to New York.
12 There's a reference to New Jersey.  Was there a crew that
13 operated in New York and New Jersey?
14 A.  Yes.
15 Q.  Was there a crew that had as its captain a person named
16 Anthony Bowat?
17 A.  Yes, Anthony Baratta, Bowat, yes.
18 Q.  He held the position of captain?
19 A.  Yes.
20 Q.  Turning your attention to the top of the page, the first
21 name on the left on the top, do you see the name Danny?
22 A.  Yes.
23 Q.  Did you know of any person who held the position of
24 captain in the Luchese Crime Family named Danny?
25 A.  Yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

684

Carew/direct/O'Connell

1 Q.  Who was that?
2 A.  That's a fellow that was around the Canarsie crew, I
3 think -- I think Anthony and his last name began with a G.
4      THE COURT:  Can you stand back there?
5      MR. O'CONNELL:  Yes, your Honor.
6 Q.  Go through each name on the left-hand column and keep
7 your voice up.
8 A.  Petey V is Pete Vario.
9      Pete the Killer is the next guy.
10      Tommy Red is the next guy.
11      They are all -- they were all members under Danny.
12 Patty Air I think it might be Patty Dellarusso and Patty Cars,
13 might be Patty Testa.
14 Q.  Did Patty Testa have any connection to the car business?
15 A.  Yes.
16 Q.  What was that?
17 A.  He had a used car lot on Foster Avenue and a body shop on
18 89th Street, down the street from the used car lot.
19 Q.  Okay.  Next is a Louie.  Did you know of a Louie in the
20 Canarsie crew with Danny Cutaia?
21 A.  There's a Louie and then there's a Ray underneath it.  It
22 might be Louie Daidone and Ray Argentina, but I'm not sure of
23 that.  Louie I thought had his own crew.
24 Q.  There's a Frank W A P?
25 A.  Yes, Frank The Wap.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

683

Carew/direct/O'Connell

1 Q.  Who was that?
2 A.  Danny Cutaia.
3 Q.  Did you know of any person in the Luchese Crime Family
4 named George who held the position of captain?
5 A.  Yes.
6 Q.  Who was that?
7 A.  Georgie Neck, Georgie Zappola.
8 Q.  Turning your attention again to the center of that page,
9 do you see the name Richie to the left of the center?
10 A.  Yes.
11 Q.  Did you know of any person in the Luchese Crime Family
12 who held the position of captain?
13 A.  Yes, Richie Pagliarulo.
14 Q.  Turning your attention to the two columns of names in the
15 upper portion of Government's Exhibit 79-A-7-C, under the name
16 Danny are a list of names?
17 A.  Yes.
18 Q.  Go through each one and tell the jury whether you knew
19 who that individual was and whether there was any connection
20 between that person and Danny.  First, did you know of a Sal
21 Boy?
22 A.  Yes, that's his son, Sally.
23 Q.  There appears to be a Fat A N T B.  Did you know of a
24 person who had that name?
25 A.  Yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

685

Carew/direct/O'Connell

1 Q.  Who is that?
2 A.  He's a long-time member.  At one time, he was acting boss
3 of the crew when Paulie Vario was in jail.  He's in jail
4 himself, I believe, now.
5 Q.  All persons, did you know them at or about the time we're
6 talking about, late 1992, to be actual made members?
7 A.  Yes.
8 Q.  Not associates?
9 A.  No.
10 Q.  Turn your attention to the column under the name George?
11 A.  Yes.
12 Q.  You knew of a George Zappola, who was a captain, is that
13 correct?
14 A.  Yes.
15 Q.  What crew did he pick up as captain, which crew did he
16 head?
17 A.  I think they put the crew together to make a crew for him
18 out of the guys that were relative new members, but I don't
19 know who had it before him.
20 Q.  Could you review the names under the name George, and
21 tell the jury what names you recognize to be names of made
22 members of the Luchese Crime Family under that name George?
23 A.  Well, L. George, that is probably Little George, that's
24 Georgie Conte.  The next guy I think is Frankie Bones, and
25 Frankie Papagni.  Frankie Gioia would probably be the next

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

686

Carew/direct/O'Connell

1 guy. Anthony B.L. might be Anthony Blue Eyes. Patty I'm not
2 sure of. Jimmy Frog was a guy that hung out with Little
3 Georgie. I'm not sure if he was a made member or not. I
4 think he was.

5 Q. Did you know of a guy with a street name Frog, or
6 something like that?

7 A. Yes.

8 Q. What name was that?

9 A. It was Froggie.

10 Q. Froggie?

11 A. Froggie. That was his nickname.

12 Q. Could you go to the next name?

13 A. Tony Albanese. Tony I'm not sure of. Frankie Bola I
14 know. And Big Mike, it could be any one of a couple of guys.
15 I don't know which one it is.

16 Q. Who did you know as Big Mike?

17 A. Mikey DeSantis. He was around us.

18 Q. Did you know of any other Big Mikes?

19 A. Mikey Spinelli. I don't know at the time if he was made
20 yet.

21 Q. As you testified, there came a time when he was made, is
22 that correct?

23 A. Yes.

24 Q. Now, under the name Richie, there's a name Vinny with a
25 question mark?

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

---

687

Carew/direct/O'Connell

1 A. Yes.

2 Q. You previously testified that a close associate, at or
3 about this time, of Mr. Pagliarulo was Vinny Electric Guarino?

4 A. Yes.

5 Q. In the course of your experience in the Luchese Crime
6 Family, did you come to learn, Mr. Carew, of certain
7 procedures that were used when associates were proposed for
8 membership?

9 A. Yes.

10 Q. In fact, did you learn that their names were circulated
11 among the organized crime families in lists?

12 A. Yes.

13 Q. Did you ever personally, as an associate of the Luchese
14 Crime Family, circulate such lists?

15 A. No.

16 Q. I'll show you several documents that were seized from
17 Mr. Casso's residence, at the time of his arrest in 1993, that
18 are in evidence.

19    First, I'll turn your attention to 79-A-19-D.

20    MR. O'CONNELL:   May I approach, your Honor?

21    THE COURT:   Yes.

22    You'll have the originals of these with you in the
23 jury room, members of the jury, when you go to deliberate.
24 They are somewhat easier to read than the xeroxes.

25 Q. Again, this is a document which was seized from

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

---

688

Carew/direct/O'Connell

1 Mr. Casso's residence in January 1993.

2    Mr. Carew, I just asked you to review, starting with
3 the left column and then turning your attention to the right
4 column, the names on that list, and explain to the jury
5 whether you knew these persons and whom you knew them to be,
6 starting with Anthony Grado?

7 A. Yes, Anthony Grado was the guy Fat Anthony, I believe in
8 Danny Cotaia's crew. I think that's who they are referring to
9 when they said Fat Anthony. Salvatore Cotaia is Sally Boy on
10 that list. That's Danny's son.

11    James Galione, that's Froggie, the guy that's marked
12 F R O G.

13    Raymond Rescildo I don't think I know.

14    Frankie Rosati I can't place. And Mike Spinelli was
15 "Mikey" around us.

16 Q. Turning your attention to the column on the right?

17 A. Yes.

18 Q. Do you recognize any of those names and know who those
19 people were?

20 A. Yes.

21 Q. Could you explain to the jury one by one who they were or
22 are, as you knew them?

23 A. Sammy Graffilotto was a guy he called Sammy Black. He
24 was a member with the family. He died a few years back. He
25 was from the Brooklyn Canarsie area.

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

---

689

Carew/direct/O'Connell

1    Moonzie Arra was one of the Harlem guys. He hung out
2 up on 116th Street.

3    Petey DePalermo, he's dead also. Moonzie, and Petey
4 DePalermo was Petey Beck. That's Joe Beck's brother. He died
5 a few years back.

6    The next guy I didn't know, at least I can't tell by
7 his name.

8    Joe Fracipane and Joe Capra are guys that were
9 members, and they are dead, as far as I know.

10 Q. If you could turn to 79-A-7-D.

11    On this slip of paper, again, there are two columns
12 of names. Could you review the first column on top, and go
13 through each one and tell the jury whether you knew these
14 individuals and who you knew them to be, and whether they had
15 any connection to the Luchese Crime Family?

16 A. The first guy I'm not sure of. The second guy is Peter
17 Argentina. He's Ray Argentina's brother.

18    Fat Tommy D'Ambrosio.

19    Frankie Giola, Junior, he's one of the guys that was
20 on that other list.

21    Joseph Tortorella, he's Tortie's son from New York.

22    Enzo Napole, he's a guy that is a friend of
23 Richie's. He was around the crew for a long time. He's an
24 Italian guy from the other side.

25 Q. What do you mean "the other side"?

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

---

**PAGE 37 SHEET 1**

690

Carew/direct/O'Connell

1  A.  He's from Italy.  He speaks with an accent and
2  everything.
3          Joey Calabrese.  Joey.  That's Richie's cousin,
4  Joey.  And Whitey Capella, Gregory Capella.
5  Q.  Whitey Capella is an individual you referred to
6  previously when you described the various attempts to kill
7  Joseph Martinelli?
8  A.  Yes.
9  Q.  Turn your attention to 79-A-18-B.
10         THE COURT:  Is that the one that's headed "Deads"?
11         MR. O'CONNELL:  Yes, your Honor.
12  Q.  Could you quickly review 79-A-18-B, and tell the jury
13  whether you are familiar with any of names of these persons
14  listed under the column "Deads" and their status in the
15  Luchese Family?
16  A.  Yes, I know some of them.
17  Q.  Review them, please?
18  A.  Anthony Stabile is Anthony Blue Eyes.  I testified that I
19  met him in prison in the early 60's.  He later became a member
20  in the family.  He was later killed.
21         The Saccos, I knew them to be, you know, old-time
22  members.  Petey Barbera, I didn't know him, but I heard of
23  him.
24         Salvatore Pellegrino, I didn't know.
25         Joey Falzone I didn't know.

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

**PAGE 38**

691

Carew/direct/O'Connell

1          Joe Spatara I didn't know.
2          Joe Zaza I knew.
3          Paulie Vario I knew.  He was a captain in a crew.  He
4  ran the Canarsie crew for a lot of years.
5  Q.  When you say "Joey Zaza," is that the name Zaza
6  Giananivo?
7  A.  I think so.
8  Q.  You knew Joey Zaza?
9  A.  Yes.
10  Q.  Is he dead?
11  A.  No.  He can't be the same guy.
12  Q.  You knew Paulie Vario?
13  A.  Yes.  He was the captain of the Canarsie crew for a lot
14  of years.
15  Q.  Is he dead?
16  A.  Yes.
17          Nunzio Arra, he was on one of the other lists I
18  testified earlier.  He's dead.  He came from 116th Street.
19          Petey DePalermo, that Joe Beck's brother.
20          Lennie Pizzolato, he is from the Jersey crew.  In
21  fact, one of the meetings we had with the Jersey crew, we were
22  trying to make peace with them.  He came.
23          Joe Schiavo I didn't know.  Michael LaRossa I didn't
24  know.  Vincent Rao, I knew him, he was an old-timer.  Tommy
25  DioGuardia.

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

692

Carew/direct/O'Connell

1  Q.  Is be dead?
2  A.  Yes.
3  Q.  Are there any you knew of that are not dead?
4  A.  I know a lot of guys here.  I couldn't say if they were
5  dead or not.
6  Q.  I'm asking you with respect to the persons you recognize?
7  A.  Everyone I recognize on there is dead.  Willie LoCasio is
8  Willie Brown, he's dead.  Joe and Frankie Peck are dead.  He's
9  dead.  Sam Cavellieri, he used to be a skipper with the crew.
10  He had a pet store up in Harlem on Second Avenue.  Vince
11  Foccari, that's Vinny Beans.  He was the consigliere before
12  Christy Tic got it.  That's it so far.
13          Do you want me to go to the back?
14          THE COURT:  Wait until he asks you a question.
15          (Continued on next page.)
16
17
18
19
20
21
22
23
24
25

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

**PAGE 40**

693

Carew-direct-O'Connell

1  EXAMINATION CONTINUES
2  BY MR. O'CONNELL:
3  Q.  If you will turn your attention to the book and review
4  the document in the same manner?
5          MR. O'CONNELL:  The back portion appears, Your Honor,
6  on the Xerox copy, the lower portion.
7          THE COURT:  Yes.
8          MR. O'CONNELL:  The same page on the lower portion.
9  A.  Louie Foccari, that's Louie Beans, Ben's brother.  He was
10  a member.  He's dead.
11          And Tom DiDinato, Big Tom.  He was with us and he's
12  dead.
13          The -- Salvatore Shillitani and Philly, I know
14  Salvatore.  I know him.  The other guy I don't know.
15          And Joey Blue Eyes and Anthony Nangana, I'm not sure
16  unless -- the only Anthony I would know of is Anthony Blue
17  Eyes.  If he was Anthony Nangana.
18  Q.  Did you know a Joey Blue Eyes?
19  A.  No.
20  Q.  Now, in the lower -- off to the left, next to the name
21  Salvatore Shillitani?
22  A.  Yes.
23  Q.  Off to the left of that there is a -- a comment used on
24  dead list.
25  A.  Yes.

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

**694**

Carew-direct-O'Connell

1 Q.   Off to the right there is a have two coming. Do you see
2 that?
3 A.   Yes.
4 Q.   In the course of your many, many years experience as you
5 have testified and your association with the Lucchese Crime
6 Family, did you come to learn about a certain procedure that
7 had to be followed in making new members that was used as a
8 form of control on the total number of members each family was
9 permitted to have?
10 A.   After they opened the books, from '57 to mid-'70s, the
11 books were closed and there was no members made. Unless it
12 was a special thing, you know, like --
13 Q.   Keep your voice up, please.
14 A.   After they opened the books, everybody got allowed to
15 make a certain amount of people and after that, you had to
16 have somebody die or be, you know, sick or retired, where
17 otherwise you couldn't make any -- you know, any new members
18 and you had -- if someone died you had a spot open that you
19 could make another guy and put him in that spot. It kept a
20 balance like where everybody, that nobody got ahead of each
21 other in the crews, you know, the different families.
22       MR. O'CONNELL:   One moment.
23       THE COURT:   Yes.
24       (Pause.)
25       MR. O'CONNELL:   Your Honor, I have no further

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

**695**

Carew-cross-Horlick

1 questions.
2       THE COURT:   All right. Mr. Horlick?
3       MR. HORLICK:   Yes.
4       Thank you, Judge.
5 CROSS-EXAMINATION
6 BY MR. HORLICK:
7 Q.   Mr. Carew, am I correct that you did not prepare any of
8 these lists that are in the book that you just testified
9 about?
10 A.   Yes, I did not prepare.
11 Q.   You were not present when anyone else prepared those
12 lists?
13 A.   No, I wasn't.
14 Q.   You don't know what year any of those lists were
15 prepared?
16 A.   I do not.
17 Q.   You don't know what purpose any of those lists served to
18 whoever prepared them?
19 A.   I -- I can imagine what they are, from what -- you know,
20 what the procedures are.
21 Q.   You can imagine what they are?
22 A.   Yes.
23 Q.   But nobody told you, no one in the Lucchese Crime Family
24 ever sat down with you and discussed these particular pieces
25 of paper with you, did they?

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

**696**

Carew-cross-Horlick

1 A.   No.
2 Q.   Nobody ever told you that you were carrying a list of
3 replacements or new members, did they?
4 A.   No.
5 Q.   You never did that?
6 A.   Did what?
7 Q.   Carried a list to circulate among crime families?
8 A.   No, I never did.
9 Q.   Of proposed new members?
10 A.   No.
11 Q.   You wouldn't have any idea of your own knowledge what
12 such a list looked like, would you?
13 A.   Not really.
14 Q.   So you are not telling us that any of these documents
15 that you looked at for the first time were used for any
16 particular purpose?
17 A.   No. I only could tell you what they look like.
18 Q.   You can tell us if you recognize a name, whether it is
19 written in hand or it is typed?
20 A.   Yes.
21 Q.   And you can tell us if you knew that person, whether he
22 is presently dead or alive?
23 A.   Right.
24 Q.   Can you tell us anything else of your own knowledge about
25 any of those documents that you looked at?

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

**697**

Carew-cross-Horlick

1 A.   Well, it looks like that some of them are replacements
2 for dead guys to be made.
3 Q.   You can look at the piece of paper and understand that
4 because it says replacements?
5 A.   Yes. That's what I thought it -- it would mean.
6 Q.   You thought it might mean that?
7 A.   That's that I think it means, yes.
8 Q.   Even as you sit here now, you are not sure that that's
9 what it means?
10 A.   I can't really be sure, no.
11 Q.   So you are speculating upon what these names and these
12 procedures are, is that right?
13 A.   Yes. To the best of my knowledge, that's what it is.
14 Q.   In the lower right-hand corner of one of those it said
15 "have two coming."
16       Do you remember reading that a moment ago?
17 A.   I think next to one of them it said "have two coming."
18 Q.   And nobody ever told you what that meant, did they?
19 A.   No, other than that the fact that if somebody dies, you
20 have a spot open and you have some -- you have a spot open to
21 put a new member in.
22 Q.   So you understood that reference "have two coming" to
23 mean that there would be two more people about to die?
24 A.   No.
25       I understood it that there was two guys had died

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

Carew-cross-Horlick                                      698

1 somewhere along the line and that there was two coming, that
2 they had two spots open.
3 Q. Now, the first time you saw these documents, these pieces
4 of paper, was not after you started to cooperate with the
5 government, is it?
6 A. No.
7 Q. You saw them when you were in jail, didn't you?
8 A. Some of them, yes.
9 Q. Some of them were given to you by your lawyer, by other
10 defendants that you talked to in jail, isn't that right?
11 A. Yes.
12 Q. And you went over these lists?
13 A. Casually, yes.
14 Q. Casually. You picked up a piece of paper and you said,
15 hey look, there is Mr. and Mrs. Spinelli, they are on a list?
16 A. Yes.
17 Q. Isn't that right?
18 A. Yes.
19 Q. One of the people you spoke to while you were in jail was
20 Anthony Casso, wasn't it?
21 A. Yes.
22 Q. Did you say to Anthony Casso, look at this list. What
23 does it mean?
24 A. I don't think I went over that with him. It was kind of
25 a touchy subject so we didn't get into it.

            ANTHONY M. MANCUSO, CSR      OFFICIAL COURT REPORTER

---

PAGE 46

Carew-cross-Horlick                                      699

1 Q. Touchy subject that he had all these documents laying in
2 his house?
3 A. Yes.
4 Q. And no one even knew what year they were prepared. Did
5 you ask them that?
6 A. I didn't ask him nothing. He was the underboss and it
7 wasn't my place to get in his face and ask him any kind of
8 questions about that. It was up to the lawyers to discuss
9 that I thought.
10 Q. So you didn't want to ask the man who had these documents
11 in his possession when they were prepared or for what purpose?
12 A. I didn't want to ask him, no.
13 Q. And you never asked that question of Anthony Casso?
14 A. No.
15 Q. Now, you told us -- let's see what that word was. That
16 there were people that obtained a high ranking position of
17 captain. You gave us names from the lists of people who
18 attained that high ranking position, is that right?
19 A. Yes.
20 Q. Did they have anything to do with running the Lucchese
21 Crime Family, those high ranking captains?
22 A. With the overall decisions, no. They just ran their
23 crews and reported to the bosses.
24 Q. Who ran the family and who made the -- those decisions?
25 A. The bosses or the administration made most policy

            ANTHONY M. MANCUSO, CSR      OFFICIAL COURT REPORTER

---

Carew-cross-Horlick                                      700

1 decisions.
2 Q. Most policy decisions?
3 A. Yes.
4 Q. What policy decision do you know of that someone other
5 than a boss, an underboss or a consigliere made?
6 A. Well, as far as a gog's family, a captain takes care of
7 their own family. Then they go up to the administration if
8 there is anything really important. They -- they have to get
9 it approved from the administration or the -- or the bosses.
10 Q. Is it fair to say, Mr. Carew, that in all of your
11 experience, the Lucchese Crime Family, the boss made the
12 decisions?
13 A. Major decisions, yes.
14 Q. And the captains were so afraid of the boss that they
15 wouldn't do anything without conferring with the boss or the
16 underboss first, isn't that true?
17 A. On major decisions, yes. Bosses were the only ones that
18 could usually order hits and things like that.
19 Q. There was never a murder ordered by a captain that you
20 know of?
21 A. Not without getting an approval first.
22 Q. Approval from the administration?
23 A. From the -- the administration or the boss.
24 Q. What was the administration of the Lucchese Crime Family
25 while you were with it?

            ANTHONY M. MANCUSO, CSR      OFFICIAL COURT REPORTER

---

PAGE 48

Carew-cross-Horlick                                      701

1 A. The -- boss, underboss and consigliere was the three
2 positions of power, other than the -- the general captains.
3 Q. Now, in May of 1990, Peter Chiodo was your captain, is
4 that right, even though you were an associate of the family?
5 A. Yes.
6 Q. Until the time of his shooting?
7 A. Yes.
8 Q. And at that time Vic Amuso was the boss?
9 A. Yes. Vic was on the lam at that time. I don't know -- I
10 just can't place at the time if there was an acting boss.
11 Al. Al was an acting boss.
12 Q. Al D'Arco?
13 A. Yes.
14 Q. Who was the underboss at that time, May of 1990?
15 A. I think Anthony Casso was.
16 Q. Anthony Casso was the underboss?
17 A. I think so.
18 Q. You didn't ever report directly to either of these two
19 people, did you?
20 A. No. Which ones? Anthony or Vic?
21 Q. Yes, Anthony and Vic.
22       Did you report directly to them?
23 A. I was friendly with Anthony and sometimes we, you know,
24 on his move, I would talk directly to him.
25 Q. Anthony Casso is the man who took away your legitimate

            ANTHONY M. MANCUSO, CSR      OFFICIAL COURT REPORTER

---

782

Carew-cross-Horlick

1 business, wasn't he?

2 A.  Yes.  I don't know what you mean by taking it away.

3 Q.  He destroyed it for you, didn't he?  When you were making

4 a living in your legitimate business and you were not

5 associating with the family at all?

6 A.  Yes.

7 Q.  Casso saw to it that that ended, didn't he?

8 A.  Well, later on, when things got bad, he wanted his -- you

9 know, he wanted properties that the business owned that I had

10 been involved with.

11 Q.  Even while you were doing legitimate business, you were

12 connected to Casso in terms of money and property?

13 A.  This was later.  I got involved with Casso after '86.

14 And got involved with him with the property after '86 and

15 in -- in around '89 or somewheres in there, '90, I turned the

16 property over to him.

17 Q.  You ended up with nothing?

18 A.  Yes.

19 Q.  You were back to driving Peter Chiodo around?

20 A.  Well, not even too much of that.

21 Q.  Now, sir, after Peter Chiodo is shot, there is a change

22 in the family administration, is there not?

23 A.  Yes.

24 Q.  Where is Mr. Amuso at the time that Peter Chiodo is shot?

25 A.  I believe he was on the lam.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

794

1          Who did he get it from?

2 A.  They -- Vic gave it to him.

3 Q.  Do you know, was Al D'Arco one of the people that was in

4 touch with Vic during this period?

5 A.  Yes, I believe so.  Yes.

6 Q.  What happened to Anthony Casso during this period in

7 terms of rank in the family?

8 A.  He was -- as far as I know, he was still underboss, but

9 he was also on the lam.

10 Q.  Did you have access to him while he was on the lam?

11 A.  Not unless, you know, he sent a message to me a couple of

12 times.

13 Q.  On a day-to-day basis, you wouldn't be able to find him

14 directly?

15 A.  No.

16 Q.  Did you know who you could go to in the family if you had

17 to get a message to Casso?

18 A.  Yes.

19 Q.  There was a designated person, as far as you knew?

20 A.  I knew that a couple of guys were in touch with him.

21 Q.  After Amuso was on the lam, was there a consigliere in

22 the family?

23 A.  No.

24          The -- I am not sure of that.  There came a time when

25 there was an administration put in, three different guys wound

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

783

Carew-cross-Horlick

1 Q.  That means he's running away from this area that he had

2 his roots in, is that right?

3 A.  Yes.

4 Q.  He's trying to make sure he doesn't get caught by the FBI

5 or any police agencies?

6 A.  Yes.

7 Q.  Did you have any contact with him while he was on the

8 lam?

9 A.  No.

10 Q.  And was there a method for family members or designated

11 members to reach him if they had to?

12 A.  No.  There was only certain guys that used to reach him.

13 Q.  So there was not a general telephone number that was

14 known to every captain or every soldier or every associate?

15 A.  No.

16 Q.  And none of those people, the general people in the

17 family, had access to wherever Vic Amuso was?

18 A.  No, not unless he called a meeting to come to and meet

19 anybody.

20 Q.  Otherwise, there were specific individuals who had a way

21 to contact him?

22 A.  Yes.

23 Q.  Who was running the family while he was on the lam?

24 A.  For a while Al D'Arco was.  Al was the acting boss.

25 Q.  How did Al D'Arco get any power?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

785

Carew-cross-Horlick

1 up being part of that administration after Al D'Arco came

2 down, but I don't know who was the consigliere.  I don't

3 remember.

4 Q.  When you say "after Al D'Arco came down," what are you

5 referring to?

6 A.  When Al D'Arco became a government witness.

7 Q.  So he was no longer acting boss of the family?

8 A.  No.

9 Q.  And now you say that in place of the boss, the underboss

10 and the consigliere, there is an administration that's placed

11 in the place of the administration?

12 A.  Yes.

13 Q.  These people who become the administration as you are

14 talking about now do not become the boss, or the underboss, or

15 the consigliere, do they?

16 A.  No.

17 Q.  Who are these three people?

18 A.  There was Sally Avellino, Anthony Bowat, and Frankie

19 Lastorino, I believe.

20 Q.  These three people oversaw the daily operation of the

21 Lucchese Crime Family?

22 A.  Yes.

23 Q.  And the power to kill people rested where at that time?

24 A.  I guess with the administration.

25 Q.  You don't know?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

706

Carew-cross-Horlick

1  A.  I wasn't really privy to that.

2  Q.  Now, Mr. Carew, there came a time when Peter Chiodo told

3  you that it was time to kill Sonny Morrissey.

4      Do you remember that?

5  A.  Yes.

6  Q.  And you recall specifically that after Morrissey was

7  dead, Peter Chiodo went to the body and took his wallet, is

8  that right?

9  A.  Yes.

10 Q.  Did you end up with four hundred dollars when he did

11 that?

12 A.  No.

13 Q.  Did you end up with anything?

14 A.  No.

15 Q.  Now, when he took the wallet, you and he drove back to

16 the city and you ripped everything up, is that right?

17 A.  Yes.  We bent the credit cards and broke them and threw

18 them out the window and Pete ripped up the wallet and threw

19 them out.

20 Q.  Before that happened, somebody talked to you about the

21 jewelry that was on Mr. Morrissey's body, didn't they?

22 A.  Yes.

23 Q.  Someone in that room was concerned that perhaps the

24 jewelry would be a way that the body could be identified, is

25 that right?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

707

Carew-cross-Horlick

1  A.  Yes.

2  Q.  And they therefore decided to take the jewelry from the

3  body?

4  A.  Yes.

5  Q.  And then you found out that person said to you, I threw

6  the jewelry into the grave, isn't that right?

7  A.  Yes.

8  Q.  Did you see the jewelry?

9  A.  No.

10 Q.  Do you know what the jewelry was?

11 A.  No.  I think was a watch and a ring though.

12 Q.  Going over any of the exhibits that you ever saw while

13 you have been cooperating, while you were in jail, did you

14 ever see a list of jewelry found in the grave with

15 Mr. Morrissey?

16 A.  No.

17 Q.  This man who said he wanted to take the jewelry to

18 prevent an identification and then said I threw it in the

19 grave, what was his name?

20 A.  Mike DeSantis.

21 Q.  Did you see him throw jewelry into the grave?

22 A.  No.

23 Q.  How was Mr. Morrissey dressed on the day that he died?

24 A.  He was dressed in pants and a shirt.

25 Q.  Can you describe them in any greater detail?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

708

Carew-cross-Horlick

1  A.  I'm not sure.  I think they might have been brown.  But I

2  don't remember.

3  Q.  Now, during the course of your time in Hidden Hills,

4  somebody mentioned that they saw a man walking with a dog, is

5  that right?

6  A.  Yes.

7  Q.  Who saw that man?

8  A.  Peter Chiodo, but he went out to tell the guy to get off

9  the property.

10 Q.  Nobody -- did you see the man?

11 A.  No.

12 Q.  Did anybody else in the room with you see the man from

13 where you were?

14 A.  I don't know.  I didn't see him.

15 Q.  There was no mention of that man other than from Peter

16 Chiodo?

17 A.  Right.

18 Q.  Now, Chiodo told you to come on that day to kill

19 Morrissey with a gun, is that right?

20 A.  Yes.

21 Q.  And you brought your own snub-nosed 38?

22 A.  Yes.

23 Q.  And that was what, a five or a six shotgun?

24 A.  I think it was a five shotgun.

25 Q.  And did you check it before you went to do this job, that

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

709

Carew-cross-Horlick

1  you were going to shoot a man?

2  A.  No, but I knew it was loaded.

3  Q.  You had loaded it?

4  A.  It was loaded from before, yes.

5  Q.  With five bullets?

6  A.  I believe so.

7  Q.  You had never killed a man before in your life, had you?

8  A.  No.

9  Q.  This is a special occasion for you, wasn't it?

10 A.  Yes.

11 Q.  You were going to show the Italian big guys that you were

12 as good as them?

13 A.  I wasn't supposed to be the shooter.  Richie was.  I had

14 to back him up.  So I wasn't -- I didn't have intentions of

15 showing anybody anything in the beginning.

16 Q.  You were just going to back up the person who was a

17 shooter?

18 A.  Yes.

19 Q.  Did you understand that to mean that if anything went

20 wrong and the shooter couldn't accomplish the murder, that you

21 were going to shoot the man?

22 A.  Yes, I did understand.

23 Q.  There was no doubt in your mind that when you went there,

24 there was a strong possibility at least that you might be

25 called upon to kill a person?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

**Carev-cross-Horlick**

710

1 A.  Yes.

2 Q.  And you said that it is Mr. Pagliarulo, this man in

3 court, who is going to be the shooter of Mr. Morrissey, isn't

4 that right?

5 A.  That's what I was told.

6 Q.  Who told you that?

7 A.  Pete.

8 Q.  Pete is the man who told you everything you know about

9 Florida?

10 A.  No.

11 Q.  Except for the two times you went there?

12 A.  No.  I had conversations with all the guys.  I had

13 conversations with Richie.  I had conversation with Mike.

14 Q.  Now you walk into this place in Hidden Hills.  You have

15 your gun in your jacket somewhere, right?

16 A.  Yes.

17 Q.  And you put the jacket down?

18 A.  Right.

19 Q.  And when Richie -- you told us he stood on the porch and

20 he waited and greeted everybody who showed up, isn't that

21 right?

22 A.  He just greeted -- what happened was, he said hello to me

23 and Pete introduced him to Sonny.  We walked inside.

24 Q.  Now, when you walk inside, you know you are in the room

25 where Morrissey is going to be murdered, isn't that right?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

**Carev-cross-Horlick**

711

1 A.  Yes.

2 Q.  And you see, you tell us, Mr. Pagliarulo pull a gun out

3 of a waist band?

4 A.  Yes.  It was folded.  It was a newspaper folded around it

5 I believe and he took it out of in between the newspaper.

6 Q.  It had a silencer?

7 A.  Yes.

8 Q.  It was pretty big?

9 A.  Yes, it was pretty long.

10 Q.  He walked right up to Morrissey, didn't he?

11 A.  Yes.  He -- he took a couple of steps towards him.

12 Q.  How close was he standing when you saw him fire that gun?

13 A.  Ten feet, seven feet.  Something like that.

14 Q.  Ten feet away from Mr. Morrissey?

15 A.  Yes.  Seven to ten feet.  Something like that.

16 Q.  He fires the gun twice?

17 A.  Yes.

18 Q.  Morrissey drops to the ground?

19 A.  Yes.

20 Q.  And now --

21 A.  First he says -- first he says he wasn't -- when he seen

22 the gun, he turned around and saw the gun and he said I ain't

23 no rat.

24 Q.  He didn't say don't shoot me?  He didn't say don't murder

25 me?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

**Carev-cross-Horlick**

712

1 A.  No.

2 Q.  He didn't say please let me go.  I have a family.  He

3 said I'm not a rat.

4 A.  Yes.  He said I'm no rat.

5 Q.  And then he's shot?

6 A.  Richie shot him, yes.

7 Q.  The man is laying on the ground?

8 A.  Yes.

9 Q.  He's moaning and groaning?

10 A.  Yes.

11 Q.  And he tells you or he tells everybody, it hurts, finish

12 the job?

13 A.  He said it hurts.  Finish me.

14 Q.  So you went to your coat and you took out your 38?

15 A.  Yes.

16 Q.  Isn't that right?

17 A.  Yes.

18 Q.  Because you knew that his gun was fouling up.  It was

19 jammed.  It won't fire again?

20 A.  He was trying to unjam it.

21 Q.  He was trying -- so you knew that he wasn't going to fire

22 that gun for a while.  Maybe not at all.  Isn't that right?

23 A.  Yes.

24 Q.  So now --

25 A.  I wasn't sure.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

**Carev-cross-Horlick**

713

1 Q.  So now you are the shooter, is that right?

2 A.  Yes.

3 Q.  You are about to kill your first human being, is that

4 right?

5 A.  No.

6 Q.  You understand that when you are standing over this body

7 on the floor, don't you?

8 A.  Yes.

9 Q.  You pull out your gun and you fire the gun to kill the

10 man, isn't that's right?

11 A.  I shot at him a few times.

12 Q.  You shot at him?

13 A.  Yes.

14 Q.  Where did you hit him?

15 A.  I don't know.  I hit him -- I was aiming for his body.

16 Q.  You are the man that fired the gun into his right leg,

17 aren't you?

18 A.  I don't know where it went.  He was laying on the ground

19 and I shot at him.

20 Q.  Then you fired a shot into his left leg, didn't you?

21 A.  I don't know where they --

22 Q.  Didn't you watch your handiwork?

23 A.  I was standing there but in -- in the way the whole thing

24 took place, in the excitement of it I just kept shooting until

25 Richie went like that.  He had his gun unjammed.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

714

Carew-cross-Horlick

1 Q.  You kept shooting until the gun was empty, didn't you?

2 A.  No.

3 Q.  You had more bullets left?

4 A.  I think there was one more but I am not sure.

5 Q.  You don't even know?

6 A.  No.

7 Q.  You couldn't even see where you were firing your own gun?

8 A.  No I could see.  I was -- I was only a few feet away.  I

9 was maybe seven, eight feet away.

10 Q.  Did you hit him any time?

11 A.  Did I --

12 Q.  Any of those bullets that you fired, the first shot that

13 you fired?

14 A.  Yes.

15 Q.  Did that hit him?

16 A.  Yes.

17 Q.  How do you know?

18 A.  I think it did.  I didn't go examine it but later on I

19 saw holes in him.

20 Q.  Did you see a hole when you fired that first shot?

21 A.  No.  I wasn't really looking.  I just was shooting.

22 Q.  You weren't looking at him?

23 A.  I was looking at him but I wasn't looking for the holes.

24 I mean, you just asked me if I saw holes.

25 Q.  Were you standing over a man who is on the floor and you

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

---

715

Carew-cross-Horlick

1 Q.  So you -- you do the same thing again.  You look down,

2 you see him, you fire.

3 A.  No.  He was moaning after I finished, after Richie went

4 like this.

5 Q.  So you fired all your shots?

6 A.  I fired -- I think four shots.

7 Q.  You don't know where they went?

8 A.  I they went into his body.  I was right close to him.

9 Q.  You were too close to see where they went?

10 A.  Not that I was too close to see.  I just don't know where

11 they went.

12 Q.  Now Richie says to you with a hand motion?  You don't

13 have to do this anymore, I'm ready to finish the job?

14 A.  He just went like that.

15 Q.  This man is -- has already been shot, let's see, twice by

16 Richie you told us, four times by you?

17 A.  Yes.

18 Q.  And now stop, don't have to do it anymore.  I am going to

19 do it.

20 A.  That's what happened.

21 Q.  Okay.  What did he do?  What did Richard do now?

22 A.  He took a couple of steps near him and he fired one more

23 time at him.

24 Q.  He took a couple of steps closer to Morrissey?

25 A.  Yes.

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

---

PAGE 62

716

Carew-cross-Horlick

1 believe at least he's wounded severely, right?

2 A.  Yes.

3 Q.  He's not going up to run away, is he?

4 A.  I don't think so.

5 Q.  You were pretty sure he wasn't getting up, right?

6 A.  Definitely.

7 Q.  You were going to finish this job.  You were going to, in

8 your words, the man, weren't you?

9 A.  Yes.

10 Q.  The first time that you were going to murder a man, gun

11 in hand, it's loaded, you are ready to go.  You look down at

12 him.  You have the gun pointed out like I'm standing right now

13 with your arm extended.

14 A.  Yes.

15 Q.  Away from your own body and you can see Morrissey.  You

16 can see the gun?

17 A.  Definitely.

18 Q.  You fire it.

19 A.  Yes.

20 Q.  Can't see where the bullet goes?

21 A.  I didn't.

22 Q.  Now, is the job done?  Is he dead?

23 A.  He's moaning.

24 Q.  Still moaning.

25 A.  Like a moan is coming out of his mouth like aah, aah.

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

---

PAGE 64

717

Carew-cross-Horlick

1 Q.  And he held out the gun the way you just showed you had,

2 extended his arm?

3 A.  Yes.  And shot.

4 Q.  He fired?

5 Where did he hit him?

6 A.  He was aiming for his head.  Was close to his head.  He

7 was maybe a few feet from his head.

8 Q.  Did he hit him in the head?

9 A.  I would assume so.

10 Q.  You didn't see that either?

11 A.  The trajectory of the bullet probably would have went

12 right into his head.  He was four feet away pointing at the

13 guy's head.

14 Q.  Now this man is dead?

15 A.  He stopped moaning.

16 Q.  Still moaning?

17 A.  He stopped moaning.

18 Q.  Stopped moaning?

19 A.  Yes.

20 Q.  So he's dead.

21 Now you have Chiodo who has just come in with

22 DeSantis, right?

23 A.  Chiodo came in alone first.

24 Q.  And then DeSantis came in?

25 A.  Then he went to get Mike to bring the back hoe over.

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

PAGE 137   SHEET 35                                          560

### Cincotta-cross-Horlick

1  A.   And then there is a cafe.  I think the Cafe Segesta or
2  Cafe Sicilia.
3  Q.   Which is?  Sicilia or Segesta?
4  A.   I really can't recall.
5  Q.   You do know there is a cafe there?
6  A.   There is a cafe.
7  Q.   And white Camaro is written on there paper?
8  A.   White Camaro, 5:30.
9          MR. ROSE:  If I may read this document?
10         THE COURT:  Certainly.  It is in evidence.
11         MR. ROSE:  In front of realty 65th Street and Bay
12 Parkway, 5:30, white Camaro.
13         Thank you, sergeant.
14         THE COURT:  Do you have any questions, Mr. Horlick?
15         MR. HORLICK:  Yes, Your Honor.
16 CROSS-EXAMINATION
17 BY MR. HORLICK:
18 Q.   Sergeant, that little paper that you have just looked at,
19 did you ever determine whose handwriting it was written in?
20 A.   No, sir.
21 Q.   Were there any tests done to determine who wrote these
22 five or eight pages of handwriting?
23 A.   Which five or eight pages?
24 Q.   I will hold them up for you.
25 A.   No.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 138                                                    561

### Cincotta-cross-Horlick

1  Q.   That's Exhibit 12-A-5.
2         No specific tests or handwriting tests?
3  A.   No.
4  Q.   The diary that you say you found which is 12-A-6 in
5  evidence, this red book, did you look through it to see if
6  there were other appointments similar to that?
7  A.   Yes, I did.
8  Q.   Did you find similar notations about places to go or cars
9  to bring?
10 A.   Yes, I did.
11        But not for that date.
12 Q.   No, these are other dates.
13 A.   Yes, right.  Exactly.
14 Q.   That white Camaro, did you ever learn whether or not it
15 was the property of Mr. Sigona?
16 A.   He was in possession of it.  He dealt in cars.  I did not
17 research it to see if the title was in his name.  He was in
18 the business of selling used cars.  At the time of his death
19 he had about five or six cars in his possession.
20 Q.   On December 7, 1988, was that white Camaro a stolen car
21 or was it properly owned and registered?
22 A.   It was not stolen.  The status of his registration was in
23 question.  It was not properly registered.
24 Q.   Since 1988, have you been able to determine the status of
25 the registration?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 139                                                    562

### Cincotta-redirect-Rose

1  A.   No.
2  Q.   What do you mean when you say the status of the
3  registration?
4  A.   I mean that the vehicle wasn't reported stolen.  It was
5  not currently registered.
6  Q.   Correct on December 7?
7  A.   Right.
8  Q.   By the way, did it have any license plates on it?
9  A.   Yes.  It had a Jersey license plate on it that did not
10 belong to that car.
11         MR. HORLICK:  Thank you.
12         THE COURT:  All right.
13 REDIRECT EXAMINATION
14 BY MR. ROSE:
15 Q.   Do you know where Dino Marino lived in relation to Angelo
16 Sigona?
17 A.   At the time I knew exactly where he lived.  Right now I
18 can only recollect that it was like a block or two away on one
19 of the bay streets.  Bay 41 or so.
20         MR. ROSE:  Thank you, sergeant.
21         THE COURT:  All right.  Do you have another — thank
22 you.
23         Do you have another witness?
24         MR. O'CONNELL:  Yes, Your Honor.
25         The government is calling Thomas Carew—

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 140                                                    563

### Carew-direct-O'Connell

1          THE COURT:  Okay.
2          MR. O'CONNELL:  It will just take a minute to arrange
3  to bring him in, Your Honor.
4          (Pause.)
5          THE COURT:  All right.  Just stop there and face me
6  and raise your right hand, while these gentlemen sit down.
7  T H O M A S      C A R E W  ,
8      called as a witness, having been first duly sworn,
9      was examined and testified as follows:
10 DIRECT EXAMINATION
11 BY MR. O'CONNELL:
12         THE COURT:  Please be seated.
13         Would you state your name, please?
14         THE WITNESS:  Thomas Carew.
15         THE COURT:  How do you spell your last name?
16         THE WITNESS:  C A R E W.
17         THE COURT:  Okay.  That microphone isn't on.
18 Mr. Carew.  So you could sit back and keep your voice up so
19 everyone can hear.
20         THE WITNESS:  Okay.
21         MR. O'CONNELL:  May I proceed, Your Honor?
22         THE COURT:  Please.
23         All right, Mr. O'Connell.
24 Q.   Mr. Carew, are you testifying pursuant to a plea
25 agreement with the government?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 141  SHEET 36

564

Carew-direct-O'Connell

1  A.  Yes, I am.

2  Q.  A cooperation agreement?

3  A.  Yes.

4  MR. O'CONNELL:  May I approach the witness, Your

5  Honor?

6  THE COURT:  Yes.

7  Q.  I show you what's been marked as Government Exhibit

8  3500-1478.  Please take a moment to examine it.

9  (Pause.)

10  Is that a signed copy of your agreement, your

11  cooperation agreement, Mr. Carew?

12  A.  Yes.

13  Q.  Does that bear your signature and the signature of

14  government counsel and of your own attorney?

15  A.  Yes.

16  Q.  Is that the entire agreement that you have with the

17  United States Government?

18  A.  Yes.

19  Q.  Mr. Carew, pursuant to that agreement, am I correct you

20  pled guilty to all criminal charges in the indictment in this

21  case, the pending case?

22  A.  Yes.

23  Q.  Yes, sir?

24  A.  Yes.

25  Q.  Keep your voice up, please.

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

---

PAGE 142

565

Carew-direct-O'Connell

1  A.  Okay.

2  Q.  Those charges included racketeering, murder and

3  extortion; is that correct?

4  A.  Yes.

5  Q.  Could you tell the jury what sentence you are currently

6  facing under your cooperation agreement and guilty plea in

7  this case?

8  A.  Zero to life imprisonment.

9  Q.  Could you tell the jury what your understanding is as to

10  what your obligation under this cooperation agreement is?

11  A.  To tell the truth and tell everything I know.

12  Q.  Under your agreement with the government, what promises

13  has the government made to you in return for your cooperation

14  and your compliance with this agreement?

15  A.  They didn't make any promises.  They just said that if I

16  testify truthfully they will give the judge a letter that I --

17  that they feel that I testified truthfully.

18  Q.  Has anyone in the government promised you a specific

19  sentence of any kind in return for your cooperation?

20  A.  No.

21  Q.  What is your understanding as to who will determine what

22  sentence you will receive?

23  A.  The judge.

24  Q.  Mr. Carew, I'd like to turn your attention now to a brief

25  inquiry into your own background.

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

---

566

Carew-direct-O'Connell

1  You were arrested in this case in approximately

2  October 1992; is that correct?

3  A.  Yes.

4  Q.  Earlier in your life, you were arrested previously?

5  A.  Yes, I was.

6  Q.  Tell the jury when you were arrested for the first time

7  and the offense for which you were arrested?

8  A.  In 19 and 61, I was arrested for conspiracy to armed

9  robbery.

10  Q.  Were you convicted in that case?

11  A.  Yes, I was.

12  Q.  Did you receive a sentence?

13  A.  I did, yes.

14  Q.  Tell the jury what sentence you received?

15  A.  I received a three and a half to seven year sentence.

16  Q.  Mr. Carew, around that time, 1960, 1961, prior to your

17  arrest, had you engaged in other criminal activity other than

18  that specific offense, for which you were arrested?

19  A.  Yes.

20  Q.  Explain to the jury just very briefly the kinds of

21  criminal activity that you were engaging in back in 1960,

22  1961, around that time?

23  A.  I was engaged in gambling, selling stolen property and

24  armed robbery.

25  THE COURT:  Keep your voice up.

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

---

PAGE 144

567

Carew-direct-O'Connell

1  THE WITNESS:  Okay.

2  Q.  Back around that same time, did there come a time when

3  you met a member of an organized crime family that you later

4  became associated with?

5  A.  Yes.

6  Q.  Who was that person?

7  A.  Chris Funari, Christy Tic.

8  Q.  What crime family did you learn he belonged to?

9  A.  Lucchese Crime Family.

10  Q.  In the early 1960s or approximately 1960, could you

11  explain to the jury how your relationship with Mr. Funari

12  began and how frequently you began to see him?

13  A.  Yes.  I -- I had a -- an argument with a couple of guys

14  and they went -- they went to Christy and because -- because I

15  started hanging out at his club and he straightened out the

16  argument and I started staying with him more and more.

17  Q.  At the time you began staying with him, as you put it,

18  did you recognize at that time that he was a person who was

19  involved in organized crime?

20  A.  Yes.

21  Q.  You made your own deliberate decision at that time,

22  voluntarily, to become associated with that individual?

23  A.  Yes.

24  Q.  Is it fair to say that that was the beginning of a long

25  relationship that you had with the Lucchese Crime Family?

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

568

Carew-direct-O'Connell

```
 1  A.   Yes.
 2  Q.   Now, you testified a moment ago that you served
 3  approximately three years in jail; is that correct?
 4  A.   I did about thirty-one months out of the three and a half
 5  to seven year bit.
 6  Q.   Could you tell the jury over what period of time
 7  approximately you served that particular prison sentence?
 8  A.   I was convicted in 1963 and I did about six months at
 9  that time and I was released on a certificate of reasonable
10  doubt pending an appeal, and I was out on an appeal bond for
11  about two years.  I went back to jail in 19 and 66 after
12  losing the appeal, and I was in jail until the end -- towards
13  the end of '68.
14  Q.   Now from the time you were arrested until the time you
15  went to jail, did you still continue from time to time to
16  engage in criminal activities?
17  A.   Yes.
18  Q.   Notwithstanding your conviction?
19  A.   Yes.
20  Q.   Did you continue to maintain your relationship with
21  Mr. Funari?
22  A.   Yes.
23  Q.   Turning your attention to the time period you were
24  actually in jail, the longer stretch, if you will, in the
25  mid-to late sixties?
```

ANTHONY M. MANCUSO, CSR      OFFICIAL COURT REPORTER

---

PAGE 146

569

Carew-direct-O'Connell

```
 1  A.   Yes.
 2  Q.   Can you tell the jury whether you made any other friends,
 3  if you will, or associates, associations with people who were
 4  engaged in organized crime while you were actually in jail?
 5  A.   Yes.  Vic Amuso was in jail at the same time as I was and
 6  he worked right near me.  We were friends.  And Anthony
 7  Stabile was there and I was friendly with him too.
 8  Q.   This individual Vic Amuso you are referring to, is that
 9  the same individual who later was promoted to a very high
10  ranking possession in the Lucchese Crime Family?
11  A.   Yes.  Eventually he became the boss.
12  Q.   After you came out of prison in late 1960s, did you
13  continue seeing Mr. Funari?
14  A.   Yes.
15  Q.   Did your relationship grow closer with him?
16  A.   Yes.
17  Q.   Could you explain to the jury what you began to do for
18  Mr. Funari upon your release from prison in the late 1960s and
19  rejoining?
20  A.   Well, I started to hang out with him quite a bit and
21  eventually I was -- he made me his driver and I used to drive
22  him around to his meetings and pick him up and hang out with
23  him, kind of bodyguard and driver.
24  Q.   Did you continue to engage in criminal activities in
25  addition to being his driver, bodyguard?
```

ANTHONY M. MANCUSO, CSR      OFFICIAL COURT REPORTER

---

570

Carew-direct-O'Connell

```
 1  A.   Yes.
 2  Q.   Tell the jury just generally the kinds of criminal
 3  activities you engaged in after rejoining Mr. Funari in late
 4  1960s?
 5  A.   Selling swag or stolen property, hijacking, labor
 6  racketeering enforcer, insurance fraud.  That's about it.
 7  Q.   Did you ever engage in illegal gambling?
 8  A.   Oh, yes, gambling and I had a junkyard.  I chopped some
 9  cars.
10  Q.   Roughly over what period of time did you serve as the
11  driver for Christy Tic Funari?
12  A.   Late '60s through the middle '70s, around '76 or
13  somewhere around there.  '77.
14  Q.   You told the jury about one arrest you had in 1961.
15       During the time period in which you were working as a
16  driver for Mr. Funari, did there come a time when you were
17  arrested again?
18  A.   Yes.
19  Q.   Approximately when were you arrested for the second time?
20  A.   In 1971, I was arrested for possession of stolen
21  property.  I had a transmission from a stolen car was found in
22  my place of business, my junkyard.
23  Q.   Was this during the same time period in which you were
24  selling stolen car parts?
25  A.   Yes.
```

ANTHONY M. MANCUSO, CSR      OFFICIAL COURT REPORTER

---

PAGE 148

571

Carew-direct-O'Connell

```
 1  Q.   What happened to that case?
 2  A.   It was dismissed.
 3  Q.   Did there come a time when you were arrested for a third
 4  time?
 5  A.   Yes.
 6  Q.   Tell the jury for what?
 7  A.   In the middle '70s I was arrested for possession of
 8  fireworks.  I had a garage full of fireworks and I was
 9  arrested for that.
10  Q.   What was the disposition of that case, Mr. Carew?
11  A.   I paid a fine.
12  Q.   During this time period in 1970s, while you were the
13  driver for Mr. Funari, you testified a moment ago that you
14  engaged in labor racketeering.
15       Can you explain to the jury what your role was in
16  labor racketeering and what connection if any it had to
17  Mr. Funari and the Lucchese Crime Family?
18  A.   Well, at various times I worked as a shop steward on
19  construction jobs that Mr. Funari put me on, and then later
20  on, I was acting -- active in giving a couple of union guys
21  beatings to put them in line.
22  Q.   During this time period, did you consider in your own
23  mind to hold a position within that Lucchese Crime Family of
24  some sort?
25  A.   Not really.
```

ANTHONY M. MANCUSO, CSR      OFFICIAL COURT REPORTER

PAGE 149  SHEET 38

572

Carev-direct-O'Connell

1  Q.  Did you ever become a -- an actual member or --

2  A.  No, I can't.

3  Q.  Or soldier in the Lucchese Family?

4  A.  No, I'm Irish and I couldn't be.

5  Q.  What did you have to be in terms of ethnic background as

6  you understood it to become an actual member?

7  A.  Your father had to be Italian.

8  Q.  You were disqualified by reason of your Irish ancestry?

9  A.  Yes.

10 Q.  During that time period in the 1970s, did you meet a

11 person named Peter Chiodo?

12 A.  Yes, I did.

13 Q.  Approximately when did you meet Mr. Chiodo?

14 A.  Around 1975.

15 Q.  Briefly, could you explain the circumstances to the jury

16 that led to your meeting Mr. Chiodo?

17 A.  Mr. Chiodo had asked -- Mr. Chiodo's father had asked

18 Chris Funari to help his son Pete. He had a dispute with some

19 members of the Colombo Crime Family, and he wanted Christy to

20 represent his son with them, and Chris did.

21        We -- he had a meeting one night in which I attended

22 and he sat down with them and he got a good decision for Pete

23 and then Pete came with him.

24 Q.  After Mr. Chiodo obtained this result that you described

25 from his meetings with Mr. Funari, did Mr. Chiodo become

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 150

573

Carev-direct-O'Connell

1  associated in any way with Mr. Funari?

2  A.  Yes.

3        He stayed with -- he stayed in The 19th Hole with

4  us. He became friendly with Chris.

5  Q.  You just referred to a place called The 19th Hole?

6  A.  Yes.

7  Q.  Could you explain to the jury what The 19th Hole had to

8  do with the Lucchese Crime Family activities as you understood

9  it back in the mid-1970s?

10 A.  Well, we stayed there. Chris kind of held court there.

11 That was his hangout, it was his place and we stayed there and

12 we had all his meetings were -- were made there and his

13 appointments.

14        (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 151

574

Carev/direct/O'Connell

1  BY MR. O'CONNELL:

2  Q.  Now, by reason of your relationship with Mr. Funari, did

3  you come to know other persons who were associated with

4  Mr. Funari during that time period?

5  A.  Yes.

6  Q.  Could you give the jury a few examples of persons who

7  associated with Mr. Funari in his 19th Hole crowd back in the

8  mid-1970's?

9  A.  Nick DiCostanza, Angelo DeFendis, Frankie Bollino,

10 Frankie Hart, myself, Tommy DiDonato, Johnny Black, but Johnny

11 was in Florida, but when he came up, he came there. That's

12 about it. Oh, Pete Chiodo. Do you want associates, too?

13 Q.  If you can mention associates in the 1970's?

14 A.  Associates, Dino Marino was coming around. Dino had a

15 barbershop, and he used to cut Chris's hair. He got friendly

16 with him and he started coming around. Frankie Zola, B O L A.

17 Q.  You mention a Mr. Amuso, who you had met in prison from

18 the early 1960's. Did he have any relationship with

19 Mr. Funari during this time period?

20 A.  Yes, Vic came around, and Gaspipe, Anthony Casso. Vic

21 came around. Anthony was around first, and then Vic came

22 around after that.

23 Q.  Did there come a time in the 1970's when certain persons

24 who were associated with Mr. Funari, who met the right

25 criteria, became actually made members of the Lucchese Crime

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 152

575

Carev/direct/O'Connell

1  Family that were in your group?

2  A.  Yes.

3  Q.  Who were those individuals that became made members of

4  the Lucchese Crime Family from among the associates around

5  Mr. Funari around that time?

6  A.  Vic Amuso, Anthony Casso, Bobby Amuso, Angelo, Nicky

7  DiCostanza, Frankie Hart, Frankie Bollino, Tommy DiDonato,

8  Johnny Black; later on, Johnny Black became a member.

9  Q.  You referred to a person by the name of Angelo. Did you

10 know that person's last name?

11 A.  Yes, DeFendis.

12 Q.  Now, during this time period in the 1970's, you mentioned

13 that Mr. Chiodo as well as yourself were in this crew with

14 Mr. Funari, is that correct?

15 A.  Yes.

16 Q.  Did you and Mr. Chiodo ever engage in criminal activities

17 together during that time period?

18 A.  Yes.

19 Q.  And briefly describe to the jury the kinds of criminal

20 activities you and Mr. Chiodo engaged in?

21 A.  We worked crap games together, and we did one of the --

22 we did an assault on a union official together.

23        We used to sell, you know, stolen property and

24 different things like that. I hung out with Pete quite a bit.

25 Q.  Did you become friends with Peter Chiodo?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

576

Carew/direct/O'Connell

1  A.  Yes.  I'm godfather to his daughter.
2  Q.  Mr. Carew, you just referred to an assault on an union
3  official.  Do you recall who that union official was who was
4  assaulted?
5  A.  Yes.  His name was Volford, James Volford.
6  Q.  What union was he connected to?
7  A.  He was in the painters' union.
8  Q.  Just very briefly, how did it come to pass that you and
9  Mr. Chiodo became involved in an assault on James Volford of
10  the painters' union?
11  A.  Jimmy Bishop, who was an official of the union, went to
12  Dino Marino and asked if Dino could get him some help to get
13  Volford out of the way so that Jimmy Bishop would have more
14  control over the union.  And Dino went to Chris, and we were
15  assigned to give him a beating.
16  Q.  Did you participate in that beating?
17  A.  Yes, I did.
18  Q.  What was the result?
19  A.  He eventually left.  I believe he resigned his position,
20  and went back to a different part of the state where he came
21  from.  I think he came from Buffalo, but I'm not sure.
22  Q.  What happened, if anything, to Mr. Bishop in connection
23  with the union?
24  A.  After that, he became very strong and he was the Luchese
25  Crime Family's guy in the union.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

578

Carew/direct/O'Connell

1  the door.  Anthony came to the door.  He led the way.  He
2  closed the door.  He led the way to the basement.  There was a
3  body on the floor and I helped him put the body in a bag, and
4  I cleaned up the blood, and we carried the body out through
5  the back door.  And there was an alleyway and he had a car
6  parked there.  We put the body in the trunk of the car and we
7  took it and dumped it, dropped it on the street off West 6th
8  Street, I think it was West 7th and Avenue V.  A little dead
9  end street.  We put the body in there, and then we left.
10  Q.  Did you participate in the murder of that individual?
11  A.  No, I didn't.
12  Q.  Had you participated in the planning of that murder?
13  A.  No.
14  Q.  Was your role limited to what you just described in your
15  testimony?
16  A.  Just that was it.
17  Q.  Did Mr. Casso indicate, at that time when he brought you
18  to that body lying on the basement floor, who had killed that
19  individual?
20  A.  No.  Who had killed him?
21  Q.  Who had killed that individual?
22  A.  I assumed he did.  He was the only one there.  He said
23  that —
24  Q.  Was there a weapon in the area of the body?
25  A.  Yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 154

572

Carew/direct/O'Connell

1  Q.  Did the Luchese Crime Family continue a relationship with
2  the painters' union following that episode?
3  A.  Yes.
4  Q.  For how long, as you understood?
5  A.  Right up until recently, you know, until the present.
6  Q.  Now, you testified that during the 1970's, that you
7  engaged in violence from time to time, is that correct?
8  A.  Yes.
9  Q.  One example was the beating that you participated in
10  involving Mr. Volford, is that right?
11  A.  Yes.
12  Q.  Did you learn that the Luchese Crime Family engaged in
13  murder?
14  A.  Yes.
15  Q.  Calling your attention to the mid-1970's, did there come
16  a time when you received a particular assignment where you
17  were requested to assist Anthony Casso in a certain matter?
18  A.  Yes.
19  Q.  Tell the jury what the assignment was and briefly
20  describe what happened?
21  A.  I was to meet Anthony in a club on 15th Avenue.  It was
22  owned by a fellow by the name of Swaggie at the time.  We had
23  previously had the crap game in the basement of that club.  I
24  was told to meet Anthony there, that he needed my help with
25  something, and I went there and rang the bell and banged on

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 156

579

Carew/direct/O'Connell

1  Q.  What kind of weapon?
2  A.  It was — I believe it was an automatic weapon.  It was
3  on the sink.  I didn't really pay attention.  He picked it up
4  and took it after that.
5  Q.  Turning your attention to the late 1970's, did there come
6  a time when you actually received an assignment from
7  Mr. Fonari to murder the son of a Luchese member?
8  A.  Yes.
9  Q.  Who was that individual?
10  A.  Joey Abbinanti.  He was the son of a guy by the name of
11  Pete the Killer.
12  Q.  Was Joey Abbinanti killed?
13  A.  No.  We did some surveillance.  While that was in
14  progress, the thing was called off.  They told us the contract
15  was off at that time.
16  Q.  So there's no misunderstanding with your role in that
17  particular episode, when you were asked to participate by
18  Mr. Fonari, did you agree to it?
19  A.  Yes.
20  Q.  Over the years in the 1970's, Mr. Carew, in the course of
21  your experience, did you come to learn that the Luchese Crime
22  Family, including Mr. Fonari's crew, would store weapons for
23  use by its members and associates from time to time?
24  A.  Yes.
25  Q.  Did you ever become involved in the storing of weapons?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

## 580

Carew/direct/O'Connell

1  A.  Yes.

2  Q.  Could you explain to the jury what kinds of weapons you

3  stored for the Luchese Crime Family and over what period of

4  time?

5  A.  Well, myself and I believe two other guys were given

6  attache cases that held handguns.  The one I had had ten

7  handguns in it, and I put it away.

8  Q.  For how long did you store this case of handguns?

9  A.  I had it a long time.  I gave it to Peter Chiodo and

10 Anthony Casso around '87, '98.  So I had to have it probably

11 close to ten years.

12 Q.  Apart from the guns that you stored for the Luchese Crime

13 Family, did you also keep guns for yourself?

14 A.  Yes, I did.

15 Q.  Tell the jury the kinds of guns that you would have at

16 various times over the years?

17 A.  I had a machine gun with a silencer.  I had a couple of

18 automatic pistols with silencers.  I had regular Smith &

19 Wesson .38's, handguns.

20 Q.  Did there come a time when you decided to get rid of all

21 the weapons in your possession?

22 A.  Yes, I did.

23 Q.  Was there a particular event that took place which

24 influenced you to make that decision?

25 A.  Yes.

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

## 581

Carew/direct/O'Connell

1  Q.  What was the event that made you make that decision to

2  get rid of all the weapons you had?

3  A.  Well, Peter Chiodo was shot, and he was cooperating with

4  the government, so I got rid of everything that I had in my

5  possession.

6  Q.  Now, turning your attention back to the late 1970's, the

7  time period in which you were the driver, as you described it,

8  for Mr. Funari.  You testified that Mr. Funari was a made

9  member of the Luchese Crime Family, am I correct?

10 A.  Yes.

11 Q.  Did there come a time in the late 1970's when Mr. Funari

12 was promoted to a higher position in the Luchese family?

13 A.  Yes.

14 Q.  Tell the jury what position and approximately when?

15 A.  He was made captain I think it was around '77, something

16 like that, somewhere in that vicinity.  1977, I think.

17 Q.  Up until the time that Mr. Funari became a captain, you

18 were his driver?

19 A.  Yes.

20 Q.  Did Mr. Funari's promotion to captain affect you and your

21 position with Mr. Funari in any way?

22 A.  Well, when you're in that position, you have to have a

23 made member so your running around, because you have to make

24 appointments with other people, and sometimes you sit in on

25 different things.  And there, usually the protocol was, a made

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

## 582

Carew/direct/O'Connell

1  member had to do that.  Some guys might not want to, somebody

2  who wasn't a made member, or wouldn't want to make

3  appointments with them and everything.  They would want to

4  deal with a member.

5  Q.  Did you lose your position then as Mr. Funari's driver?

6  A.  Yes.

7  Q.  Following that change in your position in the late

8  1970's, did there come a time when you reduced your

9  involvement, your active involvement, with the Luchese Crime

10 Family?

11 A.  Yes.

12 Q.  Approximately when did that happen?

13 A.  Around the end of '79, I started -- I had a couple of

14 legitimate business opportunities, and I went and asked if it

15 would be all right if I took them and spent less time, you

16 know, with the group, and I had everybody's blessing.  They

17 let me go.

18 Q.  When you say "everybody's blessing," was there anybody in

19 particular who allowed you to dissociate yourself from active

20 involvement with the Luchese family?

21 A.  Yes, Chris Funari.

22 Q.  Could you just very briefly describe the kinds of

23 activities you were planning to engage in once you separated

24 from the Luchese family?

25 A.  Yes.  I had an opportunity to go into the jobber business

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

## 583

Carew/direct/O'Connell

1  in the clothing center, sell job lots of clothing, and I

2  wanted to take it.

3  And I had started to buy and sell some buildings, fix

4  them up and sell them, you know, one-story taxpayer buildings

5  I was fixing and selling.  That's what I wanted to do.

6  Q.  Is it fair to say that up until now, throughout the

7  1960's, 1970's, that you didn't declare or report to the

8  government all of the income you were earning in your various

9  illegal activities?

10 A.  Yes.  That's fair to say.

11 Q.  Is it also fair to say that throughout the next decade,

12 you followed that same pattern and failed to report all of

13 your income from your various activities?

14 A.  I declared some, but I didn't declare it all, no.

15 Q.  Now, you described several kinds of businesses that you

16 were planning on entering into.  Did you, in fact, go into the

17 business of selling job lots of clothing and enter into the

18 construction business starting in late 1979 and 1980?

19 A.  Yes, I did.

20 Q.  During that time period, so the jury understands clearly,

21 did you still remain friendly, if you will, with the Luchese

22 Crime Family figures you had been associated with for the past

23 twenty years?

24 A.  Yes, I did.

25 Q.  Did you still, from time to time, go to see Mr. Funari

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

584

Carew/direct/O'Connell

1 over in the 19th hole?

2 A. Yes.

3 Q. You described some legitimate business activities you

4 engaged in, starting in 1979 or 1980, Mr. Carew?

5 A. Yes.

6 Q. Despite moving into some legitimate businesses, did you

7 nevertheless, from that time forward, also engage in criminal

8 activities from time to time?

9 A. Yes, I did.

10 Q. Did you engage in any criminal activities tied to the

11 clothing business?

12 A. Yes, I did.

13 Q. Briefly, tell the jury what kind of criminal activities

14 you engaged in that area?

15 A. I was manufacturing knock-off, what they call knock-off

16 jeans. I would make a jean with the same label and hangtags

17 and everything of a major-name jean, and I would sell them

18 through vendors that I had become acquainted with.

19 Q. You testified back in the 1970's from time to time you

20 would sell stolen property?

21 A. Yes.

22 Q. Did opportunities to sell stolen property present

23 themselves, in the 1980's, to you from time to time?

24 A. Occasionally, yes.

25 Q. And did you engage in that kind of activity?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

586

Carew/direct/O'Connell

1 A. Yes, as well as building houses. Yes.

2 Q. Now, in the mid-1980's, did there come a time when a

3 particular Luchese member asked you to work on a construction

4 job on his residence?

5 A. Yes.

6 Q. Who was that Luchese member in the 1980's who asked for

7 your services in construction-related work on a residence?

8 A. Anthony Casso.

9 Q. Could you just briefly describe the job that Mr. Casso

10 asked you to do?

11 A. Anthony had some plans that he had for a house that he

12 wanted to be built on a lot he owned on Avenue X, in the Mill

13 Basin section of Brooklyn. The house was to be put on a plot

14 that there was an existing house on.

15 He wanted the existing house to be demolished and to

16 put a foundation and everything in, footings and foundation in

17 to support the new house that he wanted to have built there,

18 and he wanted me to guide him through it. He asked me if I

19 could spend some time and give him some advice, that he asked

20 me to do the foundation work, which I did.

21 Q. I would like to return to that matter in a moment. I

22 would like to ask you a few other questions first.

23 Mr. Carew, throughout your criminal career, were you

24 ever involved in selling, manufacturing, importing or using

25 narcotics or drugs of any kind?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 162

585

Carew/direct/O'Connell

1 A. I did, a couple of times, yes.

2 Q. Did there come a time when you defrauded an insurance

3 company in connection with a car?

4 A. Yes.

5 Q. Very briefly, what did that involve?

6 A. I claimed a car was stolen, and I collected the money,

7 the insurance company money.

8 Q. With regard to the construction business, could you

9 briefly describe the type of construction businesses you

10 engaged in in the 1970's?

11 A. I had a concrete company, and I used to do foundations

12 and sidewalks and things like that. I had another company

13 that dealt strictly in home improvement and in building of

14 homes, and that's what I did.

15 Q. When you say you had a concrete company, did you actually

16 manufacture concrete?

17 A. No. We put in the foundations and the frames and

18 everything, the forms for the foundations. We owned the

19 forms, and we set foundations and footings for other

20 builders. And we did sidewalks, in general, concrete work,

21 curbs and sidewalks, things like that.

22 Q. So you were a contractor of sorts involved in concrete

23 foundation installation, and sidewalks?

24 A. Yes.

25 Q. That area?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 164

587

Carew/direct/O'Connell

1 A. No.

2 Q. Mr. Carew, did there come a time when a particular

3 Luchese member who you knew to be involved in a drug deal

4 asked you for particular assistance on that drug deal?

5 A. Yeah.

6 Q. Who was that Luchese member who asked for the help?

7 A. Mike DeSantis asked me to do him a favor and sit on a

8 house, he kind of a watchman on a house that he intended to

9 bring some drugs in. He was going to put a van in the garage,

10 and he wanted to make sure the house was clean and that nobody

11 went near it.

12 Q. Were the drugs ever brought to the house?

13 A. No. The load was confiscated.

14 Q. Approximately when did Mr. DeSantis ask you to perform

15 that function?

16 A. In 1990. I guess it was the end of the summer of 1991. I

17 believe.

18 Q. On another occasion, did some other person, at a previous

19 time, who you also knew was involved in drug dealing, once ask

20 you to do him a favor?

21 A. Yes, a fellow by the name of Ray Fontaine. He asked me

22 to mediate a dispute he had with one of his partners on a drug

23 deal. The guy took a bunch of pot that they had, and Ray

24 wanted his share back. And I mediated the deal and they had

25 an agreement who got what.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

Carew/direct/O'Connell
588

1 Q. Were you involved in that pot deal?

2 A. No.

3 Q. What was your understanding of why Mr. Fontaine looked to

4 you to help mediate his dispute?

5 A. Well, more or less, it was like a strong-arm reason. He

6 felt I had a reputation that might get him the results he

7 wanted.

8 Q. What was the result?

9 A. He got the results he wanted. They made an agreement on

10 the goods that they had, and Ray got his share and the other

11 guy got his share.

12 Q. Did you have to engage in violence to accomplish that?

13 A. Yes.

14 Q. Were you prepared to, if necessary?

15 A. Yes.

16 Q. I would like to return to the construction job Mr. Casso

17 asked you to perform — is that the mid-1980's, approximately?

18 A. I believe it was around the end of '85, sometime in '86,

19 the summer of '86.

20 Q. Did you work on that project over a period of time?

21 A. Yes, I did. We had — as I said before, there was an

22 existing house there, so I had to — he had a building permit

23 that was a reconstruction permit.

24     It wasn't a total brand-new house, so we had a leave

25 a couple of walls up, and we had to be a little delicate about

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

Carew/direct/O'Connell
590

1 thought Pete would go for it. And I said, I think so, but I'm

2 not sure, you know. He's doing construction up in Jersey.

3 And I wasn't sure. But I agreed to go to Pete and ask him,

4 which I did.

5 Q. Now, is it fair to say, Mr. Carew, that discussions

6 regarding the straightening out, as you put it, or the making

7 of a member in the Luchese Crime Family, is something that

8 ordinarily would only be discussed with and among made

9 members?

10 A. Yes.

11 Q. Could you explain to the jury what your understanding was

12 as to why Mr. Casso would discuss this matter with you when

13 you've explained to the jury that you weren't a made member?

14 A. I knew Anthony a long time, and I had been around the

15 family a long time and I was friendly with Pete, and it fit

16 the time frame. I could get to Pete, and I was trusted by

17 Mr. Casso. So he told me to bring the message to him.

18 Q. By that particular point in time, based on your

19 testimony, is it fair to say that you had been friendly with

20 members of the Luchese Crime Family for over twenty-five years

21 by that point in time?

22 A. Middle's '80s, from '60. Twenty-five years.

23 Q. Well, in accordance with Mr. Casso's request, did you

24 contact Mr. Chiodo?

25 A. Yes, I did.

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

Carew/direct/O'Connell
589

1 how we put that in so that the building department didn't come

2 down on him and make him stop. So I took the house down in

3 sections, and we put in the foundation, and eventually we took

4 the whole house down. He decided not to go any further with

5 the house, and we took the other house down and we fenced in

6 the lot.

7 Q. Throughout the time period when you were working on that

8 job, did you see Mr. Casso?

9 A. Yes. There was several months I saw him all the time,

10 yes.

11 Q. This is the same Mr. Casso whom you had met back in the

12 1970's or thereabouts, around Mr. Funari, is that correct?

13 A. I knew Anthony close to twenty-five, thirty years, yes,

14 the same one.

15 Q. Turning your attention to late 1986, around the turn of

16 the year, early 1987, did there come a time when Mr. Casso

17 brought up in conversation with you a very specific matter

18 concerning your friend Peter Chiodo?

19 A. Yes.

20 Q. Tell the jury, as best you can recall, what Mr. Casso

21 discussed with you on that occasion concerning Mr. Chiodo?

22 A. He asked me if I could get in touch with Pete. He said

23 that he would like to see him and discuss having Pete be

24 straightened out, having him be a made member.

25     He asked me what I thought about that, you know, if I

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

Carew/direct/O'Connell
591

1 Q. Did you have a conversation concerning this matter with

2 him?

3 A. Yes.

4 Q. Did you receive a response from him?

5 A. Yes.

6 Q. What was that?

7 A. He told me to tell Anthony and Vic that it would be his

8 honor, and I made an appointment for him to come and talk to

9 them himself.

10 Q. Did there come a time when you learned that Mr. Chiodo

11 was actually inducted as a member into the Luchese Crime

12 Family?

13 A. Yes.

14 Q. How long after Mr. Casso brought this matter up?

15 A. I would say it was probably a couple of months. I was

16 called and told to meet Pete and bring him to a location, and

17 I did. I picked him up. I met him.

18     We met Frankie Lastorino and Bobby Amuso, and they

19 went in a car and went away. I was told to come back a couple

20 — in a couple of hours.

21 Q. Were you able to accompany Mr. Chiodo to this ceremony,

22 if you will?

23 A. No. As I said, I was told to come back in a couple of

24 hours, which I did, and I met them after they came back.

25 Q. Did you discuss what had happened with Mr. Chiodo upon

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

592

Carey/direct/O'Connell

1 his return?

2 A. Yes. We had a drink congratulating Pete, and then Bobby

3 left, and I had dinner with Pete.

4 Q. After Mr. Chiodo became a member of the Luchese Crime

5 Family, turning your attention to early 1987, did you make a

6 decision to become a little more active once again in the

7 affairs of the Luchese Crime Family?

8 A. Yes.

9 Q. Could you tell the jury, briefly, what led you to making

10 this decision to become more active once again in the affairs

11 of the Luchese Crime Family?

12 A. Well, Pete said he needed me to hang out. I knew a lot

13 of guys and I had been around a long time, and he wanted me to

14 start hanging out with him again and become active, and he

15 said there would be a lot of financial opportunities that I

16 would do good. And then I decided to go back into it almost

17 every day, getting back into the crime family.

18 Q. After Mr. Chiodo became an actual member of the Luchese

19 Crime Family, did he set up a headquarters of any kind or a

20 meeting place for himself and the persons around him?

21 A. Yeah. We put up a club on McDonald Avenue, myself,

22 Gabe, Miley D and Pete put up some money, and we built a

23 club. We took a building and made it a club.

24 Q. You just referred to an individual named "Miley D." Do

25 you know that person's last name other than "D"?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

594

Carey/direct/O'Connell

1 A. Yes.

2 Q. Are these persons indicated as "Michael DeSantis and Gabe

3 Lombardo" two of the individuals that you identified

4 previously?

5 A. Yes. The fellow over here next to me, his name is Sal.

6 Q. You're off to the far right of the picture?

7 A. The far right, yes.

8 Q. You're indicated by your name, "Tommy Carey"?

9 A. Yes.

10 Q. The person next to you —

11 A. No. His name is not there. Sal was around Joe Beck, and

12 that's Don Trusciello.

13 Q. The other two individuals, Michael DeSantis and Gabe

14 Lombardo?

15 A. Yes, that's Michael DeSantis and Gabe Lombardo. Gabe

16 died a couple of years ago.

17 Q. Mr. DeSantis and Mr. Lombardo were one of the first

18 persons to open the club on McDonald Avenue, along with you

19 and Mr. Chiodo?

20 A. Yes.

21 Q. Turn your attention to Exhibit 2-61, the photo of the La

22 Donna Rosa restaurant. Would you go to the La Donna Rosa

23 restaurant from time to time?

24 A. Yes.

25 Q. Did anybody in particular operate the La Donna Rosa

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 170

593

Carey/direct/O'Connell

1 A. Yes, Mike DeSantis.

2 Q. You mentioned a person named "Gabe." Do you know that

3 person's last name?

4 A. I'm not sure of Gabe's last name. Lombardo, I think.

5 Yeah, Gabe Lombardo.

6 Q. Prior to coming to court today, did you have an

7 opportunity to view certain photographs —

8 A. Yes.

9 Q. — in preparation for your testimony?

10 A. Yes.

11 Q. At the time you reviewed them, were names that appear on

12 these photographs covered?

13 A. Yes.

14 Q. Were you able to verify the identity of many of the

15 persons depicted in the photographs you reviewed?

16 A. Yes.

17 MR. O'CONNELL:    Your Honor, may I approach the

18 witness?

19 THE COURT:   Yes.

20 Q. I would like you to examine Government's Exhibit 2-78,

21 which is in the jurors' books.

22 (Pause.)

23 Q. Have you had an opportunity to look at it?

24 A. Yes.

25 Q. Is this one of the photographs you reviewed?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 172

595

Carey/direct/O'Connell

1 restaurant?

2 A. Yes, it was operated by Little Al D'Arco.

3 Q. Was he associated in some way with the Luchese Crime

4 Family?

5 A. Yes. He was the acting boss for a while.

6 Q. Prior to becoming acting boss, what position did he hold,

7 Al D'Arco?

8 A. He was a captain. He had what was the Paulie Vario's old

9 crew.

10 Q. Are these individuals —

11 THE COURT:   They are not hearing you, Mr. Carey.

12 Q. Can you repeat that answer?

13 THE COURT:   You have to keep your voice up.

14 Who was Al D'Arco? He had something?

15 THE WITNESS:   He was the acting boss. Then, prior

16 to that, he was a captain, that he had members of the old

17 Paulie Vario crew under his jurisdiction.

18 Q. With respect to Exhibit 2-61, are these individuals

19 accurately indicated by the names on these photos, "Michael

20 DeSantis," the far right?

21 A. That's Michael DeSantis. That's myself. Don Trusciello,

22 and that guy is Petey Canarsie. You don't have a name by him.

23 Q. Which fellow are you referring to as "Petey Canarsie"?

24 A. The fellow in back of me. Looks like he's coming out the

25 door.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 173   SHEET 44                                                          596

### Carew/direct/O'Connell

1  Q.  Did he have any connection with the Luchese Crime Family?

2  A.  He was friends with Mike DeSantis. He didn't have no

3  real connection to the family. He was a friend of Mikey

4  DeSantis.

5  Q.  If you would turn to Exhibit 2-131. moving from left to

6  right, could you identify the persons that you know or knew,

7  and what relationship, if any, they had with any organized

8  crime entity?

9  A.  That's Angelo DeFendis. He's a soldier with us.

10     Bruno Facciola, he was a soldier.

11     Frankie the Hat. He was just an associate.

12     Sammy Kaplan was an associate and a good friend of

13 Chris*, Chris Funari. When he left, he was the consigliere of

14 the family.

15     THE COURT:  Keep your voice up, now.  You don't have

16 a little private conversation with Mr. O'Connell.

17     THE WITNESS:  Okay.

18     THE COURT:  Keep your voice up.

19     THE WITNESS:  Chris was the consigliere of the

20 family when he left.

21 Q.  When you say 'he left,' did he go on vacation or

22 someplace else?

23 A.  No. He was sentenced to a hundred years in prison for

24 his role in the Luchese Crime Family dealings.

25 Q.  Turning your attention back to 1987 once again, you

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 174                                                                     597

### Carew/direct/O'Connell

1  testified that early on when you became active once again in

2  the Luchese Crime Family's affairs, that you and Mr. Chiodo,

3  Sabo Lombardo and Michael DeSantis opened a club on McDonald

4  Avenue?

5  A.  Yes.

6  Q.  Did Michael DeSantis have a particular business that he

7  operated in the same vicinity?

8  A.  Yes. He had a body and fender shop across the street.

9  Q.  What was the name of that business?

10 A.  Concept Auto Body.

11 Q.  Did you and Mr. Chiodo and other persons in your crew

12 meet from time to time at the Concept Auto premises in

13 addition to McDonald Avenue -- the McDonald Avenue social

14 club?

15 A.  Yes.

16 Q.  During this time in 1987, did there come a time when

17 Mr. DeSantis introduced you to a friend of his who was to

18 become an associate of your crew?

19 A.  Yes.

20 Q.  Who was that person?

21 A.  Richie Pagliarulo.

22 Q.  Do you see that person Richard Pagliarulo, who

23 Mr. DeSantis introduced to you at that time, present in this

24 courtroom today?

25 A.  Yes, I do.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 175                                                                     598

### Carew/direct/O'Connell

1  Q.  Would you point him out and describe his for the jury?

2  A.  Richie is sitting right there in the middle between Jay

3  Horlick and Mr. Keelan.

4     THE COURT:   All right.  He identified

5  Mr. Pagliarulo.

6  Q.  Mr. DeSantis introduced you to Mr. Pagliarulo?

7  A.  Yes.

8  Q.  Prior to meeting Mr. Pagliarulo, did Mr. DeSantis or

9  Mr. Chiodo describe Mr. Pagliarulo to you?

10 A.  Yes.

11 Q.  Could you tell the jury what, in substance, Mr. Chiodo

12 and Mr. DeSantis told you about Mr. Pagliarulo at this time?

13 A.  They told me he was a tough guy and he was a shooter and

14 he was a good friend of Michael's.

15 Q.  After being introduced to him, did Mr. Pagliarulo engage

16 in conversation with you from time to time directly?

17 A.  Yes.

18 Q.  In this time period when you first met Mr. Pagliarulo,

19 did he give you, from time to time, some information directly

20 from him to you concerning his own background in connection

21 with organized crime?

22 A.  Yes. Well, he had said that he originated with the Gallo

23 crew. I believe his uncle was one of the Gallos, either Joey

24 or Albert, one of the Gallos.

25 Q.  Who was Joey Gallo?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 176                                                                     599

### Carew/direct/O'Connell

1  A.  He was the head of a faction that broke off from the

2  Colombo crew, and years ago they had a war, which is what they

3  call the Gallo wars. Joey was one of the main participants.

4  He was a leader of one of the factions.

5  Q.  Is it fair to say that over the next several years, you

6  spent a lot of time with Mr. Chiodo, Mr. DeSantis,

7  Mr. Pagliarulo and other persons involved with Mr. Chiodo and

8  his crew?

9  A.  Yes.

10 Q.  Is it also fair to say that you personally engaged in

11 plots involving murder and in an actual murder with

12 Mr. Pagliarulo and other members of that crew over the next

13 few years?

14 A.  Yes.

15     (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

600

Carew-direct-O'Connell

1  EXAMINATION CONTINUES
2  BY MR. O'CONNELL:
3  Q.  I'd like to turn your attention, Mr. Carew, to an
4  individual named Joseph Martinelli.
5      Did you know Mr. Martinelli or who Mr. Martinelli was
6  back in the 1980s?
7  A.  Yes.
8  Q.  Tell the jury who you knew Mr. Martinelli to be at that
9  time?
10 A.  Mr. Martinelli was the -- one of the principals in a
11 construction company called Northberry Construction.
12 Q.  Turning your attention to around the time that Mr. Chiodo
13 first became a member, in approximately early 1987.  Did there
14 come a time when a member of the Lucchese Crime Family
15 approached you and attempted to assign you to a matter
16 involving Mr. Martinelli?
17 A.  Yes.
18 Q.  Who was that Lucchese member who approached you?
19 A.  Chris Funari, Junior, Jumbo.
20 Q.  As of early 1987, who -- what position, if any, did Chris
21 Funari, Junior or Jumbo hold in the Lucchese Crime Family?
22 A.  He was acting captain for a while.  Then he was put back
23 to the regular soldier.
24 Q.  What assignment involving Mr. Martinelli did Mr. Jumbo
25 Chris Funari Junior attempt to assign to you?

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

601

Carew-direct-O'Connell

1  A.  He wanted me to give -- to get Pete Chiodo and give
2  Martinelli a beating.
3  Q.  Did he explain to you the reason?
4  A.  He said that Martinelli wasn't doing the right thing with
5  money.
6  Q.  Was Mr. Chris Funari, Junior the son of Chris Funari,
7  Senior, the man you described who eventually became the
8  consigliere, later was jailed?
9  A.  Yes.
10 Q.  Did you discuss this matter with Mr. Chiodo after being
11 approached by Mr. Funari to go give Mr. Martinelli a beating?
12 A.  I did.
13 Q.  Who at that time were you and Mr. Chiodo reporting to?
14 Who was the captain in charge of Mr. Chiodo?
15 A.  Bobby Abuso, Vic Abuso's brother.
16 Q.  Did Mr. Chiodo attempt to review with any of his
17 superiors this request from Chris Funari, Junior to give
18 Martinelli a beating?
19 A.  Yes.  Well, we had talked it over and Chris had -- I had
20 asked Chris that, and he said that his father wanted it done
21 and that he had gotten the okay from Bobby Abuso.
22      We figured we'd better just check it out with Bobby
23 before we went and did anything, and before it went any
24 further, and Pete made arrangement to do that.
25 Q.  Did you later receive word from Mr. Chiodo about what

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

602

Carew-direct-O'Connell

1  decision had been made, whether you should proceed or not
2  proceed with the beating of Mr. Martinelli?
3  A.  Yes.  He said it was called off.  He had made an
4  appointment to meet Angelo DeFendis and Mickey DiCostanzo at
5  Angelo's club on a Saturday and proceed to give Martinelli a
6  beating after that, and they called it off and they said that
7  Bobby had nothing to do with it, that he didn't even know
8  about it.
9  Q.  Was there any repercussion that followed from this and
10 any other incidents involving Mr. Funari around this time
11 period?
12 A.  Could you repeat that?
13 Q.  Okay.
14     I will rephrase it entirely.
15     Around this time period, following this particular
16 event where Mr. Funari had asked you and others to go give a
17 beating to Mr. Martinelli, did Mr. Martinelli's position in
18 the family change?  Excuse me.  Mr. Funari's position in the
19 family change around this time period?
20 A.  Yes.
21     He -- I think they called him down on the fact that
22 he said that, you know, he tried to get something done to
23 Martinelli without getting it okayed and saying that he had it
24 okayed.  And I believe eventually he was shelved for that and
25 a few other things that took place.  They didn't -- they put

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

603

Carew-direct-O'Connell

1  him on what we call the shelf.  He was inactive.
2  Q.  Now, this event you described took place sometime in
3  early 1987, as you recall?
4  A.  Yes, I would say early '87, spring of '87.
5  Q.  Turning your attention to about two years later.  Did
6  there come a time when you learned that a murder contract was
7  placed on Joseph Martinelli?
8  A.  Yes.
9  Q.  Who informed you of this?
10 A.  Pete Chiodo.
11 Q.  What did Mr. Chiodo tell you in substance at the time?
12 A.  He said that Gas and Vic wanted Martinelli taken out, or
13 killed, and that we wound up with the assignment, and to get
14 on it and start doing some layout work, surveillance.
15 Q.  Other than yourself, was anyone else in your crew
16 assigned the task of participation in the planning, the
17 carrying out of the murder of Joseph Martinelli back in 1989?
18 A.  Yes.
19 Q.  Tell the jury who else participated in the planning and
20 attempts to kill Mr. Martinelli from that time forward?
21 A.  Mike DeSantis, myself, Richard Pagliarulo, Pete Chiodo
22 and Andrew Cappello.  Greg Cappello.
23 Q.  Can you tell the jury what the first steps were that you
24 and Mr. Pagliarulo and the others took regarding your efforts
25 to plan and carry out this murder contract?

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

584

Carew-direct-O'Connell

1  A.  Well, we did -- first thing we did, we did surveillance
2  on the house and on his place of business, Woodberry
3  Construction (sic), to see what -- where the best place to --
4  where we would have the best opportunity to take him out.
5  Q.  Was Mr. -- was the Northberry Construction site found by
6  you and the others to be a good location for attempting to
7  kill Mr. Martinelli?
8  A.  We went there on a few occasions and every time that we
9  saw Martinelli -- Mr. Martinelli there, he was always in
10 somebody's company, and there was always a lot of people in
11 his place of business.  We decided that the best place was at
12 the house and that's where we -- we decided to make the first
13 attempts.
14 Q.  You used this term "surveillance."  What was the purpose
15 of conducting surveillance at the Northberry site, at the
16 house that you just mentioned?
17 A.  To get familiar with his movements, so we could, you
18 know, kind of get a time when, or an opportunity where we
19 could -- could shoot him.
20 Q.  Now, did you and the others plan to use cars in the
21 course of your efforts to set up on and murder Mr. Martinelli?
22 A.  Yes, we did.
23 Q.  Could you tell the jury what plans generally were made
24 regarding what cars to use for this assignment?
25 A.  Well, we always -- we used to do -- we get a couple of

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

585

Carew-direct-O'Connell

1  work cars, either rentals that were rented in a phony name or
2  cars that were stolen, and we would put them in the nearby area
3  and when we needed them, we would use them to do the work.
4  Q.  When you and Mr. Pagliarulo and the others engaged in
5  these efforts to kill Mr. Martinelli, would you take certain
6  precautions so as not to leave fingerprints?
7  A.  Yes.
8          While we're in the work cars we would usually wear
9  gloves.
10 Q.  What kind of gloves would you wear?
11 A.  We would either wear that -- what they call the racing
12 driver's gloves or we would wear the plastic kind of gloves
13 like a doctor wears.
14 Q.  Surgical gloves?
15 A.  Surgical gloves, yes.
16 Q.  Is it fair to say that over the next few months, you,
17 Mr. Pagliarulo and other members of your crew made a series of
18 attempts to kill Mr. Martinelli?
19 A.  Yes, we did.
20 Q.  Were any of these attempts to kill Mr. Martinelli
21 successful?
22 A.  No.
23 Q.  Can you tell the jury what location was the first
24 location that you and Mr. Pagliarulo and the others selected
25 to make an actual attempt to murder Joseph Martinelli?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

586

Carew-direct-O'Connell

1  A.  The first attempt was made at his house.  We went and we
2  laid across the street.  We saw his car.  It was Richie,
3  myself, Mike and Gregory, and we saw his car by the house and
4  we waited for him to come.  He never came out, and then Mikey
5  decided to lay in the lot.  There was a lot across the
6  street.  Mikey decided that the next attempt he would lay in
7  the lot, either the next evening or a couple of evenings after
8  that.  He would lay in the lot and wait for the opportunity if
9  Martinelli came home, he would shoot him.
10 Q.  When you say he would lay in the lot, was there any kind
11 of screening or coverage?
12 A.  It was a wooded lot.  There was bushes and leaves and all
13 kinds of things there.
14 Q.  For this --
15 A.  Fairly well wooded lot.
16 Q.  Excuse me.
17          For this particular assignment, did you and
18 Mr. Chiodo and Mr. Pagliarulo and the others decide who, if
19 anyone, among you was to be the shooter?
20 A.  Yes.
21 Q.  For the murder of Mr. Martinelli at this stage, who was
22 it decided?
23 A.  Richie wanted Mike Mike to do the work.  Felt it was
24 Mike's turn to, you know, to get in and do the work.
25 Q.  It was Mr. Pagliarulo who suggested Mr. DeSantis do this

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

587

Carew-direct-O'Connell

1  work?
2  A.  Yes.
3  Q.  What role did you intend for yourself to play or what was
4  decided by you and the others would be played by yourself?
5  A.  I was going to be a crash -- I was driving a crash car
6  or, you know, one of the follow-up cars.  Pickup car.
7  Q.  This series of attempts beginning at the first location,
8  Mr. Martinelli's house, what role did Mr. Pagliarulo agree to
9  play in the attempted murder of Mr. Martinelli?
10 A.  At the house?
11 Q.  At the house, and subsequently.
12 A.  At the house, he was just present on the one occasion
13 where we set up and Martinelli didn't come out of the house.
14 Other than that, he didn't have nothing else that I know of.
15 I think he went with Mikey one time to -- while Mikey was
16 doing his thing in the lot.  He accompanied Mikey.  Other than
17 that, I don't think he had any other involvement at the
18 house.
19 Q.  So with regard to the house, Mr. Pagliarulo's role was in
20 the form of backup, is that fair to say?
21 A.  Yes.
22 Q.  Similar to your own?
23 A.  Yes.
24 Q.  Not the shooter?
25 A.  No.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 182

PAGE 184

718

Carew-cross-Horlick

1 Q. And you are standing in the room with Richie?
2 A. Yes.
3 Q. The four of you are in this room?
4 A. Three of us.
5 Q. And you have Mr. Morrissey laying there dead?
6 A. Yes.
7 Q. When does Mr. Chiodo take his wallet?
8 A. We were cutting the rug. Pete went out for a while,
9 while they were digging the hole. Then he came back in, and
10 he took the wallet. Before we wrapped him up.
11 Q. Now you wrapped up this man in the rug.
12 A. Yes.
13 Q. And you tied it with a -- some kind -- what was it?
14 A. Wire. It was like the phone wire, electric wire.
15 Something like that.
16 Q. And you take the man and you put him in the hole? You
17 bury him?
18     Now, Mr. Carew, let's go back to two minutes before
19 that. Morrissey is laying on the rug. You have already cut
20 this piece of rug so that it's ready to be rolled up.
21 A. Yes.
22 Q. Chiodo has already taken his wallet?
23 A. Yes.
24 Q. And DeSantis has already taken his jewelry?
25 A. Yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

719

Carew-cross-Horlick

1 Q. Is that the purpose, to steal all his property from
2 Mr. Morrissey, is that why he was shot?
3 A. No.
4 Q. Now, Morrissey is wearing a shirt and a pair of pants you
5 told us, and I assume shoes?
6 A. Yes. I think he had loafers on. But I am not sure.
7 Q. Do you put a bag on his head?
8 A. No.
9 Q. Does Mr. DeSantis put a bag on the man's head?
10 A. I didn't see anybody put a bag.
11 Q. Nobody put a bag on the man's head?
12 A. I don't know. I didn't see anybody. It might have been
13 but I didn't see.
14 Q. Well, you are standing in a room. How big is that room
15 with the body in it?
16 A. Maybe twenty by twenty or something in that area.
17 Q. And in this twenty by twenty room, is there a single
18 piece of furniture?
19 A. Yes. There are desks and a few things. Well, there is
20 one desk and I think a couple of chairs.
21 Q. Is there any way that anything could happen to Morrissey
22 while he's laying on the floor that you would not be able to
23 see because you were obstructed?
24 A. No.
25 Q. Did anybody put a bag on the man's head?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

720

Carew-cross-Horlick

1 A. I don't know. Maybe somebody when I wasn't looking just
2 before they -- they wrapped him up. They could have did that,
3 yes. But I didn't see it.
4 Q. As far as you are concerned, there was no bag ever put on
5 the man's head?
6 A. I didn't see it. I don't know.
7 Q. Did you help roll up the body in the rug?
8 A. Yes. We all -- I helped tie. I don't know about rolling
9 it. I helped tie the cord.
10 Q. You watch them roll the body up in the rug?
11 A. I don't independently watch them roll the body up. I
12 remember coming over and helping them tie the cord.
13 Q. In the course of your studies prior to cooperating with
14 the government, you got a list of the materials that were
15 found with the body of Sonny Morrissey, didn't you?
16     MR. O'CONNELL: Objection, to form of the question.
17     THE COURT: Yes. Sustained.
18 Q. Did you ever see a list of the body -- of the body and
19 anything recovered at the site?
20 A. I believe so.
21 Q. You know from reading the material that there was a bag
22 placed around the man's head, don't you?
23 A. I don't remember reading that.
24 Q. You don't remember reading that at all?
25 A. No. I just don't recall that.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

721

Carew-cross-Horlick

1 Q. When you went to set up this murder of Mr. Morrissey, you
2 met him on some street in Manhattan with Peter Chiodo, is that
3 right?
4 A. The day before.
5 Q. The day before was a --
6 A. Saturday.
7 Q. A preliminary meeting, sidewalk meeting, is that right?
8 A. It was in a -- in a restaurant. In a little coffee
9 shop.
10 Q. Someone had called Morrissey to say, come down, we have
11 to talk to you about this?
12 A. Yes. Pete made an appointment I think through Jimmy
13 McCarthy.
14 Q. Jimmy McCarthy was a friend of Pete's?
15 A. A friend of Pete's and a friend of Sonny's.
16 Q. And a friend of Sonny's.
17     What about Paoli, who was he?
18 A. He was Jimmy McCarthy's partner in a window business that
19 they had.
20 Q. So on the day before you are planning the murder of
21 Morrissey, you meet with Chiodo, Morrissey and two of
22 Morrissey's friends, is that right?
23 A. Yes.
24 Q. These two people, McCarthy and Paoli, they don't come to
25 that site with you and Pete, do they?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

722

Carey-cross-Horlick

1 A.   What site?

2 Q.   To the meeting.

3 A.   I don't follow you.

4 Q.   When you go to the meeting the day before the murder?

5 A.   Yes.

6 Q.   You say that you and Pete go to a place on First Avenue

7 or Third Avenue in Manhattan?

8 A.   Second Avenue.

9 Q.   And you meet Morrissey?

10 A.   We meet Morrissey, Pauley Paoli and Jimmy McCarthy.

11 Q.   They are already there, the three of them?

12 A.   Yes, as I recall.  Yes.

13 Q.   The meeting that takes place on that day is not to be a

14 shooting, is it?

15 A.   No.

16 Q.   You don't have a gun that day, do you?

17 A.   No.

18 Q.   You don't know if Chiodo has a gun?

19 A.   I don't know.  I don't think so, but I don't know.

20 Q.   Now, you don't want McCarthy or Paoli to hear any of the

21 conversation you are about to have, do you?

22 A.   I didn't --

23 Q.   Or Peter Chiodo is about to have?

24 A.   Chiodo went for a walk with Sonny.

25 Q.   And left you with McCarthy and Paoli?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 70

723

Carey-cross-Horlick

1 A.   Yes.

2 Q.   And then they came back?

3 A.   Yes.

4 Q.   And Pete told you basically that he cheered the guy up.

5 He told him don't worry about the windows case.  Vic and Gas

6 are behind you and whatever you need we're going to do for you

7 and he made him feel like he was still part of the Lucchese

8 Crime Family.

9 A.   I don't know what he did as far as that's concerned.  All

10 he told me is that he made an appointment for the next day.

11 Q.   The next day was to be a day for shooting, is that right?

12 A.   Yes.  He told him to come alone, that he was going to

13 meet Vic.  That's what he told me.

14 Q.   Now, Mr. Chiodo, you testified that you, Mr. Pagliarulo

15 and Mr. Chiodo took a trip to Florida, is that right?

16 A.   Yes.

17 Q.   Was that the only time that you, Chiodo and Pagliarulo

18 went to Florida together?

19 A.   Yes.

20 Q.   Was that trip in early December of 1988?

21 A.   I'm not sure.  I think it was.

22 Q.   The purpose of that trip --

23 A.   Might have been early '89.  I am not sure.

24 Q.   The purpose of the first trip was to see a man named

25 Junior, do you remember that?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

724

Carey-cross-Horlick

1 A.   Yes.  When you say "the first trip," that was the only

2 trip that I made there.

3 Q.   You didn't go down to Florida with Michael DeSantis in

4 early 1989?

5 A.   Oh, yes.  I went with Mike but I'm talking about anything

6 with Pete or with the family.

7 Q.   The trip that you made in -- in early 1989 had nothing to

8 do with family business, did it?

9 A.   No.

10 Q.   That was just going down for a holiday, to have some fun?

11 A.   Yes.

12 Q.   Let's go back to the other trip, the first trip?

13 A.   Yes.

14 Q.   You are going to see a man named Junior, is that right?

15 A.   I didn't know his name at the time.  I was introduced to

16 him at the meeting.

17 Q.   All right.  Peter Chiodo tells you he's going to Florida?

18 A.   Yes.

19 Q.   And he wants you to come along with him?

20 A.   Yes.  He said he wanted us to watch his back.

21 Q.   And he says he wants Mr. Pagliarulo to go too, is that

22 right?

23 A.   Yes.  He told me Richie was going to come.

24 Q.   You are going down to see Junior, whoever he may be?

25 A.   He didn't mention the name.  He just said he had to meet

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 72

725

Carey-cross-Horlick

1 somebody for Gas.

2 Q.   Ultimately, you see on the way to Florida that he has a

3 package that's wrapped in Christmas paper?

4 A.   I didn't see it then.  I saw it with the morning that we

5 were going to the meeting.

6 Q.   And that trip is now from the -- this area, from

7 Brooklyn, down to where, what airport do you go to?

8 A.   I think we went to Fort Lauderdale.  I am not sure.

9 Q.   Did you buy the ticket?

10 A.   No, I don't think I did.

11 Q.   Do you know who bought the ticket?

12 A.   I believe Pete did but I am not sure.

13 Q.   You weren't with him?

14 A.   When he bought the ticket?

15 Q.   Yes.

16 A.   I just don't remember, you know.

17 Q.   But --

18 A.   That particular incident.

19 Q.   Anyway, you get to Florida?

20 A.   Yeah.

21 Q.   And you go in a hotel or motel?

22 A.   We went in the Marriott Hotel, I believe.

23 Q.   You stayed there until you went to meet this man Junior?

24 A.   No.

25 Q.   What did you do?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

PAGE 73   SHEET 19

726

Carev-cross-Horlick

1   A.   We went out the night we got there.  We went to eat and
2   then we went to a bar and had a few drinks.
3   Q.   Socializing?
4   A.   Socializing, yes.
5   Q.   Just the three of you having a dinner and a good time
6   together?
7   A.   Yes.
8   Q.   And then the next day, did you go to Cocoanut Grove?
9   A.   Yes.
10  Q.   Did you drive there?
11  A.   Yes.
12  Q.   You rented a car?
13  A.   Yeah.
14  Q.   Did you pay for that?
15  A.   No.
16  Q.   Do you know if, Mr. Pagliarulo paid or if Mr. Chiodo paid?
17  A.   I don't know who paid for it.  I think Pete paid for it
18  but I am not sure.
19  Q.   Did you fly and did you rent this car in your own name or
20  in whoever's name it was, if you know?
21  A.   I don't know.  I don't know whose name it was in.
22  Q.   Now you go to the Cocoanut Grove and you are introduced
23  by Pete to a man named Junior?
24  A.   Yes.
25  Q.   Mr. Pagliarulo is introduced to the man named Junior?

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

PAGE 74

727

Carev-cross-Horlick

1   A.   Yes.
2   Q.   Do you have any other conversation about that man?
3   A.   No.  Not really.  Other than, you know, the weather is
4   nice or something maybe like that.
5   Q.   You don't even know why this man Junior is meeting Pete
6   do you, at this time?
7   A.   No.
8   Q.   Pete has this present?
9   A.   Yes.
10  Q.   And he and this man Junior sit away from you?
11  A.   Yes.
12  Q.   And they look like they're talking to each other?
13  A.   Definitely, yes.
14  Q.   You can see that that Christmas present wrapping,
15  whatever that is, is passed from Pete to Junior?
16  A.   Yes.
17  Q.   And they talk a few more minutes and then you all get
18  back together and talk a few more minutes?
19  A.   Yes.
20  Q.   And you leave?
21  A.   Right.
22  Q.   What do you do with the rest of the day?
23  A.   I think we went to eat and -- that Burt Reynold's place
24  or something.  We went to have dinner there.
25  Q.   Burt and Jacks?

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

PAGE 75

728

Carev-cross-Horlick

1   A.   Burt and Jacks, yes.
2   Q.   That's dinner?
3   A.   Yes.  We had dinner there.
4   Q.   You do the same this evening you did the night before,
5   dinner and you go out for a few drinks?
6   A.   I just don't remember after that.  That night, what we
7   did.  I know we went home.  I think that night or the next
8   morning.  I am not sure.
9   Q.   So basically what you're telling us, you fly to Florida
10  on one day.  You meet with this man Junior and you either
11  leave later in that day or the next?
12  A.   Yes.  I believe that's what it was.
13  Q.   You don't take any time to go to find out if Accetturo
14  owns a house in Florida, do you?
15  A.   No.
16  Q.   You don't take any time to go sit and watch the front
17  door where you think Joseph La Morte lives, do you?
18  A.   No.
19  Q.   You don't meet anyone, you don't have a conversation with
20  anyone about those people at all, do you?
21  A.   No.
22  Q.   And you have no idea until Pete tells you at some other
23  time what his conversation is with Junior?
24  A.   No.
25  Q.   And he tells you that that Christmas wrapping thing had

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

PAGE 76

729

Carev-cross-Horlick

1   fifty thousand dollars in cash in it, is that right?
2   A.   That's what he said.
3   Q.   You never saw the money, did you?
4   A.   No.
5   Q.   So there is no way for you to know of your own knowledge
6   whether or not there was really money in there or not and
7   there was nothing also said about that, was there?
8   A.   No.
9        Just he said that -- that there was -- that was the
10  money for Junior was -- was the down payment on Junior killing
11  Accetturo.
12  Q.   Right.  He said this was money that was sent down from
13  Casso or Vic or both and this is setup money so he can get
14  ready to kill Accetturo?
15  A.   Yes.
16  Q.   You don't know if that conversation ever took place, do
17  you?
18  A.   That's what he told me.  I went by that.
19  Q.   The second time you go to Florida is a little bit later,
20  early in 1989 and you go with Michael DeSantis?
21  A.   Yes.
22  Q.   Again, you don't take out time from whatever socializing
23  you are going to sit on anybody's house or to buy guns or to
24  rent cars or to do anything like that?
25  A.   No.

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

Carew-cross-Horlick

1 Q. This trip has nothing to do with family business at all?
2 A. Nothing at all.
3 Q. Now, you told us that while Michael Spinelli was in jail,
4 there was a ceremony held to induct him into the Luccbese
5 Crime Family, is that right?
6 A. I believe so.
7 Q. You weren't there?
8 A. I wasn't there.
9 Q. So this is again something that you heard from someone
10 else?
11 A. Yes.
12 Q. Do you know where the ceremony took place?
13 A. No.
14 Q. Do you know who attended the ceremony?
15 A. No.
16 Q. And but one thing you are sure of, they didn't have a gun
17 and a knife on the table when they did that ceremony?
18 A. They might have had a knife. I don't think they had a
19 gun.
20 Q. Because everybody was in jail?
21 A. Yes.
22 Q. Now, you told us that long before you went on this trip
23 to shoot Mr. Morrissey, you were prepared to do violence as
24 part of your life as an associate in this family, is that
25 right?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 78                                                    731

Carew-cross-Horlick

1 A. Yes.
2 Q. And Ray Fontain came to mind, Fountain or Fontain?
3 A. Ray Fontain.
4 Q. That was a mediation dispute between people that you --
5 knew you and that you knew?
6 A. Yes.
7 Q. And you were prepared at that time you said if you had to
8 resort to violence you would have?
9 A. Yes.
10 Q. And of course, there was time that you were prepared to
11 allow two people from New Jersey to be murdered in your home,
12 isn't that right?
13 A. Yes. I wasn't happy about it but I would have let it go.
14 Q. You were not happy that your home was going to be used as
15 a site for murder, is that right?
16 A. That's correct.
17 Q. And even though Peter Chiodo told you about a meeting, it
18 was Gaspipe who told you that it was a meeting and a murder,
19 isn't that right?
20 A. No. Gaspipe told me it was -- he wanted to have a
21 meeting at my house and then later on Pete came to me and told
22 me they wanted to use it to kill the Accetturos. Father and
23 son.
24 Q. Where were you living at that time?
25 A. I was living in 39 Hanover Avenue in Staten Island was my

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

732

Carew-cross-Horlick

1 house.
2 Q. Who lived with you?
3 A. My wife and children.
4 Q. How many children?
5 A. One of my daughters.
6 Q. How many children did you have at that time at home?
7 A. Two. One lived at home.
8 Q. One lived at home?
9 A. Yes.
10 Q. And did you express to them your unhappiness of the
11 consent of having someone shot in your home, two people?
12 A. I expressed it to Pete.
13 Q. What did he tell you?
14 A. He said that they want to do it, and you know.
15 A. That is the only place in the world that's available on
16 that day at that time to have the Accettoros shot?
17 A. Well, to be honest with you I just didn't want to go
18 against the bosses and say no so I went along with it.
19 Q. You knew that one of the rules, even though you weren't a
20 made member, but one of the rules that they lived by was that
21 if you said no, you would suffer a penalty, isn't that right?
22 A. Well, I don't know about that. That particular thing
23 for -- for not wanting somebody to get killed in your house, I
24 don't know if -- if there would have been a penalty for that,
25 other than, you know.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 80

733

Carew-cross-Horlick

1 Q. There were rules but then the rules had to relate to
2 specific situations?
3 A. Not specific. You --
4 Q. You didn't tell your wife that there was going to be a
5 meeting in your house and two people were going to be shot but
6 don't worry. The place will be cleaned up, did you?
7 A. No.
8 Q. You didn't tell her anything about the proposed murders,
9 did you?
10 A. No.
11 Q. You told her basically on a certain day, which I'll tell
12 you about, we need the house empty?
13 A. Yes. I just told her that I wanted her to go stay with a
14 friend of hers for the day, her and my daughter.
15 Q. Your daughter was approximately how old at the time?
16 A. Twenty-five.
17 Q. You told your daughter the same thing?
18 A. Yes, basically. My wife told her.
19 Q. Did either of them say to you, what's going to happen
20 here?
21 A. No.
22 Q. Did either of them ask you who might be coming over?
23 A. No. I just told them I was going to have some of my
24 friends over for a meeting.
25 Q. And you told your son-in-law that you might need some

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

734

Carew-cross-Horlick

1  cold cuts and some potato salad you said?
2  A.  Yes.  Stuff for a meal.
3  Q.  And that never happened?
4  A.  No.
5  Q.  Before the delivery of the cold cuts this meeting was
6  called off?
7  A.  Yes.
8  Q.  And somebody, either Gaspipe or Peter told you forget
9  about it?
10 A.  Yeah.
11 Q.  Now, you told us that very often when business, work was
12 going to be done, you would use, or the family would use cars
13 that were stolen or cars that had been rented with phony IDs,
14 is that right?
15 A.  Yes.
16 Q.  Why did you use stolen cars?
17 A.  For crash cars or cars that would be seen.  They would
18 use those cars.
19 Q.  Why did you use phony IDs to rent cars?
20 A.  Because in case someone seen it they couldn't trace the
21 car back to the person who took it.
22 Q.  You mean the people who were going to do murders wanted
23 to keep their identities secret?
24 A.  If you were going to do a murder, wouldn't you want to
25 keep your identity secret?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 82

735

Carew-cross-Horlick

1  Q.  So that people didn't go to Hertz to rent a car with
2  their license and their registration and their own credit card
3  when they were going to do work, did they?
4  A.  Not usually, no.
5  Q.  Not at all, isn't that right?
6  A.  No, not if the car was going to be used for a crash car
7  or anything like that.  If it was going to be in a clean
8  situation, I'm sure you not use your own.
9  Q.  What's a clean situation?
10 A.  Well, if you are not going to use it directly in a murder
11 or any kind of criminal activity.
12 Q.  In other words, if you are going to drive yourself to
13 some place and then walk ten blocks away and not have that car
14 involved in the crime, you might use your own car?
15 A.  Yes.
16 Q.  But if you have it in your mind that you are going to use
17 a car as a getaway car which might be followed or stopped, you
18 are going to use a stolen car or a rented car with a phony ID?
19 A.  In most cases, unless there was an emergency and you
20 might --
21 Q.  The information part of this is that there be no way to
22 trace the car to a Luccbese Crime Family member, isn't that
23 right?
24 A.  Basically.
25 Q.  And you said when you used cars, the rule was that you

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

736

Carew-cross-Horlick

1  wore either racing car driver gloves or surgical gloves?
2  A.  It's not a rule.  It's just the way that we -- that I
3  worked and a few of the other guys.
4  Q.  Wouldn't you say, Mr. Carew, that there was a certain
5  amount of common sense in doing that?
6  A.  Of course, yes.
7  Q.  You wanted to prevent any automobile that was left at a
8  scene or crashed or abandoned in a flight, you wanted to
9  prevent that from yielding a fingerprint that would lead back
10 to you or to Richie or to me or to anyone associated with this
11 venture, right?
12 A.  Yes.
13 Q.  What about the use of disguises, anybody ever use
14 disguises?
15 A.  I've heard of it, yes.
16 Q.  What kind of disguises?
17 A.  All different kinds, beards.
18 Q.  Hats?
19 A.  Hats, beards, baseball hats or regular hats.  Anything
20 that --
21 Q.  Sunglasses?
22 A.  Glasses.  Phony glasses.
23 Q.  Anything that would help an observer to be unable to
24 identify someone?
25 A.  Yeah.  To make it more difficult.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 84

737

Carew-cross-Horlick

1  Q.  Now there came a time where you found out that
2  Mr. Martinelli had to be killed, isn't that's right?
3  A.  Yes.
4  Q.  He had to be killed because Vic and Gas said so, isn't
5  that what you learned?
6  A.  Yes.
7  Q.  And you went out and one of the many places that you
8  started to observe was his house?
9  A.  Yes.
10 Q.  Is that right?
11      And what happened at his house?
12      Did you ever see him?
13 A.  On two occasions -- one occasion we saw his car and --
14 and another occasion he parked the car and we went away to get
15 another car and when we came back his car was gone.
16 Q.  But there was an occasion when you saw him go into his
17 house, isn't there?
18 A.  One occasion, yes.
19 Q.  And you reported back to Mr. Chiodo or to Gaspipe or
20 whoever was in charge and wanted to know, the man never came
21 out of his house?
22 A.  Yes.  That's --
23 Q.  Did anybody who was waiting to commit this murder say, we
24 know Martinelli is in the house.  Why don't we just wait?
25 A.  You know when you are standing there with a gun and

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

738

Carew-cross-Horlick

1 everything, you don't want to stay there too long. Eventually
2 somebody is liable to see you there for a long amount of time
3 and call the authorities so you try not to stay too long.
4 Q.   You mean, you were standing in the street with a gun in
5 your hand?
6 A.   No. Parked in a car.
7 Q.   But you had guns?
8 A.   On a couple of occasions, sure.
9 Q.   Some occasions there were no guns. It was just
10 surveillance, right?
11 A.   Right. In the beginning that's what most of it was.
12 Q.   Most of the time when you did this surveillance, you did
13 not have guns?
14 A.   No.
15 Q.   And for the very purpose that you are talking about, in
16 case someone called the police or saw you there for too long,
17 isn't that right?
18 A.   Right.
19 Q.   You could give them any story you wanted about what you
20 were doing?
21 A.   Right.
22 Q.   Now Mr. Martinelli never coming out of his house again,
23 you decide to go to his place of business, is that right?
24 A.   No.
25          We -- they were -- they were surveilling the both

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

740

Carew-cross-Horlick

1          (In open court; jury not present.)
2          THE COURT:   Are we ready? Can someone call
3 Mr. Rose?
4          (Pause.)
5          THE COURT:   All right. Are we ready to resume?
6          Would you ask the jury to join us?
7          (Jury present.)
8          THE COURT:   Please be seated.
9          All right, Mr. Horlick.
10          Sorry for that delay, members of the jury.
11 CROSS-EXAMINATION (Continuing)
12 BY MR. HORLICK:
13 Q.   Mr. Carew, we were talking about the time when you were
14 watching the home of Mr. Martinelli; do you recall that?
15 A.   Yes.
16 Q.   You said at the same time there were people who were
17 watching his place of business?
18 A.   Not at the same particular time. At the same time that
19 we were watching the house, we were doing surveillance on the
20 business, too. If we went to the house in the afternoon at
21 2:00 o'clock, maybe at 4:00 o'clock, maybe we went by the
22 business, something like that.
23 Q.   When you got to the place of business, you could see, on
24 some occasions, at least, Mr. Martinelli walking around
25 talking to people?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

739

Carew-cross-Horlick

1 houses. The both things at the same time basically.
2 Q.   So while you were watching in-house --
3          THE COURT:   Excuse me.
4          MR. HORLICK:   I'm sorry.
5          THE COURT:   I am going to have to take another case
6 now so we will take our recess now and don't discuss the
7 case.
8          (Recess taken.)
9          (Continued on the next page.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

741

Carew/cross/Horlick

1 A.   Yes.
2 Q.   Most often when you did see him at his place of business,
3 he was with other people?
4 A.   Yes.
5 Q.   And you decided that it would be too risky to do anything
6 at that place and time because of the other people around?
7 A.   Yes.
8 Q.   You didn't want to expose yourselves unnecessarily to the
9 problem of either being caught or having people identify you?
10 A.   Well, also, if he was with any other people, that anyone
11 else would get hurt.
12 Q.   You had no intention of shooting when people came to see
13 him for business?
14 A.   Right. That's why in a lot of cases if you couldn't get
15 him by himself.
16 Q.   There came a time when you decided, your group, that you
17 were going to use this place on Nostrand Avenue where the
18 insurance company was, is that right?
19 A.   Yes.
20 Q.   And Peter Chiodo came over and he looked at the site?
21 A.   Yes.
22 Q.   And basically you all discussed the positioning of the
23 various components of this group that would commit a murder,
24 right?
25 A.   Yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

742

Carew/cross/Horlick

1 Q.   You discussed where the crash car would be and where the
2 pickup car would be, is that right?
3 A.   Yes.
4 Q.   The crash car was meant to provide some delay if the car,
5 the getaway car, was followed?
6 A.   Right.
7 Q.   And the pickup car was to pick up whoever was going to do
8 the work, the shooting?
9 A.   Right, yes.
10 Q.   You looked at everything and you found that when it was
11 set up, Mr. Martinelli came in his car with his brother?
12 A.   Yes.
13 Q.   Mr. Chiodo didn't want to do it then, because his brother
14 was present?
15 A.   I don't remember if he was there at that time.
16 Q.   Didn't Mr. Chipdo call off one of these plans?
17 A.   It was called off, but I don't know -- I don't recall him
18 being there.  I think it was Richie and Mike, and they called
19 it off because he came with the brother.  I was around the
20 corner, and they came and told me that, you know, that he came
21 with the brother and they called it off.
22 Q.   You don't remember who it was that called it off?
23 A.   No.  I think it was Richie and Mike decided not to do it,
24 because he came with the brother.
25 Q.   Now, let me show you a document that is 3500-1466, and

ANTHONY M. NANCUSO, CSR    OFFICIAL COURT REPORTER

---

743

Carew/cross/Horlick

1 ask you to read a paragraph on page 4.  Read it to yourself,
2 sir.
3          (Pause.)
4 Q.   Does that refresh your recollection, Mr. Carew, that Pete
5 Chiodo was on the scene at the time that Martinelli drove up
6 with his brother?
7 A.   I don't think he did.  I don't think he was.
8 Q.   Did you tell that to the FBI at some time?
9 A.   Tell what to them?
10 Q.   That Chiodo was on the scene when Martinelli drove up,
11 but because his brother was there, Chiodo called off the hit?
12 A.   I don't remember saying that Chiodo was there.
13 Q.   Do you remember Chiodo being present at that scene, at
14 the Nostrand Avenue scene, at any time?
15 A.   Yes, when we first looked at it, I know he was there.
16 Q.   And when you first looked at it, was that a surveillance
17 walk-by situation as opposed to getting ready to do anything?
18 A.   Yes.
19 Q.   So it was just to look at the scene physically so that
20 Mr. Chiodo could understand how this murder would take place
21 and how everybody would be able to get away from the scene?
22 A.   Well, he was part of the planning of it.  He would have a
23 lot to say with the planning.
24 Q.   Now, there came a time when you go back to that same
25 Nostrand Avenue address, and you have DeSantis, Michael

ANTHONY M. NANCUSO, CSR    OFFICIAL COURT REPORTER

---

744

Carew/cross/Horlick

1 DeSantis, who is supposed to be a shooter, is that right?
2 A.   Yes.
3 Q.   And basically Mr. Pagliarulo, you told us -- let's not
4 forget him -- he's a backup shooter, is that right?
5 A.   Yes.
6 Q.   That's the same situation that we discussed before: if
7 for some reason DeSantis can't get the job done, then it falls
8 to Mr. Pagliarulo as the number two man, the backup man, to do
9 the job?
10 A.   Yes.
11 Q.   Now, you are driving what, is it a crash car or pickup
12 car on this occasion?
13 A.   Which occasion, the first one?
14 Q.   No.  The occasion when DeSantis is the shooter and
15 Mr. Pagliarulo is the backup; is that the first occasion?
16 A.   That's how it was on both occasions, I believe.
17 Q.   What's your job on this occasion?
18 A.   On the first occasion, I was running the block car, in
19 other words, they would turn the corner, come past me, and I
20 would pull out in back of them.
21 Q.   That's similar to a crash car?
22 A.   Yes.
23 Q.   A crash car doesn't necessarily crash into anything?
24 A.   No.  It just runs interference.
25 Q.   Also on the scene is Greg Capella?

ANTHONY M. NANCUSO, CSR    OFFICIAL COURT REPORTER

---

745

Carew/cross/Horlick

1 A.   Yes.
2 Q.   He's the person you referred to as "Whitey"?
3 A.   Yes.
4 Q.   His job is to be in another car?
5 A.   Yes.
6 Q.   What is his job?
7 A.   He was, at that time, if we turned and came the other
8 way, he would pick them up on the other side.  In other words,
9 if they made a U-turn and went down Nostrand Avenue, he was on
10 the other side.  He would pick them up and go in back of them
11 that way.
12 Q.   If who made a U-turn?
13 A.   If Richie and Mike made a U-turn and went that way
14 instead of coming around the corner, Greg would pick them up.
15 Q.   If this shooting happened the way that you planned it,
16 Richie and Mike DeSantis would come running out of that
17 building?
18 A.   No.  The first time, it was outside.  They were going to
19 shoot him as soon as he came up in his car.
20 Q.   You've told us about that, and because the brother came,
21 nothing happened?
22 A.   Right.
23 Q.   The next time, you also set up at the Nostrand Avenue
24 insurance place?
25 A.   Yes, yes.

ANTHONY M. NANCUSO, CSR    OFFICIAL COURT REPORTER

746

Carew/cross/Horlick

1 Q. That time, what is your job?
2 A. I'm to pick them up when they finish the job.
3 Q. "They" meaning?
4 A. Richie and Mike.
5 Q. And what is Mr. Capella's job?
6 A. He was running the interference car.
7 Q. Now, he was in place, was he not, Mr. Capella?
8 A. Yes. He was on Nostrand Avenue, and as soon as he saw
9 Martinelli going into the building, he was going to move
10 around the corner, and when we came out of the driveway, he
11 would come right in back of us.
12 Q. And you were ready to do your job, which was to pick up
13 the people -- Mr. Pagliarolo and Mr. DeSantis -- pick them up
14 when they came running out of the building?
15 A. Yes.
16 Q. Michael DeSantis is the shooter, is that right?
17 A. Yes.
18 Q. How does Michael DeSantis get to that area, if you know?
19 A. He had another car. He pulled up next to me, and Richie
20 and he said there was something wrong with the car. He was
21 going to park it and see if later on he would -- he would fix
22 it later.
23 Q. He was going to park the car on the street, because it
24 was not going to be used in this crime, isn't that right?
25 A. Yes.

---

747

Carew/cross/Horlick

1 Q. He drives around to find a parking spot?
2 A. Yes. Then he said he would meet us by the building. We
3 went around the block a couple of times. We didn't see him in
4 front of the building, and Richie was afraid that he was
5 inside. He didn't want him to be alone in there and
6 Martinelli show up.
7 Q. Richie didn't want who to be alone?
8 A. Mike.
9 Q. Because he thought -- I think what you are saying --
10 correct me if I'm wrong -- Mr. Pagliarolo feels at this time
11 in the street that Michael DeSantis may actually be in the
12 building?
13 A. In the building, right.
14 Q. And he is upset, because it's sort of out of whack with
15 the plan; they are supposed to go in together?
16 A. Right.
17 Q. Does Mr. Pagliarolo have a gun at this time?
18 A. Yes.
19 Q. Does he have that shotgun you're talking about?
20 A. He has a sawed-off shotgun.
21 Q. He's now wondering and you're wondering, where is
22 DeSantis, is that right?
23 A. That's right.
24 Q. Does the backup man now go in to do the job?
25 A. He thought Mike might have been in there. He told me to

---

748

Carew/cross/Horlick

1 drop him off and wait for him in the back, like we planned.
2 He went in. About five to ten minutes later, maybe
3 closer to ten minutes later, he came out of the back door in
4 the alley, and I drove down and picked him up, came out of the
5 alley and went back to the neighborhood.
6 Q. You had not heard a shotgun blast, had you?
7 A. No.
8 Q. You didn't hear any gunshots, did you?
9 A. No.
10 Q. The fact is, Martinelli never showed up, did he?
11 A. Not that we know of.
12 Q. So nothing happened?
13 A. Nothing happened.
14 Q. The only thing that happened is, Mr. Capella got in the
15 car, and he got in position, you got in a car and you got in
16 position, and you say that Mr. Pagliarolo walked into a
17 building with a sawed-off shotgun?
18 A. Yes, wrapped up in a jacket, yeah.
19 Q. What time was this?
20 A. Around 7:00 o'clock at night, I would think.
21 Q. Did you know at that time or in your prior preparations
22 whether there would be people still working in that building?
23 A. I believe the building was occupied, yes.
24 Q. And was there a concern that somebody might come out and
25 see people standing around with sawed-off shotguns?

---

749

Carew/cross/Horlick

1 A. Yes.
2 Q. But Mr. Pagliarolo went in anyway?
3 A. Yes.
4 Q. And he's now lost from sight? You don't know where he
5 is?
6 A. No.
7 Q. Just you know he's in the building? You have to say it
8 out loud.
9 A. I knew he was in the building.
10 Q. You drive around now to where you're supposed to wait in
11 the alley?
12 A. Yes. I am up in the top of the alley, looking down.
13 Q. You can see the entire length of this alley?
14 A. Just about, yes.
15 Q. It went from the street you were on to the next street?
16 A. To the next street.
17 Q. Whichever way you ended up going, you would reach the
18 street and continue?
19 A. Right.
20 Q. After nothing happens, you see Mr. Pagliarolo come out?
21 A. I drive down the alley.
22 Q. You pick him up and everybody drives away?
23 A. Right.
24 Q. So that as a result of all of this planning and is a
25 result of all the effort that went into it, there's nothing

---

750

Carew/cross/Horlick

1 that went on?

2 A. No.

3 Q. Now, you decide that Mr. Martinelli, who has to be

4 killed, and Gas and Vic's order is going to be -- withdrawn.

5 All this time, now, you have set up at his house, his

6 place of business, and twice at this Nostrand Avenue place, is

7 that right?

8 A. Yes.

9 Q. None of the times that you're set up, Martinelli is in

10 position to be killed, he's with someone or he's not there?

11 A. Right.

12 Q. Or he doesn't show up where he's supposed to show up?

13 A. Right.

14 Q. Now you decide that you're going to use Vinny Electric's

15 business premises?

16 A. Right.

17 Q. Which looks like -- has a big pull-down door?

18 A. Yeah. It has a pull-down door in the front, and two

19 small doors on the side.

20 Q. And you're going to use those premises, is that right?

21 A. Yes.

22 Q. And as far as you knew at that time, there was, in fact,

23 a business being operated on those premises?

24 A. Yes.

25 Q. Did you go to Vinny Electric to ask for keys to get into

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

751

Carew/cross/Horlick

1 this premises?

2 A. No. I believe Pete did.

3 Q. You weren't with him?

4 A. I wasn't with him.

5 Q. So you don't know how he did this?

6 A. No.

7 Q. What you are going to do now is, you're going to set up

8 inside the building, and Pete is going to call Martinelli to

9 set up a meeting to bring him so that he can have a secret

10 meeting with Vic or Gas?

11 A. He already made an appointment to meet him when we set up.

12 Q. He made the appointment?

13 A. Right.

14 Q. So you begin to set up, Mr. Pagliarulo goes to Vinny

15 Electric's place. Mr. DeSantis goes into Vinny Electric's

16 place --

17 A. And Whitey.

18 Q. Whitey.

19 The team stays the same?

20 A. Yes.

21 Q. The murder team stays the same?

22 A. Right.

23 Q. And you go into this building, and where are you?

24 A. I'm on the corner.

25 Q. You're job -- I'm sorry.

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

752

Carew/cross/Horlick

1 A. I'm on the corner, parked, watching the street to let

2 them know when Pete arrives, and make sure that there's no

3 cops or anything in the street.

4 Q. Your job is to use some kind of a two-way radio --

5 A. Yes.

6 Q. -- to call into the premises to say they are at the door?

7 A. Yes.

8 Q. In fact, when Pete gets there and you see him get there,

9 he knocks on the door?

10 A. Yes.

11 Q. So what was your job?

12 A. Well, I called them when I seen them turn the corner, and

13 I told them, he's coming. They says, I believe it was Richie,

14 he said, Mikey went out and didn't come back, and they are not

15 going to open the door.

16 Q. You were in place when the people went into the building,

17 weren't you?

18 A. Yes.

19 Q. Did you see Michael come out of the building?

20 A. Before that, yes.

21 Q. Did he come over to you to tell you what he was doing?

22 A. No. I was on the corner here. He turned this way and

23 went that way.

24 Q. He just walked out of the building, walked away from you

25 and kept going?

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

---

753

Carew/cross/Horlick

1 A. Yes.

2 Q. He didn't have a radio?

3 A. No.

4 Q. When he left, which was not part of your plan, did you

5 call up and say, where is Michael going?

6 A. Yes.

7 Q. Right away?

8 A. Yes, a minute or so later.

9 Q. And you got a message back where Michael was going?

10 A. Yeah. They said that there was something with a camera

11 and he's going to check it out.

12 Q. He's going to check out the camera?

13 A. Yes, I think that was it.

14 Q. The camera that you saw in the photograph, that you saw

15 on that day when you were in front of Vinny Electric's, was

16 mounted like the one that's in the courtroom?

17 A. I think there were cameras inside the building, too.

18 Q. Did you ever go into the building to see if there were

19 cameras?

20 A. Yes, I had been in the building before.

21 Q. Did you see cameras in the building?

22 A. I believe so, yes.

23 Q. Did you see where a TV or tape machine might be located?

24 A. Yes. He had the monitors in the office upstairs.

25 Q. So you call up, and you say, what's going on, Michael

ANTHONY M. MANCUSO, CSR     OFFICIAL COURT REPORTER

754

Carew/cross/Horlick

1  Just walked away?
2  A.  Yes.
3  Q.  What do they tell you?
4  A.  He went to check on the cameras. In other words, what
5  happened was, they wanted to see if they were direct into a
6  place or they were recording what was going on.
7  Q.  Mr. Carew, maybe you figured that out. What I'm asking
8  you is, what did they say?
9  A.  They said that they were going to check on the cameras.
10  Q.  Going to check on the cameras?
11  A.  Yes.
12  Q.  Did you say, where is he going?
13  A.  No. I didn't ask them.
14  Q.  Do you have any idea who he could call or see, in the few
15  minutes that might be available, to check on the cameras?
16  A.  No. I assumed he was going to try to beep Pete or get in
17  touch with Vinny. I don't know if they had any prearranged
18  thing to meet later or anything.
19  Q.  You had no idea where he was going --
20  A.  No.
21  Q.  -- to check on the cameras?
22  A.  No.
23  Q.  You said he might beep Pete?
24  A.  Yes. That was an assumption on my part.
25  Q.  Pete was driving with Martinelli at this time, wasn't he?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

756

Carew/cross/Horlick

1  A.  No. I didn't think they answered at all.
2  Q.  And from where you are situated, you don't see any doors
3  open?
4  A.  No.
5  Q.  Pete gets back in his car --
6  A.  Yes.
7  Q.  -- with Martinelli, and they drive away?
8  A.  Yes.
9  Q.  Does DeSantis ever come back?
10  A.  No, not then, later on.
11  Q.  Now, at this moment, Peter Chiodo is in a car with the
12  man he was told to kill, is that right?
13  A.  Yes.
14  Q.  He had already exhausted the plan to kill him in the
15  electrician's place, is that right?
16  A.  Definitely, yes.
17  Q.  He had him in the car, didn't he?
18  A.  Yes.
19  Q.  They are together?
20  A.  Yes.
21  Q.  They are alone?
22  A.  Yes.
23  Q.  Instead of being on the inside of the door, they are on
24  the outside of the door to the electrician's place, isn't that
25  right?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 182

755

Carew/cross/Horlick

1  A.  Yes.
2  Q.  This was getting close to the time that he was supposed
3  to show up?
4  A.  Yes.
5  Q.  Now, you see the car, Pete's car?
6  A.  No. It was Martinelli's car, a blue Lincoln.
7  Q.  Who is driving the car?
8  A.  I believe Martinelli was driving.
9  Q.  He pulls up to where you think it should be, and pulls
10  almost close to the building itself?
11  A.  Yes, right up in front. Pulled into the driveway.
12  Q.  Does Pete beep the horn?
13  A.  No. I think he got out of the car and banged on the
14  window. I didn't hear him beep the horn. I was a little too
15  far away. I was maybe two hundred feet away. Pete banged on
16  the door.
17  Q.  What time was this?
18  A.  Early evening, maybe 6:30, 7:00 o'clock at night.
19  Q.  Is it dark or light out?
20  A.  It was dark out.
21  Q.  And you see Pete physically get out of the car, go to one
22  of the doors and bang on it?
23  A.  Right.
24  Q.  You can't hear whether or not anybody says anything or
25  does anything from the inside?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 184

757

Carew/cross/Horlick

1  A.  Yes.
2  Q.  He doesn't shoot him there, does he?
3  A.  No.
4  Q.  He doesn't take him to some other place where people can
5  meet up with him and shoot him?
6  A.  No.
7  Q.  He doesn't take him to someplace where he can shoot him?
8  A.  No.
9  Q.  He drives him back wherever they go?
10  A.  I guess back to get his car, wherever he left his car.
11  Q.  Back for Pete -- to get Pete's car?
12  A.  Yes, I would assume so.
13  Q.  So Martinelli can go away on his own?
14  A.  Yes.
15  Q.  Now, you learn that there's another plot to kill
16  Martinelli, right?
17  A.  Yes.
18  Q.  Do you learn about it before it happens, or do you find
19  out about it after it happens?
20  A.  After it happened.
21  Q.  Talking to Peter Chiodo?
22  A.  Talking to Richie and then Pete.
23  Q.  Richie. And they basically tell you that, again, a
24  meeting is to be held between Pete, Martinelli and Gas or Vic?
25  A.  Yeah.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

**758**

Carew/cross/Horlick

1 Q. And Martinelli --

2 A. I didn't say nothing about Gas and Vic. He just said

3 they made an appointment to meet Martinelli. Richie told me.

4 Q. And sometime later, Chiodo told you that he actually did

5 meet with the man?

6 A. Yes.

7 Q. He was in the car with him and they drove to someplace on

8 Staten Island?

9 A. Yes.

10 Q. Not your house this time?

11 A. No, not my house.

12 Q. Peter gets out of the car and he waits over to where

13 Martinelli is sitting, whatever side of the car that is?

14 A. He didn't say he walked over to him. He just said he

15 pointed the gun at him and it didn't go off.

16 Q. Took out a gun, what you understood to be an automatic of

17 some kind, from your conversation?

18 A. I assume it was an automatic when he said it didn't

19 work. I don't know.

20 Q. He told you afterwards he banged the clip in and then the

21 gun fired, Pete told you that?

22 A. No.

23 Q. He didn't tell you he found out the reason it didn't work

24 was the clip wasn't in?

25 A. I don't believe he told me that, no.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

**760**

Carew/cross/Horlick

1 Q. Mr. Carew, you spent many years in the company of Pete

2 Chiodo, did you not?

3 A. Yes, on and off. Yes.

4 Q. You acted as his driver on occasion?

5 A. Yes.

6 Q. You were a person that confided in Pete Chiodo?

7 A. To a degree, yes.

8 Q. And he told you things?

9 A. Yes.

10 Q. Basically he told you what you could do and couldn't do,

11 isn't that right?

12 A. That was later on. In the early days, we were all equal.

13 Q. You were collecting money that had to be turned over to

14 Pete?

15 A. I don't recall.

16 Q. Did Pete collect money for the family?

17 A. Yes.

18 Q. In your presence?

19 A. Oh, yes.

20 Q. And some of those notes you looked at; did they reflect

21 money that went up to Gaspipe?

22 A. Yes, I believe so.

23 Q. Was Pete Chiodo one of the people that you could trust?

24 A. I could.

25 Q. Did you think he was an honest man in dealing with you?

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 106

**759**

Carew/cross/Horlick

1 Q. By the way, did you ever own an automatic?

2 A. Yes.

3 Q. Can you fire an automatic if you have a round in the

4 chamber without having forced up through the clip?

5 A. Yes. I believe sometimes you can just cock the gun and

6 it's in the chamber, I believe.

7 Q. Pete tells you -- Pete tells you he takes the gun and

8 puts the gun close to Martinelli and he pulls the trigger?

9 A. He just said he pointed at him and pulled the trigger and

10 it didn't work.

11 Q. The gun didn't work?

12 A. Yes.

13 Q. Did he say he pulled the trigger a number of times?

14 A. No. He said it didn't work and he said it was his kid's

15 gun.

16 Q. He said, look at this, it's so real, I just took it away

17 from my kid?

18 A. Something like that.

19 Q. Mr. Martinelli is looking down the barrel of an automatic

20 weapon, and he looks at it and it looks like a toy to him?

21 A. That's the way they told it to me.

22 Q. Then you so not -- you are not told by Pete that he ever

23 finds out that there's something wrong with the way the

24 mechanism of the gun was operating?

25 A. I don't recall that, no.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

PAGE 108

**761**

Carew/cross/Horlick

1 A. To a degree.

2 Q. But he was untruthful to a degree as well, wasn't he?

3 A. Some occasions.

4 Q. He was a person that could not always be relied upon to

5 tell you the truth?

6 A. Well, on most occasions, he did, as far as I know.

7 Q. Now, after your arrest, there comes a period of time,

8 about a year or so, perhaps more, where you are reading Pete

9 Chiodo's materials, isn't that right?

10 A. We read some of them, yes.

11 Q. When I say "materials," I'm talking about transcripts of

12 his testimony in other cases?

13 A. Yes.

14 Q. And interviews that were reduced to writing with members

15 of the Federal Bureau of Investigation?

16 A. Are you talking about like what they call the 302's?

17 Q. Yes.

18 A. Yes.

19 Q. You read his?

20 A. Some of them.

21 Q. And during the course of time, you had conversations

22 with, for instance, Michael DeSantis about the content of

23 those documents, did you not?

24 A. Yes, some.

25 Q. And you said to Mr. DeSantis and to other people that

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

762

Carew/cross/Horlick

1  Pete Chiodo was a liar when he said that you did certain
2  things, didn't you?
3  A.   I don't recall that.
4  Q.   Did you ever stand up in front of any of your friends,
5  DeSantis, Mr. Pagliarulo, Mr. Casso, Mr. Avellino, any of
6  those people, and say, you know, Chiodo's telling the truth
7  about what I did in the Morrissey case? Did you ever say that
8  to anybody?
9  A.   No.  I didn't say he was telling the truth.
10  Q.   You told them exactly the opposite, didn't you?
11  A.   I don't recall ever saying anything either way.
12  Q.   You had no opinion that you expressed to the people that
13  were facing the same charges you were facing?
14  A.   I don't think so.  I don't recall ever saying anything
15  one way or another about his testimony.  You know.  We all
16  knew he testified, and we all knew what we did, if he was
17  telling the truth or not.
18  Q.   And did there come a time when the people that you were
19  in jail with wanted to know if something was the truth or not
20  because you were supposed to be present?
21  A.   Most of the things that he said in there that I recall,
22  in fact, everything that I had read, was the truth.
23  Q.   Was true?
24  A.   Basically, yes.
25  Q.   That's what you told these people?

ANTHONY M. NANCUSO, CSR    OFFICIAL COURT REPORTER

---

763

Carew/cross/Horlick

1  A.   We didn't go into that and discuss that. We basically
2  knew what we did and what we didn't do, and nobody really went
3  into, is that true or is that true? They were looking for --
4  Q.   You were --
5       MR. O'CONNELL:  Objection.
6       THE COURT:  Wait a minute. Let him finish his
7  answer.
8       MR. HORLICK:  I'm sorry.
9       THE COURT:  Go ahead. Finish your answer.
10      THE WITNESS:  I'm finished.
11  Q.   You knew what you had done?
12  A.   Yes.
13  Q.   And on many occasions, you had done things with Pete
14  Chiodo where no one else was present, isn't that true?
15  A.   That were on the 302's and everything?
16  Q.   Testimony that you read, the 302's, any of it?
17  A.   No. Most of the stuff we did as a group.
18  Q.   You never did anything just you and Pete Chiodo?
19  A.   Not that I can recall, other than in the beginning, when
20  they brought him in, and I went and told him, you know, the
21  fact that he was to be proposed if he wanted it, things like
22  that. But nothing, no criminal activity that would appear in
23  anything to do with this case.
24  Q.   Now, there came a time when you decided that you should
25  cooperate with the government in this case?

ANTHONY M. NANCUSO, CSR    OFFICIAL COURT REPORTER

---

764

Carew/cross/Horlick

1  A.   Yes.
2  Q.   Is that right?
3  A.   Yes.
4  Q.   You had been a defendant, you had been charged in this
5  indictment, and you made a decision, based upon what you
6  thought were your best interests, to go to the other side, so
7  to speak?
8  A.   Yes.
9  Q.   When you made that decision, you agreed to tell the FBI
10  or the U.S. Attorney, or whoever they wanted you to, whatever
11  you knew about this case?
12  A.   Yes.
13  Q.   Isn't that right?
14  A.   Yes.
15  Q.   They might ask you about Morrissey or they might ask you
16  about Calder or they might ask you about who held certain
17  ranks, and you told them that, right?
18  A.   Yes.
19  Q.   And very often, you saw that the members of the group
20  that were interviewing you were taking notes, isn't that
21  right?
22  A.   Yes.
23  Q.   And do you know from your own experience as a defendant
24  in this case that when those notes are reduced to written
25  form, they are going to be turned over to whoever goes to

ANTHONY M. NANCUSO, CSR    OFFICIAL COURT REPORTER

---

765

Carew/cross/Horlick

1  trial?
2  A.   Right.
3  Q.   You told us that Richard Pagliarulo told you about a time
4  where he committed a murder, is that right?
5  A.   Yes.
6  Q.   Did you ever tell that to the FBI?
7       MR. O'CONNELL:  Objection to the form of the
8  question. It's too vague, your Honor.
9       THE COURT:  I think it is.
10      If you could be more specific.
11  Q.   You told us that Richard Pagliarulo told you, in essence,
12  that he didn't get enough credit at this meeting, when he had
13  the dispute, for shooting Morrissey?
14  A.   That wasn't what I said.
15  Q.   What did you say, sir?
16  A.   I said that he was angry that, you know, the way the
17  meeting had went. Are you talking about the meeting that
18  happened in prison?
19  Q.   You told us Mr. Pagliarulo had a conversation with you
20  after some kind of a sit-down over a problem with Michael
21  DeSantis?
22  A.   Yes, that was in prison.
23  Q.   That took place in jail?
24  A.   Yes.
25  Q.   In that conversation, Mr. Pagliarulo said to you, I

ANTHONY M. NANCUSO, CSR    OFFICIAL COURT REPORTER

766

Carew/cross/Horlick

1  didn't get enough credit for the Morrissey thing?

2  A.  He didn't say that.

3  Q.  What did he say?

4  A.  He said that, you know, that he was being treated shitty

5  after he had done a lot of work for the family.  He worked

6  with me with the thing with Soong.  He did Bruno, and a whole

7  lot of work for the family, and they are treating him like

8  shit.  That, in other words, like they were taking the other

9  guy's part over him.

10  Q.  When was the first time that you told a member of the law

11  enforcement community that Mr. Pagliarulo made that statement?

12  A.  After I was arrested and they debriefed me.

13  Q.  Did you ever read the 302 debriefings of yourself?

14  A.  No, I don't think so.

15  Q.  Do you know the content of them?

16  A.  I would assume it's what I told them.

17  Q.  You assume, then, that that reference to the meeting

18  after the dispute was settled, that's in there?

19  A.  I would assume so.

20  Q.  He said, according to you, that he had done a lot of work

21  for the family?

22  A.  Yes.

23  Q.  Isn't that right?

24  A.  Yes.

25  Q.  You decided that the word "work," in that context as he

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

767

Carew/cross/Horlick

1  said it, meant murder?

2  A.  That's what I thought he meant.

3  Q.  Was there any other work that was ever done for the

4  Luchese family?

5  A.  I don't know.  I took it to mean work, as in killing.

6  Q.  You took it to mean?

7  A.  That's what I took it to mean, yes.

8  Q.  When he said to you -- he's supposed to have said to you,

9  when Bruno Facciola saw me, he tried to make a break or run

10  away, you took it to mean that was at a time when he was

11  shooting him, isn't that right?

12  A.  Yes.  I took it to mean when Bruno saw him, he knew he

13  wasn't -- that he was there to be killed.

14  Q.  So you have no idea what Mr. Pagliarulo meant when he

15  said those words, do you?

16  A.  Other than that, no.

17  Q.  And you did not ask him any questions about the

18  statements that he made to you, did you?

19  A.  No.  I didn't want to go into anything further without

20  him telling me, like that I was prying into his business.

21  Q.  When he said to you, I worked with you and shot

22  Morrissey, you didn't want to pry into that, because that was

23  his business?

24  A.  I didn't want to go into that.  I didn't ask him any

25  questions about it.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

768

Carew-cross-Horlick

1  EXAMINATION CONTINUES

2  BY MR. HORLICK:

3  Q.  Weren't you there?  Didn't you see what happened with

4  Morrissey?

5  A.  I'm sorry?  I didn't --

6  Q.  Weren't you present and didn't you see what happened to

7  Morrissey?

8  A.  Yes.  I thought you meant with the -- with the other

9  thing with Bruno.  I'm sorry.

10  Q.  Bruno Facciola, you don't know anything about from your

11  personal knowledge, isn't that right?

12  A.  No.  Other than what he told me.

13  Q.  You weren't consulted about how he should be killed or

14  why he should be killed?

15  A.  No.

16  Q.  You weren't on the scene when he was, if he was killed?

17  A.  No.

18  Q.  And you don't have any personal knowledge about what

19  happened afterwards?

20  A.  No.

21  Q.  There came a time that the newspapers carried a story

22  that Bruno Facciola, that a man by that name, was found?

23  A.  Right.

24  Q.  It described to you what you thought was a murder, right?

25  A.  Yes.

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

769

Carew-cross-Horlick

1  Q.  And you told us that after that newspaper story appeared,

2  that there were a lot of people that were talking about it?

3  A.  Yes.

4  Q.  A lot of people meaning people that you associated with

5  the family?

6  A.  Yes.

7  Q.  And they were talking about the motive that was possible?

8  A.  Right.

9  Q.  Somebody thought he was going to cooperate, somebody

10  thought he owed Soong to the administration, somebody thought

11  other things?

12  A.  Right.

13  Q.  Nobody knew the answer?

14  A.  No.

15  Q.  It was a lot of talk, gossip, back and forth?

16  A.  Right.

17  Q.  Then some other time, some later time Mr. Pagliarulo says

18  to you when you used to see me, he used to run away?

19  A.  Asked him if he thought that Bruno was bad, that Bruno

20  was a rat.  He said I don't know.  But when he saw me, he

21  tried to make a break for it.

22  Q.  Now, when you say "make a break for it," that means he

23  wanted to run away?

24  A.  That's what I thought, yes.

25  Q.  And that certainly was an idea that occurred to you when

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

770

Carew-cross-Horlick

```
 1   you heard those words?
 2 A.  Right.
 3 Q.  Did you say to him, what are you talking about?
 4 A.  No.
 5 Q.  Did you say to him, did you actually do that?
 6 A.  No.
 7 Q.  Piece of work?
 8 A.  No.
 9 Q.  Did you say to him, who else was involved in this?
10 A.  No.
11 Q.  You didn't say a word to him about Bruno Facciola?
12 A.  No.  I didn't ask him.  It's not my place.  If he wanted
13    to tell me, he would have told me.
14 Q.  Well, you are an associate in the family at this time?
15 A.  Yes.
16 Q.  And what is he at this time?
17 A.  At that time he was --
18 Q.  He's in jail remember.  I'm sorry.  Is he in jail at this
19    time?
20        MR. ROSE:  Excuse me.  I'm sorry.  Could Mr. Carew
21    be permitted to finish his answer?
22        THE COURT:  I think he changed the question.
23        MR. HORLICK:  I will withdraw the question.
24 Q.  When you had this conversation with Mr. Pagliarulo about
25    Bruno?
```

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

771

Carew-cross-Horlick

```
 1 A.  The first conversation where he told me about the -- that
 2    Bruno tried to make a break?
 3 Q.  Yes.
 4 A.  Okay.  That was outside in the street.
 5 Q.  That's in the street?
 6 A.  Yes.
 7 Q.  Now, you say you don't ask him any questions at all about
 8    that?
 9 A.  No.
10        If he wanted to tell me --
11        THE COURT:  No.  Listen, just respond to the
12    questions.  Don't volunteer.
13 Q.  Mr. Carew, during the course of conversations that you
14    had with Peter Chiodo, you testified he told you things about
15    what had happened in Florida after you went with Michael
16    DeSantis, is that right?
17 A.  I don't --
18 Q.  If it is confusing I can break it up?
19 A.  Please.
20 Q.  You went to Florida with Richard Pagliarulo and Peter
21    Chiodo before Christmas of 1988, to see Junior?
22 A.  Yes.
23 Q.  Then shortly after the new year, you went to Florida with
24    DeSantis on that social trip you told us?
25 A.  Yes.  I think it was right after that, yes.
```

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

772

Carew-cross-Horlick

```
 1 Q.  From that time on, you did not physically go to the state
 2    of Florida?
 3 A.  No.
 4 Q.  And yet, you told us what Peter Chiodo had told you went
 5    on in Florida?
 6 A.  Pete told me, Mike told me, Richie told me different
 7    things.
 8 Q.  You were told about buying houses, renting houses, going
 9    to hotels, right?
10 A.  Yes.
11 Q.  All in the context of trying to either locate or kill
12    Accettoro?
13 A.  Yes.
14 Q.  Senior?
15 A.  A hum.
16 Q.  And at some time you were told a story about going down
17    and watching places where they thought they could find Joe
18    La Morte?
19 A.  Yes.
20 Q.  And all of that, all of the information that you restated
21    in court yesterday, had only to do with Peter Chiodo telling
22    that to you?
23 A.  No.  Some of it --
24 Q.  And other people?
25 A.  Yes.
```

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER

---

773

Carew-cross-Horlick

```
 1 Q.  But not from your independent observation of what went
 2    on?
 3 A.  No, I didn't have independent.
 4        MR. HORLICK:  I have no other questions.
 5        THE COURT:  Do you have anything more?
 6        MR. O'CONNELL:  No, Your Honor.
 7        THE COURT:  All right.  Do you have another witness?
 8        MR. ROSE:  Judge, the other witness will not be here
 9    until after lunch.  I'm sorry.
10        THE COURT:  What time will he or she be here?
11        MR. ROSE:  He will be here at 2:00 o'clock.
12        Actually, he could be here -- we have to switch him.
13    There is a manpower problem, Judge, in transporting this
14    particular witness.  So when Mr. Carew is taken back, the next
15    witness will come.  It will be Corrado Marino.
16        THE COURT:  All right.  What time shall we tell the
17    jury to come back?
18        MR. ROSE:  I have to ask the marshals.  I'm not --
19        THE COURT:  No.  When is in your lunch?
20        THE MARSHAL:  1:00 o'clock, Judge.
21        THE COURT:  We will take a recess and we will come
22    back here at 2:00 o'clock.
23        Don't discuss the case.
24        THE WITNESS:  Your Honor, Mr. Horlick left this.
25        THE COURT:  Just leave it there.
```

ANTHONY M. MANCUSO, CSR    OFFICIAL COURT REPORTER